```
 1                 UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                       ORLANDO DIVISION
                     CASE NUMBER 6:20-cr-89
 3
     . . . . . . . . . . . . . . .
 4   UNITED STATES OF AMERICA,     :
                                   :
 5             Plaintiff,          :
                                   :          Orlando, Florida
 6             v.                  :          November 4, 2020
                                   :          9:59 a.m.
 7   JAMES LAPIN,                  :
                                   :
 8             Defendant.          :
     . . . . . . . . . . . . . . .
 9

10                 TRANSCRIPT OF MOTION HEARING

11          BEFORE THE HONORABLE ROY B. DALTON, JR.

12                 UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15

16   Counsel for Government:     Amanda Sterling Daniels

17                               Roger B. Handberg, III

18

19   Counsel for Defendant:      Michael S. Ryan

20

21   Court Reporter:    Amie R. First, RDR, CRR, CRC, CPE
                         Federal Official Court Reporter
22                       401 West Central Boulevard, Suite 4600
                         Orlando, Florida  32801
23                       AmieFirst.CourtReporter@gmail.com

24   Proceedings recorded by Realtime Stenography.

25   Transcript produced by Computer-Aided Transcription.
```

1       **INDEX OF PROCEEDINGS**

2

3       **EXHIBITS**

4                                                           A D M I T T E D

5       Joint Exhibits 1-3                                        6

6

7       **DEFENDANT WITNESSES**

8                               D I R E C T   C R O S S   R E D I R E C T   R E C R O S S

9       Sheila Rapa                    6        33        67

10

11

12      **ARGUMENT**

13      By Ms. Daniels ..........................   87

14      By Mr. Ryan .............................   94

15      Rulings By The Court ....................  107

16

17

18

19

20

21

22

23

24

25

```
 1                   P R O C E E D I N G S

 2                          * * * * *

 3           THE DEPUTY CLERK:  This is case 6:20-cr-89, United

 4   States of America versus James Lapin.

 5           Counsel, would you please state your appearance

 6   starting with the Government.

 7           MS. DANIELS:  Good morning, Your Honor.  Assistant

 8   U.S. Attorney Amanda Daniels on behalf of the Government.

 9   With me is Assistant U.S. Attorney Roger Handberg.

10           THE COURT:  Good morning.

11           MR. RYAN:  Good morning, Your Honor.  Michael Ryan

12   on behalf of Mr. Lapin.  With me at counsel table is

13   Investigator Colin Kelly and Paralegal Ashley Badano.

14           THE COURT:  All right.  Good morning.

15           We're here on the Government's motion to exclude

16   the testimony of Dr. Rapa.

17           In terms of going forward, Mr. Ryan, do you intend

18   to call the witness for a proffer, or are you going to

19   stand on her report?

20           MR. RYAN:  She's here.  I'll probably ask her

21   to --

22           THE COURT:  Well, the reason I ask is in the

23   interest of trying to be respectful of her time, I'd like

24   to go ahead and get that testimony in the record and then

25   I'll take your arguments once I have your proffer.
```

1           I didn't know if you were going to present

2   testimony this morning or whether you wanted to just stand

3   on the report.

4           The witness is here.  I think a proffer would be

5   helpful.  I'd be happy to hear it.  Why don't we do that

6   now.

7           MR. RYAN:  Very good.

8           Do you want me to proffer first?

9           THE COURT:  Yes.

10          Dr. Rapa, do you want to come forward, please,

11  ma'am.

12          Just come here in front of the witness stand, and

13  when you arrive there if you'll raise your right hand to be

14  sworn, please.

15          THE DEPUTY CLERK:  Do you solemnly swear or affirm

16  that the testimony you're about to give in the case before

17  the Court will be the truth, the whole truth, and nothing

18  but the truth?

19          THE WITNESS:  Yes.

20          (Witness sworn.)

21          THE DEPUTY CLERK:  Okay.  You can have a seat

22  right there on the witness stand.

23          Also, if you can adjust the microphone so you're

24  comfortable.

25          THE WITNESS:  Absolutely.

```
 1              THE DEPUTY CLERK:  And once you're comfortable, if
 2   you can please state and spell your name for the court
 3   reporter.
 4              THE WITNESS:  Yes.  It's Sheila Rapa, R-A-P-A.
 5              THE COURT:  Thank you.
 6              You may inquire, Mr. Ryan.
 7              MR. RYAN:  Thank you, Your Honor.
 8              May the witness remove the mask while testifying?
 9              THE COURT:  Yes, you may.
10              THE WITNESS:  Thank you.
11              THE COURT:  And, Doctor, just in case I forget --
12   I probably won't but if I do -- when you finish your
13   testimony, if you would take that microphone cover with
14   you --
15              THE WITNESS:  Yes.
16              THE COURT:  -- and dispose of it on your way out,
17   and we'll replace it for the next person with a fresh clean
18   one.
19              THE WITNESS:  You got it.
20              THE COURT:  Okay.  You may proceed, Mr. Ryan.
21              MR. RYAN:  Thank you, Your Honor.
22              To begin with, the parties have stipulated to
23   Dr. Rapa being an expert in psychology to dispense with the
24   foundational testimony, if that pleases the Court.
25              THE COURT:  Yes.
```

```
 1              I see the Government nodding in agreement so
 2   that's fine.
 3              MR. RYAN:  Also, Your Honor, I believe that we
 4   have stipulated to the admission on the list of exhibits on
 5   the joint exhibit list which include Dr. Rapa's CV.
 6              THE COURT:  Okay.  I have in front of me a joint
 7   exhibit list.  It looks like it consists of three exhibits.
 8              Exhibit 1 is the witness's curriculum vitae.  It
 9   looks like 2 is her psychological evaluation, her initial
10   evaluation report.  And then Exhibit 3 is the addendum to
11   the report.
12              Those are received without objection.
13              (Joint Exhibits 1-3 were received
14               in evidence.)
15              MR. RYAN:  Thank you, Your Honor.
16                      DIRECT EXAMINATION
17   BY MR. RYAN:
18   Q    So the Government complains that in your original
19   report, which is at Exhibit 2, that you did not review or
20   barely reviewed the five voice mails that are the subject
21   of this case.
22        Is that true?
23   A    No, sir.  I did review the five voice mails that are
24   part of this case.
25   Q    And why did you do that?
```

```
 1   A    Well, when I was initially hired, I was hired on the

 2   basis of those voice mails.  So the defense came to me and

 3   said there's these voice mails and can you let us know if

 4   there's any mental health issues that might have

 5   contributed to these voice mails.

 6        So for sure I had the voice mails from the beginning

 7   and reviewed them before I even saw Mr. Lapin.

 8   Q    But in your original report you failed to list it as

 9   one of the collateral evidentiary items.

10        Why is that?

11   A    Actually, it was my bad.  I did forget to put it in

12   there.  When I was doing my report, I was assuming that the

13   reader knew that I had the voice mails, which I shouldn't

14   have done.  So I should have listed it in my original

15   report and didn't.

16   Q    And I believe in your addendum you explain in a bit

17   more detail -- that's Exhibit 3 -- exactly what this review

18   of the voice mails entailed.

19        Could you explain that for us?

20   A    Okay.  So I had the voice mails -- not only did I have

21   the voice mails, but I had the transcript of the voice

22   mails also.

23        And so what I would do is prior to meeting with

24   Mr. Lapin, I reviewed all the voice mails and the

25   transcripts of those voice mails.  And then after I met
```

```
 1   with him, as I was scoring his psychological data and as I
 2   was writing up his report, I'm also reviewing those voice
 3   mails and the transcripts that go along with it.
 4       So there were multiple times.  Luckily, they are short
 5   so they were quick to review.  And anytime I would pick up
 6   my report to write or to conceptualize the case, I would
 7   review again.
 8   Q   And let's just talk a little bit about the original
 9   report.  You make references in -- or I should say, do you
10   make references in what we'll call the original report,
11   Exhibit 2, to the voice mails themselves?
12   A   I do.
13   Q   For example, can you -- directing your attention to
14   page 6 of the original report, tell us what you are
15   discussing there in pretty much the very first, very long
16   paragraph.
17   A   In the first paragraph I'm discussing the interview
18   with the federal investigator and Mr. Lapin.  So in this
19   interview, they are discussing the voice mails
20   specifically.
21   Q   This was -- and how is it you were able to enter to
22   review this interview?
23   A   I did have also that interview as like a voice mail on
24   a file -- audio file, sorry.
25   Q   Did you have a transcript of it as well?
```

1    A    Yes, I did.

2    Q    So did you review this May 18th interview

3    conducted by Agent Anyaso?

4    A    I did.

5    Q    Can you tell the Court, can you tell Judge Dalton,

6    what is this interview about?

7    A    This is when the federal investigator actually called

8    Mr. Lapin to ask him about the voice mails.  He started off

9    asking him does he even remember leaving the voice mails,

10   and then they continued on from there where -- and he was

11   just querying about the voice mails and Mr. Lapin was

12   answering him about that.

13   Q    And in this part of your report, do you discuss the

14   voice mail itself?

15   A    Yes.

16   Q    How do you do that?

17   A    I put exactly in quotes what the statement that

18   Mr. Lapin made on Nancy Pelosi's voice mail.  I just wrote

19   it -- wrote it out verbatim, pretty much.

20   Q    Is there analysis there as to how Mr. Lapin is

21   discussing this?

22   A    Yes.

23   Q    Can you tell us about that?

24   A    Yeah.  So Mr. Lapin, when I talked to him about these

25   voice mails and read the voice mails to him, he said -- and

```
 1    I put in quotes -- he denied it and said no.
 2         I said, I hope she had a bulletproof vest because the
 3    American people aren't going to put up with her shit.
 4         And then he just went on to explain why he had said
 5    what he had said which basically was that he was kind of
 6    backing the Republican Party.
 7    Q    So you set forth there in paragraph 6 how -- I believe
 8    you do, correct me if I'm wrong -- how Mr. Lapin is dealing
 9    with and discussing the voice mail with Dr. -- I'm sorry
10    Agent Anyaso; is that correct?
11    A    Yes.
12    Q    But you're also discussing how he's dealing with it
13    with you, are you not?
14    A    Correct.  Yes.
15    Q    What did you conclude or say here about what Mr. Lapin
16    tells you about that voice mail?
17    A    Well, Mr. Lapin told me that he really didn't even
18    remember the voice mails, first of all.  And he also said
19    that when the detective interviewed him on the phone, he
20    said he didn't remember making them.  I believe it had been
21    a few months prior.
22         And so he told me he feels like that society is
23    against him because he's a gay Republican -- he's
24    conservative but gay -- and that he never threatened
25    anyone.
```

```
1        He believed he was exercising his First Amendment

2   right of speech when he was calling her names and he said

3   that she should be charged with treason, but he didn't

4   necessarily say that he was making any threats or meant it

5   to be threatening.

6   Q    So you're discussing in detail particularly the

7   December 20th email in this section of your report; is

8   that correct?

9   A    I'm discussing an email -- I'm sorry.

10  Q    I'm sorry.  Did I say email?

11  A    That's okay.

12  Q    You're discussing in detail the December 20th

13  voice mail?

14  A    Correct.

15  Q    Doesn't Mr. Lapin go on to discuss his view of the

16  prosecution based on these voice mails?

17       Towards the end of page 6, you have in italicized

18  letters what I believe he told you about his view of the

19  prosecution.

20  A    Yes.  He told me about how they came in and arrested

21  him in his house.  He went through that.  And then he also

22  went through how the court case was going on behalf of

23  those voice mails, what was happening afterwards.

24  Q    He compares himself to like Kathy Griffin?

25  A    Yes.  So he talks about, you know, Kathy Griffin can
```

1   go on TV and put a target on the President and make jokes

2   about killing the President, but she doesn't get in

3   trouble; but he says something on a voice mail and he gets

4   in trouble.

5        So he was talking again about -- Mr. Lapin feels

6   persecuted in a lot of areas in his life, not just

7   politically.  But politically was one of the ones that he

8   grabbed onto and felt persecuted and felt like his rights

9   were being violated when he couldn't speak the way he

10  wanted to speak on her voice mail.

11  Q    And you go on, onto page 7, continuing to discuss

12  Mr. Lapin's -- sort of the defense of himself, do you not?

13  A    Yes.

14  Q    Where he explains to you things like I said we, like

15  we the people.  I don't remember making the calls.

16       That he is a good person essentially because he would

17  take a bullet for a police officer.

18  A    Yes.  That's correct.

19  Q    And all of this is in the context of discussion about

20  -- if I said email again, I apologize -- about the voice

21  mails that he left, correct?

22  A    Yes, it is.

23  Q    You're not talking about any other item?

24  A    No.  We were specifically talking about the five voice

25  mails that he had left on Nancy Pelosi's voice mail.

1    Q    And in the original report, you go on.

2         The next section has to do with some history.  And

3    then you start on page 8 with the particular testing that

4    you administered; is that correct?

5    A    That's correct.

6    Q    And you're discussing your impressions and the

7    results?

8    A    Yes.

9    Q    Speaking of impressions, as I think of this right now,

10   this is a little bit of a segue.

11        The Government accuses you of not making a diagnosis,

12   that you're unsure of yourself because you say things like

13   "impressions," "probably" and "likely."

14        Can you explain to the judge, is that proper for a

15   psychologist to talk in that way, or are you unsure of

16   yourself?  What is that language all about?

17   A    Okay.  So I definitely did give him diagnoses.  I gave

18   him more than one diagnoses.  I put diagnostic impressions.

19   That's just one of the verbiage of psychologists.  That's

20   what we use when we're giving a diagnosis.

21        But I definitely gave him three diagnoses, I believe,

22   that are firm, that I believe are firm, within a reasonable

23   degree of psychological certainty.

24        And I also used words such as "likely to,"  "appears

25   to" because we're still dealing with human behavior.  So

1    you do have to realize that, you know, that what I'm

2    believing and what I'm writing and what I'm opining is

3    definitely within psychological certainty, but we're still

4    dealing with human behavior so I'm not going to make a

5    definite statement about anyone's behavior even based on

6    testings or based on my clinical interview.

7    Q    Is it even possible to do that ever?

8    A    No.  I don't know any psychologist that does that.

9    I've never read that in any report where somebody makes a

10   definite statement about somebody's behavior.

11        A definite statement about diagnosis, absolutely.  And

12   I stand behind my diagnosis.

13        But, you know, when you're talking behaviors, you're

14   talking about personality trends or you're talking about

15   symptoms of disorders that may come and go with the client.

16   So you do have to be careful in your vocabulary.

17   Q    Well, you tell us about your testing starting on

18   page 8 through about page 11.  And you tell us your

19   diagnoses.

20        And then begins a section labeled clinical interview

21   analysis summary beginning on page 11.  And this is pretty

22   much the remainder of the report, aside from the

23   recommendations.  This goes to page 15.

24        Is that correct?

25   A    That's correct.

1    Q    And here you say all kinds of things about what

2    your -- what your view was of Mr. Lapin when he was making

3    the voice mails; is that correct?

4    A    Yes.

5    Q    So this is a discussion about your diagnosis but also

6    what was going on with Mr. Lapin at the time he left the

7    voice mails?

