```
 1                 UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                      ORLANDO DIVISION
                   CASE NUMBER 6:20-cr-00089
 3
     . . . . . . . . . . . . . . . .
 4   UNITED STATES OF AMERICA,      :
                                    :
 5           Plaintiff,             :
                                    :         Orlando, Florida
 6              v.                  :         November 17, 2020
                                    :         3:00 p.m.
 7   JAMES LAPIN,                   :
                                    :
 8           Defendant.            :
     . . . . . . . . . . . . . . . .
 9

10        EXCERPT TRANSCRIPT OF JURY TRIAL, VOLUME I
          GOVERNMENT AND DEFENSE OPENING STATEMENTS
11            TESTIMONY OF ELIZABETH BELTRAN,
            JENNIFER DALMIDA, STACY FLEURISSAINT
12        BEFORE THE HONORABLE ROY B. DALTON, JR.
                 UNITED STATES DISTRICT JUDGE
13

14   APPEARANCES:

15

16   Counsel for Government:      Amanda Sterling Daniels
                                  Chauncey A. Bratt
17

18   Counsel for Defendant:      Michael Shay Ryan
                                  Nicole Mouakar
19

20

21   Court Reporter:     Amie R. First, RDR, CRR, CRC, CPE
                         Federal Official Court Reporter
22                       401 West Central Boulevard, Suite 4600
                         Orlando, Florida  32801
23                       AmieFirst.CourtReporter@gmail.com

24   Proceedings recorded by Realtime Stenography.

25   Transcript produced by Computer-Aided Transcription.
```

**INDEX OF PROCEEDINGS**

Opening Statement by the Government ............. 3

Opening Statement by the Defense ............... 7

Rule of Sequestration ......................... 57


**EXHIBITS**

|  | ADMITTED |
|---|---|
| Government's Exhibits 1-10 | 14 |
| Government's Exhibits 14-15 | 14 |
| Defendant's Exhibit 6 | 31 |
| Defendant's Exhibit 5 | 31 |
| Government's Exhibit 11A | 39 |
| Government's Exhibit 12 | 51 |


**GOVERNMENT WITNESSES**

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Elizabeth Beltran | 15 | 23 | 27 | |
| Jennifer Dalmida | 37 | 46 | | |
| Stacy Fleurissaint | 49 | 55 | | |


**DEFENDANT WITNESSES**

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Elizabeth Beltran | 28 | 34 | | |

```
 1                    P R O C E E D I N G S

 2                    (Beginning of excerpt)

 3                         * * * * *

 4         OPENING STATEMENT BY THE GOVERNMENT

 5         MS. DANIELS:  Thank you, Your Honor.

 6         May it please the Court.

 7         Ladies and gentlemen of the jury, we are here

 8  today because the defendant threatened to kill Speaker of

 9  the House Nancy Pelosi for retaliation for her role in the

10  impeachment of President Trump.

11         Specifically, on December 20, 2019, the defendant

12  called the Speaker's office in Washington, D.C., and he

13  left her a voice mail stating:

14         We're fucking coming for you, cunt.  You better

15  have a bulletproof fucking vest on because, bitch, we're

16  fucking coming for you.  We're going to fucking hang your

17  dentures above the fucking Capitol building.  You're

18  fucking dead.

19         Please excuse this language.  These are not my

20  words.  They are the defendant's.

21         You will hear during the presentation of evidence

22  in this case that the defendant left more than one angry

23  voice mail for the Speaker, but this one crossed the line

24  from an angry voice mail into a criminal threat.

25         You will hear the voice mails for yourself.  And
```

1   in them, you will be able to hear the defendant's words,

2   his tone, and just how serious he was; how these threats

3   are not a joke or a careless remark but, rather, true

4   threats intended to intimidate the Speaker.

5          You will be able to tell this from the voice mails

6   themselves, but you will also be able to tell that the

7   defendant's threat on December 20 was a true one by the

8   number of times and the number of ways he attempts to reach

9   the Speaker.

10          You will hear that in only about two months the

11   defendant called the Speaker's office not once, not twice,

12   not three times, not four, not five, but ten times.  He

13   left her five voice mails.  He called her at her office in

14   Washington, D.C., and at her office in San Francisco,

15   California.  And he called her during the day, during

16   business hours, all to increase the odds that his threats

17   would reach and intimidate her.

18          You will hear that these threats were transmitted

19   to the United States Capitol Police and that a special

20   agent with the United States Capitol Police contacted the

21   defendant and had a recorded interview with him.  You will

22   hear this interview for yourself.

23          Now, pay close attention to this interview because

24   in it you will hear the defendant have the presence of mind

25   to lie to the special agent.  You will hear that when he's

1    confronted with the threats from December 20th that he

2    has the presence of mind to lie about where he lives, who

3    he lives with, what he drives, and whether he has ever

4    called the Speaker.

5           And you won't have to guess that these statements

6    are lies because you will see the records that prove that

7    these statements are lies.

8           But that's not all you'll hear on this recorded

9    interview.  You will be able to hear the defendant's tone

10   and emotion while discussing Ms. Pelosi and the

11   impeachment months after leaving the voice mails.

12          And you will be able to hear the defendant do what

13   only a person who left these voice mails could do.  You

14   will hear the defendant correct certain statements from the

15   voice mail to the special agent.

16          You will hear the special agent ask the defendant,

17   Did you tell Nancy Pelosi she better have a bulletproof

18   vest?

19          And you will hear the defendant respond, No.  I

20   said I hope she has a bulletproof vest.

21          All on the same call where he claims he's never

22   called the Speaker's office.  And that's because months

23   after making the voice mail, he knows, he remembers what he

24   said.  And he knows it was a threat.  And now he knows he

25   needs to lie about it.  He knows he needs to lie because it

1  was not a joke or a careless remark or idle talk but a true

2  threat sent to intimidate the Speaker.

3  He knows that a reasonable person hearing his

4  words would understand them to be a true threat.  And

5  so months later when he's confronted about them, he knows

6  he has to lie to cover up his crime.

7  Because that's what this is.  This is a crime.

8  This is not a case about politics or the First Amendment.

9  No one here is going to ask you whether you like Nancy

10  Pelosi or whether you agree with the impeachment

11  proceedings because that's not why you're here.  And that's

12  important, because this is not a case about anyone's

13  politics.  This is a case about a threat sent to a

14  United States official in retaliation for her performance

15  of her duties.

16  And at the end of the evidence in this case after

17  you've heard the voice mails and seen the records and heard

18  the recorded interview, you will have no reasonable doubt

19  that the defendant issued these threats with the intent to

20  intimidate the Speaker for the performance of her duties.

21  And at the close of this case, I will stand before

22  you and I will ask you to return the only verdict that fits

23  the evidence in this case, that the defendant is guilty of

24  the offense as charged.

25  Thank you.

1          THE COURT:  Thank you, Ms. Daniels.

2          Mr. Ryan, you might want to use those wipes and

3     wipe that area down.

4          In fact, why don't I get Ms. Daniels to come back

5     and do that before you come here.

6          MR. RYAN:  Thank you, Your Honor.

7          THE COURT:  Thank you.  You may proceed.

8          Ladies and gentlemen, please give Mr. Ryan your

9     attention.

10                **OPENING STATEMENT BY THE DEFENSE**

11          MR. RYAN:  Good afternoon, everyone.

12          Let me just get a little organized.

13          This case is a lot about words and what they mean.

14     And the prosecutor is right.  You need to listen to the

15     voice mails -- I shouldn't say need.  Please listen to the

16     voice mails with an open mind and an open heart and ask

17     yourself who is Mr. Lapin talking about?  Who is he talking

18     about?  And what is he talking about?

19          So we heard Ms. -- the prosecutor read to you

20     verbatim the December 20th, 2019, voice mail that is

21     the subject matter of the Indictment.  That's the email --

22     the voice mail that the Government accuses Mr. Lapin of a

23     crime for.  For words.

