1            UNITED STATES DISTRICT COURT
             MIDDLE DISTRICT OF FLORIDA
2                 ORLANDO DIVISION
              CASE NUMBER 6:20-cr-00089
3

. . . . . . . . . . . . . . . .
4  UNITED STATES OF AMERICA,      :
                                  :
5           Plaintiff,            :
                                  :        Orlando, Florida
6                v.               :        November 17, 2020
                                  :        3:06 p.m.
7  JAMES LAPIN,                   :
                                  :
8           Defendant.            :
. . . . . . . . . . . . . . . .
9

10      EXCERPT TRANSCRIPT OF JURY TRIAL, VOLUME I
               DEFENSE OPENING STATEMENT
11          TESTIMONY OF ELIZABETH BELTRAN,
          JENNIFER DALMIDA, STACY FLEURISSAINT
12      BEFORE THE HONORABLE ROY B. DALTON, JR.
               UNITED STATES DISTRICT JUDGE
13

14  APPEARANCES:

15

16  Counsel for Government:      Amanda Sterling Daniels
                                 Chauncey A. Bratt
17

18  Counsel for Defendant:       Michael Shay Ryan
                                 Nicole Mouakar
19

20

21  Court Reporter:     Amie R. First, RDR, CRR, CRC, CPE
                        Federal Official Court Reporter
22                      401 West Central Boulevard, Suite 4600
                        Orlando, Florida  32801
23                      AmieFirst.CourtReporter@gmail.com

24  Proceedings recorded by Realtime Stenography.

25  Transcript produced by Computer-Aided Transcription.

**INDEX OF PROCEEDINGS**

Opening Statement by the Defense ...............    2

Rule of Sequestration .........................   52

**EXHIBITS**

|                              | ADMITTED |
| ---------------------------- | -------- |
| Government's Exhibits 1-10   | 8        |
| Government's Exhibits 14-15  | 9        |
| Defendant's Exhibit 6        | 26       |
| Defendant's Exhibit 5        | 26       |
| Government's Exhibit 11A     | 34       |
| Government's Exhibit 12      | 46       |

**GOVERNMENT WITNESSES**

|                     | DIRECT | CROSS | REDIRECT | RECROSS |
| ------------------- | ------ | ----- | -------- | ------- |
| Elizabeth Beltran   | 10     | 18    | 22       |         |
| Jennifer Dalmida    | 32     | 41    |          |         |
| Stacy Fleurissaint  | 44     | 50    |          |         |

**DEFENDANT WITNESSES**

|                     | DIRECT | CROSS | REDIRECT | RECROSS |
| ------------------- | ------ | ----- | -------- | ------- |
| Elizabeth Beltran   | 23     | 29    |          |         |

```
 1                    P R O C E E D I N G S

 2                  (Beginning of excerpt)

 3                         * * * * *

 4           OPENING STATEMENT BY THE DEFENSE

 5           MR. RYAN:  Good afternoon, everyone.

 6           Let me just get a little organized.

 7           This case is a lot about words and what they mean.

 8   And the prosecutor is right.  You need to listen to the

 9   voice mails -- I shouldn't say need.  Please listen to the

10   voice mails with an open mind and an open heart and ask

11   yourself who is Mr. Lapin talking about?  Who is he talking

12   about?  And what is he talking about?

13           So we heard Ms. -- the prosecutor read to you

14   verbatim the December 20th, 2019, voice mail that is

15   the subject matter of the Indictment.  That's the email --

16   the voice mail that the Government accuses Mr. Lapin of a

17   crime for.  For words.

18           And this is what he said:

19           We're coming for you, cunt.  We are coming for you

20   and your bullshit mother fucking ass, bitch.  You better

21   have a bulletproof vest on because, bitch, we're coming for

22   you.  How fucking dare you impeach our president and then

23   go on fucking winter vacation.

24           There's more of the same.

25           And he says, again:  We're coming for you.  We're
```

 1    going to fucking hang your dentures above the Capitol.

 2         He's talking about Nancy Pelosi.

 3         Now, who is the "we" he's talking about?  Because

 4    guess what?  There is no evidence in this case that he and

 5    a cohort, a group, a gang, were planning some action

 6    against Nancy Pelosi, even to scare her.  There's no

 7    testimony.  You'll hear nothing like that.

 8         Now, you have to ask yourself, too, when you're

 9    looking at these words, what did they -- what did they

10    mean?

11         He's speaking in metaphor and idiomatic

12    expressions as a natural part of our daily communications

13    with everybody.  Did he really insinuate that they were

14    going to be hanging dentures above the Capitol?  Who knows

15    if Nancy Pelosi even wears dentures.

16         So who are the "we" that we're talking about?

17    Who's this we?

18         Well, on December 19th -- by the way, he does

19    leave five messages, two in December:  December 19th

20    and December 20th.

21         The Judge is going to tell you that on

22    December 18th, 2019, the United States House of

23    Representatives voted to impeach Donald J. Trump.  You're

24    going to learn during this trial that Mr. Lapin is a huge

25    supporter of Donald J. Trump.  He believes in Donald J.

1    Trump.  And these messages are metaphors about politics.

2         So contrary to what the prosecutor is telling you,

3    this is about politics.  These are metaphors about

4    politics.  And other actions taken by the government and

5    other things that you're going to learn about Mr. Lapin

6    will show you that that's exactly what's going on here.

7         Now, on December 19th, he called the day after

8    the impeachment and said, So when do we try Nancy Pelosi

9    for treason and hang her for treason against the people of

10   our country?  She forgot she works for us, right?  She

11   works for the American people.  Right?  Not her son working

12   over in Ukraine for Joe Biden's son.  No.  That couldn't be

13   why she tried to impeach our president.  That bitch is a

14   traitor and so is the entire DNC.  It's time to abolish the

15   DNC.  Pulse Nightclub survivors for Trump 2020.

16        We.  Us.  Our.  We're coming for you.  He's not

17   talking about himself.  He never says I.  He never says I'm

18   coming for you.  He says we are.  We the people.  We the

19   electorate.  We the body politic is talking about Nancy

20   Pelosi's political career, not her physical well-being.

21   He's using metaphor to protest what he considers to be the

22   unrighteous impeachment of the President of the United

23   States.

24        Now, I grant you, this is not the way you should

25   protest.  It's not polite.  Somewhat harassing.  But a

1   federal crime?

2          There are other messages I guess we will hear that

3   go along the same -- that go along the same lines.  But

4   those two tell you who the "we" are and the "what."  We are

5   the people, or the supporters of Donald Trump or the

6   Republican Party or the body politic or the cultural

7   response to you, the impeachers of the president.  It's a

8   political rant.  Not a threat.

9          The other thing you're going to learn is that

10  Mr. Lapin suffers from some mental health issues.  He's

11  bipolar.  You're going to learn that he is bipolar, that he

12  suffers narcissism and also general anxiety disorder.

13         You'll hear from a forensic and clinical

14  psychologist that he was likely in a manic phase during the

15  calls because he wouldn't probably normally talk to people

16  like that face to face.  That's not how he behaves face to

17  face.

18         But with the distance of a telephone and leaving a

19  voice mail and being excited about the current politics of

20  the day and supporting very strongly one version of that,

21  those politics, led him to say extreme hyperbolic things

22  over a phone that he probably wouldn't otherwise say.

23         Now, you may think I'm just the defense attorney

24  spinning, but I'm not.  Because the way the Government

25  reacted also was evidence that they understood this not to

1   be a true threat.