8    A    Yes.

9    Q    So this section in and of itself is written in the

10   context largely of the voice mails themselves?

11   A    Yes, it's in direct response to the voice mails.

12        So it's how does his -- his specific psychological

13   diagnoses play into the voice mails that we hear.  So yes,

14   so they go hand in hand in this section.

15   Q    For example, on page 11, you defined disinhibition for

16   us.

17   A    I'm sorry.  Say that one more time.

18   Q    Yeah, right.  That's what I was worried about.

19        I can't move that thing.

20        So beginning on page -- so on page 11, you defined

21   disinhibition for us?

22   A    Yes.

23   Q    Could you briefly tell the Court what that is?

24   A    Yes.  So disinhibition -- and I wrote it here -- is a

25   loss of constraints that someone experiences when their

1    behavior isn't, isn't being guided by having somebody right

2    in front of them or somebody judging them at that moment.

3         They feel more disinhibited like behind a computer

4    screen or on a telephone.  Because they're not face to face

5    with someone, they feel like they can say whatever they

6    want because there's no one there to judge them or give

7    them consequences right at that moment.

8    Q    At the top of page 12, you sort of summarize

9    Mr. Lapin's -- the application of disinhibition in

10   Mr. Lapin's case; is that right?

11   A    Yes.

12   Q    The last sentence there of the first paragraph, can

13   you explain that to the judge?

14        You say, quote, in Mr. Lapin's case, test results

15   indicate.  Can you --

16   A    I'm sorry.  I don't know where you are.

17   Q    Page 12 at the top.

18   A    Okay.

19   Q    The last sentence of that top paragraph.

20   A    Maybe we have different -- my last sentence says, For

21   individuals such as Mr. Lapin who evidence online or other

22   electronic bullying, they have no aggression or violence in

23   face-to-face interactions.  Disinhibition is usually that

24   reason.

25        Is that what you're looking at?

```
 1   Q     No.

 2              MR. RYAN:  May I approach?

 3              THE COURT:  Yes.

 4              MR. RYAN:  Show me your page 12.

 5              THE WITNESS:  Sure.

 6              Maybe it printed differently.  I'm sorry.

 7              MR. RYAN:  And use this one.

 8              THE WITNESS:  Okay.  That will be fine.

 9              Sorry about that.

10   BY MR. RYAN:

11   Q     That was my mistake, too.  I've been referring to my

12   own copy of it.

13   A     Okay.  So you're talking about the --

14   Q     Wait, wait.  Let me get there.

15   A     Okay.

16   Q     Yeah.  Okay.  Good.

17              MR. RYAN:  The Court's exhibit appears to be what

18   I was using, Your Honor, just for the record.  So yes.

19   BY MR. RYAN:

20   Q     Now, looking at page 12, then, you've told the reader

21   what disinhibition means.  And you're explaining, I

22   believe, in the last -- particularly in the last sentence

23   how it applies in Mr. Lapin case.

24         Is that right?

25   A     Yes.
```

1  Q     Could you read that and explain that for us?

2  A     Yes.

3        All right.  In Mr. Lapin's case, test results indicate

4  he actually comes across as submissive in face-to-face

5  interactions thus allowing himself to verbally release his

6  anger in environments where he's anonymous and/or he

7  perceives it to be socially acceptable such as in our

8  current political environment.

9  Q     Now, are you talking about the voice mails there?

10 A     Yes.

11 Q     Why didn't you just say that, Doctor, right?

12 A     No, again, I assumed that because the report was

13 written from the idea of me reviewing these voice mails

14 that the reader recognized that that is what I was

15 commenting on was the voice mails.

16 Q     To go on, on page 12, to further explain the

17 manifestation of aggressive verbalizations, in the last

18 full paragraph on the page, do you see that?

19 A     Yes.  It starts with "interestingly"?

20 Q     Yes.

21 A     Yes.

22 Q     Again, you are bringing these concepts to the reader's

23 attention because of the facts in this case?

24 A     Yes.

25 Q     Which is the voice mails that you reviewed?

```
1    A    Yes.
2    Q    You go on and explain towards the end of page 12 and
3    going into page 13 how anonymity is a factor in this case;
4    is that correct?
5    A    Yes.
6    Q    And that's because of the content and the manner of
7    the voice mails?
8    A    Yes.
9    Q    Also, you talk about the concept of deindividuation.
10        What is that?
11   A    Deindividuation is when you don't see yourself as an
12   individual.  You see yourself as part of a larger crowd.
13        In this instance, he sees himself as the speaker or
14   part of the Republican Party.  So he doesn't necessarily
15   see himself as an individual leaving a voice mail for Nancy
16   Pelosi.  He sees himself as the speaker for the Republican
17   Party leaving a voice mail.
18        That's why the voice mails were constantly saying
19   "we," "we," "we."  He doesn't really say "I" in the voice
20   mail.  So he deindividuates during that time.  And that's
21   one of the factors we see in somebody that is a little
22   disinhibited and being verbally aggressive in situations
23   like this.
24   Q    And why does -- what about -- why does Mr. Lapin
25   deindividuate like this?
```

```
 1   A    Well, I think it's part of the political climate right
 2   now to kind of gather into a group, really maintain your
 3   stance within that group, and then to feel like you can say
 4   whatever you want because you're part of that group, you're
 5   speaking on behalf of that group.
 6        And we know that the language, you know, has been
 7   pretty rough throughout this whole political process.  So
 8   Mr. Lapin was jumping right into that.  But he definitely
 9   was seeing himself as part of a bigger movement.
10   Q    Does Mr. Lapin have some need to feel belonging to a
11   part of a group?
12   A    Yes.  So we'll see that through his history that he
13   has always felt disenfranchised.  He has always felt like
14   people didn't acknowledge him or didn't treat him fairly.
15        And so because he feels this way, it's easy then for
16   him to go into a group such as the Republican Party where
17   he can feel empowered and feel like he has a voice and he
18   has people around him that understand him.
19   Q    So he embraces the Republicans because it makes him
20   feel like he's part of something, like he's part of
21   something?
22   A    Yes, exactly.
23   Q    And he doesn't get this sense of belonging in other
24   aspects of his life?
25   A    No.  And I think particularly during this period, like
```

1    he was having a lot of depression.  You were seeing a lot

2    of his psychological symptoms come up.  So when you see

3    that type of thing, that's usually when someone is more

4    liable to join a group where they feel like they have

5    common friends or they're part of a community.

6    Q    Again, this is a discussion based on the facts in this

7    case including the voice mails?

8    A    Yes.

9    Q    In fact, most of your discussion, particularly the

10   last paragraph -- sorry, not the last.

11        The top paragraph on page 15, you're very specifically

12   addressing Nancy Pelosi there.  Why is that?

13   A    Because I'm talking about the voice mails in

14   particular.

15   Q    And tell us what -- this is sort of a concluding

16   paragraph, is it not?

17   A    Yes.

18   Q    What is your conclusion there?

19   A    I write, and I believe, that Mr. Lapin remains

20   anonymous and displays a grandiose, disinhibited, verbally

21   abusive rant about her politics, but due to his mental

22   health issues he is particularly susceptible to the

23   divisive environment around our current politics.

24        So I think that in the voice mails -- and I write

25   that -- that he's just parroting back what he thinks is

```
 1   appropriate talk from the Republican Party, on behalf of
 2   the Republican Party.
 3   Q    He is defending the Republican Party?
 4   A    Yes.
 5   Q    His mental state -- we'll talk about his mental state
 6   at the time.
 7        So now I pointed out pieces of your report; but I want
 8   to ask you again, the report itself, what is the report
 9   itself directed at in terms of this case?
10   A    So the report -- the report is directed at
11   specifically the voice mails and if there is a
12   psychological diagnosis that would explain or help us
13   understand why somebody would leave such voice mails and if
14   this is somebody through testing that we can find is
15   sociopathic, that has an antisocial personality disorder,
16   anything that we would worry that this is someone who could
17   become interpersonally violent because of his psychological
18   diagnosis and because of his affiliation with the
19   Republican Party at this time.
20   Q    So in your view, he's not threatening Nancy Pelosi.
21   He's, rather, defending his position?
22   A    Yes.
23   Q    Defending the position that he identifies with in
24   terms of President Trump's impeachment and the Republican
25   Party in general?
```

1  A     Right.

2        He felt it was extremely unfair that President Trump

3  was being impeached, and he felt like his voice needed to

4  be heard in that way.

5        Mr. Lapin, in general, curses and calls names.  Even

6  in my clinical interview -- he didn't do it towards me at

7  all, but when he was discussing other people he was cursing

8  and calling names.  This is part of how he expresses

9  himself.  And for sure it comes across angry.

10 Q     And your recommendations section on page 15 is really

11 about what treatments he should consider, correct?

12 A     Yes.

13 Q     In your addendum, Exhibit 3, you tell us how you

14 clarify the report was addressing the voice mails?

15 A     Yes.

16 Q     Okay.  And tell us, you detail here more than in the

17 original report what about the voice mails?  What did you

18 observe about the voice mails?

19 A     So the voice mails are important to me because when

20 we're trying to give a diagnosis of someone, one of the

21 things that we do look at is their presentation, whether

22 it's nonverbal or verbal presentation.

23       I want to see things such as, you know, how does he

24 sound?  How fast is he talking?  Is he making sense?  Is he

25 jumping from subject to subject?  When is he making these

```
 1   calls?  Has he been out drinking all night and now he's

 2   making the call?

 3        So there's many, many things I'm looking at when I

 4   look at the voice mail -- or when I listen to the voice

 5   mails.

 6   Q    In arriving at your opinions and conclusions in this

 7   report, did you rely primarily on Mr. Lapin's self-report?

 8   A    No.

 9   Q    Can you tell us what your -- in general what your --

10   or overall what your opinions and conclusions are based --

11   data that you reviewed?

12   A    Yes.  So I had a lot of data at my disposal.

13        I had interviews from his sisters, two sisters;

14   interview from his significant other.  I had his interview

15   with the detective.  I also had medical records.  I had

16   some mental health records.  I had some school records.  I

17   also gave psychological testing.  And the clinical

18   interview, of course.

19        So it wasn't one thing in particular.  It was

20   everything together.

21   Q    Was there any input by his father?

22   A    Oh, yes.  And I also had input from his father.

23   Q    Did you ever conclude -- okay.

24        So how did you review Mr. Lapin's state of mind?  And

25   this may overlap and sound a little repetitive.  Forgive me
```

```
 1   if it does.

 2        How did you review his state of mind at the time that

 3   he reviewed -- I'm sorry.  At the time that he left the

 4   voice mails?  How would you do that as a psychologist?  How

 5   were you doing that?

 6   A    Well, again, it was what I explained before.  You

 7   listen to the voice mails because you're trying to

 8   determine at that time how he sounded:  If he was logical;

 9   if he was goal directed; if he was screaming, hollering, or

10   if he was quiet, calm.

11        What time of day?  How many voice mails did he leave?

12   Did he stop the voice mails?  Did he need a sanction to

13   stop the voice mails?  All these things kind of help me

14   form an opinion of what was going on during that time.

15   Q    And earlier you pointed out how he never said "I."

16   Why is that significant?

17   A    I found that significant because if you're going to

18   threaten someone, normally it's "I'm going to get you, I'm

19   going to hurt you."  But we see him say "we," "we," "we,"

20   throughout the whole thing.

21        And, again, I think it goes with this deindividuation

22   that he just felt like he was part of a bigger community

23   and a group.  And because he was behind a telephone, he

24   could say anything he wanted, hang up, and go on with his

25   life.  He didn't have to necessarily see someone
```

```
1    face-to-face where I find face-to-face he's much more

2    submissive.

3    Q    And can you tell us what you believe his state -- or

4    what your opinion is, not believe, opinion is about his

5    state of mind at the time that he left the voice mail?

6    A    Yes.  I believe that he was cycling through a manic

7    phase of bipolar disorder.  And what we see when someone

8    cycles through a manic phase of bipolar disorder is this

9    type of impulsivity, especially verbal impulsivity.

10        And also there's anger in people that are cycling

11   through a manic phase.  Irritability.  We hear that in the

12   tone.

13        So I firmly believe it's just part of his bipolar

14   disorder and he was cycling through a phase.

15   Q    And is there data other than the voice mails -- okay.

16   So let me see if I got this right.

17        So your state of mind, opinions are based on the

18   psychological testing that you did?

19   A    Yes.

20   Q    The social history that you had?

21   A    Yes.

22   Q    And the voice mails themselves?

23   A    Yes.

24   Q    And the voice mails themselves contain important data

25   in and of themselves?
```

```
 1    A     Yes.

 2    Q     Such as the tone, the grammar, the word choice, vocal

 3    production, all of that?

 4    A     Correct.

 5    Q     All of these things are things that you noticed?

 6    A     Yes.

 7    Q     Things that a psychologist is trained to notice and to

 8    incorporate within their diagnosis?

 9    A     Yes.  That is part of what we do when we're trying to

10    ascertain if someone has a mental health disorder.  So it's

11    just part -- standard of the job.

12    Q     The Government states that you opined that -- or that

13    your report --

14          MR. RYAN:  I'm sorry.  May I have a moment,

15    Your Honor?

16          THE COURT:  Yes.

17          MR. RYAN:  Sorry.

18    BY MR. RYAN:

19    Q     So the Government asserts that your disinhibition

20    analysis that Mr. Lapin felt fear to vocalize over the

21    phone in a voice mail is akin to a presentation -- and I'm

22    quoting from the Government's motion -- of the defendant's

23    mental disease or defect to demonstrate that he lacks

24    substantial capacity to control his actions or reflect upon

25    the consequences or nature of his actions.
```

1          Is that true?

2     A     No.

3     Q     Did you opine that he lacked volitional control or an

4     ability to form intents?

5     A     No.

6     Q     What does the disinhibition analysis -- why isn't the

7     disinhibition analysis akin to lack of self-control or

8     inability to form intent?

9     A     Disinhibition really doesn't have anything to do with

10    forming intent or a lack of volitional control, which I do

11    believe Mr. Lapin has volitional control and I also think

12    he can absolutely form intent.

13         I think that disinhibition is a construct to explain

14    how he can get behind a phone and start to rant and rave

15    and verbally abuse somebody but wouldn't necessarily do it

16    to their face.

17         I think that he showed control.  I think the control

18    he showed was picking up the phone.  He didn't show up to

19    her office.  He didn't stalk her.  He didn't continue the

20    voice mails after, you know, January.  So I think that

21    there's some control there.

22         And definitely intent is there, but the intent was to

23    defend the Republican Party and to leave a scathing voice

24    mail.