24          And this is what he said:

25          We're coming for you, cunt.  We are coming for you

 1    and your bullshit mother fucking ass, bitch.  You better

 2    have a bulletproof vest on because, bitch, we're coming for

 3    you.  How fucking dare you impeach our president and then

 4    go on fucking winter vacation.

 5              There's more of the same.

 6              And he says, again:  We're coming for you.  We're

 7    going to fucking hang your dentures above the Capitol.

 8              He's talking about Nancy Pelosi.

 9              Now, who is the "we" he's talking about?  Because

10    guess what?  There is no evidence in this case that he and

11    a cohort, a group, a gang, were planning some action

12    against Nancy Pelosi, even to scare her.  There's no

13    testimony.  You'll hear nothing like that.

14              Now, you have to ask yourself, too, when you're

15    looking at these words, what did they -- what did they

16    mean?

17              He's speaking in metaphor and idiomatic

18    expressions as a natural part of our daily communications

19    with everybody.  Did he really insinuate that they were

20    going to be hanging dentures above the Capitol?  Who knows

21    if Nancy Pelosi even wears dentures.

22              So who are the "we" that we're talking about?

23    Who's this we?

24              Well, on December 19th -- by the way, he does

25    leave five messages, two in December:  December 19th

```
1   and December 20th.

2          The Judge is going to tell you that on

3   December 18th, 2019, the United States House of

4   Representatives voted to impeach Donald J. Trump.  You're

5   going to learn during this trial that Mr. Lapin is a huge

6   supporter of Donald J. Trump.  He believes in Donald J.

7   Trump.  And these messages are metaphors about politics.

8          So contrary to what the prosecutor is telling you,

9   this is about politics.  These are metaphors about

10  politics.  And other actions taken by the government and

11  other things that you're going to learn about Mr. Lapin

12  will show you that that's exactly what's going on here.

13         Now, on December 19th, he called the day after

14  the impeachment and said, So when do we try Nancy Pelosi

15  for treason and hang her for treason against the people of

16  our country?  She forgot she works for us, right?  She

17  works for the American people.  Right?  Not her son working

18  over in Ukraine for Joe Biden's son.  No.  That couldn't be

19  why she tried to impeach our president.  That bitch is a

20  traitor and so is the entire DNC.  It's time to abolish the

21  DNC.  Pulse Nightclub survivors for Trump 2020.

22         We.  Us.  Our.  We're coming for you.  He's not

23  talking about himself.  He never says I.  He never says I'm

24  coming for you.  He says we are.  We the people.  We the

25  electorate.  We the body politic is talking about Nancy
```

1    Pelosi's political career, not her physical well-being.

2    He's using metaphor to protest what he considers to be the

3    unrighteous impeachment of the President of the United

4    States.

5           Now, I grant you, this is not the way you should

6    protest.  It's not polite.  Somewhat harassing.  But a

7    federal crime?

8           There are other messages I guess we will hear that

9    go along the same -- that go along the same lines.  But

10   those two tell you who the "we" are and the "what."  We are

11   the people, or the supporters of Donald Trump or the

12   Republican Party or the body politic or the cultural

13   response to you, the impeachers of the president.  It's a

14   political rant.  Not a threat.

15          The other thing you're going to learn is that

16   Mr. Lapin suffers from some mental health issues.  He's

17   bipolar.  You're going to learn that he is bipolar, that he

18   suffers narcissism and also general anxiety disorder.

19          You'll hear from a forensic and clinical

20   psychologist that he was likely in a manic phase during the

21   calls because he wouldn't probably normally talk to people

22   like that face to face.  That's not how he behaves face to

23   face.

24          But with the distance of a telephone and leaving a

25   voice mail and being excited about the current politics of

1    the day and supporting very strongly one version of that,

2    those politics, led him to say extreme hyperbolic things

3    over a phone that he probably wouldn't otherwise say.

4            Now, you may think I'm just the defense attorney

5    spinning, but I'm not.  Because the way the Government

6    reacted also was evidence that they understood this not to

7    be a true threat.

8            He left those messages, the December 20th one,

9    that's the offensive one, the criminal one according to the

10   Government, on December 20th.  Nancy Pelosi's office

11   doesn't even bother to report it until February 24th,

12   two months later.

13           Now, grant you, in the interim there were a

14   couple of other calls.  But if a threat comes in on

15   December 20th that's a true threat, one would think one

16   would react as if it were a true threat.  But they didn't.

17           And then when Agent Anyaso gets the case, he

18   doesn't bother reaching out to Mr. Lapin.  They get the

19   phone number as soon as it's called in.  It's called in, by

20   the way -- I hope we will get to understand how it's left.

21   It's left as a voice mail.  So they have the number right

22   then and there.  They know the phone number that left the

23   voice mail.

24           So as soon as it was reported to Agent Anyaso's

25   office -- sorry, I'm getting tongue tied on his name --

```
 1    they have the phone number.  And it takes them, you know, a
 2    week or two to get the information from telephone companies
 3    to figure out who the phone belongs to, but they have the
 4    phone number.
 5            They have the phone number and get the information
 6    about who the phone belongs to or who they believe the
 7    phone belongs to fairly early on in this process.  But it's
 8    not until May 18th that he bothers to reach out and ask
 9    him about it.
10            So they told you there were ten calls.  I'm not
11    sure there were ten.  I don't recall.  But there are two
12    other calls.  There's three calls in January; two, by the
13    way, on the 16th.
14            So they're making it sound like he's calling her
15    all the time, you know, December 19th and the 20th;
16    two on the 16th; one on January 11th.  They're all
17    very short.  Those are the voice mails.  You may hear that
18    he also called on February 5th.
19            You know what happened on February 5th?  That
20    was the day that the Senate acquitted Donald Trump and said
21    you're not guilty of impeachable offenses.  But he didn't
22    leave any voice mails.  So he exercised discretion then.
23            So it takes Agent Anyaso four months later to
24    reach out to call Mr. Lapin.  These are not actions taken
25    by people who believe that there's a true threat going on
```

```
 1   here and anything -- that a true threat is going on.

 2          So at the end of this case, I will be asking you

 3   to enter the only verdict that corresponds to the evidence,

 4   which is that he's not guilty.

 5          Thank you.

 6          THE COURT:  Thank you, Mr. Ryan.

 7          Ms. Daniels, the Government can call its first

 8   witness.

 9          MS. DANIELS:  Your Honor, there are a number of

10   exhibits that have been stipulated to.  May I enter those

11   in evidence?

12          THE COURT:  Yes.

13          MS. DANIELS:  Your Honor, at this time the

14   Government would like to move Exhibits 1 through 10 and

15   Exhibits 14 and 15 into evidence, please.

16          THE COURT:  All right.  1 through 10, 14 and 15, I

17   have those as the joint trial exhibits.

18          Is that correct?

19          MS. DANIELS:  Yes, Your Honor.

20          THE COURT:  All right.  And do you acknowledge

21   that those are joint exhibits that can come in without any

22   further discussion, Mr. Ryan?

23          MR. RYAN:  Yes.  I believe so, yes.

24          THE COURT:  All right.  Government's 1 through 10,

25   14 and 15 will be received without objection.
```

```
1              (Government's Exhibits 1-10 were received

2               in evidence.)

3              (Government's Exhibits 14-15 were received

4               in evidence.)

5              THE COURT:  So, ladies and gentlemen, the lawyers

6    work cooperatively before we get underway to look at each

7    other's exhibits and reach agreements with respect to some

8    that can come in without the necessity of having a witness

9    testify about them or identify them or lay any further

10   foundation for them.  So you shouldn't think there's

11   anything unusual about that.

12             These exhibits are in that category, and I'm going

13   to admit them without any further testimony about them; but

14   they may be referenced by some of the witnesses or by the

15   lawyers during the course of the proceeding.

16             There may be some others as we go along.  I think

17   there might also be some factual stipulations or things

18   that I've taken judicial notice of that are saleable facts

19   that need not actually be proven up by a particular

20   witness.  We'll cross that bridge when we come to it,

21   depending on when the lawyers ask me to do it.

22             MS. DANIELS:  Thank you, Your Honor.

23             The Government calls Elizabeth Beltran.

24             THE COURT:  Thank you.

25             THE DEPUTY CLERK:  Ms. Beltran, please come
```

```
 1   forward to be sworn.

 2         Please raise your right hand.

 3         Do you solemnly swear or affirm under penalty of

 4   perjury that all the testimony you will give will be the

 5   truth, the whole truth, and nothing but the truth?

 6         THE WITNESS:  I do.

 7         (Witness sworn.)

 8         THE DEPUTY CLERK:  Have a seat in the witness box

 9   over here to my left.

10         And you can adjust the microphone so that the

11   court reporter can hear you.

12         Once you're settled in, please state your name,

13   state and spell your name for the court reporter, please.

14         THE COURT:  Once you get settled in, you can

15   remove your mask if you're comfortable removing it.  If

16   you're not comfortable, you're welcome to leave it on.  But

17   you do have a screen there in front of you so --

18         THE WITNESS:  I'd prefer to leave it on.

19         THE COURT:  Okay.
```