2          He left those messages, the December 20th one,

3   that's the offensive one, the criminal one according to the

4   Government, on December 20th.  Nancy Pelosi's office

5   doesn't even bother to report it until February 24th,

6   two months later.

7          Now, grant you, in the interim there were a

8   couple of other calls.  But if a threat comes in on

9   December 20th that's a true threat, one would think one

10  would react as if it were a true threat.  But they didn't.

11         And then when Agent Anyaso gets the case, he

12  doesn't bother reaching out to Mr. Lapin.  They get the

13  phone number as soon as it's called in.  It's called in, by

14  the way -- I hope we will get to understand how it's left.

15  It's left as a voice mail.  So they have the number right

16  then and there.  They know the phone number that left the

17  voice mail.

18         So as soon as it was reported to Agent Anyaso's

19  office -- sorry, I'm getting tongue tied on his name --

20  they have the phone number.  And it takes them, you know, a

21  week or two to get the information from telephone companies

22  to figure out who the phone belongs to, but they have the

23  phone number.

24         They have the phone number and get the information

25  about who the phone belongs to or who they believe the

1   phone belongs to fairly early on in this process.  But it's

2   not until May 18th that he bothers to reach out and ask

3   him about it.

4           So they told you there were ten calls.  I'm not

5   sure there were ten.  I don't recall.  But there are two

6   other calls.  There's three calls in January; two, by the

7   way, on the 16th.

8           So they're making it sound like he's calling her

9   all the time, you know, December 19th and the 20th;

10  two on the 16th; one on January 11th.  They're all

11  very short.  Those are the voice mails.  You may hear that

12  he also called on February 5th.

13          You know what happened on February 5th?  That

14  was the day that the Senate acquitted Donald Trump and said

15  you're not guilty of impeachable offenses.  But he didn't

16  leave any voice mails.  So he exercised discretion then.

17          So it takes Agent Anyaso four months later to

18  reach out to call Mr. Lapin.  These are not actions taken

19  by people who believe that there's a true threat going on

20  here and anything -- that a true threat is going on.

21          So at the end of this case, I will be asking you

22  to enter the only verdict that corresponds to the evidence,

23  which is that he's not guilty.

24          Thank you.

25          THE COURT:  Thank you, Mr. Ryan.

1          Ms. Daniels, the Government can call its first

2    witness.

3          MS. DANIELS:  Your Honor, there are a number of

4    exhibits that have been stipulated to.  May I enter those

5    in evidence?

6          THE COURT:  Yes.

7          MS. DANIELS:  Your Honor, at this time the

8    Government would like to move Exhibits 1 through 10 and

9    Exhibits 14 and 15 into evidence, please.

10          THE COURT:  All right.  1 through 10, 14 and 15, I

11    have those as the joint trial exhibits.

12          Is that correct?

13          MS. DANIELS:  Yes, Your Honor.

14          THE COURT:  All right.  And do you acknowledge

15    that those are joint exhibits that can come in without any

16    further discussion, Mr. Ryan?

17          MR. RYAN:  Yes.  I believe so, yes.

18          THE COURT:  All right.  Government's 1 through 10,

19    14 and 15 will be received without objection.

20          (Government's Exhibits 1-10 were received

21           in evidence.)

22          (Government's Exhibits 14-15 were received

23           in evidence.)

24          THE COURT:  So, ladies and gentlemen, the lawyers

25    work cooperatively before we get underway to look at each

1    other's exhibits and reach agreements with respect to some

2    that can come in without the necessity of having a witness

3    testify about them or identify them or lay any further

4    foundation for them.  So you shouldn't think there's

5    anything unusual about that.

6         These exhibits are in that category, and I'm going

7    to admit them without any further testimony about them; but

8    they may be referenced by some of the witnesses or by the

9    lawyers during the course of the proceeding.

10        There may be some others as we go along.  I think

11   there might also be some factual stipulations or things

12   that I've taken judicial notice of that are saleable facts

13   that need not actually be proven up by a particular

14   witness.  We'll cross that bridge when we come to it,

15   depending on when the lawyers ask me to do it.

16        MS. DANIELS:  Thank you, Your Honor.

17        The Government calls Elizabeth Beltran.

18        THE COURT:  Thank you.

19        THE DEPUTY CLERK:  Ms. Beltran, please come

20   forward to be sworn.

21        Please raise your right hand.

22        Do you solemnly swear or affirm under penalty of

23   perjury that all the testimony you will give will be the

24   truth, the whole truth, and nothing but the truth?

25        THE WITNESS:  I do.

```
1              (Witness sworn.)

2              THE DEPUTY CLERK:  Have a seat in the witness box

3    over here to my left.

4              And you can adjust the microphone so that the

5    court reporter can hear you.

6              Once you're settled in, please state your name,

7    state and spell your name for the court reporter, please.

8              THE COURT:  Once you get settled in, you can

9    remove your mask if you're comfortable removing it.  If

10   you're not comfortable, you're welcome to leave it on.  But

11   you do have a screen there in front of you so --

12             THE WITNESS:  I'd prefer to leave it on.

13             THE COURT:  Okay.
```

## DIRECT EXAMINATION

```
15   BY MS. DANIELS:

16   Q    Good afternoon, Ms. Beltran.

17        Can you please tell the jury what you do for work?

18   A    I manage the front desk.  I answer the phones.

19        I screen voice mails, and I do administrative tasks.

20   Q    And who do you work for?

21   A    For Speaker Nancy Pelosi.

22   Q    And what's Ms. Pelosi's official title?

23   A    Congresswoman Pelosi, California's 12th District and

24   Speaker of the House, of the United States House of

25   Representatives.
```

1   Q    Okay.  So what is your title, your job title at this
2   position?
3   A    Staff assistant.
4   Q    And you described some of your duties.  Can you
5   describe them one more time?
6   A    Sure.  I answer the phones.  I screen voice mails, and
7   I manage the office's front desk.
8   Q    How long have you had this job?
9   A    Almost two years.
10  Q    Where is your office located?
11  A    In Washington, D.C.
12  Q    Do you know if the representative has an office in any
13  location outside of Washington, D.C.?
14  A    Yes.  She has the district office in San Francisco,
15  California.
16  Q    Do you check the voice mails for the district office
17  in San Francisco?
18  A    No, just the D.C. office.
19  Q    If someone wants to leave a voice mail for the
20  representative, how do they do that?
21  A    They call our phone number on the home screen of our
22  website, and they are prompted with a phone menu and they
23  can choose one of the options.
24  Q    What number would they call to reach the Speaker --
25  what is one of the numbers they would call to reach the

1    Speaker's office in D.C.?

2    A    202-225-4965.

3    Q    When someone leaves a voice mail, how do you get it?

4    A    So the voice mails are connected to an email account

5    inbox.  So we receive the audio clip and the transcription

6    in the inbox.

7    Q    Are you able to see the phone number that left a voice

8    mail?

9    A    Yes.

10   Q    Did you check the voice mails from December 20th,

11   2019?

12   A    Yes.

13   Q    Did you review a transcript for this voice mail?

14   A    Yes.

15   Q    Were you able to see what number left this voice mail?

16   A    Yes.

17        MS. DANIELS:  Your Honor, at this -- I'd request

18   permission to publish Government's Exhibits 1 and 2 that

19   have previously been admitted.

20        THE COURT:  Yes.  It's already in evidence.  You

21   may publish.