25         So the disinhibition really in my mind and in my

```
 1    report didn't have anything to do with him lacking

 2    volitional control or no intent.  These were two separate

 3    things.  And I believe he can have control and he can have

 4    intent.

 5    Q    So the fact that he didn't continue making phone calls

 6    is an example of control and possibly intent?

 7    A    Right.  For sure.

 8         Plus I think what happened is I think we saw him cycle

 9    into a manic phase of bipolar disorder.  And when the manic

10    phase goes away, so do the manic behaviors.  That's just

11    what happens when you're an unmedicated bipolar.

12         And that's why I recommend tons and tons of treatment

13    for him and a proper mood stabilizer.

14    Q    The voice mails are left during a particular political

15    period in our country.  Do you recall that?

16    A    Yes.

17    Q    Is that significant?

18    A    Yes.  I mean, he was angry because he felt like Nancy

19    Pelosi was trying to impeach the President.  He even talked

20    about how much money she spent on impeachment pens.  So

21    there were many details about that that were bothering him

22    at the time.

23    Q    So does the manic phase contribute to how he is

24    feeling about the impeachment?

25    A    Sure.  So what happens when someone is in a manic
```

```
 1   phase is they pick up on anything in their environment,
 2   anything that can make them feel irritable, anything that
 3   they can be angry about.
 4        And it's really just a part of the disorder.
 5   Irritability and aggression is part of what we see of
 6   someone in a manic phase.  And verbal impulsivity also,
 7   which is what we also see here.
 8   Q    So nothing in your report is an opinion that he lacked
 9   the ability to form intent or volitional control?
10   A    That's correct.
11   Q    And your opinion is his intent was to defend the
12   President against impeachment?
13   A    Yes.  He was angry about the impeachment.  He felt
14   like his voice should be heard on behalf of the Republican
15   Party about what was going on with that impeachment.
16   Q    And his control was not otherwise attempting to reach
17   out to Nancy Pelosi in terms of --
18   A    Right.
19        I mean, you would think that if somebody is going to
20   do a threat, they're going to use the word "I" and then
21   they're going to show up or they're going to stalk or
22   they're going to do something.  But we just kind of see the
23   voice mails just fade away after that last one in January.
24   Q    Does it matter to you that he may have also left one
25   call at the San Francisco office that there was no
```

```
 1   recording for?

 2   A     No.  I mean, if it was during the same time period or

 3   if it was during a time period where he was having a cycle,

 4   I wouldn't be surprised.

 5   Q     So to summarize, your opinion is that his intent at

 6   the time was to defend the President?

 7   A     Yes.

 8   Q     That he did not lack volitional control?

 9   A     He did not.

10   Q     And there's evidence for that in the record itself?

11   A     Yes.

12   Q     And, again, what is that?

13   A     What is the evidence?

14   Q     Yeah.

15   A     The evidence is the voice mails themselves.  The

16   evidence is that he didn't go any further than the phone

17   calls.

18         Am I answering you correctly?

19   Q     Yes.

20   A     Okay.

21   Q     I know I'm sort of repeating myself.  Just to make it

22   clear, you reviewed the voice mails?

23   A     Yes.

24   Q     And your addendum clears these items up as well,

25   correct?
```

```
 1   A    Yes.

 2   Q    In fact, in the addendum you make it very clear that

 3   nothing in your report should be read to suggest that you

 4   were opining that he lacked capacity to form intent or

 5   volitional control; is that right?

 6   A    That is right.

 7   Q    The last full paragraph on the second page of the

 8   addendum.

 9   A    Yes.

10          MR. RYAN:  Okay.  Your witness.

11          THE COURT:  Cross-examination, Ms. Daniels.

12          MS. DANIELS:  Yes, Your Honor.

13          THE COURT:  Ms. Daniels, you'll need to pull the

14   microphone down.

15          MS. DANIELS:  Thank you.

16          Can you hear me?

17          THE COURT:  There's also some wipes right by you

18   if you want to take a minute and wipe that area down.  I

19   would recommend you do that.

20          MS. DANIELS:  Thank you, Your Honor.

21          THE COURT:  There also should be a box of

22   microphone covers there.

23          Mr. Ryan, if you'll come up maybe and remove the

24   microphone cover that you were utilizing.

25          I'll let Ms. Daniels replace it.  There should be
```

1  a trash can right underneath the podium.

2         MR. RYAN:  It looks like I took the --

3         THE COURT:  Just pull it out.

4         MR. RYAN:  This stays with the microphone.

5               **CROSS EXAMINATION**

6  BY MS. DANIELS:

7  Q    Good morning, Dr. Rapa.  How are you?

8  A    I'm good.  Thank you.

9  Q    Now, Dr. Rapa, your interview was conducted

10  nine months after the date the offenses occurred; is that

11  correct?

12  A    That is right.

13  Q    And at the beginning of your report -- and I apologize

14  if this is repetitive.

15  A    Okay.

16  Q    But at the beginning of your report, you list

17  collateral records that you reviewed; is that correct?

18  A    Yes.

19  Q    These records include the Indictment for this case; is

20  that correct?

21  A    Yes.

22  Q    It includes the Orlando Regional Healthcare System

23  dated from March 2008 to April 2017?

24  A    Yes.

25  Q    It includes the AdventHealth medical records dated

1    September 23rd, 2008?

2    A    Yes.

3    Q    It includes medical records from Florida HealthCare

4    Partners dated from August 2017 to May 2019?

5    A    Yes.

6    Q    Okay.  It includes Orange County school records dated

7    from August 2020?

8    A    Yes.

9         THE COURT:  Ms. Daniels, if you'll do me a favor

10   and make a concerted effort to keep your voice up.

11        MS. DANIELS:  Yes, Your Honor.

12        THE COURT:  You're a little bit soft-spoken and

13   with the mask it makes it difficult for me to hear you if

14   your voice trails off.  And I suspect the court reporter is

15   having trouble as well.

16        MS. DANIELS:  Yes, Your Honor.  Thank you for the

17   reminder.

18   BY MS. DANIELS:

19   Q    You've also reviewed the audio interviews with

20   Agent Anyaso?

21   A    Yes.

22   Q    Pamela Margeson?

23   A    Yes.

24   Q    Marie Neer?

25   A    Yes.

1    Q    And Herman Jones?

2    A    Yes.

3    Q    Now, the voice mails themselves are not listed in the

4    collateral records; is that correct?

5    A    That's correct.

6    Q    Now, in your addendum you mentioned that you do not

7    list these voice mails because you assumed familiarity with

8    the material; is that correct?

9    A    Yes.

10           THE COURT:  I'm sorry, Ms. Daniels.  I'm going to

11   ask you to do me a favor.

12           Ms. Acevedo, could you give this to Ms. Daniels,

13   please.

14           Would you swap off your mask for this face shield.

15   I can't hear you.

16           Thank you.

17           MS. DANIELS:  Of course.

18   BY MS. DANIELS:

19   Q    Now, you chose to list recorded interviews that are

20   evidence in this case; is that correct?

21   A    I did.

22   Q    And you chose to list the Indictment which is also a

23   part of the record in this case; is that correct?

24   A    Yes.

25   Q    Now, is there anything else that you reviewed but did

1   not list?

2   A     I believe there was.  The five voice mails for sure.

3   And I'm going to look what else.

4         No, I think everything else was there.  I'm so sorry.

5   It was the five voice mails that I did not list.

6   Q     Thank you.

7         Now, Dr. Rapa, I noticed that when you were checking,

8   you opened what was in a portfolio and checked.

9   A     Yes.

10  Q     Now, do you have a different version of this report

11  than what's Exhibit 2 in this case?

12  A     No.  I don't have a different version, although it's

13  printed differently so all the pages look different.

14  Q     Did you record your interview of Mr. Lapin?

15  A     No.

16  Q     Now, we've gone over the medical records that were

17  provided by the defendant which you use as collateral

18  records; is that correct?

19  A     Yes.

20  Q     Okay.  Did you rely on these records in preparing your

21  evaluation?

22  A     I did.

23  Q     The most recent medical record, as I understand it, is

24  from May 15, 2019; is that correct?

25  A     Yes, I believe you're right.

```
1    Q    This is about four months prior to the first voice

2    mail; is that correct?

3    A    Yes.

4    Q    Can you please describe what's listed in this record.

5    A    The most recent record?

6    Q    Uh-huh.

7    A    I do believe -- oh, now you're relying on my memory.

8    But I do believe that that one is where he was diagnosed

9    with an anxiety disorder.  And he had gone to the doctor.

10   I believe they put him on Zoloft at the time or he was on

11   Zoloft at the time.

12        Pretty much that's my memory of it.

13   Q    Do you know if that treatment was ongoing or if he was

14   seeing somebody regularly for the anxiety disorder?

15   A    I think that he was seeing somebody and he was staying

16   on medication.  At some point he came off medication.  And

17   I want to say it was right after that.  I don't recall the

18   reason.

19        But he wasn't -- he wasn't necessarily seeing somebody

20   like ongoing as he should have been.  He would see them

21   when he would feel bad or his anxiety or his medical

22   reasons would come up.

23   Q    Okay.  And you said he had a general anxiety disorder.

24   Do you remember the specifics of that, how that presented,

25   what that looked like?
```

1    A    Well, I know how general anxiety disorder presents.

2    So it's somebody who ruminates.  It's somebody who worries

3    all the time.  Sometimes there's somatic symptoms like a

4    stomachache and a headache and things like that.  But it's

5    just excessive worry.

6        It's not just like worry like we do but worry that is

7    so excessive that they live with it day in and day out.  So

8    it's a pretty significant disorder.

9    Q    And do you know if that was what was listed in this

10   report, the symptoms that you just described?

11   A    I believe so.  I believe if they gave him the

12   diagnosis of anxiety disorder they must have listed the

13   symptoms, but I can't recall without it in front of me

14   exactly what it said.

15   Q    Now, you also rely on the medical records that are

16   dated from September 23rd, 2018.

17       Can you please describe what's in those records?

18   A    Yes.  Which ones are you asking me about?  The

19   HealthCare Partners records?

20   Q    Yes.

21   A    Okay.

22   Q    No.  I apologize.  The AdventHealth Care medical

23   records.

24   A    Oh, the Advent records.

25       So the Advent records have to do with a lot of medical

```
 1   things that are just -- he's going to the doctor for
 2   medical things.  But in those Advent records, I believe was
 3   the report of his Baker Act.
 4        So he was Baker Acted back in 2008.  And those records
 5   would have shown the Baker Act what they diagnosed him with
 6   and how he was presenting to the hospital at that time.
 7   Q    And do you know what those records said?
 8   A    Yeah.  So those records, when he was put in
 9   specifically for mental health, which is what I would have
10   been really more interested in, he was Baker Acted to the
11   hospital.  He had taken a bunch of Xanax, but they didn't
12   believe that the Xanax was necessarily the cause of his
13   psychiatric breakdown.
14        So they put him inpatient and kept him.  They ended up
15   giving him a bipolar diagnosis, a mood disorder diagnosis.
16   I believe that that was kind of the gist of it, that they
17   kept him inpatient and then they medicated him and gave him
18   a diagnosis and he went home.
19   Q    Now, you mentioned that those records are included
20   amongst other records about physical ailments?
21   A    That's correct.
22   Q    Now, did you pull those records specifically, or were
23   you looking at them amongst -- I guess the question is, are
24   they referenced or are they separate records?
25   A    They weren't separate records.  They were all within
```

1    the volume of records that I was looking at.

2    Q    So you had all of the specific records referring to

3    Baker Act?

4    A    I did.  At least I think I did.

5    Q    Thank you.

6         Now, you also looked at school records from August

7    2020.  Can you please describe what's in that report?

8    A    Yes.  So the school records, I believe, showed that he

9    was in the ESE classes.  It showed the classes that he had

10   failed.  It showed his absentee record, if he was missing

11   school.  It showed his GPA which was extremely low.

12        So it was just basically an overview of what we saw --

13   of what they saw for him in high school, I believe.

14   Q    And what are ESE classes?

15   A    Oh, ESE is exceptional student.  It's where somebody

16   can't keep up in mainstream classes.  So what they do is

17   they put them in smaller specialized classes.  And that's

18   what we see with Mr. Lapin in school.

19   Q    And any mental health records in that body of records?

20   A    No, ma'am.

21   Q    Now, per your addendum, you spent three hours

22   evaluating Mr. Lapin; is that correct?

23   A    Yes.

24   Q    And in that three hours, you did the clinical

25   interview of him?

```
 1   A      Yes.

 2   Q      And you also had him take a series of tests?

 3   A      I did.

 4   Q      Okay.  Now, that's all included within the

 5   three hours?

 6   A      That is correct.

 7   Q      And during your clinical interview, you and Mr. Lapin

 8   spent time discussing his family history?

 9   A      Yes.

10   Q      His work history?

11   A      Yes.

12   Q      School records?

13   A      Yes.

14   Q      And physical health history?

15   A      Yes.

16   Q      On page 4 of your report, you discuss information

17   about Mr. Lapin given by his father?

18   A      Yes.

19   Q      Now, it's my understanding that you did not actually

20   interview his father; is that correct?

21   A      That is correct.  I did not.

22   Q      So you didn't actually speak with him?

23   A      No, I did not.

24   Q      Who gave you this information?

25   A      His attorneys gave me that information.
```

1   Q     Okay.  Now, did you personally speak with Mr. Lapin's

2   partner, Mr. Jones?

3   A     No.

4   Q     What about his sisters?

5   A     No.

6   Q     You reviewed excerpts from the phone interview dated

7   May 18, 2020; is that correct?

8   A     I did.

9   Q     Okay.  And you also spoke with Mr. Lapin about the

10  date of his arrest?

11  A     Yes.

12  Q     Now, during this conversation, based on your report,

13  it appears that he remains unapologetic about his

14  statements; is that correct?

15  A     Right.  I don't remember him apologizing for his

16  statements at all.  I think he saw himself as the voice of

17  the party and he was doing -- exercising his right to

18  speech.

19  Q     Now, during your evaluation, it looks like you

20  administered two assessment tests.

21  A     Yes.

22  Q     I'd like to draw your attention to the Personality

23  Assessment Inventory test.

24  A     Okay.

25        Can you just tell me what page?  I'm so sorry.

```
 1   Q     Yes.

 2   A     Oh, I found it.  No worries.

 3   Q     Could you explain how this test works?

 4   A     Yes.  The Personality Assessment Inventory is a

 5   self-report measure.  And it has about 300 -- I want to say

 6   324, but don't quote me on that.  But over 300 questions.

 7         And what it looks for is psychological disorders.  It

 8   also looks for personality variables.  It will also look

 9   for personality disorders.

10         It's a really well researched test, you know, that

11   stands up very well in court because it does -- it

12   allows -- it asks so many questions but it also allows for

13   a validity.

14         So it allows us to look to see if the results are

15   valid, to see if someone is faking bad, to see if someone

16   is malingering, to see if someone is faking good like

17   they're an angel and nothing ever happens bad to them.

18         So this test not only gives us good validity, it also

19   gives us good reliability in terms of how we can diagnose

20   someone or how we can collaborate with this test to

21   diagnose someone.

22   Q     So how does it do that?  How does it allow you to

23   confirm whether someone is faking good, faking bad, you

24   know, trying to cheat the test?

25   A     What it does is it has validity scales.  So on these
```

1    scales, there's a cutoff.  And there is a certain cutoff

2    that would say, this test is invalid, you can't even use it

3    because somebody faked so bad or somebody faked so good; or

4    they weren't responding to the test questions.  They

5    Christmas-treed it.  They really weren't even paying

6    attention.  So they would come back to me and say that this

7    test was invalid.