**DIRECT EXAMINATION**

```
21   BY MS. DANIELS:

22   Q   Good afternoon, Ms. Beltran.

23       Can you please tell the jury what you do for work?

24   A   I manage the front desk.  I answer the phones.

25       I screen voice mails, and I do administrative tasks.
```

```
 1    Q     And who do you work for?

 2    A     For Speaker Nancy Pelosi.

 3    Q     And what's Ms. Pelosi's official title?

 4    A     Congresswoman Pelosi, California's 12th District and

 5    Speaker of the House, of the United States House of

 6    Representatives.

 7    Q     Okay.  So what is your title, your job title at this

 8    position?

 9    A     Staff assistant.

10    Q     And you described some of your duties.  Can you

11    describe them one more time?

12    A     Sure.  I answer the phones.  I screen voice mails, and

13    I manage the office's front desk.

14    Q     How long have you had this job?

15    A     Almost two years.

16    Q     Where is your office located?

17    A     In Washington, D.C.

18    Q     Do you know if the representative has an office in any

19    location outside of Washington, D.C.?

20    A     Yes.  She has the district office in San Francisco,

21    California.

22    Q     Do you check the voice mails for the district office

23    in San Francisco?

24    A     No, just the D.C. office.

25    Q     If someone wants to leave a voice mail for the
```

1    representative, how do they do that?

2    A    They call our phone number on the home screen of our

3    website, and they are prompted with a phone menu and they

4    can choose one of the options.

5    Q    What number would they call to reach the Speaker --

6    what is one of the numbers they would call to reach the

7    Speaker's office in D.C.?

8    A    202-225-4965.

9    Q    When someone leaves a voice mail, how do you get it?

10   A    So the voice mails are connected to an email account

11   inbox.  So we receive the audio clip and the transcription

12   in the inbox.

13   Q    Are you able to see the phone number that left a voice

14   mail?

15   A    Yes.

16   Q    Did you check the voice mails from December 20th,

17   2019?

18   A    Yes.

19   Q    Did you review a transcript for this voice mail?

20   A    Yes.

21   Q    Were you able to see what number left this voice mail?

22   A    Yes.

23        MS. DANIELS:  Your Honor, at this -- I'd request

24   permission to publish Government's Exhibits 1 and 2 that

25   have previously been admitted.

```
 1              THE COURT:  Yes.  It's already in evidence.  You
 2  may publish.
 3              MS. DANIELS:  Ms. Valente, could you please
 4  publish that for the jury.
 5              THE COURT:  Clear the screen for me, please.
 6              (Playing audio exhibit.)
 7              MS. DANIELS:  Thank you, Ms. Valente.
 8  BY MS. DANIELS:
 9  Q    What did you do -- and is this an accurate copy of the
10  recording you heard?
11  A    Yes.
12  Q    And the transcript you reviewed?
13  A    Yes.
14  Q    What did you do after hearing this voice mail?
15  A    I forwarded the message to Capitol Police's threat
16  assessment division.
17  Q    Now, do you forward every voice mail, every call the
18  Speaker gets to the U.S. Capitol Police?
19  A    No, just the ones that have threats in them.
20  Q    And approximately how many calls total do you review?
21  A    About 5,000 to 8,000 a week.
22  Q    Why did you forward this voice mail?
23  A    The caller mentioned that the Speaker should be
24  wearing a bulletproof vest, that we're coming for you, and
25  that she was F-word dead.
```

1    Q     What did you perceive those words to be?

2    A     A threat.

3    Q     Did you find any additional voice mails from this

4    caller?

5    A     Yes.  I found four additional voice mails.

6    Q     So how many voice mails total?

7    A     Five.

8    Q     Do you know approximately when these voice mails were

9    left?

10   A     In December and January.

11   Q     Do you recall what, if anything, was going on at the

12   House of Representatives at this time?

13   A     The House was going through the impeachment process at

14   that time.

15   Q     Have you listened to the other voice mails?

16   A     Yes.

17   Q     Did you listen to the voice mail from

18   December 19th, 2019?

19   A     Yes.

20   Q     Did you also review a transcript of that voice mail?

21   A     Yes.

22         MS. DANIELS:  Your Honor, at this time I would

23   like to request permission to publish Exhibits 3 and 4,

24   which were previously admitted.

25         THE COURT:  Yes, ma'am.  You may publish 3 and 4

```
 1   previously admitted.

 2           MS. DANIELS:  Thank you, Your Honor.

 3           Ms. Valente, could you please publish those for

 4   the jury.

 5           (Playing audio exhibit.)

 6   BY MS. DANIELS:

 7   Q    Is this the voice mail you heard?

 8   A    Yes.

 9   Q    Is this the transcript you reviewed?

10   A    Yes.

11   Q    Did you also listen to a voice mail from

12   January 11th, 2020?

13   A    Yes.

14   Q    Did you review a transcript of that voice mail?

15   A    Yes.

16           MS. DANIELS:  Your Honor, may I have permission to

17   publish Exhibits 5 and 6, which were previously admitted?

18           THE COURT:  Yes.  You may proceed.

19           MS. DANIELS:  Thank you.

20           Ms. Valente, would you please publish those for

21   the jury.

22           (Playing audio exhibit.)

23   BY MS. DANIELS:

24   Q    Is this the voice mail you heard?

25   A    Yes.
```

1    Q     Is this the transcript of the voice mail you read?

2    A     Yes.

3    Q     Did you also listen to the voice mail from

4    January 16th, 2020, at around 11:04?

5    A     Yes.

6    Q     Did you review a transcript of this voice mail?

7    A     Yes.

8          MS. DANIELS:  Your Honor, may I have permission to

9    publish Exhibit 7 and 8 which have previously been

10   admitted.

11         THE COURT:  Yes.  You may proceed.

12         MS. DANIELS:  Ms. Valente, could you please

13   publish that for the jury.

14         (Playing audio exhibit.)

15   BY MS. DANIELS:

16   Q     Is that the voice mail you heard?

17   A     Yes.

18   Q     Is that the transcript you read?

19   A     Yes.

20   Q     Did you listen to a voice mail from January 16th,

21   2020, at 11:05?