22        MS. DANIELS:  Ms. Valente, could you please

23   publish that for the jury.

24        THE COURT:  Clear the screen for me, please.

25        (Playing audio exhibit.)

```
 1              MS. DANIELS:  Thank you, Ms. Valente.
 2    BY MS. DANIELS:
 3    Q    What did you do -- and is this an accurate copy of the
 4    recording you heard?
 5    A    Yes.
 6    Q    And the transcript you reviewed?
 7    A    Yes.
 8    Q    What did you do after hearing this voice mail?
 9    A    I forwarded the message to Capitol Police's threat
10    assessment division.
11    Q    Now, do you forward every voice mail, every call the
12    Speaker gets to the U.S. Capitol Police?
13    A    No, just the ones that have threats in them.
14    Q    And approximately how many calls total do you review?
15    A    About 5,000 to 8,000 a week.
16    Q    Why did you forward this voice mail?
17    A    The caller mentioned that the Speaker should be
18    wearing a bulletproof vest, that we're coming for you, and
19    that she was F-word dead.
20    Q    What did you perceive those words to be?
21    A    A threat.
22    Q    Did you find any additional voice mails from this
23    caller?
24    A    Yes.  I found four additional voice mails.
25    Q    So how many voice mails total?
```

```
1    A     Five.

2    Q     Do you know approximately when these voice mails were

3    left?

4    A     In December and January.

5    Q     Do you recall what, if anything, was going on at the

6    House of Representatives at this time?

7    A     The House was going through the impeachment process at

8    that time.

9    Q     Have you listened to the other voice mails?

10   A     Yes.

11   Q     Did you listen to the voice mail from

12   December 19th, 2019?

13   A     Yes.

14   Q     Did you also review a transcript of that voice mail?

15   A     Yes.

16         MS. DANIELS:  Your Honor, at this time I would

17   like to request permission to publish Exhibits 3 and 4,

18   which were previously admitted.

19         THE COURT:  Yes, ma'am.  You may publish 3 and 4

20   previously admitted.

21         MS. DANIELS:  Thank you, Your Honor.

22         Ms. Valente, could you please publish those for

23   the jury.

24         (Playing audio exhibit.)

25   BY MS. DANIELS:
```

1    Q    Is this the voice mail you heard?

2    A    Yes.

3    Q    Is this the transcript you reviewed?

4    A    Yes.

5    Q    Did you also listen to a voice mail from

6    January 11th, 2020?

7    A    Yes.

8    Q    Did you review a transcript of that voice mail?

9    A    Yes.

10        MS. DANIELS:  Your Honor, may I have permission to

11   publish Exhibits 5 and 6, which were previously admitted?

12        THE COURT:  Yes.  You may proceed.

13        MS. DANIELS:  Thank you.

14        Ms. Valente, would you please publish those for

15   the jury.

16        (Playing audio exhibit.)

17   BY MS. DANIELS:

18   Q    Is this the voice mail you heard?

19   A    Yes.

20   Q    Is this the transcript of the voice mail you read?

21   A    Yes.

22   Q    Did you also listen to the voice mail from

23   January 16th, 2020, at around 11:04?

24   A    Yes.

25   Q    Did you review a transcript of this voice mail?

```
 1   A    Yes.

 2          MS. DANIELS:  Your Honor, may I have permission to

 3   publish Exhibit 7 and 8 which have previously been

 4   admitted.

 5          THE COURT:  Yes.  You may proceed.

 6          MS. DANIELS:  Ms. Valente, could you please

 7   publish that for the jury.

 8          (Playing audio exhibit.)

 9   BY MS. DANIELS:

10   Q    Is that the voice mail you heard?

11   A    Yes.

12   Q    Is that the transcript you read?

13   A    Yes.

14   Q    Did you listen to a voice mail from January 16th,

15   2020, at 11:05?

16   A    Yes.

17   Q    Did you also review a transcript of this voice mail?

18   A    Yes.

19          MS. DANIELS:  Ms. Valente, could you please

20   publish Exhibits 9 and 10.

21          Your Honor, I apologize.  May I have permission to

22   publish Exhibits 9 and 10?

23          THE COURT:  You may.

24          MS. DANIELS:  Thank you.

25          (Playing audio exhibit.)
```

```
 1   BY MS. DANIELS:

 2   Q     Is that the voice mail you heard?

 3   A     Yes.

 4   Q     Is that the transcript you read?

 5   A     Yes.

 6   Q     Could you explain why you collected the other voice

 7   mails after hearing the voice mail from December 20th,

 8   2019?

 9   A     So after we find one threatening voice mail from a

10   caller, we run a search on the phone number in our voice

11   mail system and we attach all other messages that that

12   caller might have left.

13   Q     Do you recall a specific statement in the

14   December 20th call that made you forward this to the

15   Capitol Police?

16   A     Yes.  He said that the Speaker should be wearing a

17   bulletproof vest, we're coming for you, and that she was

18   F-word dead.

19          MS. DANIELS:  Your Honor, may I have a second to

20   confer with co-counsel?

21          THE COURT:  You may.

22   BY MS. DANIELS:

23   Q     Ms. Beltran, around what time did you forward this

24   voice mail to the U.S. Capitol Police?  Around what month?

25   A     In February 2020.
```

```
1   Q    When did you hear this voice mail, the December 20th
2   voice mail for the first time?
3   A    In February.
4   Q    And how long did you wait to forward it to the Capitol
5   Police?
6   A    I mean, it came in December so maybe two months after.
7   Q    But when did you hear it?
8   A    I heard it in February.
9            MS. DANIELS:  No other questions at this time,
10  Your Honor.
11           THE COURT:  Thank you.
12           Ms. Daniels, if you would wipe that area down and
13  swap out that cover for me, please.  And just remove your
14  cover, and I'll let Mr. Ryan put his own on.
15           Okay.  Cross-examination, Mr. Ryan.
16           MR. RYAN:  Thank you, Your Honor.
17                     CROSS EXAMINATION
18  BY MR. RYAN:
19  Q    Good afternoon.  My name is Michael Ryan.  I'm
20  Mr. Lapin's attorney.
21       This is the rest of the people in our -- working for
22  Mr. Lapin.
23       How are you?
24  A    Good.  How are you?
25  Q    Good.
```

1        So I just want to ask you a few questions.

2        I'm kind of curious how come it takes so long for you

3   to review the voice mails?

4   A    As I mentioned to Ms. Daniels, we receive about 5,000

5   to 8,000 calls a week.  So you can imagine that that's a

6   lot of calls to get through.  And so I didn't -- it took me

7   a while to get to the calls that were made in December and

8   January.

9   Q    So you listen to 5- to 8,000 voice mails a week?

10  A    A week.

11  Q    So was that -- how much of that is your job?

12  What percentage of your job is devoted to listening to

13  voice mails?

14  A    I don't know about an exact percentage, but that is

15  one of my main, like, tasks that I do in my job.

16  Q    More than half the time?

17       Just a ballpark figure.  I'm not asking for anything

18  exact.

19       Do you have an idea?

20  A    75 percent, 50 percent.  I mean, a big chunk.

21  Q    Okay.  So pretty much daily you're going into the

22  office and you're listening to voice mails?

23  A    I listen to them daily, that's correct.

24  Q    And how many -- how often do you end up reporting

25  calls to the threat assessment bureau?  Every week?  Every

1   month?