8    Q    How does the test know?

9    A    Well, I didn't create the test.  So now you're way

10   beyond my scope.

11        But it does.  It's able to say this is where people

12   that have these types of disorders fall.

13        And so if you have that -- if you have bipolar

14   disorder, for example, and you're taking this test, then

15   you should look like almost everyone else that has bipolar

16   disorder.

17        But if you're looking like you have some weird

18   symptoms that aren't really bipolar, then it's going to

19   flag you and it's going to say, yeah, they're reporting

20   things that aren't true.

21   Q    So is it the case that you provided --

22        MR. RYAN:  Your Honor, I'm going to object to this

23   line of questioning.  It's not really related to the basis

24   of the motion that the testing was somehow flawed or not

25   scientifically acceptable.

```
 1              THE COURT:  Objection is overruled.
 2              MR. RYAN:  My understanding --
 3   BY MS. DANIELS:
 4   Q    When someone takes the test, do you personally score
 5   it?
 6   A    It is scored by a computer.  It is not scored by me.
 7        You can hand-score it.  And there's some psychologists
 8   that do.  I do not.  A computer scores the testing.
 9   Q    So there's an algorithm that then determines the
10   validity?
11   A    Yes, I would assume so.
12   Q    Okay.  And of the 300 questions, what types of
13   questions are they asking?
14   A    All different types of questions.
15        So they are looking for everything.  They're not just
16   looking for a psychological disorder.  Again, they're
17   looking at personality variabilities.  Are you an
18   extrovert?  An introvert?  How are you likely to react in
19   certain situations?
20        So the questions can be as benign as "I like to be in
21   a group" or "I feel more free in a group" to "I see things
22   other people don't see" or "I hear things other people
23   don't hear."
24        So it's looking for such a variety of things that the
25   questions are also a variety of questions.
```

```
1    Q    Now, you mentioned -- so, for example, if someone has

2    bipolar disorder and they take this test and they sort of

3    score outside of the range of what a normal bipolar

4    individual might score, that's how it sort of determines

5    validity.

6         So do you see the test diagnosis and then that's how

7    it knows what's valid?  How does the test know what someone

8    is presenting with?

9    A    The test will take whatever symptoms that somebody is

10   reporting or how they're reporting themselves, you know, in

11   terms of introvert, extrovert, or personality disorder

12   variables.  And then the test will actually come up with

13   here's some diagnosis that we think are going on based on

14   the testing.

15        And then because there are always certain symptoms

16   that go with certain diagnoses, that they would let -- they

17   would say, hey, these are the diagnoses we're thinking, but

18   this person said that they were like four or five other

19   symptoms that we don't know what to do with.  That's what

20   would invalidate the test.

21   Q    Okay.  Do you have the results of Mr. Lapin's test?

22   A    I do.

23   Q    How did he do?

24   A    On his Personality Assessment Inventory?

25   Q    Uh-huh.
```

1  A    That's where it came up -- and I agreed -- that he has

2  bipolar disorder and that he has an anxiety disorder and

3  that he also has narcissistic personality disorder.

4  Q    Okay.  So the test makes the diagnosis and then you

5  sort of match that against your impression?

6  A    Exactly.

7       So I'll have my idea of what I think is going on,

8  he'll take some tests, and then we'll see if they match.

9  And if they don't match, then something is going on either

10 with my diagnostic impression or what I'm getting from the

11 client and what the test is saying from the client.

12      But normally, I'm saying 95 percent of the time, they

13 align.

14 Q    Did you rely on these results in making your

15 assessment?

16 A    Yes.  I rely on everything that I look at or anything

17 that has to do with the case to make my assessment.

18 Q    Thank you.

19      I'd now like to bring your attention to the

20 State-Trait Anger Expression Inventory.

21 A    Yes.

22 Q    Can you explain how that test works?

23 A    Yes.

24      So that's a State-Trait Anger Expression meaning how

25 do you act -- what is your state when you're angry, or what

1  traits do you have of anger?

2       So traits are a little different than states because

3  states can change, but traits are kind of who we are

4  inside.

5       So what this test looks at is it looks at how somebody

6  feels internally in terms of anger variabilities.  And then

7  how likely are they to act out in terms of anger

8  variabilities?  Or how are they going to act out?

9       Some people are angry and they keep it inside and you

10  don't even know they're angry.  Some people are angry and

11  they spew it everywhere.  So this test looks for those kind

12  of things.

13       Again, it's a self-report measure -- and it is

14  computer scored -- where somebody will sit and they ask

15  questions about anger, when you're more angry, when you're

16  less angry, how you're feeling right now while you sit in

17  front of the examiner, how do you feel when you're out in

18  the world.

19       Many different questions to access your level of anger

20  and then how likely you are to act out that anger.

21  Q    All right.  Do you know of any questions it asks to

22  assess whether you're going to act out?  What does it look

23  at to --

24  A    So some of the questions might be "when I get angry, I

25  punch a wall."  "When I get angry, I throw things."  "I

```
 1    feel like I'm going to kill somebody I get so mad."  You
 2    know, it's these kind of questions.
 3    Q    How many questions are there?
 4    A    Oh, I don't remember.  I'm sorry, but I don't
 5    remember.  I want to say maybe 100 -- 80 to 100, but I
 6    don't remember.
 7    Q    Do you have these results?
 8    A    I do.
 9    Q    And how did the defendant score on this test?
10    A    I wrote how he was scored.  Let's see.
11         Definitely he uses verbal aggression to deal with his
12    anger.  He is sarcastic when dealing with his anger.  He
13    doesn't have -- he has little to no inclination to hit
14    someone or break things.
15         So while he might verbally act out, he's not really
16    likely to follow it up with anything physical.
17    Q    And did you rely on these results in making your
18    assessment?
19    A    They were part of the things I relied on, yes.
20    Q    In your evaluation, you list a number of diagnostic
21    impressions.  Now, you've already described what you mean
22    as a diagnostic impression.
23         And my question is, is that different in some way from
24    just saying a diagnosis?
25    A    No.  It's the exact same thing.
```

1      Some psychologists just write diagnosis.  I write

2 diagnostic impression.  But it's the same.

3 Q    And you list generalized anxiety disorder.  Now,

4 you've described that previously because I believe that you

5 said it was in other medical records; is that correct?

6 A    Yes.

7 Q    Okay.  Did you notice those symptoms in Mr. Lapin when

8 you evaluated him?

9 A    Yes.  Mr. Lapin is extremely anxious.

10 Q    He also was bipolar I.  How does this present

11 generally?

12 A    Generally people with bipolar go through phases.  So

13 there might be times when you see someone with bipolar and

14 you do not realize that they have a mental health disorder.

15      There are other times when they are cycling through

16 their phases.  Whether it's depression or whether it's

17 mania, you're definitely going to know.  I don't even know

18 that you need a Ph.D. to sit in front of somebody and

19 realize when they are cycling through a manic phase or a

20 depressive phase.  So it depends on what cycle they're in

21 is the answer to that.

22 Q    And what are the ways in which the mania or the manic

23 phases can present generally?

24 A    Generally, somebody can have a lot of sex with people,

25 they can overspend money, they get very impulsive verbally,

```
 1    they get very risk-taking.  They do things and say things
 2    they wouldn't normally do during that time.
 3         Manic, they talk fast or their train -- you can't keep
 4    up with their train of thought because their train of
 5    thought changes so rapidly.
 6    Q    Is it the case that a manic phase in a specific
 7    patient will always present the exact same way every time?
 8    Do they have a -- so if they're spending money in a manic
 9    phase, they're always spending money in a manic phase?
10    A    That's a really good question.  Not necessarily.
11         Sometimes it might be too much sex.  Sometimes it
12    might be that they're going to go out and spend money.  But
13    what underlies almost all of that manic phase is
14    impulsivity.
15    Q    And when you say "impulsivity," what do you mean by
16    that?  Is it the consequences of sort of doing what you
17    want when you want?
18    A    Well, I think it's a little bit of just doing whatever
19    you feel like at that moment without thinking about
20    consequences, yes.
21         But I think a lot of it is just you're acting without
22    thinking at all.  You know, you're just acting.  You feel a
23    certain way so you're going to act that way for that
24    moment.
25    Q    How does the manic state present to Mr. Lapin?
```

```
 1   A    What it looks like is that he gets more irritable,

 2   more angry.  He verbally assaults anybody and everybody.

 3   He has huge problems interpersonally with people when he

 4   goes through these phases.

 5       Because, you know, people don't necessarily want to be

 6   cursed at and yelled at.  So I think that interpersonally

 7   it affects him.  I think -- and I do think we see a lot of

 8   the impulsivity verbally more than anything else for him.

 9   Q    How often does Mr. Lapin cycle through these manic

10   states?

11   A    That, I don't know.

12       We would have to really kind of watch him over time,

13   over a year's time probably to get a good idea.  And some

14   people cycle more regularly than others.  It really just

15   depends on their own bipolar disorder.

16   Q    How long do they last?  How long do Mr. Lapin's manic

17   states last?

18   A    I don't know.

19   Q    Now, you mentioned his manic states are often

20   characterized by irritability and verbal abuse, so on and

21   so forth.

22       Did you discuss whether or not he's verbally abused or

23   threatened anybody else outside of the political context?

24   A    We talked about his verbal abuse.  And I didn't really

25   -- and yes, we did, we discussed it.  But I want to go back
```

```
 1   to my clinical interview.

 2        And even in my interview, like the way he describes

 3   family members, he uses curse words within that.  And the

 4   way he describes his life, like he calls names and uses

 5   curse words as just part of who he is and that's who he is

 6   in life.

 7        So when we see him in a manic phase, it's even

 8   heightened.  So we see more verbal abuse, more aggression

 9   verbally.

10   Q    And were you able to suss out or did you have any

11   examples about him doing this in other circumstances?

12   A    He said -- he said he's done it.  He's done it in past

13   relationships a lot.  He's done it with his sisters, with

14   his father.  So we do see that he verbally abuses people.

15        I believe his sister even talked about it in her

16   statement, you know, that he has a big mouth and he says a

17   lot of things that he shouldn't say.

18        So yes, I think that throughout his life this is what

19   he does when he gets hypermanic.

20   Q    Now, you list narcissistic personality disorder also

21   in your diagnostic impression.

22        What is that?

23   A    Narcissistic personality disorder, so a personality

24   disorder is a little bit different than a psychological

25   disorder.
```

1      A psychological disorder we see symptoms that could

2  come and that could go.

3      A personality disorder means it's the very nature of

4  who you are.  So it's something you're going to keep for a

5  lifetime.

6      With narcissism what we normally see is that it starts

7  to decrease a little as you get older just because you

8  mellow with time.

9      But in narcissism we see somebody that is completely

10  self-centered that feels like they are very important and

11  that people don't recognize their importance.  Sometimes

12  they have little empathy for others in terms of how they

13  might affect others with what they say or what they do.

14  Q    And then how does it specifically present in

15  Mr. Lapin?

16  A    So, again, Mr. Lapin does feel like that he has things

17  to say that people need to listen to, that he kind of is

18  the center of his own universe.  He's very dramatic.  He's

19  very -- you know, this is my world and everyone else is

20  just in it.

21      And that's part of narcissism, just part of a

22  personality bent or characteristics we see in him.

23  Q    All right.  Now, in your evaluation, you discussed

24  mental factors which we've already discussed, such as

25  disinhibition and invisibility, to explain how using

1    digital and telephonic media affects people.

2         Is that correct?

3    A    Yes.

4    Q    Now, you don't state when you discussed these factors

5    that any of them would have diminished Mr. Lapin's intent

6    or ability to form intent?

7    A    That is correct.

8    Q    Right?  And you don't make the finding that his

9    actions are not intentional?

10   A    Oh, I think they were very intentional.

11   Q    There is nothing in your evaluation that suggests he

12   did not know what he was saying?

13   A    No.

14   Q    And the fact that he discussed in general seemed to

15   explain why on a voice mail Mr. Lapin may feel emboldened

16   to say things he might not say in person?

17   A    Yes.

18   Q    Your evaluation does not seem to conclude that he did

19   not mean what he said?

20   A    No.  I think at the time, I think he meant what he

21   said.  I think he was just going on -- you know, he was

22   going on a verbal tirade about all the things that were

23   bothering him about the Democratic Party at that time.

24   Q    Would it be fair to say that these factors could have

25   the same effect on somebody without a mental health

1    condition?

2    A    Sure.  I think that people without a mental health

3    condition could make a phone call like that.  I think it

4    would be a little more scary if they did because I think

5    that his was really propelled because of his manic phase or

6    hypermanic phase where he just had to spew his anger and

7    then he probably hung up the phone and moved on with his

8    life.

9        He didn't remember when they called him about the

10   phone calls.  So he wasn't thinking of it as this big, huge

11   thing.  He was just spewing his anger and moving on.

12   Q    And there's nothing in your evaluation or addendum

13   that suggests auditory or visual delusions?

14   A    No.

15   Q    Based on your evaluation, it does not appear that you

16   ever confront Mr. Lapin with the statements from the five

17   voice mails, anything specific, right, so anything about

18   pens, anything like that?

19   A    We did talk about the voice mails.

20   Q    Okay.

21   A    We talked about the voice mails in specific.  But I

22   don't know that I necessarily said what did you mean about

23   them spending too much money on the pens.  You know, pretty

24   much we talked about the voice mails.  He told me what he

25   thought about the Democratic party.

1    Q    Okay.  So when you discussed the voice mails, you

2    discussed them as a body of voice mails, or did you

3    discuss them on -- I'm sorry -- as of January 11th, you

4    said this, what did you mean when you said it?

5    A    Yes.  So I would have said to him, so in this voice

6    mail you left you said this.  What was going on with you?

7         The one I think that we focused on the most was the

8    one where he said we're coming to get you or something

9    along those lines.  So I did want to focus on that one

10   rather than the ones where he's talking about where her son

11   works.

12   Q    In your addendum, you mentioned that you reviewed the

13   voice mails in their tone, language, vocal production, and

14   speed of the voice mails?

15   A    Yes.

16   Q    And you don't discuss any of these specifically in

17   your assessment or in your addendum.  You're kind of just

18   sort of working with these factors; is that correct?

19   A    That is correct.

20   Q    Now, is it your opinion that the defendant presents as

21   manic in all of the voice mails?

22   A    I think pretty much.  I think what we see is that he

23   -- you know, he's got this train of thought that's very

24   bizarre.