22   A     Yes.

23   Q     Did you also review a transcript of this voice mail?

24   A     Yes.

25         MS. DANIELS:  Ms. Valente, could you please

```
 1    publish Exhibits 9 and 10.
 2              Your Honor, I apologize.  May I have permission to
 3    publish Exhibits 9 and 10?
 4              THE COURT:  You may.
 5              MS. DANIELS:  Thank you.
 6              (Playing audio exhibit.)
 7    BY MS. DANIELS:
 8    Q    Is that the voice mail you heard?
 9    A    Yes.
10    Q    Is that the transcript you read?
11    A    Yes.
12    Q    Could you explain why you collected the other voice
13    mails after hearing the voice mail from December 20th,
14    2019?
15    A    So after we find one threatening voice mail from a
16    caller, we run a search on the phone number in our voice
17    mail system and we attach all other messages that that
18    caller might have left.
19    Q    Do you recall a specific statement in the
20    December 20th call that made you forward this to the
21    Capitol Police?
22    A    Yes.  He said that the Speaker should be wearing a
23    bulletproof vest, we're coming for you, and that she was
24    F-word dead.
25              MS. DANIELS:  Your Honor, may I have a second to
```

```
 1   confer with co-counsel?

 2           THE COURT:  You may.

 3   BY MS. DANIELS:

 4   Q    Ms. Beltran, around what time did you forward this

 5   voice mail to the U.S. Capitol Police?  Around what month?

 6   A    In February 2020.

 7   Q    When did you hear this voice mail, the December 20th

 8   voice mail for the first time?

 9   A    In February.

10   Q    And how long did you wait to forward it to the Capitol

11   Police?

12   A    I mean, it came in December so maybe two months after.

13   Q    But when did you hear it?

14   A    I heard it in February.

15           MS. DANIELS:  No other questions at this time,

16   Your Honor.

17           THE COURT:  Thank you.

18           Ms. Daniels, if you would wipe that area down and

19   swap out that cover for me, please.  And just remove your

20   cover, and I'll let Mr. Ryan put his own on.

21           Okay.  Cross-examination, Mr. Ryan.

22           MR. RYAN:  Thank you, Your Honor.

23                     CROSS EXAMINATION

24   BY MR. RYAN:

25   Q    Good afternoon.  My name is Michael Ryan.  I'm
```

```
 1   Mr. Lapin's attorney.
 2       This is the rest of the people in our -- working for
 3   Mr. Lapin.
 4       How are you?
 5   A   Good.  How are you?
 6   Q   Good.
 7       So I just want to ask you a few questions.
 8       I'm kind of curious how come it takes so long for you
 9   to review the voice mails?
10   A   As I mentioned to Ms. Daniels, we receive about 5,000
11   to 8,000 calls a week.  So you can imagine that that's a
12   lot of calls to get through.  And so I didn't -- it took me
13   a while to get to the calls that were made in December and
14   January.
15   Q   So you listen to 5- to 8,000 voice mails a week?
16   A   A week.
17   Q   So was that -- how much of that is your job?
18   What percentage of your job is devoted to listening to
19   voice mails?
20   A   I don't know about an exact percentage, but that is
21   one of my main, like, tasks that I do in my job.
22   Q   More than half the time?
23       Just a ballpark figure.  I'm not asking for anything
24   exact.
25       Do you have an idea?
```

```
 1   A    75 percent, 50 percent.  I mean, a big chunk.
 2   Q    Okay.  So pretty much daily you're going into the
 3   office and you're listening to voice mails?
 4   A    I listen to them daily, that's correct.
 5   Q    And how many -- how often do you end up reporting
 6   calls to the threat assessment bureau?  Every week?  Every
 7   month?
 8   A    I'd say there's a threat at least once a day so --
 9   Q    At least once a day.
10        And how were you trained to evaluate the voice mails
11   for threats?
12        Or were you trained?  Let me start off with that.  I'm
13   sorry.
14        Were you trained in something to evaluate the voice
15   mails to determine threat content?
16   A    I was trained to screen voice mails according to
17   Capitol Police.  And I look for key words when I'm
18   screening those voice mails.
19   Q    So you were trained to listen for key words; is that
20   correct?
21   A    Anything that is a threat against the Speaker or her
22   family or staff.
23   Q    Right.  I understand that.
24        I'm just curious as to how you were trained to
25   evaluate the voice mails for threat content.  Were you
```

```
 1    given a class?  Were you just given a sheet of words?  How
 2    did you -- or they just told you to go by your own lights?
 3    What did they -- how does that work?
 4    A    I was trained by my colleague on how to evaluate
 5    threats for the voice mails and then send them to Capitol
 6    Police per our office's protocol.
 7    Q    So daily your routine is sending, forwarding voice
 8    mails to the threat assessment section?
 9    A    Yes.
10    Q    Is there anybody else in the office who has any access
11    to the voice mail?
12    A    Can you specify what you mean by voice mail?  Just
13    message or --
14    Q    You listen to the voice mails, the 5- to 8,000 that
15    come in a week.  I'm talking about that body of voice
16    mails.
17         Are you the only one that reviews them?  Or can
18    anybody in the office review them?  Does anybody else have
19    access to that body of voice mails?
20    A    My colleague who has the same title as me.
21    Q    And she's doing the same thing you're doing?
22    A    It's a he; but yeah, he's doing the same thing.
23    Q    Sorry.  I stand corrected.  Thank you.
24         So he -- so there's two of you reviewing a lot of
25    voice mails on a daily basis?
```

```
1    A    Yes, us two.
2    Q    So he probably -- is he also -- well, I guess you
3    don't know.  Or maybe you do.
4         Do you know how often he is referring voice mails to
5    the Capitol Hill Police?
6    A    I don't know.  I can't speak on his behalf.
7              MR. RYAN:  May I have one moment?
8              THE COURT:  Yes, you may.
9              MR. RYAN:  Thank you, Your Honor.
10             I have nothing further.
11             THE COURT:  Thank you, Mr. Ryan.
12             Would you wipe that area down on your way out.
13             Ms. Daniels, are you going to have any redirect?
14             MS. DANIELS:  Very briefly, Your Honor.
15             THE COURT:  Okay.  Just stand by for a minute.
16             All right.  You may inquire.
17             MS. DANIELS:  Thank you, Your Honor.
18                       REDIRECT EXAMINATION
19   BY MS. DANIELS:
20   Q    Ms. Beltran, when you get a threat, after you forward
21   it to the U.S. Capitol Police, do you have any further
22   involvement with it?
23   A    No.
24             MS. DANIELS:  I don't have any other questions at
25   this time.
```

```
 1              THE COURT:  Thank you.
 2              May this witness be excused?
 3              MS. DANIELS:  Your Honor, this witness, I don't
 4    have any further matters for this witness.
 5              THE COURT:  Okay.  Mr. Ryan, may she be excused?
 6              MR. RYAN:  Actually, Judge, I meant to ask her
 7    something else.  I have her under subpoena as well.  May I
 8    ask her now?  I meant to ask her something else.
 9              THE COURT:  All right.  You can proceed.
10              MR. RYAN:  Thank you.
11              Sorry about that.
```