2   A     I'd say there's a threat at least once a day so --

3   Q     At least once a day.

4         And how were you trained to evaluate the voice mails

5   for threats?

6         Or were you trained?  Let me start off with that.  I'm

7   sorry.

8         Were you trained in something to evaluate the voice

9   mails to determine threat content?

10  A     I was trained to screen voice mails according to

11  Capitol Police.  And I look for key words when I'm

12  screening those voice mails.

13  Q     So you were trained to listen for key words; is that

14  correct?

15  A     Anything that is a threat against the Speaker or her

16  family or staff.

17  Q     Right.  I understand that.

18        I'm just curious as to how you were trained to

19  evaluate the voice mails for threat content.  Were you

20  given a class?  Were you just given a sheet of words?  How

21  did you -- or they just told you to go by your own lights?

22  What did they -- how does that work?

23  A     I was trained by my colleague on how to evaluate

24  threats for the voice mails and then send them to Capitol

25  Police per our office's protocol.

1    Q    So daily your routine is sending, forwarding voice

2    mails to the threat assessment section?

3    A    Yes.

4    Q    Is there anybody else in the office who has any access

5    to the voice mail?

6    A    Can you specify what you mean by voice mail?  Just

7    message or --

8    Q    You listen to the voice mails, the 5- to 8,000 that

9    come in a week.  I'm talking about that body of voice

10   mails.

11        Are you the only one that reviews them?  Or can

12   anybody in the office review them?  Does anybody else have

13   access to that body of voice mails?

14   A    My colleague who has the same title as me.

15   Q    And she's doing the same thing you're doing?

16   A    It's a he; but yeah, he's doing the same thing.

17   Q    Sorry.  I stand corrected.  Thank you.

18        So he -- so there's two of you reviewing a lot of

19   voice mails on a daily basis?

20   A    Yes, us two.

21   Q    So he probably -- is he also -- well, I guess you

22   don't know.  Or maybe you do.

23        Do you know how often he is referring voice mails to

24   the Capitol Hill Police?

25   A    I don't know.  I can't speak on his behalf.

1        MR. RYAN:  May I have one moment?

2        THE COURT:  Yes, you may.

3        MR. RYAN:  Thank you, Your Honor.

4        I have nothing further.

5        THE COURT:  Thank you, Mr. Ryan.

6        Would you wipe that area down on your way out.

7        Ms. Daniels, are you going to have any redirect?

8        MS. DANIELS:  Very briefly, Your Honor.

9        THE COURT:  Okay.  Just stand by for a minute.

10        All right.  You may inquire.

11        MS. DANIELS:  Thank you, Your Honor.

12                    **REDIRECT EXAMINATION**

13  BY MS. DANIELS:

14  Q    Ms. Beltran, when you get a threat, after you forward

15  it to the U.S. Capitol Police, do you have any further

16  involvement with it?

17  A    No.

18        MS. DANIELS:  I don't have any other questions at

19  this time.

20        THE COURT:  Thank you.

21        May this witness be excused?

22        MS. DANIELS:  Your Honor, this witness, I don't

23  have any further matters for this witness.

24        THE COURT:  Okay.  Mr. Ryan, may she be excused?

25        MR. RYAN:  Actually, Judge, I meant to ask her

```
 1    something else.  I have her under subpoena as well.  May I

 2    ask her now?  I meant to ask her something else.

 3              THE COURT:  All right.  You can proceed.

 4              MR. RYAN:  Thank you.

 5              Sorry about that.
```

**DIRECT EXAMINATION**

```
 7    BY MR. RYAN:

 8    Q    When the calls come in, you noted that there's an

 9    outgoing recording that gives you options.

10    A    I'm sorry.  Can you repeat the question?

11    Q    Yeah.  I didn't ask that very well.

12         So when you call the Speaker's office in Washington,

13    D.C., this is a public line, correct?

14    A    Yes.

15    Q    The line that Mr. Lapin called is not a private line?

16    A    No.  It's public.

17    Q    He didn't access any back line?

18    A    No.  It's a public line.

19    Q    Okay.  And where can you get this, the information for

20    this line?

21    A    You go to Pelosi.house.gov which is the

22    congresswoman's website, the home page.  The home page,

23    that's it.

24    Q    Okay.  But there are lines that are semiprivate lines

25    or back lines that, you know, that you can call to get into
```

```
 1   the office, is there not?

 2   A    I don't know.

 3   Q    Oh, you don't know.  Okay.

 4        So when you call this general number, what happens?

 5   A    You're prompted with a phone menu that has four

 6   options.

 7   Q    What are those four options?

 8   A    So option one is to leave a message for the Speaker;

 9   option two is to find out how to email the Speaker; three

10   is for finding out her policy positions; and four is if you

11   have official business with the office you get a live

12   person.

13   Q    I sort of have it right.

14        May I show you Defense Exhibit Number 6.

15        Do you have it there?

16   A    Number 6?

17   Q    Yes.

18   A    There's a CD on here.

19   Q    Number six.  Tab number six.

20   A    Okay.

21   Q    Do you see that now?

22   A    (Nods head.)

23        Yes.

24   Q    It's a short paragraph.  Would you take a moment to

25   read it.
```

```
 1   A     (Complying.)

 2         Yeah, so there is an option for English and for

 3   Spanish.

 4   Q     And you read the whole paragraph?

 5   A     Yes.

 6   Q     Is this an accurate transcript of the outgoing voice

 7   menu that callers receive when they call Speaker Pelosi's

 8   office?

 9   A     Yes.

10             MR. RYAN:  May we admit Number 6, Your Honor?

11             THE COURT:  Does the Government have any objection

12   to this coming in out of order?

13             MS. DANIELS:  No, Your Honor.

14             THE COURT:  All right.  Then defense -- well, let

15   me ask you this.  Now, do you have any substantive

16   objection to it other than the chronology?

17             MS. DANIELS:  No, Your Honor.

18             THE COURT:  All right.  Defense 6 will be admitted

19   without objection.

20             (Defendant's Exhibit 6 was received

21              in evidence.

22             MR. RYAN:  Now, when the -- we have an audio of

23   the same thing, Your Honor, at Defense Exhibit 5.  I would

24   like to play for the jury if there's no objection.

25             THE COURT:  Again, this is in the middle of the
```

```
 1   Government's case in chief.

 2          So, Ms. Daniels, I guess we're doing this to

 3   Mr. Ryan as a courtesy to the witness, which I have no

 4   problem with.  I just want to make sure the Government

 5   doesn't have a problem with it.

 6          MS. DANIELS:  Thank you, Your Honor.  That's fine.

 7          THE COURT:  All right.  So Defense 5 will be

 8   admitted without objection.

 9          You may publish.

10          (Defendant's Exhibit 5 was received

11           in evidence.)

12   BY MR. RYAN:

13   Q    So this is what people hear when they call the

14   Speaker's office, correct?

15        What we're about to hear.  I guess I have to ask that.

16   Sorry.

17        Forget it.  We won't play it.

18        So let me just go over this with you a little bit.

19        So when you call, after asking about English and

20   Spanish, it says if you would like to voice your opinion,

21   share feedback, or pass along a personal story to

22   Speaker Pelosi, please press one.

23        Is that correct?

24   A    Yes.

25   Q    If you would like to find out how to email the
```

```
 1   Speaker, please press two.
 2        Correct?
 3   A    Yes.
 4   Q    And if you have any questions about -- I'm sorry.
 5        If you have any questions about Speaker Pelosi's
 6   policy positions, please press three.
 7   A    Yes.
 8   Q    And if you are not leaving a message for the Speaker,
 9   for Speaker Pelosi, and have business with the office,
10   please press four.
11        Is that right?
12   A    Yes.
13   Q    And it says to repeat this menu, please press zero.
14   Thank you for calling.
15   A    Yes.
16   Q    Okay.  So do we know when Mr. Lapin or anyone else
17   calls which of the voice message buttons they pushed?
18   A    No.  He would have needed to press one to leave a
19   message.
20   Q    Well, but you can leave a message by pressing one,
21   two, or three -- I mean, by pressing one or three, correct?
22   A    You can only leave a message if he presses option one.
23   Q    Okay.  So that's the only voice mail option.  The rest
24   are all to actually contact someone within the office?
25   A    That's not what I said.
```

1    Q    Okay.  That's what I'm asking.

2    A    If he wants to leave a voice mail for the Speaker, he

3    needs to press option one.