25        He's calling during the middle of the day.  So it's

```
1    not like he's drunk at night or waking up from doing too

2    many drugs.  You know, he's calling during the day.

3         His train of thought is a little bizarre like he's

4    talking about her son and then he's talking about the pens

5    and then he's talking -- so, you know, you can see that the

6    thought process isn't logical and goal directed or

7    concrete.

8    Q    Now, I've listened to the voice mails, and I noted

9    that there are different -- the pacing of language is not

10   the same throughout nor is the language he uses the same

11   throughout; is that correct?

12   A    I will agree with you with that, yes.

13   Q    Okay.  And so is your assessment that he was manic

14   during all of the voice mails really just based on the

15   train of thought?

16   A    I do.  I think so.  And the time of day.

17        I think even the way he's speaking, like he is

18   switching subjects quickly.

19        So there were a number of things in those voice mails

20   that concerned me.

21   Q    Is it fair to say your discussion about the specific

22   statements from the voice mails to place in a context of

23   the May 18th interviews -- I'm asking you that because

24   that's what I see in the initial assessment.

25        So that's Exhibit 2.  Right?
```

```
 1        You launch into a conversation about the specifics of

 2   the December 20th voice mail from the May 18th

 3   interview.

 4   A    No.  I had had those voice mails prior to seeing him.

 5   Q    Okay.

 6   A    So we would have discussed all the voice mails, not

 7   necessarily just the one that he did with the detective,

 8   but I think that was the one that I focused on the most.

 9   Q    There's no part of your evaluation that I was able to

10   see where you discussed the mental state, his mental state,

11   sorry, specifically in December of 2019 or January of '20;

12   is that correct?

13   A    Right.  I don't know that I specifically pulled it out

14   that way.

15   Q    You don't identify any other expressions of

16   Mr. Lapin's manic episode in December 2019 or January 2020;

17   is that correct?

18   A    No.  I think I talked to him in general about what he

19   was going through during that time when he was talking

20   about all the interpersonal problems he was having and the

21   problems with his husband and things like that.

22        So I think there were other things going on during

23   that time, but I think the glaring spotlight was on that

24   this impeachment was happening and he really felt like the

25   government -- the Republican Party was getting screwed, for
```

```
 1   lack of better words.
 2   Q    You engaged in no discussion that I was able to see
 3   with Mr. Lapin about how long these episodes generally last
 4   for him?
 5   A    I don't recall.  I probably did.  And it might be in
 6   progress notes, but it didn't make it my report.  So I
 7   don't recall.
 8        He did tell me that he felt like he was bipolar and
 9   that his whole family suffered with bipolar disorder.  But
10   off the top of my head, I don't recall if he said how long
11   his manic episodes would last.
12   Q    You mentioned progress notes.  What are those?
13   A    So while I'm meeting with somebody, I write notes.
14   Q    Did you rely on your notes when you were writing your
15   assessment?
16   A    Yes.
17   Q    What's in your notes?
18   A    Pretty much what you're going to find in the report.
19   There may be things in there that I didn't put in, such as
20   if I asked him, you know, do you have a cat at home?  You
21   know, I wouldn't necessarily put that in the report.
22        So not every single thing is there but anything that
23   would be relevant to his mental health or to how I formed
24   my opinion.
25   Q    You discussed the responses to the five voice mails,
```

1   so Mr. Lapin's responses to the five voice mails in your

2   notes?

3   A    Yes, I would have.

4   Q    And you specifically state that you are not opining

5   that Mr. Lapin cannot form the intent to issue a threat; is

6   that correct?

7   A    Yes.

8   Q    You also mentioned that he did retain control of his

9   behavior?

10  A    Yes.

11  Q    Now, on page 12 of Exhibit 2, which is your

12  evaluation, Mr. Ryan asked you about the last sentence of

13  the first paragraph, which is, "In Mr. Lapin's case, the

14  test results indicate" and it goes on from there.

15  A    Yes.

16  Q    Now, you mentioned that you're specifically discussing

17  the context of -- you're making a statement in the context

18  of the voice mails; is that correct?

19  A    Yes.

20  Q    Okay.  But it appears that the statement would also

21  apply to his general behavior; is that correct?

22  A    It does, because it also ties in what we found in the

23  Personality Assessment Inventory and what I found when

24  talking to him.  So I think in general this is true about

25  him but in particular with the voice mails.

```
 1   Q    Okay.  And then in the second paragraph you state,
 2   Indeed, Mr. Lapin's problematic behavior create difficulty
 3   in a social and work function; is that correct?
 4   A    Yes.
 5   Q    So that's not really tied to the voice mails; is that
 6   correct?
 7   A    No, that's not necessarily tied to the voice mails,
 8   although he did say that that was going on with him during
 9   the time.
10   Q    Now, I'd like to bring your attention to page 13, the
11   paragraph marked D, individuation.
12   A    Yes.
13   Q    All right.  In this case you talk about sort of this
14   idea of the collective mind and group think and how it
15   applied to Mr. Lapin.
16        And I was wondering how you came to that conclusion
17   that this group think model applied to Mr. Lapin.
18   A    Mr. Lapin is very clear about that he feels like he is
19   part of the Republican Party community, and any of the
20   verbalizations that you see that he gave even to me -- like
21   he feels like the -- he is part of the Republican Party.
22   It's "we the people," and we the people are the Republican
23   Party.
24        You know, and kind of the Democrats are the ones that
25   are trying to come after us, burn our homes, and not allow
```

1    us to be we the people.

2         So I think that that came from himself directly.

3    Q    And so this is not based on test results?

4    A    Test results I don't know that talk about

5    deindividuation as such.

6         In this area, in this section what I'm talking about

7    is what the literature says about people that are more

8    disinhibited when they are leaving voice mails or when they

9    are behind the keyboard.

10   Q    How is this different than any other avid supporter of

11   any other political party?  What marks this as different?

12   A    In terms of what makes the voice mails different?

13   Q    No.  What makes this sort of collective mind different

14   than being an avid supporter of the Republican Party or an

15   avid supporter of the Democratic Party?

16   A    I don't know that it necessarily is different, but it

17   is one of the things that we know help make people kind of

18   a little more disinhibited.

19        So if I'm standing out with a group of Republicans and

20   I'm waving a Trump flag, you know, that's very different

21   than if I'm standing alone on a street corner waving a

22   Trump flag.

23        So it's kind of that.  It's kind of this community

24   mindset.  But in his case, it helps him then feel like he

25   needs to be the defender of that party.

1    Q    Right.  And so it's not your contention that he left

2    this voice mail with anybody else?

3    A    No.

4    Q    Now, you mentioned that you were seeing a lot of

5    psychological symptoms come up for him when you were

6    discussing deindividuation.

7    A    Yes.

8    Q    Now, you weren't treating him at this time?

9    A    No.

10   Q    Okay.  And you don't treat him regularly.  Is that --

11   A    I would not and do not, no.

12   Q    Okay.  Now, in the last paragraph -- I'm sorry, the

13   first paragraph on page 15, which is your summary of your

14   evaluation, you mentioned that you believe that Mr. Lapin

15   is parroting what he sees, you know, portrayed in the media

16   by the Republican Party; is that correct?

17   A    Yes.

18   Q    Now, is it your contention that the Republican Party

19   is advocating that people threaten to kill Ms. Pelosi?

20   A    No.  I mean, I don't think that they necessarily go

21   that far, but I think that they were absolutely enraged

22   about the impeachment process, about her flashing the pens.

23   I think that there was so much anger regarding that.

24        So I think that -- and I think within the Republican

25   Party there are people that don't mind using verbal

```
 1   aggression and talking in a very verbally abusive way about

 2   other people.  So it kind of gave him permission.

 3   Q    Right.  But just to be clear, not permission to

 4   threaten to harm her?

 5   A    No, I don't think so.

 6        And I don't -- I don't know that he saw it that way.

 7   Again, I think he was just spewing anger and then hung up

 8   the phone and moved on.

 9   Q    And it's your position that he felt like he was

10   defending the Republican Party; is that correct?

11   A    Yes, he was "we the people."  You know, we the people

12   need to have our voices heard and you're not hearing them

13   and not only that you're tramping on our rights.

14   Q    Right.  And his way of defending him on December

15   20th was threatening harm?

16   A    Definitely leaving voice mails that were, you know,

17   verbally abusive and inappropriate.

18   Q    Now, you mentioned that in the voice mails he never

19   says the word "I"; is that correct?

20   A    Right.  If he does, it's only a couple of times.  Most

21   of the voice mails are "we," "we," "we."

22   Q    Right.  And so in the voice mail left on January

23   11th, he uses the word "I" or "me"?

24   A    I would say that's true.  I think there's a couple

25   times.
```

1   Q    Okay.  Now that you've spoken with Mr. Lapin about his

2   opinions and his identification with the Republican Party,

3   would you -- would you opine that he would be mad even if

4   he wasn't cycling through a manic phase during the

5   impeachment process?

6   A    Yes.  I believe he feels very strongly about the

7   Republican Party, and I think that he would have been

8   aggravated.

9        Would he have gone to the lengths he did?  Probably

10  not.  You know, he probably would have just talked to his

11  other Republican friends about it or online about it.

12           MS. DANIELS:  Okay.  May I have a moment with

13  counsel, please?

14           THE COURT:  Yes.

15           MS. DANIELS:  No other questions at this time,

16  ma'am.

17           THE COURT:  All right.  Ms. Daniels, on your way

18  down, if you'll take your microphone cover with you.  And

19  also if you'll wipe the -- well, actually, I'll let

20  Mr. Ryan wipe it down when he arrives.

21           Once you get back in your chair and you're

22  comfortable, if you'll put your mask back on.

23           All right.  Mr. Ryan, do you have redirect?

24           MR. RYAN:  Yes, Your Honor.

25           Thank you.

```
 1              You can take a minute and wipe down the podium.
 2                        REDIRECT EXAMINATION
 3    BY MR. RYAN:
 4    Q    Do you happen to have copies handy of the transcripts
 5    of the voice mails?
 6    A    Yes.
 7    Q    Let's look at the one from January 11th where he
 8    says "me."
 9    A    Okay.  Hold on.
10         Okay.
11    Q    It says, Me and 6,000 other citizens are filing
12    lawsuits.
13    A    Correct.
14    Q    So he's still referring to "we" there, correct?
15    A    Yes.  He says, Me and 6,000 others.
16    Q    And then he uses a rhetorical, Are you kidding me?
17    A    Yes.
18    Q    But then in the very next sentence, he says, We're
19    suing you for defamation?
20    A    Yes.
21    Q    So this paragraph, once again, is about "we" and "us"
22    and "our," isn't it?
23    A    Yes, I agree.  I think that most of his -- the great
24    volume of all his writing, I mean, all of his ramblings
25    were "we."
```

```
 1   Q    Okay.  Let's look at the one, the only one that's

 2   charged in the Indictment on December 20th.

 3        Do you have a copy of that transcript?

 4   A    I do.

 5   Q    Is there one time in there he says "I" or "me"?

 6   A    No.  He says "we" throughout.

 7   Q    He says --

 8        MR. RYAN:  Now, Judge, do you want me to use the

 9   actual foul language or just abbreviate it?

10   BY MR. RYAN:

11   Q    Okay.

12        We're fucking coming for you.  We are coming for you.

13   How dare you impeach our President.  We're going to hang

14   your dentures above the Capitol.

15        I took out some of the F-bombs.

16   A    Yes.

17   Q    In the collateral -- with the interview by the agent,

18   does he ask Mr. Lapin, Who are you talking about?

19   A    Yes.

20   Q    He asks, Who you're talking about when he -- about the

21   "we"?

22   A    Oh, from the -- oh, I'm so sorry.  I thought you meant

23   did I ask him.

24        No, I don't remember the detective asking him.

25        MR. RYAN:  Can you hear me okay?
```

```
 1            THE COURT:  Yes, I can.  If you were asking me, I
 2   can.  I think the court reporter can as well.
 3            MR. RYAN:  Thank you, Your Honor.
 4   BY MR. RYAN:
 5   Q    Let's talk about your use of -- what your profession
 6   refers to as collateral -- the collateral medical records.
 7        What is the point of looking at the client's medical
 8   records in general?
 9   A    In general, what we want to see is just what -- from
10   me, I want to see mental health history, if it's there.  It
11   usually patterns behaviors.  It patterns how many times
12   you're going to the doctor, things like that.
13   Q    So anything that would be notable would -- you would
14   include in your report?
15   A    Usually.  I mean, there's so many things.  I mean, if
16   you're looking at a volume of records that are, you know, a
17   thousand pages, 3,000 pages, you're not necessarily going
18   to put every single thing.  You know, you'd have a report
19   this long.
20        But you're going to put the things that are important
21   that catch your attention or that help you formulate your
22   diagnosis or impressions.
23   Q    Aren't you also looking for material in the records
24   that would explain behavior outside of mental health
25   issues?
```

```
1    A     Sure.  We want to see -- for some people, you know,

2    they have seizures, and those seizures will affect their

3    behavior.  So I'm looking for even those types of things.

4    Q     Same with the school records; isn't that true?

5    A     Yes.

6          One of the things about school records is I also want

7    to see, you know, was there a childhood disorder there?

8    Was there anything that would point to a childhood

9    disorder?

10         There's a lot of adults with psychiatric problems that

11   started as children and we see it in the school records as

12   we look at their grades or their behaviors in school.

13   Q     So I would think a lot of this record review is about

14   ensuring that what you're seeing is not somehow explained

15   in a different way?

16   A     Yes.

17   Q     Organic brain damage?

18   A     Sure.  That's one of the things we would look at.

19   Q     You were asked if you recorded your conversations with

20   Mr. Lapin?

21   A     Yes.

22   Q     And you did not?

23   A     No.

24   Q     Why not?

25   A     I don't record any of my psychological -- oh, that's
```

```
1    not true.  I do record forensic sexual abuse evaluations.

2    Other than that, I do not record psychological evaluations.

3    Q    Is it generally accepted in the psychological

4    community to record a forensic interview of a client?

5    A    No.  I've never known a psychologist that does it

6    unless they're directly required to do it by the court.

7    Q    Speaking of which, how long have you been doing this?

8    A    Twenty-some years.

9    Q    Okay.  I have you beat.

10   A    Thanks.

11   Q    And how many -- well, the prosecutor made some

12   questions to you -- I was having a hard time hearing.

13        Something about the dates of these medical records not

14   being exactly right, like sometime, you know, a few months

15   before or a few months after -- I can't remember if it was

16   before or after, like months before or months after the

17   voice mails in question.

18        Do you remember that line of questions?

19   A    Yes, I think she was asking me or clarifying when

20   the -- when the records stopped or when was the last record

21   I saw.

22   Q    Is there any significance to you about these records

23   being months or even a few years before the voice mails

24   were left?

25   A    No.  I mean, any records that I can get, you know,
```

```
 1   that shows me -- his functioning throughout his life is
 2   important to me.
 3        So it doesn't matter -- I mean, does it matter if
 4   they're ten years old?  It does help that they are closer
 5   in time to the voice mails just because I get a better
 6   picture.  But any type of information is helpful.
 7   Q    Did you have any information or records that show that
 8   Mr. Lapin was currently -- when I say currently, I'm always
 9   talking about at about the time of the voice mails, okay,
10   which would be December 19th through January 16th.
11        Did you have any information -- excuse me -- that he
12   was in treatment and being treated for bipolar disorder?
13   A    Not during that time.
14   Q    Did he tell you that he was?
15   A    I believe he did not.  I believe he said he was not in
16   treatment and was not taking medicine at that time.
17   Q    In fact, he complained in your interview and you noted
18   it in your report that he and his family were all bipolar
19   as F-bomb, correct?
20   A    Yes.
21   Q    He told you that in a sense -- did he tell you that in
22   a sense that he felt it a problem?
23   A    No.  I think that he accepted that as that's just the
24   way his family was.  And that's, you know, that's the way
25   life is.
```

1      Although me saying that, he also did say that he

2   wanted treatment and he realized he needed treatment and

3   was asking me for referrals for treatment.  So I think that

4   that part of it was also there.