**DIRECT EXAMINATION**

```
13    BY MR. RYAN:
14    Q    When the calls come in, you noted that there's an
15    outgoing recording that gives you options.
16    A    I'm sorry.  Can you repeat the question?
17    Q    Yeah.  I didn't ask that very well.
18         So when you call the Speaker's office in Washington,
19    D.C., this is a public line, correct?
20    A    Yes.
21    Q    The line that Mr. Lapin called is not a private line?
22    A    No.  It's public.
23    Q    He didn't access any back line?
24    A    No.  It's a public line.
25    Q    Okay.  And where can you get this, the information for
```

```
 1   this line?

 2   A    You go to Pelosi.house.gov which is the

 3   congresswoman's website, the home page.  The home page,

 4   that's it.

 5   Q    Okay.  But there are lines that are semiprivate lines

 6   or back lines that, you know, that you can call to get into

 7   the office, is there not?

 8   A    I don't know.

 9   Q    Oh, you don't know.  Okay.

10        So when you call this general number, what happens?

11   A    You're prompted with a phone menu that has four

12   options.

13   Q    What are those four options?

14   A    So option one is to leave a message for the Speaker;

15   option two is to find out how to email the Speaker; three

16   is for finding out her policy positions; and four is if you

17   have official business with the office you get a live

18   person.

19   Q    I sort of have it right.

20        May I show you Defense Exhibit Number 6.

21        Do you have it there?

22   A    Number 6?

23   Q    Yes.

24   A    There's a CD on here.

25   Q    Number six.  Tab number six.
```

```
 1   A     Okay.

 2   Q     Do you see that now?

 3   A     (Nods head.)

 4         Yes.

 5   Q     It's a short paragraph.  Would you take a moment to

 6   read it.

 7   A     (Complying.)

 8         Yeah, so there is an option for English and for

 9   Spanish.

10   Q     And you read the whole paragraph?

11   A     Yes.

12   Q     Is this an accurate transcript of the outgoing voice

13   menu that callers receive when they call Speaker Pelosi's

14   office?

15   A     Yes.

16         MR. RYAN:  May we admit Number 6, Your Honor?

17         THE COURT:  Does the Government have any objection

18   to this coming in out of order?

19         MS. DANIELS:  No, Your Honor.

20         THE COURT:  All right.  Then defense -- well, let

21   me ask you this.  Now, do you have any substantive

22   objection to it other than the chronology?

23         MS. DANIELS:  No, Your Honor.

24         THE COURT:  All right.  Defense 6 will be admitted

25   without objection.
```

```
 1              (Defendant's Exhibit 6 was received

 2               in evidence.

 3          MR. RYAN:  Now, when the -- we have an audio of

 4   the same thing, Your Honor, at Defense Exhibit 5.  I would

 5   like to play for the jury if there's no objection.

 6          THE COURT:  Again, this is in the middle of the

 7   Government's case in chief.

 8          So, Ms. Daniels, I guess we're doing this to

 9   Mr. Ryan as a courtesy to the witness, which I have no

10   problem with.  I just want to make sure the Government

11   doesn't have a problem with it.

12          MS. DANIELS:  Thank you, Your Honor.  That's fine.

13          THE COURT:  All right.  So Defense 5 will be

14   admitted without objection.

15          You may publish.

16          (Defendant's Exhibit 5 was received

17               in evidence.)

18   BY MR. RYAN:

19   Q    So this is what people hear when they call the

20   Speaker's office, correct?

21        What we're about to hear.  I guess I have to ask that.

22   Sorry.

23        Forget it.  We won't play it.

24        So let me just go over this with you a little bit.

25        So when you call, after asking about English and
```

```
 1   Spanish, it says if you would like to voice your opinion,

 2   share feedback, or pass along a personal story to

 3   Speaker Pelosi, please press one.

 4        Is that correct?

 5   A    Yes.

 6   Q    If you would like to find out how to email the

 7   Speaker, please press two.

 8        Correct?

 9   A    Yes.

10   Q    And if you have any questions about -- I'm sorry.

11        If you have any questions about Speaker Pelosi's

12   policy positions, please press three.

13   A    Yes.

14   Q    And if you are not leaving a message for the Speaker,

15   for Speaker Pelosi, and have business with the office,

16   please press four.

17        Is that right?

18   A    Yes.

19   Q    And it says to repeat this menu, please press zero.

20   Thank you for calling.

21   A    Yes.

22   Q    Okay.  So do we know when Mr. Lapin or anyone else

23   calls which of the voice message buttons they pushed?

24   A    No.  He would have needed to press one to leave a

25   message.
```

1  Q    Well, but you can leave a message by pressing one,

2  two, or three -- I mean, by pressing one or three, correct?

3  A    You can only leave a message if he presses option one.

4  Q    Okay.  So that's the only voice mail option.  The rest

5  are all to actually contact someone within the office?

6  A    That's not what I said.

7  Q    Okay.  That's what I'm asking.

8  A    If he wants to leave a voice mail for the Speaker, he

9  needs to press option one.

10  Q    Okay.  What happens if you press two?  You hear --

11  okay.

12      You hear a voice mail about Speaker Pelosi's email.

13  And if you have questions, that is also an attempt to reach

14  a staffer, number three?

15  A    Are you asking if you would like to find out how to

16  email Speaker Pelosi, please press two; or are you asking

17  about number three which is --

18  Q    Yeah, I kind of skipped over number two.

19      I'm asking if when you press number three, are you

20  also leaving a voice mail, or is that an attempt to reach a

21  staff member?

22  A    If you press three, you're directed to her resources

23  where you can find her policy positions.

24  Q    I see.  And if you press number four, is that an

25  attempt to reach an actual staff member on the phone?

1    A    If you press number four, you get somebody that's

2    answering the phones at the front desk.

3    Q    Okay.  So based on the fact that he left a voice mail,

4    your understanding is he pressed number one?

5    A    Yes.

6    Q    And number one is the opportunity to leave an opinion

7    or feedback, among other choices, correct?

8    A    Yes.

9            MR. RYAN:  That's all.

10           Thank you, Your Honor.  Thank you for letting me

11   go.

12           THE COURT:  Do you have cross-examination of the

13   defense direct exam on this additional area of inquiry?

14           MS. DANIELS:  May I just have one moment,

15   Your Honor?

16           THE COURT:  Yes.

17           You may proceed.

18                       **CROSS EXAMINATION**

19   BY MS. DANIELS:

20   Q    Ms. Beltran, in this outgoing message, does it say

21   that you are leaving a message for Speaker of the House

22   Nancy Pelosi?

23   A    Can you repeat that?

24   Q    So in the outgoing message, does it make clear that

25   you're calling Speaker of the House Nancy Pelosi?

1    A    Yes.

2    Q    Okay.  When it says if you would like to voice your

3    opinion, share feedback, or pass along a personal story, is

4    that inviting a threat?

5    A    No.

6              MS. DANIELS:  No other questions, Your Honor.

7              THE COURT:  Okay.  Any redirect, Mr. Ryan?

8              MR. RYAN:  No, Your Honor.  Thank you.

9              THE COURT:  Now may this witness be excused?

10             MR. RYAN:  Yes, Your Honor.  Thank you.

11             MS. DANIELS:  Yes, Your Honor.  Thank you.

12             THE COURT:  All right.  Thank you, Ms. Beltran.

13        If you're here under subpoena from either side,

14   you are released from those subpoenas.  You can go on about

15   your business.

16             THE WITNESS:  Thank you.

17             THE COURT:  So, ladies and gentlemen, just by way

18   of brief explanation, in order to accommodate the witness

19   and not require her to travel again to be called back as a

20   witness, as a defense witness in their case, I permitted

21   her to be examined by both, both in the Government's case

22   and in the defense case.