4    Q    Okay.  What happens if you press two?  You hear --

5    okay.

6         You hear a voice mail about Speaker Pelosi's email.

7    And if you have questions, that is also an attempt to reach

8    a staffer, number three?

9    A    Are you asking if you would like to find out how to

10   email Speaker Pelosi, please press two; or are you asking

11   about number three which is --

12   Q    Yeah, I kind of skipped over number two.

13        I'm asking if when you press number three, are you

14   also leaving a voice mail, or is that an attempt to reach a

15   staff member?

16   A    If you press three, you're directed to her resources

17   where you can find her policy positions.

18   Q    I see.  And if you press number four, is that an

19   attempt to reach an actual staff member on the phone?

20   A    If you press number four, you get somebody that's

21   answering the phones at the front desk.

22   Q    Okay.  So based on the fact that he left a voice mail,

23   your understanding is he pressed number one?

24   A    Yes.

25   Q    And number one is the opportunity to leave an opinion

1   or feedback, among other choices, correct?

2   A    Yes.

3            MR. RYAN:  That's all.

4            Thank you, Your Honor.  Thank you for letting me

5   go.

6            THE COURT:  Do you have cross-examination of the

7   defense direct exam on this additional area of inquiry?

8            MS. DANIELS:  May I just have one moment,

9   Your Honor?

10           THE COURT:  Yes.

11           You may proceed.

12                    **CROSS EXAMINATION**

13   BY MS. DANIELS:

14   Q    Ms. Beltran, in this outgoing message, does it say

15   that you are leaving a message for Speaker of the House

16   Nancy Pelosi?

17   A    Can you repeat that?

18   Q    So in the outgoing message, does it make clear that

19   you're calling Speaker of the House Nancy Pelosi?

20   A    Yes.

21   Q    Okay.  When it says if you would like to voice your

22   opinion, share feedback, or pass along a personal story, is

23   that inviting a threat?

24   A    No.

25           MS. DANIELS:  No other questions, Your Honor.

```
 1              THE COURT:  Okay.  Any redirect, Mr. Ryan?

 2              MR. RYAN:  No, Your Honor.  Thank you.

 3              THE COURT:  Now may this witness be excused?

 4              MR. RYAN:  Yes, Your Honor.  Thank you.

 5              MS. DANIELS:  Yes, Your Honor.  Thank you.

 6              THE COURT:  All right.  Thank you, Ms. Beltran.

 7              If you're here under subpoena from either side,

 8      you are released from those subpoenas.  You can go on about

 9      your business.

10              THE WITNESS:  Thank you.

11              THE COURT:  So, ladies and gentlemen, just by way

12      of brief explanation, in order to accommodate the witness

13      and not require her to travel again to be called back as a

14      witness, as a defense witness in their case, I permitted

15      her to be examined by both, both in the Government's case

16      and in the defense case.

17              It doesn't make any difference to you, but it's a

18      little different than how I explained to you the process

19      would proceed.  I just wanted you to understand why it

20      happened that way.

21              Thank you, ma'am.  You can step down.

22              When you go, would you take that cover off your

23      microphone and deposit it in the trash can.

24              And maybe take a wipe before you go and just wipe

25      your area down.
```

```
 1              Thank you, Ms. Beltran.  You can head out the
 2   back.
 3              Call your next witness.
 4              MS. DANIELS:  Your Honor, the Government would
 5   call Jennifer Dalmida.
 6              THE DEPUTY CLERK:  Ms. Dalmida, please come
 7   forward to be sworn.
 8              Please raise your right hand.
 9              Do you solemnly swear or affirm under penalty of
10   perjury the testimony you will give will be the truth, the
11   whole truth, and nothing but the truth?
12              THE WITNESS:  Yes.
13              (Witness sworn.)
14              THE DEPUTY CLERK:  Please have a seat in the
15   witness box to my left.
16              And you can adjust the microphone so that the
17   court reporter can hear you.
18              Once you're settled, please state and spell your
19   name for the record.
20              THE COURT:  Ms. Dalmida, I'll also give you an
21   option.  You have a screen there in front of you.  If
22   you're comfortable taking your mask off, you may do that.
23   If you're uncomfortable, you may leave that on as well.
24   You certainly may take it off if it's more comfortable for
25   you.
```

```
1              THE WITNESS:  Okay.
```

**DIRECT EXAMINATION**

```
3    BY MS. DANIELS:
4    Q    Good afternoon, Ms. Dalmida.
5    A    Good afternoon.
6    Q    Could you please tell the jury where you work?
7    A    Verizon Wireless.
8    Q    What is Verizon Wireless?
9    A    We're a telecommunications company.
10   Q    How long have you worked there?
11   A    A little over 13 years.
12   Q    What is your position at Verizon?
13   A    I'm a senior analyst who's a custodian of records.
14   Q    Does Verizon maintain records related to its
15   customers?
16   A    Yes.
17   Q    Are the entries on those records made at or near the
18   time that the records were created?
19   A    Yes.
20   Q    Does Verizon maintain these records in the course of
21   their normal business?
22   A    Yes.
23   Q    Did Verizon receive a request for records related to
24   James Lapin?
25   A    Yes.
```

1   Q    Did Verizon produce these records?

2   A    Yes.

3         MS. DANIELS:  Your Honor, permission to approach

4   the witness.

5         THE COURT:  Yes.

6   BY MS. DANIELS:

7   Q    Ms. Dalmida, I've handed you what's been marked as

8   Government's Exhibit for identification 11A.

9         What is that disk?

10  A    This is a copy of the records which we produced.

11  Q    How do you recognize that?

12  A    I had an opportunity to review the disk, and I

13  initialed and dated it.

14  Q    Does it contain a digital copy of the records Verizon

15  produced?

16  A    Yes.

17        MS. DANIELS:  Your Honor, at this time the

18  Government would move Government's Exhibit 11A for

19  identification into evidence.

20        THE COURT:  Any objection?

21        MR. RYAN:  No.

22        THE COURT:  11A will be received without

23  objection.