5      Like this is how my family is, this is how we've

6   always been, we're angry, we're bipolar; but yet I kind of

7   realize that I need treatment.

8   Q    Okay.  There were a lot of questions about length of

9   phasing or lengths of cycles.

10      Can you tell us, is there an average length, a

11  ballpark length of a manic episode?

12  A    No.  It's absolutely different for everyone.  Some

13  people cycle throughout the day.  Some people cycle in

14  weeks.  Some people months.  Some people can go a year and

15  be pretty well and then fall into a cycle.

16      It's very different and it can be brought on by

17  stressors.  It can be brought on by interpersonal issues.

18  It can be brought on by many different things.  So there's

19  no way for us to predict it or to really put a time limit

20  on it specifically.

21      There are some people, you know, that cycle regularly,

22  and you can kind of catch it; but you'd have to watch them

23  over at least a year and see what the pattern is.  But it's

24  not for everyone.

25  Q    So a cycle could last minutes, hours, even days, or

```
 1   weeks?

 2   A    Depending on the person.

 3   Q    And one of the ways a cycle can begin is by being

 4   triggered?

 5   A    Yes.  Most cycles are.

 6        I mean, normally if you just start to tear apart, you

 7   know, what's going on in their life at the time there was

 8   some kind of significant stressor, for some people it's

 9   trauma related.  They had trauma in their past; and so when

10   anything triggers that trauma, we see a cycle.  It just

11   depends.

12   Q    Do you consider the impeachment process a stressor for

13   Mr. Lapin?

14   A    For Mr. Lapin it was, yes.

15   Q    And, again, why is that a stressor to him?

16   A    He is extremely invested in the Republican Party.

17   He's extremely invested in people having their rights, and

18   he felt like they were being taken away.

19   Q    So this could have been his trigger for a manic phase?

20   A    I mean, I don't know that I could make that leap.  I

21   don't know what else was going on in his life at the time.

22   But it could be -- it could play a part.

23   Q    I'm just asking, Doctor --

24   A    Yes.

25   Q    -- could it be a trigger?
```

```
1    A    Yeah, it could play a part.
2    Q    You were asked questions about items not being listed
3    in the collateral.
4         Do you recall that?
5    A    Yes.
6    Q    I think mainly the voice mails.  I have to say, I
7    don't think you list in the collateral, in the collateral
8    list --
9         I'm sorry.  Let me get there.
10        You know, Doctor, I don't think you mentioned that you
11   reviewed an Agent Anyaso in the collateral.
12   A    I didn't?
13   Q    I don't think you did.
14   A    That was the audio interview with James Lapin.
15   Q    Oh, okay.
16   A    Yeah.
17   Q    My mistake.  Okay.  Very good.  I just want to make
18   sure.
19        Now, you were asked a whole lot of questions about the
20   PAI.
21   A    Yes.
22   Q    Is this test generally accepted in the psychological
23   community?
24   A    Yes, it is widely used.
25   Q    How often have you administered it?
```

```
 1    A     Hundreds of times.
 2    Q     And I believe these things are -- they're considered
 3    proprietary by the developers; is that correct?
 4    A     Yes.
 5    Q     So do they give you the algorithm as to how the
 6    computer scoring works?
 7    A     No.
 8    Q     Has anyone that you have known of ever -- do you know
 9    of any criticism of how the algorithm works?
10    A     No.  It's a test that's very well founded in research,
11    and it's well accepted in my field.  So nobody has ever,
12    that I've heard, complained about it.
13    Q     You've never heard it being questioned at all?
14    A     No.
15    Q     And you've administered it hundreds of times?
16    A     Yes.
17    Q     Have there been times where your impression based on
18    your forensic interview differed significantly enough from
19    the PAI that you wondered what was going on?
20    A     Not usually, no.
21    Q     You've never had that happen?
22    A     No, I can't recall a time when I was so far off.  It
23    might be something that the PAI would say it's an
24    adjustment disorder with anxiety and I would think it was a
25    generalized anxiety disorder.  But again, we're splitting
```

```
 1   hairs.
 2        I am going to say that most of the time my clinical --
 3   what I'm seeing clinically, I also see follow-up in
 4   testing.
 5   Q    And you are a doctor of psychology, correct?
 6   A    Yes.
 7   Q    And how many forensic interviews have you done?
 8   A    Oh, I've been doing them for 20 years, so I'm going to
 9   say probably in the thousands at this point.
10   Q    Oh, the prosecutor made a lot of references to the use
11   of the word "relied."
12        The way I show -- when you say you've relied on
13   something, do you mean that that is something exclusive?
14   A    No.  Again, I rely on every single piece of evidence
15   or information that comes across -- that I can come across.
16   So whether it's a clinical interview or a psychological
17   testing or collateral information, I'm going to rely on all
18   of that when giving my opinion.
19   Q    So it's just a reference to the fact that it's data.
20   It's a set of data that you utilize in reaching your
21   diagnosis?
22   A    Yes.
23   Q    Okay.  Now, the prosecutor also suggested that you
24   weren't doing the diagnosis but, rather, the computer
25   scoring was when it came to the PAI.
```

```
 1        Do you agree with that?

 2   A    No, I don't agree with that.

 3        I do formulate my own diagnoses, and then the computer

 4   formulates their diagnoses.  Most of the time we match.

 5        In fact, I can't remember a time, unless it's a tiny

 6   little thing, you know, where we differ.  But I've been

 7   diagnosing for a lot of years.

 8        But no, I would never just rely on a computer.  That

 9   would be so inappropriate to hand someone a test and then

10   just rely on that to give a diagnosis.  And it's not done

11   that way.

12   Q    In any of this, do you maintain like -- is there

13   continuing education requirements in your field?

14   A    There are.

15   Q    So do you maintain a -- you stay up on current

16   literature in the field?

17   A    Yes.

18   Q    Are you familiar with any literature that has

19   criticized this testing with the use of computer scoring in

20   any way?

21   A    No.

22   Q    Same thing with this -- the State-Trait Anger

23   Expression Inventory, is this a generally accepted

24   assessment used in the psychological world?

25   A    Yes.
```

1  Q    And how often has it been used -- how often -- let's

2  do it this way.

3       How often have you used it?

4  A    Again, hundreds of times, because we definitely want

5  to look for anger if we think somebody has impulsivity

6  issues, verbal aggression.

7  Q    Anything about Mr. Lapin's results there that seem

8  contradicted by your own observations and impressions?

9  A    No.  In fact, I thought that was -- the way it came

10 out was exactly what I was seeing is that he is somebody

11 who is verbally aggressive but doesn't follow it up with

12 any physical aggression.

13      We don't see it in his history.  We don't see it in

14 this case, and I didn't see it in the testing or in my

15 interview.

16 Q    Are you familiar, again, with any literature in the

17 psychological scientific community that criticizes this

18 testing?

19 A    I'm not familiar.  If it's out there, I haven't seen

20 it and I'm not familiar with it.

21 Q    I think we asked this, but would that further your

22 long lasting -- well, let me ask you this.

23      How would we ever figure out Mr. Lapin's cycle

24 lengths?

25 A    Well, he would have to be unmedicated and then

```
1   somebody would have to be observing him pretty closely,

2   probably for at least a year to see if there's any pattern

3   to his cycles.

4        I mean, I don't know what would be even the point of

5   that.  I think that we realize that he has bipolar

6   disorder.  And so now a mood stabilizer is appropriate, and

7   therapy and coping skills to deal with this disorder is

8   appropriate.

9   Q    Would there necessarily be a particular set pattern

10  for an individual's cycles?

11  A    Some people.  Some people.  But not most.  I mean,

12  most people it's kind of arbitrary and you don't know.

13       There are some people that cycle in and out like a

14  couple times a month and you can pattern it, but it

15  depends.

16       I'm not sure which way Mr. Lapin goes.

17  Q    Would it -- I'm sorry.

18  A    That's okay.

19  Q    Would it be considered ethical within your community

20  to ascertain like cycle lengths and to study an individual

21  this way that you're describing?

22  A    No.  I don't think anybody does that.  I think people

23  realize if someone has a bipolar disorder that they need a

24  mood stabilizer or an antidepressant depending on, you

25  know, where their -- if their cycle is manic or depressive.
```

1    And then, you know, you kind of go from there.  You

2    properly medicate and you properly treat.

3    Q    So the prosecutor asked you about narcissistic

4    personality disorder.  Just remind us briefly why is it you

5    find that in Mr. Lapin?

6    A    Again, because Mr. Lapin's world kind of revolves

7    around himself.  He really does feel he's the center of the

8    universe, and he is the king of his domain.  It is --

9    that's a feature of narcissistic personality disorder.

10   Q    Maybe I jumped ahead a little too much.

11        What can you tell us about evidence in this case that

12   Mr. Lapin was cycling or phasing or having a manic phase at

13   the time he was leaving the voice mails?

14   A    Again, he was leaving the voice mails during the day

15   so he wasn't leaving the voice mails where we would assume

16   somebody would if they'd be drinking or under some kind of

17   influence.

18        It appears he picks up the phone, says these kinds of

19   things, and then hangs up the phone and doesn't do it again

20   for a few days or whenever he gets angry again.

21        When he's talking in the voice mails, he's a little

22   loud.  He's cursing.  He's using a lot of really vulgar

23   language.  But he's jumping also from subject to subject.

24        So he starts off talking about, you know, we're coming

25   after you, then he's talking about dentures, and then he's

1    talking about, you know, pens that you give for

2    impeachment.

3        I mean, he's all over the place.  Like there's so many

4    things going through his head that he's angry at, you know,

5    and he's trying to get it all out.

6    Q    I believe the prosecutor asked you why you didn't or

7    noted that you didn't write in your report what his state

8    of mind exactly was -- or was, I'm sorry, on specific

9    dates, on December 19th, on December 20th.

10       Why didn't you write like that in your report?

11   A    I think that I would have written that exactly like

12   that in the report for an NGI, but it's not really

13   something that I would have written in a report for this.

14       This was how is his mental health disorder playing

15   into what we hear about those voice mails.  So in my mind

16   it was just a little different.

17   Q    Now, if you would have concluded that he was bipolar

18   but it wasn't a factor during the time that he left the

19   voice mails, you would have told me that, correct?

20   A    Yes.

21   Q    You're not writing this report and telling us what

22   you're telling us just to provide us with a defense, are

23   you?

24   A    No.  If there was nothing there, there would have been

25   nothing there.

1    Q    Okay.

2    A    But there was plenty there.

3    Q    The fact that you did such a thing, it would probably

4    have a negative effect on your reputation and your ability

5    to earn an income, wouldn't it?

6    A    Yeah, for sure.  Right.  You can't buy my opinion.

7    Q    Now, the prosecutor asked you if Mr. Lapin meant what

8    he said.  Do you recall that question?

9    A    Yes.

10   Q    And I think you answered yes.

11   A    I mean, I think that he meant that he was angry and he

12   wanted her to know how angry he was and he was angry about

13   the impeachment and he was angry about the money spent on

14   the pens.  And yeah, I think he meant that.

15   Q    Let's look at the December 20th voice mail again.

16   You've got a transcript there?

17   A    Yes.

18   Q    Now, you agree that he meant what he said.  So let's

19   talk about what he's saying.

20        What is he saying?

21   A    In the December 20th, he's saying, We're coming

22   for you.

23   Q    Do you think that he meant literally that we, whoever

24   that is, is coming for her, Nancy Pelosi?

25   A    Oh, no.  I don't think that he literally meant that

1   the Republican Party or him were going after Nancy Pelosi

2   literally.  We see no evidence of him trying to go after

3   Nancy Pelosi literally.

4   Q    Could this be sort of metaphorical language?

5   A    Right.  I mean, he described it -- he described it in

6   our interview as reading somebody.  I don't know, you know,

7   if you're familiar with the term.

8        But it's a term that's used usually in the homosexual

9   community when you're telling somebody off.  You're reading

10  them.  You're just telling them what you think.  And you're

11  just, you know, putting it all out there.

12       And I think that that's what he was doing.  I think he

13  was just, you know, on a verbal rant.  And so he was

14  ranting.  I don't in any way think that he meant that he

15  was going to go and hang her up by her dentures or whatever

16  he said.

17       I think he was just verbally ranting.

18  Q    Ranting.  He meant it, though?  He meant the rant?

19            MR. RYAN:  Objection, Your Honor.  Leading.

20            THE COURT:  I'm sorry.  I can't hear you.

21            MS. DANIELS:  Objection, Your Honor.  Counsel is

22  leading.

23            THE COURT:  Well, he's been leading all day.

24            I mean, I do want to tell you, Mr. Ryan, that

25  you're not going to be able to examine this witness this

1    way if I permit her to testify during trial.  I just want

2    to make sure that you leave here not under this impression.

3           And again, you don't need me to give you trial

4    lawyering tips, but it's a very bad habit to get into just

5    because we don't have a jury here to ask improper, leading

6    questions.  And in any event, it is not going to be

7    permitted in the presence of the jury, but that's the first

8    objection that I've heard.

9           So I'm going to sustain it also with the caveat

10   that this is redirect now.  We're not going back through

11   the witness's testimony from top to bottom.

12          So make your points on redirect and let's button

13   up this portion of the hearing.

14          MR. RYAN:  Very good, Your Honor.

15          I do apologize for the leading.  It's habit.  I'm

16   sorry.

17   BY MR. RYAN:

18   Q    Okay.  So just, again, using the December 20th one

19   as an example, you know, what do you mean when you say he

20   meant what he said?

21        Let's try it that way.

22   A    Okay.  What I meant is that he -- he was angry.  And

23   so did he at the time mean to spew his anger and say

24   whatever was on his mind?  Yes.