23        It doesn't make any difference to you, but it's a

24   little different than how I explained to you the process

25   would proceed.  I just wanted you to understand why it

```
 1    happened that way.
 2             Thank you, ma'am.  You can step down.
 3             When you go, would you take that cover off your
 4    microphone and deposit it in the trash can.
 5             And maybe take a wipe before you go and just wipe
 6    your area down.
 7             Thank you, Ms. Beltran.  You can head out the
 8    back.
 9             Call your next witness.
10             MS. DANIELS:  Your Honor, the Government would
11    call Jennifer Dalmida.
12             THE DEPUTY CLERK:  Ms. Dalmida, please come
13    forward to be sworn.
14             Please raise your right hand.
15             Do you solemnly swear or affirm under penalty of
16    perjury the testimony you will give will be the truth, the
17    whole truth, and nothing but the truth?
18             THE WITNESS:  Yes.
19             (Witness sworn.)
20             THE DEPUTY CLERK:  Please have a seat in the
21    witness box to my left.
22             And you can adjust the microphone so that the
23    court reporter can hear you.
24             Once you're settled, please state and spell your
25    name for the record.
```

```
 1            THE COURT:  Ms. Dalmida, I'll also give you an

 2   option.  You have a screen there in front of you.  If

 3   you're comfortable taking your mask off, you may do that.

 4   If you're uncomfortable, you may leave that on as well.

 5   You certainly may take it off if it's more comfortable for

 6   you.

 7            THE WITNESS:  Okay.

 8                       DIRECT EXAMINATION

 9   BY MS. DANIELS:

10   Q    Good afternoon, Ms. Dalmida.

11   A    Good afternoon.

12   Q    Could you please tell the jury where you work?

13   A    Verizon Wireless.

14   Q    What is Verizon Wireless?

15   A    We're a telecommunications company.

16   Q    How long have you worked there?

17   A    A little over 13 years.

18   Q    What is your position at Verizon?

19   A    I'm a senior analyst who's a custodian of records.

20   Q    Does Verizon maintain records related to its

21   customers?

22   A    Yes.

23   Q    Are the entries on those records made at or near the

24   time that the records were created?

25   A    Yes.
```

```
 1   Q     Does Verizon maintain these records in the course of

 2   their normal business?

 3   A     Yes.

 4   Q     Did Verizon receive a request for records related to

 5   James Lapin?

 6   A     Yes.

 7   Q     Did Verizon produce these records?

 8   A     Yes.

 9         MS. DANIELS:  Your Honor, permission to approach

10   the witness.

11         THE COURT:  Yes.

12   BY MS. DANIELS:

13   Q     Ms. Dalmida, I've handed you what's been marked as

14   Government's Exhibit for identification 11A.

15         What is that disk?

16   A     This is a copy of the records which we produced.

17   Q     How do you recognize that?

18   A     I had an opportunity to review the disk, and I

19   initialed and dated it.

20   Q     Does it contain a digital copy of the records Verizon

21   produced?

22   A     Yes.

23         MS. DANIELS:  Your Honor, at this time the

24   Government would move Government's Exhibit 11A for

25   identification into evidence.
```

```
 1              THE COURT:  Any objection?

 2              MR. RYAN:  No.

 3              THE COURT:  11A will be received without

 4  objection.

 5              You may publish.

 6              (Government's Exhibit 11A was received

 7               in evidence.)

 8              MS. DANIELS:  Thank you, Your Honor.

 9  BY MS. DANIELS:

10  Q    Now, before you publish, Ms. Dalmida, what types of

11  information are contained on these records?

12  A    Those records have a copy of our VoLTE report, it has

13  a copy of our sales site key, and subscriber information.

14  Q    Ms. Dalmida, I'd like to direct your attention to the

15  spreadsheet labeled VoLTE report.

16              MS. DANIELS:  Ms. Valente, could you please

17  publish that, 11A.

18  BY MS. DANIELS:

19  Q    Ms. Dalmida, can you please explain what information

20  is included in this spreadsheet.

21  A    This is a copy of a VoLTE report which has incoming

22  and outgoing calls.  This spreadsheet would indicate the

23  time that the call was placed, the cell tower in which the

24  call initiated on, the number that was either being called

25  or that made the call, and the length of the call.
```

```
 1   Q     On this record, column A says record opened, date and
 2   time.
 3         What information is listed under that call-in?
 4   A     This would be the date and time for which the call
 5   occurred.
 6   Q     And in column G, that column is titled market.
 7         What information is listed in that column?
 8   A     This would be the switch number for which the call was
 9   either placed or received.
10   Q     And in column H, that column is listed as eNB-ID.
11         What is that?
12   A     This is the cell tower number for which process the
13   call.
14   Q     Okay.  And what do you mean by that, "process the
15   call"?
16   A     In order for a call to either be delivered to our
17   subscriber or to the recipient of our subscribers making an
18   outbound call, a cell tower has to be utilized.  So this is
19   the cell tower number that was utilized for that call.
20   Q     Column I lists direction, DIR.
21         What's in that column?
22   A     This would indicate the direction of the call.  So it
23   would have an MF for mobile forwarding, MT for mobile
24   terminated, or MO for mobile originated.
25   Q     And what does it mean if something is mobile
```

1   originated?

2   A      That means our subscriber placed the call.

3   Q      What does it mean if it's mobile forwarding?

4   A      That means the call was either forwarded to voice mail

5   or the network took an extra step to deliver the call.

6   Q      And what does it mean if it's mobile terminated?

7   A      Our subscriber received a call.

8   Q      Okay.  And in column J, that column is labeled MSISDN.

9          What information is in there?

10  A      This is the target telephone number for the records in

11  which we produced.

12  Q      Okay.  And in column K, it says "called" with the

13  number symbol.

14         What information is in there?

15  A      This is the number that our subscriber called in

16  outbound calls.

17  Q      And in column L, what is listed in the column labeled

18  CPN?

19  A      This would indicate who actually initiated the call in

20  terms of telephone number.

21  Q      And then column M, SOU is listed at the top.

22         What does that mean?

23  A      This would be the seconds of usage.  This would be the

24  length of the call in seconds.

25  Q      And in column P, that column is titled status.

```
 1          What information is listed in that column?
 2   A     It lets you know if the call was successful or if it
 3   failed.
 4   Q     I would now like to direct your attention to the
 5   spreadsheet labeled Orlando LEA.
 6          What information is contained in this spreadsheet?
 7   A     On the spreadsheet, it would have the latitude and
 8   longitude, as well as the physical address of our cell
 9   towers.
10   Q     And what do the latitude and longitude coordinates in
11   this spreadsheet correspond to?
12   A     The location of the actual cell tower.
13   Q     And in column -- where it says street address, what
14   address is that?
15   A     That would be the physical address of the tower.
16   Q     Okay.  And in column Q -- column Q is labeled
17   e node B-ID.
18          What information is in that column?
19   A     This would be the cell tower number.
20   Q     And, again, when you say "cell tower," what are you
21   referring to?
22   A     The cell tower that was used to process the call.
23   Q     Now, can you please walk the jury through how you
24   might read these records to figure out where a call was
25   dialed from utilizing the VoLTE calls.
```

1          Row 780.

2          (Pause in proceedings.)

3     BY MS. DANIELS:

4     Q     Okay.  So how would you figure out where this call

5     originated from?

6     A     If we looked under column H, it would indicate the

7     cell tower number.  In this case, it was 145120.

8     Q     Okay.  And who -- in reading these records, who would

9     have placed that call?  Where do you see that information?

10    A     In the next column, column I, it says MO.

11          So it indicates it was mobile originated, which means

12    our subscriber placed the call to someone.

13    Q     And which phone number is the one that's originating

14    the call?

15    A     The phone number listed in column L, 140774678865.

16    Q     And where is the call being placed to?

17    A     It's being placed to 20222254965.

18    Q     And was that call successful?

19    A     Yes.

20    Q     And where do you see that?

21    A     Column P says success.

22    Q     Okay.  Now, you mentioned that in column H, the code

23    is 145120.

24    A     Correct.

25    Q     How would you figure out which cell tower that call

1   used?

2   A    We would have to go to the Excel spreadsheet titled

3   LEA and find 145120.

4         MS. DANIELS:  Ms. Valente, could you please search

5   column Q for 145120.

6         Could you please search column Q for 145120.

7   BY MS. DANIELS:

8   Q    Where would this call be coming from?

9   A    If you slide over to the left.

10        The tower that was used to initiate this call was

11  1051 Ocean Shore Boulevard.  And that is -- over to the

12  right, please.

13        In Ormond Beach, Florida, 32176.

14  Q    Thank you.

15        I would like to now direct your attention to the

16  spreadsheet, the VoLTE subscriber information.

17        Can you describe the information on this spreadsheet?

18  A    The subscriber information sheet will have the name

19  and who we have this account registered to as well as the

20  billing address and whether their account is a post-paid or

21  a prepaid.

22  Q    And on this, on this specifically, what is the name of

23  the account holder?

24  A    James Lapin.

25  Q    And what address is he at?

```
1    A      119 Ocean Terrace in Ormond Beach, Florida.

2    Q      And how do you know what type of account he has?

3    A      If we scroll all the way over to the right, under

4    column AD, it indicates post-pay, which means the

5    subscriber pays for service after they actually use it.

6           And we verify their identity with the Social Security

7    number and/or driver's license.

8    Q      And who provides that information -- who provides the

9    information on this spreadsheet?

10   A      Who provides it?

11   Q      Right.

12   A      The consumer.

13   Q      I'm sorry.  Who was it?

14   A      The consumer.

15   Q      Are you able to see when this account was opened?

16   A      Yes.

17          Column AB indicates 8/5/2017.

18          MS. DANIELS:  Your Honor, may I just have a moment

19   to confer with counsel?

20          THE COURT:  Yes.

21          MS. DANIELS:  No more questions at this time,

22   Your Honor.

23          THE COURT:  All right.  Thank you.

24          Ms. Dalmida, I neglected to mention it to you, but

25   there's a little box there in front of you that's got some
```

 1    little white microphone covers in it.  Right there.  Look

 2    in there.  I think there should be some microphone covers

 3    in that.