24        You may publish.

25

```
 1              (Government's Exhibit 11A was received

 2               in evidence.)

 3          MS. DANIELS:  Thank you, Your Honor.

 4   BY MS. DANIELS:

 5   Q    Now, before you publish, Ms. Dalmida, what types of

 6   information are contained on these records?

 7   A    Those records have a copy of our VoLTE report, it has

 8   a copy of our sales site key, and subscriber information.

 9   Q    Ms. Dalmida, I'd like to direct your attention to the

10   spreadsheet labeled VoLTE report.

11          MS. DANIELS:  Ms. Valente, could you please

12   publish that, 11A.

13   BY MS. DANIELS:

14   Q    Ms. Dalmida, can you please explain what information

15   is included in this spreadsheet.

16   A    This is a copy of a VoLTE report which has incoming

17   and outgoing calls.  This spreadsheet would indicate the

18   time that the call was placed, the cell tower in which the

19   call initiated on, the number that was either being called

20   or that made the call, and the length of the call.

21   Q    On this record, column A says record opened, date and

22   time.

23          What information is listed under that call-in?

24   A    This would be the date and time for which the call

25   occurred.
```

1  Q     And in column G, that column is titled market.

2        What information is listed in that column?

3  A     This would be the switch number for which the call was

4  either placed or received.

5  Q     And in column H, that column is listed as eNB-ID.

6        What is that?

7  A     This is the cell tower number for which process the

8  call.

9  Q     Okay.  And what do you mean by that, "process the

10 call"?

11 A     In order for a call to either be delivered to our

12 subscriber or to the recipient of our subscribers making an

13 outbound call, a cell tower has to be utilized.  So this is

14 the cell tower number that was utilized for that call.

15 Q     Column I lists direction, DIR.

16        What's in that column?

17 A     This would indicate the direction of the call.  So it

18 would have an MF for mobile forwarding, MT for mobile

19 terminated, or MO for mobile originated.

20 Q     And what does it mean if something is mobile

21 originated?

22 A     That means our subscriber placed the call.

23 Q     What does it mean if it's mobile forwarding?

24 A     That means the call was either forwarded to voice mail

25 or the network took an extra step to deliver the call.

1    Q     And what does it mean if it's mobile terminated?

2    A     Our subscriber received a call.

3    Q     Okay.  And in column J, that column is labeled MSISDN.

4          What information is in there?

5    A     This is the target telephone number for the records in

6    which we produced.

7    Q     Okay.  And in column K, it says "called" with the

8    number symbol.

9          What information is in there?

10   A     This is the number that our subscriber called in

11   outbound calls.

12   Q     And in column L, what is listed in the column labeled

13   CPN?

14   A     This would indicate who actually initiated the call in

15   terms of telephone number.

16   Q     And then column M, SOU is listed at the top.

17         What does that mean?

18   A     This would be the seconds of usage.  This would be the

19   length of the call in seconds.

20   Q     And in column P, that column is titled status.

21         What information is listed in that column?

22   A     It lets you know if the call was successful or if it

23   failed.

24   Q     I would now like to direct your attention to the

25   spreadsheet labeled Orlando LEA.

1        What information is contained in this spreadsheet?

2    A    On the spreadsheet, it would have the latitude and

3    longitude, as well as the physical address of our cell

4    towers.

5    Q    And what do the latitude and longitude coordinates in

6    this spreadsheet correspond to?

7    A    The location of the actual cell tower.

8    Q    And in column -- where it says street address, what

9    address is that?

10   A    That would be the physical address of the tower.

11   Q    Okay.  And in column Q -- column Q is labeled

12   e node B-ID.

13       What information is in that column?

14   A    This would be the cell tower number.

15   Q    And, again, when you say "cell tower," what are you

16   referring to?

17   A    The cell tower that was used to process the call.

18   Q    Now, can you please walk the jury through how you

19   might read these records to figure out where a call was

20   dialed from utilizing the VoLTE calls.

21       Row 780.

22       (Pause in proceedings.)

23   BY MS. DANIELS:

24   Q    Okay.  So how would you figure out where this call

25   originated from?

1    A    If we looked under column H, it would indicate the

2    cell tower number.  In this case, it was 145120.

3    Q    Okay.  And who -- in reading these records, who would

4    have placed that call?  Where do you see that information?

5    A    In the next column, column I, it says MO.

6         So it indicates it was mobile originated, which means

7    our subscriber placed the call to someone.

8    Q    And which phone number is the one that's originating

9    the call?

10   A    The phone number listed in column L, 140774678865.

11   Q    And where is the call being placed to?

12   A    It's being placed to 20222254965.

13   Q    And was that call successful?

14   A    Yes.

15   Q    And where do you see that?

16   A    Column P says success.

17   Q    Okay.  Now, you mentioned that in column H, the code

18   is 145120.

19   A    Correct.

20   Q    How would you figure out which cell tower that call

21   used?

22   A    We would have to go to the Excel spreadsheet titled

23   LEA and find 145120.

24        MS. DANIELS:  Ms. Valente, could you please search

25   column Q for 145120.

```
1              Could you please search column Q for 145120.
2   BY MS. DANIELS:
3   Q    Where would this call be coming from?
4   A    If you slide over to the left.
5        The tower that was used to initiate this call was
6   1051 Ocean Shore Boulevard.  And that is -- over to the
7   right, please.
8        In Ormond Beach, Florida, 32176.
9   Q    Thank you.
10       I would like to now direct your attention to the
11  spreadsheet, the VoLTE subscriber information.
12       Can you describe the information on this spreadsheet?
13  A    The subscriber information sheet will have the name
14  and who we have this account registered to as well as the
15  billing address and whether their account is a post-paid or
16  a prepaid.
17  Q    And on this, on this specifically, what is the name of
18  the account holder?
19  A    James Lapin.
20  Q    And what address is he at?
21  A    119 Ocean Terrace in Ormond Beach, Florida.
22  Q    And how do you know what type of account he has?
23  A    If we scroll all the way over to the right, under
24  column AD, it indicates post-pay, which means the
25  subscriber pays for service after they actually use it.
```

```
 1        And we verify their identity with the Social Security

 2   number and/or driver's license.

 3   Q    And who provides that information -- who provides the

 4   information on this spreadsheet?

 5   A    Who provides it?

 6   Q    Right.

 7   A    The consumer.

 8   Q    I'm sorry.  Who was it?

 9   A    The consumer.

10   Q    Are you able to see when this account was opened?

11   A    Yes.

12        Column AB indicates 8/5/2017.

13            MS. DANIELS:  Your Honor, may I just have a moment

14   to confer with counsel?

15            THE COURT:  Yes.

16            MS. DANIELS:  No more questions at this time,

17   Your Honor.

18            THE COURT:  All right.  Thank you.

19            Ms. Dalmida, I neglected to mention it to you, but

20   there's a little box there in front of you that's got some

21   little white microphone covers in it.  Right there.  Look

22   in there.  I think there should be some microphone covers

23   in that.

24            Could you do me a favor and put one on.

25            When you leave, if I forget -- I hope I won't --
```

```
 1    but when you leave, if you'll take that off and put it in

 2    the trash can on your way out.

 3             THE WITNESS:  Yes, sir.

 4             THE COURT:  I would appreciate it.

 5             All right.  Cross-examination?

 6             MR. RYAN:  Thank you, Your Honor.  Just briefly.

 7                       CROSS EXAMINATION

 8    BY MR. RYAN:

 9    Q    Good afternoon.

10    A    Good afternoon.

11    Q    When were these records ordered by the Government; do

12    you know?

13    A    I would have to look at the search warrant or the

14    subpoena.

15    Q    Do you have that?

16    A    I don't believe it's on those records there, no.

17    Q    So you don't know?

18    A    I don't know the date off the top of my head, no.

19    Q    Do you know which agent contacted you?

20    A    No, not to the top of -- not to the top of my head.

21    Q    Okay.  This is what you do like routinely at work,

22    correct?

23    A    Correct.

24    Q    So you'd have to have something in front of you to

25    remember exactly?
```

```
 1   A    Yeah.  We deal with a lot of different agencies,
 2   uh-huh.
 3            MR. RYAN:  Okay.  Thank you.
 4            Nothing further.
 5            THE COURT:  Any redirect?
 6            MS. DANIELS:  No, Your Honor.
 7            THE COURT:  May this witness be excused?
 8            MR. RYAN:  Yes, Your Honor.
 9            THE COURT:  All right.  Thank you, ma'am.
10            If you're here under subpoena, you're released
11   from it.  You can go on about your business.
12            Thank you.  I appreciate you wiping that down for
13   me.
14            And I know you just put that cover on, but if I
15   could -- put a fresh one on there for me before you go.  I
16   appreciate it.
17            Thank you very much.
18            Call your next witness.
19            MS. DANIELS:  Your Honor, may I retrieve the
20   exhibit from the stand?
21            THE COURT:  Yes.
22            MS. DANIELS:  Your Honor, the Government's next
23   witness is Stacy Fleurissaint.
24            THE DEPUTY CLERK:  Ms. Fleurissaint, please come
25   forward to be sworn.
```