25        Is he literally going to go after and hurt someone?  I

```
 1    see no evidence of that and nothing came up in testing that
 2    would suggest such a thing.
 3         So I don't think he's literally going to go after her.
 4    But did he mean to say nasty things and call her names
 5    and -- yes.
 6              MR. RYAN:  I'm done, Your Honor.  Thank you.
 7              THE COURT:  All right.  Thank you.
 8              Do you all require anything else from the witness?
 9              MR. RYAN:  I do not, Your Honor.
10              THE COURT:  All right.  We're going to take a
11    short recess.
12              Ms. Daniels, do you require anything else from the
13    witness?
14              MS. DANIELS:  Your Honor, I apologize.  If the
15    doctor has her stuff with her, the medical records that she
16    relied on in her report, anything like that, I would
17    request them at this time.
18              Oh, right.
19              Because we've asked for it and it has not yet been
20    produced.
21              THE COURT:  Okay.  All right.
22              I'm going to direct you to provide the Government
23    with all the information that the witness relied upon in
24    order to arrive at her opinions about what she's prepared
25    to testify.  So all that needs to be produced to the
```

```
 1   United States.

 2            If there's not anything else then, Dr. Rapa, you

 3   are excused as far as I'm concerned.  You may step down.

 4            THE WITNESS:  Thank you.

 5            THE COURT:  If you would put your mask back on and

 6   remove that microphone cover.

 7            THE WITNESS:  Okay.

 8            THE COURT:  All right.  Thank you.

 9            Then we'll take a ten-minute recess.  I'll come

10   back and hear your argument.

11            (Recess taken at 11:49 a.m. to 12:00 p.m.)

12            THE COURT:  All right.  We're back on the record

13   in United States versus Lapin, 6:20-cr-89.

14            All counsel and the defendant are present.

15            So, Ms. Daniels, it's the Government's motion.

16   I'll give you the opening argument.  Mr. Ryan will have an

17   opportunity to respond.  And then I'll give you a few

18   minutes to respond to the defense position.

19            MS. DANIELS:  Thank you, Your Honor.

20            THE COURT:  I have, of course, read your papers,

21   and I'm generally reasonably well versed in the case law.

22   But I say that not to encourage you to make anything less

23   than a robust presentation, but just so that you know that

24   I've read your materials.

25            MS. DANIELS:  So the Government will rely on the
```

1    facts and arguments made in its motion at docket S-51.

2    However, in addition to that, Dr. Rapa's testimony on

3    mental defect is improper testimony to negate intent under

4    the IDRA and the relevant case law.

5          At the outset, as the Government explained in its

6    motion, this defense would only be applicable to count two,

7    which is a violation of 18 U.S.C. 875(c), because that is

8    the only specific intent crime charged in this case.

9          Here the defendant must have transmitted his

10   communication for the purpose of issuing a threat or with

11   the knowledge that that communication will be viewed as a

12   threat.

13         THE COURT:  So let me interrupt you for just a

14   second at the risk of getting you off your argument which

15   is not my intent at all, but I don't want to forget to ask

16   you this question because it's been troubling me a little

17   bit.

18         I, of course, read the Berki case carefully.  And

19   in the Berki case with respect to whether or not 115 --

20   18, United States Code, 115 -- was a general or a specific

21   intent offense, there they were focused on -- the Court was

22   focused on the question of whether or not the defendant had

23   to know whether the Government had the obligation to prove

24   that the defendant knew that the individual being assailed

25   was a federal officer, or let's call him a qualifying

1    individual under the act.

2          And Berki clearly stands for the proposition that

3    they do not.  There is no specific intent element with

4    respect to that portion of the statute.

5          It's curious to me, though, maybe because it was

6    not before the Berki court, that the question of whether or

7    not there is a specific intent component to 115, that being

8    that the defendant must specifically intend to interfere,

9    impede, or intimidate that particular officer or official

10   from engaging in or from conducting their normal duty.

11   That, it seems to me, is a specific intent component of

12   that statute, which was not addressed in Berki.

13         Do you agree with that, or do you think I'm wrong

14   about that?

15         MS. DANIELS:  May I get my motion, Your Honor?

16         THE COURT:  Yes.

17         And I don't want to spend an inordinate amount of

18   time on it because it's probably not relevant to what's

19   before me today.

20         I don't think the defense is actually assailing

21   that portion.  I don't think that's what they're offering

22   Dr. Rapa for, but I don't want to preempt Mr. Ryan's

23   creativity or his thinking about it.

24         MS. DANIELS:  Yes, Your Honor.

25         Your Honor, I would have to -- I would have to

1    brief that issue specifically, but my argument would still

2    be that even if 115 is a specific intent crime the argument

3    would still be the same but the evidence is inadmissible

4    under the IDRA.

5         THE COURT:  Okay.  As I said, I don't want to

6    spent a lot of time on it because we have at least one

7    statute about which there is no argument.  There is a

8    specific intent component that relates to the nature of the

9    threat.

10        So since it's not going to be determinative, we

11   don't need to spend a lot of time on it.  But it's

12   interesting to me, I guess is the best way to put it.

13        MS. DANIELS:  Thank you, Your Honor.

14        Okay.  So as the Court heard, Dr. Rapa's entire

15   evaluation serves an improper purpose which is that it's

16   attempting to demonstrate that the defendant lacked a

17   substantial capacity to control his actions or reflect on

18   the consequences of his actions.

19        And I really believe that in this circumstance it

20   is to reflect on the consequence of his actions to just

21   state that she does believe that he had volitional control

22   over what he was saying.

23        The gist of her report seems to be that the medium

24   of the voice mail provides some explanation or

25   justification for why the defendant made his threats on a

1    voice mail which he might not otherwise make in person.

2           And, in fact, in her addendum she specifically

3    addresses impulsivity.  And when asked on

4    cross-examination, she said that impulsivity is acting the

5    way you want to act without consideration of the

6    consequences.

7           This is the type of testimony that the case law

8    says is improper under the IDRA.

9           Nothing discussed in Dr. Rapa's -- by Dr. Rapa is

10   key to providing evidence that the defendant lacked the

11   requisite mental state to commit the offense here.

12          Indeed, she does not make that claim.  In fact,

13   she specifically does not make that claim in her addendum.

14          As the Government cited in Lawson, psychiatric

15   evidence tendered to negate specific intent must show not

16   merely that the defendant was unable to reflect properly on

17   or control -- in that case, the defendant was female -- her

18   actions or motivations.  A lack of conscious

19   self-reflection does not mean a lack of intent.

20          Nothing about Dr. Rapa, what Dr. Rapa testified to

21   there weighs on intent.  Dr. Rapa engages in no discussion

22   with the defendant about his mental state at the time.  She

23   started gleaning that from the voice mails specifically.

24          And, in fact, much of her diagnostic impressions

25   appear to be based on tests that are proprietary or the way

1    that they are scored are proprietary, is my understanding

2    from the testimony that she gave.

3         The cases relied upon by the defendant in the

4    defense motion regarding this issue are distinguishable

5    from the facts in this case.

6         So in Westcott, the defendant cited a case where

7    evidence was offered that the defendant's, in Westcott,

8    altered brain chemistry showed that he genuinely believed

9    that he was a Secret Service agent and did so to negate

10   the mens rea element that he falsely pretended to be a

11   Secret Service agent.

12        In Wattleton, the defendant there had a delusional

13   disorder that led him to believe that he was being

14   persecuted by a police conspiracy and also that evidence

15   was offered to negate the mens rea that he willfully made a

16   bomb threat.

17        There's no evidence here that the defendant

18   suffers from delusions.  In fact, when specifically asked,

19   Dr. Rapa said there is no evidence that he suffered from

20   delusions.  She didn't find any of that.

21        In those cases, the evidence was used to make the

22   intent of -- the mens rea intent of the crime.  And that's

23   not what Dr. Rapa is doing here.  So her testimony cannot

24   be offered under the IDRA.  So it cannot be offered for

25   that purpose.

1          Now, the alternate purpose which is that perhaps

2     Dr. Rapa is opining on the defendant's state, that the

3     defendant's state of mind -- sorry.  If she's not opining

4     on that, then her testimony is not necessary to help the

5     trier of fact determine the facts at issue.

6          So if she's not opining that he lacked the mens

7     rea to commit these crimes, then her testimony is not

8     necessary.  The concept that people are less inhibited when

9     they believe that they are anonymous is not one that

10    requires expert explanation.

11         In fact, this was partially addressed in Lawson

12    where the defendant argued that expert testimony was meant

13    to help the jury determine the weight they should give the

14    confession.

15         All right.  And there the Court explained that it

16    didn't do that, right?  It wasn't key to determining mens

17    rea any more than it was key to determining whether or not

18    she improperly gave her-- or was improperly giving her

19    confession.

20         So to the extent that the proper testimony

21    comments on whether the defendant's statements constitute a

22    true threat here, any such opinion would be a comment on

23    the ultimate issue that the jury must decide and then find

24    it improper.

25         And in the alternative, should the Court find that

 1   the evidence is admissible, the United States asks that

 2   this Court preclude Dr. Rapa from opining as to the

 3   likelihood that the defendant would act on his threat and

 4   preclude Dr. Rapa from offering an opinion as to whether or

 5   not his statements constitute each threat.

 6           And may I confer with co-counsel?

 7           THE COURT:  Yes.

 8           MS. DANIELS:  No other argument at this time,

 9   Your Honor.

10           THE COURT:  All right.  Thank you, Ms. Daniels.

11           Mr. Ryan.

12           Ms. Daniels, take your mic cover with you or toss

13   it in the trash can, if you would.

14           MR. RYAN:  In a way, Dr. Rapa's testimony is

15   fairly simple.  She says that Mr. Lapin is suffering

16   through a bipolar episode, one trigger of which could have

17   been the impeachment proceedings themselves.

18           And he left voice mails, not to threaten the

19   Speaker, but to defend in a way himself through his strong

20   affiliation and identity with the President and his party.

21           He was lashing out about what he perceived to be

22   her unfair attacks on the place where he felt at home as a

23   follower or supporter of the President and his party.

24   That's kind of it in a nutshell.

25           So the foundation for that testimony, it comes

```
1    along through scientific testimony about psychology and

2    testing and what a manic phase looks like and sounds like.

3          And she testifies that, you know, her hearing of

4    the voice mails based on his history and the testing, based

5    on his social history, the records she reviewed, her own

6    testing, and the voice mails themselves indicated that he

7    was in a manic phase.

8          He was calling to --

9          THE COURT:  So help me understand how does that

10   negate some element of the Government's burden?  What

11   element of the offense does that negate?

12         MR. RYAN:  He's not intending to convey a true

13   threat.  He's not conveying in his mind what he thinks is a

14   threat or what he thinks could be perceived as a threat

15   under Elonis.

16         And under the 115 statute, he's certainly not

17   calling to impede Nancy Pelosi's ability to conduct

18   impeachment proceedings or to conduct the affairs in her

19   office.  He's warning Nancy Pelosi that the people, the

20   "we" that he's talking about, will one day extract its

21   penalty from her through treason.

22         THE COURT:  Well, she's not -- I mean, at the risk

23   of tipping my hand, you know, I don't know -- I think you

24   would -- well, maybe you wouldn't agree.  She's clearly not

25   going to be permitted to testify about what he did mean,
```

1    what he did intend.  I mean, that's clearly beyond the

2    pale.

3            That would be a violation of 704(b) as to whether

4    or not -- that's the ultimate question of the offense as to

5    whether or not he had the requisite intent at the time that

6    he left the voice mails.  That's for the jury's

7    determination without question.

8            MR. RYAN:  Right.

9            THE COURT:  At a minimum -- or at a maximum, let's

10   put it that way, it seems to me that she might be able to

11   testify if I were persuaded in your favor that he was

12   suffering from a bipolar disorder, that he was in a manic

13   phase of his bipolar disorder at the time that he left the

14   calls, period.

15           What the effect of that is on his intent is for

16   the fact finder.  She's not going to be permitted to

17   testify that ergo he lacked the requisite intent to commit

18   the crime, because that's the ultimate question for the

19   jury.

20           It would not be permissible under 704(b) even if

21   it were permissible under the IDRA and even if it meets the

22   Daubert standard, which the Government contends it does not

23   because the Government's contention is there's no fit, to

24   use Daubert language, that that testimony -- her testimony

25   is not helpful to the jury in terms of the work that they

 1    have to do to make that determination.

 2            I'm not suggesting I'm necessarily on board with

 3    that, but that's the Government's argument, that there's

 4    no -- it's the fit aspect of Daubert that the Government is

 5    asserting should be applied to keep it out in addition to

 6    their argument that it's not proper under the IDRA.

 7            So I guess the point of that is I'm pressing you a

 8    little bit to tell me what element of the offense do you

 9    believe that Dr. Rapa's testimony that Mr. Lapin's

10    condition of bipolar disorder was in a manic phase at the

11    time these calls were made?

12            MR. RYAN:  Right, Your Honor.

13            Like in the true threat, that he is not conveying

14    a true threat, both statutes -- okay.  With 115, there is

15    the intent to impede.  But for both statutes, the true

16    threat, he has to know that he's conveying information that

17    he intends to be threatening or that he knows would be

18    perceived that way.

19            And her testimony is he's in a manic phase calling

20    up to defend his party, his President.  He's a soldier

21    defending the President.  He's not calling to threaten

22    anybody.  He wasn't -- he wasn't perceiving himself as

23    leaving a message that was threatening literally the life

24    of the Speaker.

25            And that he was --

```
 1            THE COURT:  So here's the slippery -- and I
 2   apologize for the interruptions.  I'll try to be quiet.
 3            But here's the slippery slope.  And this is why
 4   there's so many cases that talk about the danger of this
 5   kind of testimony.
 6            Here's the slippery slope.  What you just said is
 7   that you at least are supposing that she's going to
 8   testify, if permitted, that he made these calls for this
 9   reason, that he's defending the interest of the President
10   or he's defending the Republican Party or he's defending
11   people that share his view of the impropriety of the
12   impeachment proceedings.
13            That's not permissible.  She's not going to be
14   allowed to -- in my opinion, she's not going to be allowed
15   to testify as to what he meant or what he intended to do.
16            At most, she would be able to testify that he was
17   bipolar, that he was in a manic phase, and that he was
18   cycling through his manic phase at the time he made these
19   calls and the jury can do with that what they will.
20            Here's the thing she cannot do, Mr. Ryan.  She
21   cannot offer a justification excuse defense for Mr. Lapin
22   and essentially put his version of the events in front of
23   the jury without taking the witness stand.  He can't have
24   that come in through Dr. Rapa.  That's just not
25   permissible.  I won't permit it.
```

```
 1              So that's where I'm left.  And that's why I keep

 2     circling back to the question of -- and I think you

 3     partially answered it before I interrupted you.  Again, I

 4     apologize for it.

 5              I think you partially answered it that it's your

 6     view that her testimony about him being manic, being

 7     bipolar and in a manic phase of his bipolar disorder is

 8     relevant to the question of whether or not he formulated a

 9     true intent under 875 which has that specific intent

10     component.

11              Did I hear you correctly on that?

12              MR. RYAN:  Yes, Your Honor.

13              And that component also exists in 115.  The

14     Government even concedes that they have to prove true

15     threat.  It goes to true threat.

16              The true threat requires --

17              THE COURT:  The Berki case is bad for you on that

18     point as to whether or not there's any specific intent for

19     true threat because the 115 statute says knowingly made a

20     true threat.  It doesn't say anything about intended to

21     make a true threat.

22              And that's what Berki -- I think Berki undermines

23     your position there.  I appreciate you may not agree with

24     it.

25              The follow-on question that I had to the Berki
```

 1   rationale is whether or not -- and I don't think the

 2   Eleventh Circuit reached it because it wasn't before

 3   them -- is whether or not there's a subpart to 115 that has

 4   a specific element to it.

 5          But you didn't raise that in your papers and it

 6   hasn't been argued.  So I'm not suggesting that we need to

 7   talk about it.