 4            Could you do me a favor and put one on.

 5            When you leave, if I forget -- I hope I won't --

 6    but when you leave, if you'll take that off and put it in

 7    the trash can on your way out.

 8            THE WITNESS:  Yes, sir.

 9            THE COURT:  I would appreciate it.

10            All right.  Cross-examination?

11            MR. RYAN:  Thank you, Your Honor.  Just briefly.

12                        **CROSS EXAMINATION**

13    BY MR. RYAN:

14    Q    Good afternoon.

15    A    Good afternoon.

16    Q    When were these records ordered by the Government; do

17    you know?

18    A    I would have to look at the search warrant or the

19    subpoena.

20    Q    Do you have that?

21    A    I don't believe it's on those records there, no.

22    Q    So you don't know?

23    A    I don't know the date off the top of my head, no.

24    Q    Do you know which agent contacted you?

25    A    No, not to the top of -- not to the top of my head.

1   Q    Okay.  This is what you do like routinely at work,

2   correct?

3   A    Correct.

4   Q    So you'd have to have something in front of you to

5   remember exactly?

6   A    Yeah.  We deal with a lot of different agencies,

7   uh-huh.

8           MR. RYAN:  Okay.  Thank you.

9           Nothing further.

10          THE COURT:  Any redirect?

11          MS. DANIELS:  No, Your Honor.

12          THE COURT:  May this witness be excused?

13          MR. RYAN:  Yes, Your Honor.

14          THE COURT:  All right.  Thank you, ma'am.

15          If you're here under subpoena, you're released

16  from it.  You can go on about your business.

17          Thank you.  I appreciate you wiping that down for

18  me.

19          And I know you just put that cover on, but if I

20  could -- put a fresh one on there for me before you go.  I

21  appreciate it.

22          Thank you very much.

23          Call your next witness.

24          MS. DANIELS:  Your Honor, may I retrieve the

25  exhibit from the stand?

```
 1            THE COURT:  Yes.

 2            MS. DANIELS:  Your Honor, the Government's next

 3   witness is Stacy Fleurissaint.

 4            THE DEPUTY CLERK:  Ms. Fleurissaint, please come

 5   forward to be sworn.

 6            And please raise your right hand.

 7            Do you solemnly swear or affirm under penalty of

 8   perjury that the testimony you will give will be the truth,

 9   the whole truth, and nothing but the truth?

10            THE WITNESS:  Yes.

11            (Witness sworn.)

12            THE DEPUTY CLERK:  Please have a seat in the

13   witness box over here to my left.  You can adjust the

14   microphone so the court reporter can hear you.

15            Once you're settled, please state your name for

16   the court reporter.

17            THE WITNESS:  Stacy Fleurissaint.

18            THE COURT:  So, Ms. Fleurissaint, two things you

19   can do for me.  If you're comfortable removing your mask,

20   you can remove your mask so we can hear you a little more

21   clearly.

22            And would you spell your name for the court

23   reporter, please, ma'am.

24            THE WITNESS:  Yes.  First name is S-T-A-C-Y.  Last

25   name is F, Frank, L, Larry, E, Edward, U-R, Robert, I,
```

 1    India, S, Sam, S, Sam, A, apple, I, India, N, Nancy, T,

 2    Thomas.

 3             THE COURT:  Thank you, ma'am.

 4             You may inquire.

 5             MS. DANIELS:  Thank you, Your Honor.

 6                        **DIRECT EXAMINATION**

 7    BY MS. DANIELS:

 8    Q    Good afternoon, Ms. Fleurissaint.

 9         Could you please tell the jury where you work.

10    A    I work for the Florida Department of Highway Safety

11    and Motor Vehicles.

12    Q    What is the Florida Department of Highway Safety and

13    Motor Vehicles?

14    A    It's a state agency that regulates driver's licenses

15    and motor vehicles, registration.

16    Q    How long have you worked at the Florida Department of

17    Highway Safety and Motor Vehicles?

18    A    About six and a half years.

19    Q    What is your position at the Florida Department of

20    Highway Safety and Motor Vehicles?

21    A    I'm a liaison.

22    Q    And what are your duties in this capacity?

23    A    I'm one of the designees for the custodian of records.

24    Q    And what does that mean?

25    A    I come to court to testify on behalf of this date on

```
 1   driver's license and motor vehicle records.
 2   Q    Does the Florida Department of Highway Safety and
 3   Motor Vehicles maintain records related to Florida drivers?
 4   A    Yes.
 5   Q    Are these records created at or near the time of a
 6   record action?
 7   A    Yes.
 8   Q    Does the Florida Department of Highway Safety and
 9   Motor Vehicles maintain these records in the normal course
10   of their business?
11   A    Yes.
12   Q    Did the Florida Department of Highway Safety and Motor
13   Vehicles receive a request for records related to James
14   Lapin?
15   A    Yes.
16   Q    Did the Florida Department of Highway Safety and Motor
17   Vehicles produce requested records?
18   A    Yes.
19        MS. DANIELS:  Your Honor, may I approach the
20   witness?
21        THE COURT:  You may.
22   BY MS. DANIELS:
23   Q    I would like to direct your attention to Government's
24   Exhibit marked for identification as Exhibit 12.
25        What are these?
```

```
 1   A     This is the records request.

 2   Q     Okay.  And what is -- I'm sorry.

 3         You said records request.  Is that what the department

 4   produced?

 5   A     Yes.

 6   Q     And how do you know that's what it is?

 7   A     This is the business record certification, and then I

 8   also recognize these data documents.

 9   Q     And how do you recognize them?

10   A     It's part of my job.

11   Q     Okay.  And is it a fair and accurate copy of the

12   records you produced?

13   A     Yes.

14         MS. DANIELS:  Your Honor, at this time the

15   Government would like to move Exhibit 12 into evidence.

16         THE COURT:  Any objection?

17         MR. RYAN:  No.

18         THE COURT:  Government's 12 will be received

19   without objection.

20         You may publish.

21         (Government's Exhibit 12 was received

22          in evidence.)

23         MS. DANIELS:  Thank you, Your Honor.

24   BY MS. DANIELS:

25   Q     Ms. Fleurissaint, I would like to direct your
```

```
1    attention to page 2 of the records, which is Bates

2    Number 363.

3              MS. DANIELS:  I'm sorry.  Bates Number 11363.

4    BY MS. DANIELS:

5    Q    What is this record?

6    A    This is a DAVID record for a customer.

7    Q    What's on this page?

8    A    This is the photo and signature and oath for a

9    driver's license transaction.

10   Q    What else is on this page?

11   A    The customer's name, driver license number, address,

12   and the timestamp.

13   Q    Okay.  And where does this information come from?

14   A    From our DAVID system.

15   Q    And who provides that information to the DAVID system?

16   A    The customer.

17   Q    You've mentioned that this includes the applicant's

18   address.

19        What is the address listed in this record?

20   A    119 Ocean Terrace, Ormond Beach, Florida, 32176.

21   Q    Are you able to tell when this information was

22   provided to the DAVID system?

23   A    Yes.

24   Q    And when was that?

25   A    October 31st, 2018.
```

1   Q    I would now like to direct your attention to page 3 of

2   these records, which is Bates Number 11369.

3        What is this part of the record?

4   A    This is a part of the driver license application.

5   Q    And what's listed on this application?

6   A    The address is, out-of-state license information,

7   guardian information, examinations.

8   Q    And what address do you see listed on this record?

9   A    119 Ocean Terrace, Ormond Beach, Florida, 32176.

10  Q    And who provides this information?

11  A    The customer.

12  Q    I would now like to direct your attention to page 4 of

13  these records, which is Bates Number 11377.

14       What is in this record?

15  A    This is another driver license transaction.

16  Q    Are you able to see when this record was completed?

17  A    Yes.

18  Q    And when was it completed?

19  A    May 17th, 2019.

20  Q    And what is the address listed on this record?

21  A    119 Ocean Terrace, Ormond Beach, Florida, 32176.

22  Q    I would now like to direct your attention to page 5 of

23  these records, which is Bates Number 11383.