1        And please raise your right hand.

2        Do you solemnly swear or affirm under penalty of

3   perjury that the testimony you will give will be the truth,

4   the whole truth, and nothing but the truth?

5        THE WITNESS:  Yes.

6        (Witness sworn.)

7        THE DEPUTY CLERK:  Please have a seat in the

8   witness box over here to my left.  You can adjust the

9   microphone so the court reporter can hear you.

10        Once you're settled, please state your name for

11   the court reporter.

12        THE WITNESS:  Stacy Fleurissaint.

13        THE COURT:  So, Ms. Fleurissaint, two things you

14   can do for me.  If you're comfortable removing your mask,

15   you can remove your mask so we can hear you a little more

16   clearly.

17        And would you spell your name for the court

18   reporter, please, ma'am.

19        THE WITNESS:  Yes.  First name is S-T-A-C-Y.  Last

20   name is F, Frank, L, Larry, E, Edward, U-R, Robert, I,

21   India, S, Sam, S, Sam, A, apple, I, India, N, Nancy, T,

22   Thomas.

23        THE COURT:  Thank you, ma'am.

24        You may inquire.

25        MS. DANIELS:  Thank you, Your Honor.

```
 1                    DIRECT EXAMINATION

 2    BY MS. DANIELS:

 3    Q     Good afternoon, Ms. Fleurissaint.

 4          Could you please tell the jury where you work.

 5    A     I work for the Florida Department of Highway Safety

 6    and Motor Vehicles.

 7    Q     What is the Florida Department of Highway Safety and

 8    Motor Vehicles?

 9    A     It's a state agency that regulates driver's licenses

10    and motor vehicles, registration.

11    Q     How long have you worked at the Florida Department of

12    Highway Safety and Motor Vehicles?

13    A     About six and a half years.

14    Q     What is your position at the Florida Department of

15    Highway Safety and Motor Vehicles?

16    A     I'm a liaison.

17    Q     And what are your duties in this capacity?

18    A     I'm one of the designees for the custodian of records.

19    Q     And what does that mean?

20    A     I come to court to testify on behalf of this date on

21    driver's license and motor vehicle records.

22    Q     Does the Florida Department of Highway Safety and

23    Motor Vehicles maintain records related to Florida drivers?

24    A     Yes.

25    Q     Are these records created at or near the time of a
```

1   record action?

2   A    Yes.

3   Q    Does the Florida Department of Highway Safety and

4   Motor Vehicles maintain these records in the normal course

5   of their business?

6   A    Yes.

7   Q    Did the Florida Department of Highway Safety and Motor

8   Vehicles receive a request for records related to James

9   Lapin?

10  A    Yes.

11  Q    Did the Florida Department of Highway Safety and Motor

12  Vehicles produce requested records?

13  A    Yes.

14          MS. DANIELS:  Your Honor, may I approach the

15  witness?

16          THE COURT:  You may.

17  BY MS. DANIELS:

18  Q    I would like to direct your attention to Government's

19  Exhibit marked for identification as Exhibit 12.

20       What are these?

21  A    This is the records request.

22  Q    Okay.  And what is -- I'm sorry.

23       You said records request.  Is that what the department

24  produced?

25  A    Yes.

1   Q    And how do you know that's what it is?

2   A    This is the business record certification, and then I

3   also recognize these data documents.

4   Q    And how do you recognize them?

5   A    It's part of my job.

6   Q    Okay.  And is it a fair and accurate copy of the

7   records you produced?

8   A    Yes.

9        MS. DANIELS:  Your Honor, at this time the

10  Government would like to move Exhibit 12 into evidence.

11       THE COURT:  Any objection?

12       MR. RYAN:  No.

13       THE COURT:  Government's 12 will be received

14  without objection.

15       You may publish.

16       (Government's Exhibit 12 was received

17        in evidence.)

18       MS. DANIELS:  Thank you, Your Honor.

19  BY MS. DANIELS:

20  Q    Ms. Fleurissaint, I would like to direct your

21  attention to page 2 of the records, which is Bates

22  Number 363.

23       MS. DANIELS:  I'm sorry.  Bates Number 11363.

24  BY MS. DANIELS:

25  Q    What is this record?

```
 1   A     This is a DAVID record for a customer.

 2   Q     What's on this page?

 3   A     This is the photo and signature and oath for a

 4   driver's license transaction.

 5   Q     What else is on this page?

 6   A     The customer's name, driver license number, address,

 7   and the timestamp.

 8   Q     Okay.  And where does this information come from?

 9   A     From our DAVID system.

10   Q     And who provides that information to the DAVID system?

11   A     The customer.

12   Q     You've mentioned that this includes the applicant's

13   address.

14         What is the address listed in this record?

15   A     119 Ocean Terrace, Ormond Beach, Florida, 32176.

16   Q     Are you able to tell when this information was

17   provided to the DAVID system?

18   A     Yes.

19   Q     And when was that?

20   A     October 31st, 2018.

21   Q     I would now like to direct your attention to page 3 of

22   these records, which is Bates Number 11369.

23         What is this part of the record?

24   A     This is a part of the driver license application.

25   Q     And what's listed on this application?
```

1    A    The address is, out-of-state license information,

2    guardian information, examinations.

3    Q    And what address do you see listed on this record?

4    A    119 Ocean Terrace, Ormond Beach, Florida, 32176.

5    Q    And who provides this information?

6    A    The customer.

7    Q    I would now like to direct your attention to page 4 of

8    these records, which is Bates Number 11377.

9         What is in this record?

10   A    This is another driver license transaction.

11   Q    Are you able to see when this record was completed?

12   A    Yes.

13   Q    And when was it completed?

14   A    May 17th, 2019.

15   Q    And what is the address listed on this record?

16   A    119 Ocean Terrace, Ormond Beach, Florida, 32176.

17   Q    I would now like to direct your attention to page 5 of

18   these records, which is Bates Number 11383.

19        MS. DANIELS:  Bates Number 11383.

20        Thank you.

21   BY MS. DANIELS:

22   Q    And what are we looking at here?

23   A    This is a driver license address history.

24   Q    And what does it show?

25   A    It shows current and previous addresses on file.

1   Q    And what's the current address listed for this

2   applicant?