 8          MR. RYAN:  Well, I think I did suggest what you're

 9   talking about when I said in my responsive paper that this

10   is -- I think it's a red herring because the Government

11   knows we're not trying to negate the intent to threaten a

12   government official.

13          I think Berki is bad law anyway.  I think Rehaif

14   is bad law.  But it doesn't matter.  And that's why I

15   dropped a footnote saying this is bad law.  We're the only

16   circuit saying this, besides it being so old.

17          And you cover Rehaif which it has certainly

18   undermined this idea that a person doesn't have to know the

19   status -- if he has to know the status of himself, I think

20   he would have to know the status of the government

21   official.

22          But because it doesn't have anything to do with

23   our defense -- and I said that in the footnote.  And I said

24   this has to do with true intent, true threat, and it has to

25   do with in terms of 115, his intent to impede.

```
 1          This is a person -- and I disagree that anything
 2   that we're saying is justification.  Justification would be
 3   that he has a right to leave these harassing messages.  I'm
 4   not suggesting that what he did is legal.  I'm just
 5   suggesting it's not a true threat under these statutes and
 6   that he didn't intend to impede the government official,
 7   the Speaker, you know, in her actions.
 8          All he intended to do was to convey the idea that
 9   her actions are going to lead to her being impeached -- her
10   being tried for treason and hung for treason.  And he's
11   defending the President in the process.
12          I think the other cases, Your Honor, with all due
13   respect -- I mean, Westcott, the testimony was allowed that
14   the person believed he was a Secret Service agent to
15   directly negate the idea that he was falsely pretending to
16   be one.
17          I mean, that's analogous to what we're doing here.
18          THE COURT:  No.  There, the diagnosis was that he
19   was delusional and that the delusion was that he was a
20   Secret Service officer which goes directly to negate the
21   element of the offense that he impersonated or
22   misrepresented himself.
23          You can't misrepresent yourself as being the
24   Messiah if you, in fact, believe that you are the Messiah.
25   It negates that element of the offense.
```

```
 1          MR. RYAN:  In Berki --
 2          THE COURT:  If you're charged, for instance, with
 3   impersonating a federal officer and you actually believe
 4   that you are a federal officer because you suffer from a
 5   mental condition or defect that makes you delusional, that
 6   negates the element of knowledge.  So you can't
 7   misrepresent something that you believe to be true as a
 8   result of a mental disease or defect.  That's not at all
 9   what we have.
10          MR. RYAN:  You have a man leaving voice mails to
11   defend the President of the United States, not to make
12   Nancy Pelosi --
13          THE COURT:  There's nothing in the voice mails
14   that suggest that he was trying to defend the President of
15   the United States.
16          MR. RYAN:  I disagree.
17          THE COURT:  Okay.
18          MR. RYAN:  He's not speaking in --
19          THE COURT:  That's your spin on the voice mails.
20   That's what -- maybe what Dr. Rapa wants to spin the voice
21   mails.  But that's not in the voice mails unless I missed
22   it somewhere.
23          MR. RYAN:  "How dare you impeach our President?"
24          That's his defense of the President.  He's saying
25   you are doing something wrong against our President.  He's
```

1    not calling to --

2         THE COURT:  And here's the difficulty is that if

3    you want to make the argument or if Mr. Lapin wants to

4    testify that that's what his intent was at the time that he

5    made the calls, that's different.

6         You can't put an expert witness on the stand with

7    the imprimatur of expertise and have her opine that that's

8    what Mr. Lapin intended to do and that's the purpose of his

9    calls.  That's not proper expert testimony.

10         It's an invasion of the province of the jury, and

11    it's not going to be permitted.

12         MR. RYAN:  Judge, you're the judge.  So I'll deal

13    with whatever ruling you give me.

14         Then by the same token they should not be allowed

15    to be saying it's a threat.  I mean, it's the same thing.

16    I'm not allowed to say he's defending the President, but

17    they're allowed to say that she was threatening --

18         THE COURT:  I didn't say you weren't allowed to

19    say he was defending the President.  If you want to argue

20    that the reasonable inference from the voice mails is that

21    he was trying to represent the Republican Party and defend

22    the President, that's properly a reasonable inference.

23         The problem is you can't put an expert on with the

24    imprimatur of expertise and say it's in my expert opinion

25    this man was trying to defend the interest of the

1  President.

2          That's an invasion of the province of the jury.

3  It's not appropriate.  It's not going to happen.

4          MR. RYAN:  Okay.  Okay, Judge.  I'm in your world.

5  So that's fine.

6          I mean, if the testimony is limited to her

7  testifying that his manic phase -- I assume, then, that the

8  Court would allow me to elicit from her that the one factor

9  possibly triggering the manic phase is the impeachment

10  proceedings and that due to his manic phase and the

11  disinhibiting effect of the voice mail and whatnot, he said

12  things that he wouldn't normally say in person to someone

13  when not in a manic phase.

14          I assume that that would be allowed.

15          THE COURT:  Well, I'm not sure I'm going to allow

16  any of it.  I'm just trying to tell you what portions of it

17  I think are not permitted.

18          So I'm not ruling at the moment.  I'm just telling

19  you -- I'm telling you that my inclination is that I'm not

20  going to permit her to violate 704(b) and offer an ultimate

21  opinion.  I'm not going to permit her to offer conjecture

22  under the guise of an expert opinion about what the intent

23  of the messages was.

24          I'm not going to permit her to essentially

25  introduce Mr. Lapin's version of the events through her as

1   an expert if I allow her to testify, if.

2          And we haven't gotten to the question about the

3   timeliness of your notice and those sorts of things.

4          But if I permit her to testify, the question would

5   be what would be -- where would the guardrails be in terms

6   of what she's permitted to testify to?

7          And the reason that the guardrails would need to

8   be carefully constructed is because, as all of the courts

9   that have considered this kind of testimony have

10  recognized, it's very, very dangerous in terms of its

11  potential misuse or misimpression or confusion of the

12  jurors as to what their responsibility is.

13         So that's why I want to try to be vigilant about

14  understanding what you want -- I know what you want to do.

15  And as you can see, I'm not going to permit you to do all

16  that you want to do.

17         But I may permit her to testify with respect to

18  the fact that she evaluated Mr. Lapin, that she reviewed

19  the voice mails, that she's -- obviously she's been --

20  you'll qualify her.

21         That in her opinion he suffers from bipolar

22  disorder; that in her opinion he was suffering from a

23  bipolar disorder at the time that he made the calls; that

24  he was under personal stressors, both political and

25  personal, that caused him to be in a manic phase; and that

```
 1   as a consequence of this manic phase, he made these phone
 2   calls which he might not otherwise have been inclined to
 3   do.
 4        MR. RYAN:  Would that include, Your Honor -- I
 5   mean, that sounds like what you're saying to me, I'm just
 6   wondering if that would include the idea to elicit the
 7   concept that he may have been using elevated language or
 8   extreme language that he would not otherwise use not in a
 9   manic phase when in person with someone.
10        THE COURT:  I think that would probably be within
11   the scope of what I would permit, that the manic phase may
12   have caused him to be -- I'll use the term "hyperbolic" at
13   least in terms of the way that he communicated his message
14   and that had he not been in a manic phase he might have
15   chosen other language or done something else.
16        But that -- what I'm going to be very careful
17   about doing is not letting her testify about what he did
18   mean or what he was trying to accomplish or that he did not
19   intend it as a true threat.  She can't do that.
20        MR. RYAN:  Very good.  I understand, Your Honor.
21        THE COURT:  Do you want to have an opportunity to
22   respond, Ms. Daniels?
23        I didn't mean to cut you off either, Mr. Ryan.
24   And I know I peppered you with questions and interrupted
25   you constantly.  So I apologize for that.
```

```
 1              I don't want to keep you from making arguments
 2   that you want to make.  If you have something else you want
 3   to share with me, I do want to hear it.
 4              MR. RYAN:  I don't think so.
 5              Thank you, Your Honor.
 6              THE COURT:  Okay.
 7              MR. RYAN:  Thank you.
 8              THE COURT:  Ms. Daniels, anything you want to add?
 9              MS. DANIELS:  Very briefly, Your Honor.
10              THE COURT:  Okay.
11              All right.  I might as well tell you what my
12   thoughts are now so you can go.
13              I share the Government's concern about whether or
14   not the testimony of Dr. Rapa is going to be helpful to the
15   jury in terms of their assessment about whether or not
16   Mr. Lapin had the requisite intent at the time he left
17   those voice mails.  However, I think that may go
18   principally to the weight of her testimony and can be
19   properly explored on cross-examination.
20              So I'm going to overrule the Government's
21   objection to the testimony.  I'm going to sustain the
22   objection in part and deny the objection in part.
23              I'm going to permit Dr. Rapa to testify as it
24   relates to the 875 offense.  That once her qualifications
25   are established, that she did examine Mr. Lapin, that in
```

1   her opinion he suffers from bipolar disorder.

2   And that in her opinion from January, mid-January

3   of 2019 to mid -- I'm sorry, mid-December of 2019 to

4   mid-January of 2020, that he was in a manic cycle of his

5   bipolar condition and that as a result of that -- and that

6   that was brought on by personal stressors.

7   And her testimony was, as I recall it, Mr. Ryan,

8   is she could not necessarily attribute it to the political

9   situation or impeachment alone, but that it was likely a

10  combination of things, both personal and political.

11  I would expect her to be consistent in that

12  testimony.  Obviously if she's not been, she'll be

13  cross-examined on it.

14  And that as a consequence of that, he left voice

15  mail messages in a hyperbolic tone that he would not have

16  otherwise -- the tone of which would have been different

17  had he not been in a manic phase.

18  I'm not going to let her testify as to what his

19  intent was, either what I would call offensively or

20  defensively.

21  And otherwise -- in other words, she will not be

22  permitted to offer that he lacked the requisite intent to

23  convey a true threat nor will she be permitted to offer

24  alternative intentions such as he intended to be a

25  spokesman for the party or he intended to be an advocate

```
 1    for the President or he intended to do fill-in-the-blank.

 2    She won't be permitted to do that.

 3            She also will not be permitted by way of

 4    recitation of history that she obtained from Mr. Lapin to

 5    offer any type of justification or excuse for the conduct

 6    or to offer some explanation as to what he did and why he

 7    did it unless it is very specifically tied to the

 8    information that she relied upon in arriving at her

 9    opinions.

10            So I want to make sure that you talk with her

11    carefully, Mr. Ryan, before she's on the witness stand.

12    I'm not asking you necessarily to agree.

13            But we have her testimony, which I'll take as your

14    proffer, that this is what she would testify to more

15    expansively if she were permitted to do that.  If I'm

16    wrong, depending on where we are in terms of my

17    limitations, then that will be -- you'll have that record

18    made for the Eleventh Circuit to evaluate.  But that's the

19    extent to which I'm going to permit her to testify.

20            And I'm going to -- again, just a reminder that

21    you need to -- you need to be prepared to elicit this

22    testimony in a proper way with direct questions.

23            And so the reason I'm such a stickler about that

24    is because there's a reason for the rule.  It's

25    fundamentally unfair to be able -- for a lawyer to be able
```

```
 1   to lead his or her witness, especially through difficult
 2   areas of testimony, and to be able to offer scenarios or
 3   descriptive, you know, backgrounds where the lawyer is
 4   doing the testifying and the witness simply nods in
 5   affirmation.
 6           That's very dangerous with an expert witness like
 7   this, and I'm vigilant about not allowing it to happen.
 8           MR. RYAN:  May I have -- I have one question.
 9           THE COURT:  Yes.
10           MR. RYAN:  May the witness testify to her
11   observations about the tone and the language in the voice
12   mails?
13           THE COURT:  No, because I don't -- she can
14   testify -- I'm not going to allow her to describe the voice
15   mails because the jury is going to hear the voice mails.
16   And so they can arrive at their own opinions about whether
17   or not -- whether the tone there is consistent with what
18   her testimony is.
19           I am going to permit her to testify that she
20   listened to the voice mails and that listening to the voice
21   mails was part of the data that she relied upon in order to
22   arrive at her conclusion because that was her testimony
23   today, that that was part of what she relied upon in
24   arriving at her opinion that he was in a manic phase of his
25   bipolar disorder.
```

```
1              But I'm not going to permit her to go through and

2    put her own descriptive terms on his tone of voice or

3    things of that nature unless it's something that I would

4    say is very generic like his speech was rapid or his voice

5    was elevated or he used hyperbolic language or it was

6    interspersed with curse words.  All of that, of course,

7    they're going to know.  But if that's significant to her

8    opinion, then I'll allow her to testify to it.

9              But I'm not going to let her characterize the

10   voice mails, if that distinction is meaningful to you.

11             MR. RYAN:  I understand.  Thank you.

12             And I assume that will be true for Government

13   witnesses as well.

14             THE COURT:  Yes.  The Government, same would

15   apply.  The Government's witnesses also -- which brings me

16   to the question of --

17             Let me ask the Government, assuming that I permit,

18   as I've indicated I'm going to, Dr. Rapa to testify to this

19   limiting stint on the 875 charge, is the Government going

20   to make a request for a continuance?  Are you going to ask

21   for an expert of your own?

22             MS. DANIELS:  No, Your Honor, we are not planning

23   on it.

24             THE COURT:  Okay.

25             So in light of that, I think there's likely little
```

1    or no prejudice to the Government as a result of the

2    violation of the Court's scheduling order in terms of the

3    filing of the 12.2 notice.

4           The only thing I'll do is take the opportunity,

5    Mr. Ryan, to tell you I read your apology in the papers,

6    but the flagrant failure to follow the Court's scheduling

7    order is not without consequence.

8           I'm not going to eliminate her testimony based on

9    the failure to timely disclose it, but I do want the record

10   to be clear that it was not timely disclosed and that had

11   the Government been prejudiced I would likely keep it out

12   for that reason.

13          So I'll get you an order essentially memorializing

14   the ruling that I've made from the bench, but I'm not going

15   to restate everything that I've said from the bench in

16   terms of the direction I've given you about the scope of

17   this witness's testimony.

18          But I will count on you, Mr. Ryan, to confer with

19   Dr. Rapa and make sure that she knows the limits of her

20   testimony so that we don't stumble into an area

21   inadvertently because she doesn't understand where the

22   guardrails are.

23          MR. RYAN:  Very good.

24          Thank you, Your Honor.

25          THE COURT:  Anything else from the Government,

1    Ms. Daniels?

2              MS. DANIELS:  No, Your Honor.

3              THE COURT:  Anything else from the defense?

4              MR. RYAN:  No, Your Honor.

5              THE COURT:  All right.  Great.  Thank you.

6         I appreciate your argument.

7         We'll be in recess.

8              MR. RYAN:  Thank you for your time.

9         (Proceedings adjourned at 12:36 p.m.)

10                        * * * * *

11

12              C E R T I F I C A T E

13

14         I certify that the foregoing is a correct

15    transcript from the record of proceedings in the

16    above-entitled matter.

17

18    November 6, 2020

19

20    ___s\__Amie_R._First_____
      Amie R. First, RDR, CRR, CRC, CPE
21    Federal Official Court Reporter
      United States District Court
22    Middle District of Florida

23

24

25