24       MS. DANIELS:  Bates Number 11383.

25       Thank you.

1    BY MS. DANIELS:

2    Q    And what are we looking at here?

3    A    This is a driver license address history.

4    Q    And what does it show?

5    A    It shows current and previous addresses on file.

6    Q    And what's the current address listed for this

7    applicant?

8    A    119 Ocean Terrace, Ormond Beach, Florida, 32176.

9    Q    And on this record, across from the current address,

10   there's a listing for DL mailing.

11   A    Yes.

12   Q    What does that mean?

13   A    It's the address provided for mailing from the

14   customer.

15   Q    And what does DL residential mean under address type?

16   A    That would be the residential address provided.

17   Q    And what's in the change date column?

18   A    That would be the date of the transaction.

19   Q    And what is that date listed here?

20   A    For the current?

21   Q    Uh-huh.

22   A    October 31, 2018.

23   Q    And in your understanding of the records, is this the

24   most up-to-date address information that's in the DAVID

25   system?

```
 1   A    Yes.
 2        MS. DANIELS:  Your Honor, may I just have a moment
 3   to confer with counsel?
 4        THE COURT:  Yes.
 5        MS. DANIELS:  Thank you, Your Honor.
 6        I tender this witness for cross now.
 7        THE COURT:  Thank you.
 8        Wipe the area down.  And then I'll invite Mr. Ryan
 9   to come up.
10        All right.  Mr. Ryan, cross-examination.
11        MR. RYAN:  Very briefly, Your Honor.  Thank you.
12                     CROSS EXAMINATION
13   BY MR. RYAN:
14   Q    Good afternoon.
15   A    Hello.
16   Q    My name is Michael Ryan, and I represent Mr. Lapin.
17        So these records, if I understand you correctly, show
18   that the last time that Mr. Lapin changed the address on
19   his Florida driver's license was in -- on October 31st,
20   2018?
21   A    Yes.
22   Q    So from October 31st of 2018, he hasn't attempted
23   to change the driver's license address, correct?
24   A    Not that we have any records for.
25   Q    Well, he hasn't -- okay.  I'm not sure what that
```

```
 1   means.
 2       Is there any indication that he has attempted to
 3   change his driver's license address for his Florida
 4   driver's license?
 5   A    No.  No indication that I can tell.
 6   Q    And apparently there's also a listing for a mailing
 7   address when you apply for driver's license?
 8   A    Yes.
 9   Q    And he kept that the same?
10   A    Yes.
11            MR. RYAN:  Nothing further.
12            THE COURT:  Any redirect?
13            MS. DANIELS:  No, Your Honor.
14            THE COURT:  May this witness be excused?
15            MR. RYAN:  Yes, Your Honor.
16            MS. DANIELS:  Your Honor, may I have a brief
17   sidebar with defense counsel?
18            THE COURT:  With respect to this witness?
19            MS. DANIELS:  No, Your Honor.
20            THE COURT:  May this witness be excused before we
21   do that?
22            MS. DANIELS:  Yes, Your Honor.
23            THE COURT:  All right.  Thank you, ma'am.  You're
24   excused.
25            If you'll do me a favor and take that mic cover
```

```
 1    off and put it in the trash for me right there.  Take one

 2    of those wipes and just sort of wipe down your area where

 3    you were touching.  I would be grateful.

 4              (Discussion at sidebar on the record.)

 5              THE COURT:  Yes, Ms. Daniels?

 6              MS. DANIELS:  It's come to my attention that two

 7    of the witnesses listed by the defense attorney have been

 8    sitting in the gallery.

 9              I would like to invoke the rule of sequestration

10    at this point.

11              THE COURT:  Rule 615 has now been invoked.

12              I'll instruct the lawyers to review the gallery

13    and make sure you ask any witnesses to step outside until

14    it's their time to testify.

15              And keep them outside until you've either asked

16    permission for them to come back or they've been released

17    from their subpoena and no further testimony will be

18    required.

19              MR. RYAN:  Very good, Your Honor.

20              MS. DANIELS:  Thank you, Your Honor.

21              (End of discussion at sidebar.)

22              THE COURT:  Call your next witness.

23              MS. DANIELS:  Your Honor, the Government's next

24    witness -- I apologize -- is lengthy.

25              So does the Court want to proceed?  I believe this
```

 1   witness' testimony would last past 5:00.

 2           THE COURT:  Okay.  We've made some pretty good

 3   progress today.  I'm not opposed to giving the jurors a

 4   little time off early.  I suspect that they're not opposed

 5   to that either.

 6           So, ladies and gentlemen, we're on track to get

 7   the case to you.  I know you had an early morning this

 8   morning in terms of getting here early to start all your

 9   work.

10           So I'm going to, rather than start a witness that

11   we won't get that far with that's going to be fairly

12   lengthy, excuse you all for the afternoon and ask you to do

13   whatever you need to do to adjust your schedule so that you

14   can be back here in those chairs ready to proceed at 9:00.

15           Just a reminder, I can't start until all of you

16   are here.  So I know all of you have different challenges.

17   I know the traffic is bad.  I know all of that.  So please

18   spend some time on your logistics tonight so that you can

19   make sure that you're up and away tomorrow in time to be

20   here ready to go at 9:00.

21           Just a reminder about my admonition not to discuss

22   the case amongst yourselves or with anyone else.

23           If you'll leave your notepads in your chair, my

24   courtroom deputy will pick those up and make sure that they

25   are kept safe.  Nobody will look at them.  She'll put them

 1   back in your chairs and they'll be ready for you when you

 2   arrive in the morning at 9:00.

 3          So I hope you have a pleasant evening.

 4          I'll turn you over to Mr. Carter.  He'll explain

 5   to you how to group up with him in the morning.  And you're

 6   in good hands.

 7          Have a pleasant evening, and I'll see you tomorrow

 8   at 9:00.

 9          (Jury exited the courtroom at 4:23 p.m.)

10          THE COURT:  Can I do anything for the lawyers

11   before we adjourn for the afternoon?

12          MS. DANIELS:  Not from the Government, Your Honor.

13          MR. RYAN:  Nothing here, Your Honor.  Thank you.

14          THE COURT:  Okay.  Great.

15          My courtroom deputy is reminding me that you said

16   you had something you wanted to take up after lunch.  And I

17   don't know what that is or was, but we have time to do it

18   now.

19          MR. RYAN:  No.  We did it in front of the jury.

20   It was the business about asking her about the outgoing

21   voice mail on the Nancy Pelosi office.

22          THE COURT:  Oh, okay.

23          So, again, just a reminder, I try to give you all

24   an opportunity at every break to let me know if you need

25   me.  It's not well received when it's time to come to court

```
 1   and then tell me now you need to see me.

 2         So, again, just a reminder.  I like to start on

 3   time, and I think the jurors appreciate starting on time.

 4         So if I tell them 2:30 or 11:30, whatever it is,

 5   and then I get a request for a sidebar or a conference

 6   that's going to make me unable to meet my obligation that I

 7   committed to the jury, then I'm usually not going to do it

 8   unless there's some exceptional reason that you couldn't

 9   have told me before when I asked you about it.

10         Anyway, just word to the wise going forward.

11   That's why I said no.

12         All right.  We'll be in recess.  I'll see you in

13   the morning at 9:00.

14             (Proceedings adjourned at 4:25 p.m. until

15              Wednesday, November 18, 2020, at 9:00 a.m.)

16                         * * * * *

17                      (End of Excerpt)

18                         * * * * *

19

20

21

22

23

24

25
```

1                    C E R T I F I C A T E

2

3          I certify that the foregoing is a correct

4   transcript from the record of proceedings in the

5   above-entitled matter.

6

7   December 7, 2021

8

9       s\  Amie R. First
    _____
    Amie R. First, RDR, CRR, CRC, CPE
10  Federal Official Court Reporter
    United States District Court
11  Middle District of Florida

12

13

14

15

16

17

18

19

20

21

22

23

24

25