3   A    119 Ocean Terrace, Ormond Beach, Florida, 32176.

4   Q    And on this record, across from the current address,

5   there's a listing for DL mailing.

6   A    Yes.

7   Q    What does that mean?

8   A    It's the address provided for mailing from the

9   customer.

10  Q    And what does DL residential mean under address type?

11  A    That would be the residential address provided.

12  Q    And what's in the change date column?

13  A    That would be the date of the transaction.

14  Q    And what is that date listed here?

15  A    For the current?

16  Q    Uh-huh.

17  A    October 31, 2018.

18  Q    And in your understanding of the records, is this the

19  most up-to-date address information that's in the DAVID

20  system?

21  A    Yes.

22       MS. DANIELS:  Your Honor, may I just have a moment

23  to confer with counsel?

24       THE COURT:  Yes.

25       MS. DANIELS:  Thank you, Your Honor.

1           I tender this witness for cross now.

2           THE COURT:  Thank you.

3           Wipe the area down.  And then I'll invite Mr. Ryan

4    to come up.

5           All right.  Mr. Ryan, cross-examination.

6           MR. RYAN:  Very briefly, Your Honor.  Thank you.

7                         **CROSS EXAMINATION**

8    BY MR. RYAN:

9    Q     Good afternoon.

10   A     Hello.

11   Q     My name is Michael Ryan, and I represent Mr. Lapin.

12         So these records, if I understand you correctly, show

13   that the last time that Mr. Lapin changed the address on

14   his Florida driver's license was in -- on October 31st,

15   2018?

16   A     Yes.

17   Q     So from October 31st of 2018, he hasn't attempted

18   to change the driver's license address, correct?

19   A     Not that we have any records for.

20   Q     Well, he hasn't -- okay.  I'm not sure what that

21   means.

22         Is there any indication that he has attempted to

23   change his driver's license address for his Florida

24   driver's license?

25   A     No.  No indication that I can tell.

```
1    Q     And apparently there's also a listing for a mailing

2    address when you apply for driver's license?

3    A     Yes.

4    Q     And he kept that the same?

5    A     Yes.

6          MR. RYAN:  Nothing further.

7          THE COURT:  Any redirect?

8          MS. DANIELS:  No, Your Honor.

9          THE COURT:  May this witness be excused?

10         MR. RYAN:  Yes, Your Honor.

11         MS. DANIELS:  Your Honor, may I have a brief

12   sidebar with defense counsel?

13         THE COURT:  With respect to this witness?

14         MS. DANIELS:  No, Your Honor.

15         THE COURT:  May this witness be excused before we

16   do that?

17         MS. DANIELS:  Yes, Your Honor.

18         THE COURT:  All right.  Thank you, ma'am.  You're

19   excused.

20         If you'll do me a favor and take that mic cover

21   off and put it in the trash for me right there.  Take one

22   of those wipes and just sort of wipe down your area where

23   you were touching.  I would be grateful.

24         (Discussion at sidebar on the record.)

25         THE COURT:  Yes, Ms. Daniels?
```

```
 1              MS. DANIELS:  It's come to my attention that two

 2    of the witnesses listed by the defense attorney have been

 3    sitting in the gallery.

 4              I would like to invoke the rule of sequestration

 5    at this point.

 6              THE COURT:  Rule 615 has now been invoked.

 7              I'll instruct the lawyers to review the gallery

 8    and make sure you ask any witnesses to step outside until

 9    it's their time to testify.

10              And keep them outside until you've either asked

11    permission for them to come back or they've been released

12    from their subpoena and no further testimony will be

13    required.

14              MR. RYAN:  Very good, Your Honor.

15              MS. DANIELS:  Thank you, Your Honor.

16              (End of discussion at sidebar.)

17              THE COURT:  Call your next witness.

18              MS. DANIELS:  Your Honor, the Government's next

19    witness -- I apologize -- is lengthy.

20              So does the Court want to proceed?  I believe this

21    witness' testimony would last past 5:00.

22              THE COURT:  Okay.  We've made some pretty good

23    progress today.  I'm not opposed to giving the jurors a

24    little time off early.  I suspect that they're not opposed

25    to that either.
```

1          So, ladies and gentlemen, we're on track to get

2    the case to you.  I know you had an early morning this

3    morning in terms of getting here early to start all your

4    work.

5          So I'm going to, rather than start a witness that

6    we won't get that far with that's going to be fairly

7    lengthy, excuse you all for the afternoon and ask you to do

8    whatever you need to do to adjust your schedule so that you

9    can be back here in those chairs ready to proceed at 9:00.

10          Just a reminder, I can't start until all of you

11   are here.  So I know all of you have different challenges.

12   I know the traffic is bad.  I know all of that.  So please

13   spend some time on your logistics tonight so that you can

14   make sure that you're up and away tomorrow in time to be

15   here ready to go at 9:00.

16          Just a reminder about my admonition not to discuss

17   the case amongst yourselves or with anyone else.

18          If you'll leave your notepads in your chair, my

19   courtroom deputy will pick those up and make sure that they

20   are kept safe.  Nobody will look at them.  She'll put them

21   back in your chairs and they'll be ready for you when you

22   arrive in the morning at 9:00.

23          So I hope you have a pleasant evening.

24          I'll turn you over to Mr. Carter.  He'll explain

25   to you how to group up with him in the morning.  And you're

1   in good hands.

2          Have a pleasant evening, and I'll see you tomorrow

3   at 9:00.

4          (Jury exited the courtroom at 4:23 p.m.)

5          THE COURT:  Can I do anything for the lawyers

6   before we adjourn for the afternoon?

7          MS. DANIELS:  Not from the Government, Your Honor.

8          MR. RYAN:  Nothing here, Your Honor.  Thank you.

9          THE COURT:  Okay.  Great.

10         My courtroom deputy is reminding me that you said

11   you had something you wanted to take up after lunch.  And I

12   don't know what that is or was, but we have time to do it

13   now.

14         MR. RYAN:  No.  We did it in front of the jury.

15   It was the business about asking her about the outgoing

16   voice mail on the Nancy Pelosi office.

17         THE COURT:  Oh, okay.

18         So, again, just a reminder, I try to give you all

19   an opportunity at every break to let me know if you need

20   me.  It's not well received when it's time to come to court

21   and then tell me now you need to see me.

22         So, again, just a reminder.  I like to start on

23   time, and I think the jurors appreciate starting on time.

24         So if I tell them 2:30 or 11:30, whatever it is,

25   and then I get a request for a sidebar or a conference

```
 1   that's going to make me unable to meet my obligation that I

 2   committed to the jury, then I'm usually not going to do it

 3   unless there's some exceptional reason that you couldn't

 4   have told me before when I asked you about it.

 5           Anyway, just word to the wise going forward.

 6   That's why I said no.

 7           All right.  We'll be in recess.  I'll see you in

 8   the morning at 9:00.

 9              (Proceedings adjourned at 4:25 p.m. until

10               Wednesday, November 18, 2020, at 9:00 a.m.)

11                           *****

12                      (End of Excerpt)

13                           *****

14

15              C E R T I F I C A T E

16

17           I certify that the foregoing is a correct

18   transcript from the record of proceedings in the

19   above-entitled matter.

20

21   December 7, 2021

22

23       s\  Amie R. First
     _____
         Amie R. First, RDR, CRR, CRC, CPE
24   Federal Official Court Reporter
     United States District Court
25   Middle District of Florida
```