```
 1                  UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                       ORLANDO DIVISION
                    CASE NUMBER 6:20-cr-00089
 3
    . . . . . . . . . . . . . . .
 4  UNITED STATES OF AMERICA,    :
                                 :
 5          Plaintiff,           :
                                 :          Orlando, Florida
 6              v.               :          November 18, 2020
                                 :          8:56 a.m.
 7  JAMES LAPIN,                 :
                                 :
 8          Defendant.           :
    . . . . . . . . . . . . . . .
 9

10          TRANSCRIPT OF JURY TRIAL, VOLUME II
         BEFORE THE HONORABLE ROY B. DALTON, JR.
11             UNITED STATES DISTRICT JUDGE

12

13  APPEARANCES:

14

15  Counsel for Government:      Amanda Sterling Daniels
                                 Chauncey A. Bratt
16

17  Counsel for Defendant:       Michael Shay Ryan
                                 Nicole Mouakar
18

19

20

21  Court Reporter:     Amie R. First, RDR, CRR, CRC, CPE
                        Federal Official Court Reporter
22                      401 West Central Boulevard, Suite 4600
                        Orlando, Florida  32801
23                      AmieFirst.CourtReporter@gmail.com

24  Proceedings recorded by Realtime Stenography.

25  Transcript produced by Computer-Aided Transcription.
```

1          **INDEX OF PROCEEDINGS**

2

3    **GOVERNMENT WITNESSES**

4                                    DIRECT  CROSS  REDIRECT  RECROSS

5    Lawrence Anyaso                    6      26      55

6

7    **DEFENDANT WITNESSES**

8                                    DIRECT  CROSS  REDIRECT  RECROSS

9    Pamela Nichole Margeson            62     74      81

10   Marie Neer                         86     93      98

11

12   (Testimony of Dr. Sheila Rapa has been previously

13   transcribed and filed at docket 93.)

14

15   Rule 29 Motion ................................   60
16   Government Rests .............................   60
17   Defense Rests ................................  108
18   Rule 29 Motion ...............................  109
19   Charge Conference ............................  112
20   Jury Charge ..................................  132
21   Closing Argument by the Government ...........  147
22   Closing Argument by the Defense ..............  158
23   Rebuttal by the Government ...................  173
24   Jury Charge ..................................  180
25   Jury Deliberating ............................  183

1

**INDEX OF EXHIBITS**

2

3   **EXHIBITS**

4                                                                **A D M I T T E D**

5   Government's Exhibit 11B                    12

6   Government's Exhibit 13                     18

7   Government's Exhibit 16                     24

8

9                                                                **M A R K E D**

10  Court's Exhibit 1                          189

11  Court's Exhibit 2                          191

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                         * * * * *

 3          THE COURT:  Good morning, everyone.

 4          We're back on the record in United States versus

 5   Lapin, 6:20-cr-89.

 6          Our jurors are all present and ready to return.

 7          Ms. Daniels, you had a question?

 8          MS. DANIELS:  Yes, Your Honor.  I had two

 9   questions.

10          My first question is, how would Your Honor like me

11   to conduct the in-court identification?  I believe the

12   defendant is the only person at his table wearing a shield.

13          MR. RYAN:  Well, we're happy to stip.

14          THE COURT:  All right.  If you don't -- if the

15   defense has no difficulty with stipulating to the identity

16   of the defendant, if the Government is agreeable to that,

17   we can proceed by stipulation.

18          MS. DANIELS:  Yes, Your Honor.  Thank you.

19          THE COURT:  Okay.

20          MS. DANIELS:  And then the other question I have

21   is, during Mr. Ryan's opening yesterday, he mentioned that

22   Dr. Rapa would testify that the defendant has generalized

23   anxiety disorder and narcissistic personality disorder.

24          My understanding of the Court's order was that her

25   testimony was going to be limited to the bipolar disorder.
```

```
 1   So I just wanted to clarify and make sure that I'm properly
 2   understanding the Court's order.
 3              THE COURT:  Okay.  I'll go back and look at that
 4   and refresh my recollection about it.  Thank you for
 5   bringing it to my attention.
 6              MS. DANIELS:  Thank you, Your Honor.
 7              THE COURT:  Bring our jurors in, Mr. Carter.
 8              Is the first witness going to be your case agent?
 9              MS. DANIELS:  Yes, Your Honor.
10              (Jury entered the courtroom at 8:59 a.m.)
11              THE COURT:  Good morning, ladies and gentlemen.  I
12   hope you all had a pleasant evening.  I appreciate you
13   being back and ready to start on time.
14              Were all of you able to following my instructions
15   not to discuss the case amongst yourselves or with others?
16              THE JURY:  Yes.
17              THE COURT:  Okay.
18              Is the Government ready to proceed, Ms. Daniels?
19              MS. DANIELS:  Yes, Your Honor.
20              THE COURT:  Call your next witness.
21              MS. DANIELS:  Your Honor, the Government calls
22   Special Agent Lawrence Anyaso.
23              THE COURT:  Agent, come forward to be sworn.
24              THE DEPUTY CLERK:  Please raise your right hand.
25              Do you solemnly swear or affirm under penalty of
```

```
 1   perjury the testimony you will give will be the truth, the

 2   whole truth, and nothing but the truth?

 3             THE WITNESS:  I do.

 4             (Witness sworn.)

 5             THE DEPUTY CLERK:  Please have a seat in the

 6   witness box to my left.

 7             You can adjust the microphone so the court

 8   reporter can hear you.

 9             Once you're settled, please state and spell your

10   name for the record.

11             THE WITNESS:  (Indicating.)

12             THE COURT:  Yes, sir.  You can remove your mask if

13   you're comfortable doing it.

14             THE WITNESS:  I'm Special Agent Lawrence Anyaso

15   with the United States Capitol Police.

16             My first name is L-A-W-R-E-N-C-E.  Last name is

17   A-N-Y-A-S-O.

18             THE COURT:  You may inquire, Ms. Daniels.

19             MS. DANIELS:  Thank you, Your Honor.

20                      **DIRECT EXAMINATION**

21   BY MS. DANIELS:

22   Q    Good morning, Agent Anyaso.

23        Would you please tell the jury what you do for work.

24   A    I'm a special agent with the United States Capitol

25   Police, investigation division, specifically working in the
```

1    threat assessment section.

2    Q    What is the United States Capitol Police?

3    A    We're the law enforcement arm for the legislative

4    branch.  So we're sort of like the Secret Service but for

5    Congress.  So we're responsible for protecting Congress.

6    Q    Do you work for a specific elected official?

7    A    No.  The Capitol Police, we're a neutral body.  So we

8    work for -- we investigate and protect all 537 members of

9    Congress regardless of who they are.

10   Q    How long have you been a special agent with the

11   U.S. Capitol Police?

12   A    Approximately six years as a special agent.  And I've

13   been with the agency approximately 18 years.

14   Q    In what city and state do you work?

15   A    Washington, D.C.

16   Q    What are your duties as a special agent with the

17   U.S. Capitol Police?

18   A    Generally, I'm in the investigation division.  So I

19   investigate any crimes or incidents of interest that are

20   directed towards members of Congress, their family, or

21   their staff in relation to the position with a member of

22   Congress.

23   Q    Were you so employed on February 24th, 2020?

24   A    Yes, I was.

25   Q    What, if anything, happened on that date?

```
 1   A     On that date, I was assigned a case that was related

 2   to a threatening voice mail that was received and reported

 3   by Speaker Nancy Pelosi's office.

 4   Q     What, if any, statements were identified within the

 5   voice mail itself?

 6   A     Upon reviewing the voice mail, there was a statement,

 7   We're coming for you, you better have a bulletproof vest,

 8   we're going to hang your dentures from the top of the

 9   Capitol, and you're dead.

10         MS. DANIELS:  Your Honor, at this point I would

11   like to request permission to publish Government's

12   Exhibits 1 and 2.

13         THE COURT:  Yes.  You may proceed.

14         MS. DANIELS:  Ms. Valente, would you please

15   publish that for the jury.

16         (Playing audio exhibit.)

17         MS. DANIELS:  Thank you, Ms. Valente.

18   BY MS. DANIELS:

19   Q     Agent Anyaso, is that the voice mail that you were

20   sent?

21   A     Yes, it is.

22   Q     Did you receive any voice mails in addition to this

23   one?

24   A     Yes.  With the original, when I was assigned the case,

25   I received an additional four voice mails.
```

```
1   Q      And how many voice mails did you receive in total?

2   A      Five total.

3   Q      Did you have any information at the time about who

4   made the call?

5   A      At the time of the call, the only information I could

6   discern from the voice mail was that it was a male caller

7   and the phone number that was captured by the caller I.D.

8   was also identified.

9   Q      Do you remember what this phone number was?

10  A      407-467-8865.

11  Q      What did you do once you received these voice mails?

12  A      Upon receiving the voice mails -- well, receiving the

13  whole report, I reviewed the voice mail for myself to

14  identify the threats that were being reported and then I

15  proceeded to make -- do some investigative techniques.

16         Basically we have access to certain law enforcement

17  databases, so we attempt to identify the person based on

18  identifiers we identify.

19         In this case, there was a phone number.  So I

20  attempted to identify the person who owned that phone

21  number but initially was unsuccessful.  So then I had to

22  submit some records requests to attempt to identify the

23  person.

24  Q      How quickly did you submit those records requests?

25  A      In terms of the -- the first record request was
```

```
1   submitted -- was actually asked for the initial date I
2   actually received the case.
3   Q    And did you submit any other records requests?
4   A    Yes.
5   Q    And what other records requests did you submit?
6   A    There was additional records requests -- well, let me
7   step back.  Are you saying the different types?
8        Okay.
9        So there was a records request that I requested for
10  additional phone records having to do with this phone
11  number.  There was records requests having to do with
12  license information, something to that effect.
13  Q    Okay.  Did you receive these records?
14  A    Yes.
15  Q    Who did you request the phone records from?
16  A    From Verizon Wireless.
17  Q    Did you review and analyze the records you received?
18  A    Yes.
19       MS. DANIELS:  Your Honor, permission to approach
20  the witness.
21       THE COURT:  Yes.
22  BY MS. DANIELS:
23  Q    Agent Anyaso, what did I just give you?
24  A    A disk.
25  Q    Okay.  And what's on that disk?
```

```
 1    A    This specific disk is a disk of a subset or filtered

 2    version of the original Verizon records I received.

 3    Q    Is the subscriber information on that disk as well?

 4    A    Yes, it is.

 5    Q    Is the cellular tower information on that disk as

 6    well?

 7    A    Yes, it is.

 8    Q    And when you say a subset or a filtered version of

 9    records, what do you mean?

10    A    So initially when we get any type of records, a lot of

11    times the records are voluminous.  There's lots of them.

12    So we want to actually focus our attention to what exactly

13    we're looking for.

14         So in this particular case, I knew that there was

15    calls to Speaker Nancy Pelosi's office.  So I had to go

16    through and analyze the records to filter down to

17    specifically the calls of interest that were made to

18    Speaker Nancy Pelosi's office.

19    Q    How do you recognize what's on this disk?

20    A    I initialed it and dated it.

21    Q    Is it a fair and accurate representation of what you

22    saw when you looked at the records?

23    A    Yes, it was.  It is.

24         MS. DANIELS:  Your Honor, the Government would

25    move Government's 11B into evidence.
```

```
 1              THE COURT:  Any objection?

 2              MR. RYAN:  No, Your Honor.

 3              THE COURT:  11B will be received without

 4    objection.

 5              You may publish.

 6              (Government's Exhibit 11B was received

 7               in evidence.)

 8              MS. DANIELS:  Ms. Valente, could you please

 9    publish the subscriber record from 11B first.

10    BY MS. DANIELS:

11    Q    Agent Anyaso, what, if anything, did this record

12    indicate to you?

13    A    So this is the subscriber record.  So it identified

14    the phone number, the 407-467-8865 number that I requested

15    the records for.

16         And then it identified the subscriber for the phone

17    record or the phone number as James R. Lapin.  It also

18    identifies his address as 119 Ocean Terrace in Ormond

19    Beach, Florida, 32176.

20              MS. DANIELS:  And, Ms. Valente, could you please

21    pull up the calls in 11B.

22    BY MS. DANIELS:

23    Q    And, Agent Anyaso, what is in these records?

24    A    So as I mentioned, there was five calls that we knew

25    about initially.  And so during the analysis of the overall
```

1   records, I was able to identify that there was actually a

2   total of ten calls that we could -- that I could tell that

3   were actually made to offices belonging to Speaker Nancy

4   Pelosi.  And that's what's reflected here.

5   Q    And let's quickly go over the columns.

6        So which of these columns shows you the defendant's

7   number?

8   A    So if you go to column J, you'll see the actual

9   defendant's number, the 407-467-8865.

10  Q    And which of these columns shows the Speaker's

11  numbers?

12  A    Column K shows the numbers that are attributed to the

13  Speaker.

14  Q    Why are there different numbers for the Speaker in

15  column K?

16  A    So the Speaker of the House is also a Congresswoman.

17  So every member of Congress has a personal office, but when

18  you're elevated to leadership you also have leadership

19  offices but still have your personal office.

20       And then because each member is from a specific area,

21  they also have their district offices in whatever state

22  they're representing.

23       So in these records, the phone numbers are reflecting

24  calls to her leadership office in D.C., her personal

25  Congressional office in D.C., and then there's also a

1    number that was directed at her San Francisco office in

2    California.

3    Q    Which of these numbers is the number for her personal

4    office?

5    A    So the number 202-225-4965 number is the number for

6    her personal office.

7    Q    Which number is the leadership one?

8    A    202-225-0100.

9    Q    And which number is Nancy Pelosi's San Francisco one?

10   A    415-556-4862.

11   Q    And from the records, are you able to see that these

12   calls were actually received or successfully placed to

13   Washington, D.C., and San Francisco?

14   A    Can you scroll over for me?

15        Yes.

16   Q    And where are you getting that information from?

17   A    In column P, it indicates those calls were successful.

18   Q    Did you notice whether the number made additional

19   calls that did not have voice mails associated with them?

20   A    Yes.

21   Q    And are the calls related to the voice mails also

22   listed here?

23   A    Yes, they are.

24   Q    How many calls total did you say there were?

25   A    Ten calls total.

1    Q    When you looked at these records, were you able to

2    determine what location the calls came from?

3    A    Yes.

4    Q    How were you able to figure this out?

5    A    So when -- well, any phone company when they provide

6    records, they're going to give us the phone records, but

7    they're also going to give us additional records that have

8    to do with their cell towers or the identification for

9    their towers.

10        So in these specific records, Verizon produced the

11   call records or also known as the VoLTE records.  And then

12   they also provided -- it's called the Orlando LEA, but it's

13   also known as -- it's the tower key which identifies all

14   their towers.

15        So looking at these specific records, once I'm able to

16   identify the calls that are of interest to me in this case,

17   then I will look at, which is here, then I look at

18   column H, which states the eNB-ID.  In that column, it

19   shows the number of 145120, which corresponding to the key

20   chart will identify the actual cell tower that actually

21   made these calls.

22             MS. DANIELS:  Okay.  Ms. Valente, could you pull

23   up the spreadsheet entitled LEA Orlando.

24   BY MS. DANIELS:

25   Q    And, Agent Anyaso, what's this record?

```
 1    A     So this is the Orlando LEA or the cell site key for

 2    Orlando.

 3    Q     Okay.  And what did you -- how did you compare this

 4    spreadsheet to the spreadsheet you just saw with the VoLTE

 5    calls?

 6    A     So -- well, can you scroll to the right for me?

 7          Okay.  So going back to -- so from the other key,

 8    identified the number 145120.  In this spreadsheet,

 9    column Q shows the same number 145120.  So that tells me

10    that that is actually the cell tower, the same cell tower

11    information.

12          And what I'm looking for is where that's located.  So

13    this, it tells me the cell tower, but it also gives me the

14    address, the physical address of the cell tower.

15              MS. DANIELS:  And, Ms. Valente, could you scroll

16    back over.

17    BY MS. DANIELS:

18    Q     And which column has the physical address of the cell

19    tower?

20    A     So column G, H, and J has the address of the cell

21    tower.

22    Q     And just to complete, what does that mean to you?  So

23    if you're seeing a call from this cell tower and this is

24    the address of the cell tower, what does that mean to you?

25    A     So what this means is the cell phone -- all cell
```

 1   phones have to use a tower.  So you have to be within a

 2   certain distance, and then it's going to trigger and use

 3   that tower to make the call.

 4        So this is telling me that the call itself was made

 5   from Ormond Beach, Florida, and that it utilized this

 6   specific tower to actually initiate that call.

 7             MS. DANIELS:  Your Honor, permission to approach

 8   the witness.

 9             THE COURT:  You may.

10   BY MS. DANIELS:

11   Q    Agent Anyaso, I've handed you United States

12   Exhibit 13, which is Bates Number 10483.

13        What is this?

14   A    This is a copy of a Google Earth image that I created

15   which -- where I plotted the locations found in the

16   spreadsheet for the cell tower.

17        And I've also indicated the address 119 Ocean Terrace,

18   which was the address for the subscriber that was sent.

19   Q    How do you recognize this image?

20   A    I created the document.

21   Q    Is the image a fair and accurate depiction of where

22   that cellphone tower was and where the address was?

23   A    Yes, it is.

24             MS. DANIELS:  Your Honor, the Government would

25   seek to move United States 13 into evidence.

```
 1              THE COURT:  Any objection?

 2              MR. RYAN:  No objection.

 3              THE COURT:  I'm sorry.

 4              Government's 13 will be received without

 5    objection.

 6              You may publish.

 7              (Government's Exhibit 13 was received

 8               in evidence.)

 9              MS. DANIELS:  Thank you, Your Honor.

10              Ms. Valente, could you please publish Bates Number

11    10483.

12              THE COURT:  Do you want to switch to the ELMO?

13              MS. DANIELS:  Yes, Your Honor.

14              THE COURT:  All right.

15    BY MS. DANIELS:

16    Q    Agent Anyaso, about how far apart are these two

17    points?

18    A    It's less than a mile.  It's approximately .9 miles

19    from what I know.

20    Q    Is Ormond Beach in the Middle District of Florida?

21    A    Yes, it is.

22              MS. DANIELS:  Thank you.

23    BY MS. DANIELS:

24    Q    Did you immediately go out after reviewing these

25    records and arrest the defendant?
```

```
1    A     No, I did not.

2    Q     Why not?

3    A     So at this time we know that the subscriber is listed

4    as James Lapin, we know that it's a male's voice, and we

5    know the phone where it was used.  But at that point, we

6    had never engaged with the subscriber to actually confirm

7    that that was the person who actually made the call.

8          So we have to make -- we have to be sure of anything

9    that we do before we can actually take additional action.

10   So we have to continue to investigate.

11   Q     What did you do after reviewing the phone records?

12   A     So after the phone records, I conducted an additional

13   phone interview of the subscriber, James Lapin.

14   Q     When did you do that?

15   A     That was May 18th, 2020.

16   Q     What number did you call?

17   A     407-467-8865.

18   Q     Is that the number that was used to make the voice

19   mail at Nancy Pelosi's office?

20   A     Yes, it was.

21   Q     Who answered the phone?

22   A     A male answered the phone.  And when asked to speak to

23   James Lapin, he identified himself as he was James Lapin.

24   Q     Was that interview recorded?

25   A     Yes, it was.
```

```
 1            MS. DANIELS:  Your Honor, may I have permission to
 2   publish Exhibits 14 and 15, which have been previously
 3   admitted.
 4            THE COURT:  You may.
 5            MS. DANIELS:  Ms. Valente, could you please
 6   publish those exhibits.
 7            THE COURT:  While you're doing that, ladies and
 8   gentlemen, this might be a good time for me to mention to
 9   you something I didn't mention before.
10            These exhibits include both an audio as well as a
11   written transcript that goes with the audio.  Obviously the
12   audio -- the transcript is designed in order to assist you
13   in listening to the audio.
14            But if what you hear on the audio does not
15   correspond with what's written on the transcript, you go by
16   what you hear, not by what's written in the transcript.
17            Understood?
18            THE JURY:  Yes.
19            THE COURT:  Thank you.
20            (Playing audio exhibit.)
21   BY MS. DANIELS:
22   Q    Agent Anyaso, what happened after you conducted this
23   interview?
24   A    After I conducted the interview, I continued to
25   investigate to obtain additional information.  We wanted to
```

```
1    verify some of the things that he stated in the call, and
2    we wanted to confirm exactly where he lived.
3         We did eventually do that.  And then in June, I was
4    able to obtain an arrest warrant for James Lapin.
5         I also reviewed the threatening voice mail and matched
6    it with the recording, and the voice sounded to be the same
7    person.  So that's why we moved -- to continue to
8    investigate and move forward with obtaining the arrest
9    warrant.
10   Q    Agent Anyaso, were you present when Mr. Lapin was
11   arrested?
12   A    I was.
13   Q    Is Mr. Lapin the defendant that's here today?
14   A    He is.
15   Q    During this interview, did you determine that the
16   defendant was the one who made the calls?
17   A    I was.
18   Q    What about the interview led to that conclusion?
19   A    The voice sounded like the same individual.  From the
20   Verizon records that I reviewed showed that James Lapin was
21   the subscriber.
22        During the interview he admitted that it was only him
23   that had the phone.  Nobody else uses the phone.  So we
24   were able to conclude that he's the caller.
25   Q    And did you ask the defendant about any specific
```

```
1   statements in the voice mail?

2   A    Yes.

3   Q    What were those statements?

4   A    So I talked about the statements, about him saying

5   "You should have a bulletproof vest.  You're dead."

6   Basically the statements from the call.

7        And so he responded at least to the statement of "you

8   should have a bulletproof vest," he stated that I said I

9   hope she had a bulletproof vest.

10  Q    Did you ever get the impression that the defendant did

11  not believe you were a law enforcement officer?

12  A    No, I didn't.

13           MR. RYAN:  Objection.  Speculation.

14           THE COURT:  Sustained.

15  BY MR. RYAN:

16  Q    Were you able to determine if any statements the

17  defendant made during this call were untrue?

18  A    Yes, I was.

19  Q    You asked the defendant about -- did you ask the

20  defendant about a silver truck?

21  A    I did.

22  Q    And what did he say?

23  A    He said he drove a black Escalade.

24  Q    Did you determine if this statement was untrue?

25  A    I was.
```

```
 1   Q    How did you determine that?

 2   A    On the date that we arrested him, there was no black

 3   Escalade present at the residence.  There was a silver

 4   pickup truck that I had referenced.

 5        And also, yesterday I observed the defendant drive

 6   here in a silver pickup truck.

 7        MS. DANIELS:  Your Honor, may I have permission to

 8   approach the witness?

 9        THE COURT:  Yes.

10   BY MS. DANIELS:

11   Q    Agent Anyaso, I've just handed you United States

12   Exhibit 16.

13        What is that?

14   A    This is a copy of a picture of the silver pickup truck

15   that I saw when I arrested him in June.

16   Q    How do you know that's what it was?

17   A    I was physically present and observed the truck.  And

18   it's the same truck I've seen the whole time.

19   Q    Is it a fair and accurate depiction of what you saw on

20   the date of arrest?

21   A    It is.

22        MS. DANIELS:  Your Honor, the Government would

23   move Exhibit 16 into evidence.

24        THE COURT:  Any objection?

25        MR. RYAN:  No objection.
```

```
 1              THE COURT:  It will be received without objection.
 2         You may publish.
 3              (Government's Exhibit 16 was received
 4               in evidence.)
 5              MS. DANIELS:  Ms. Valente, could you please
 6    publish Bates Number 21.
 7    BY MS. DANIELS:
 8    Q    Agent Anyaso, did you ever observe a Cadillac on the
 9    date of arrest?
10    A    I did not.
11              MS. DANIELS:  Thank you, Ms. Valente.
12    BY MS. DANIELS:
13    Q    Did you ask the defendant whether he lived in Ormond
14    Beach?
15    A    I did.
16    Q    What did he say?
17    A    He said he did not live there and he lived in Orlando.
18    Q    Were you able to determine if that statement was
19    untrue?
20    A    Yes.
21    Q    How?
22    A    We take from the Verizon subscriber records the
23    address stated, 119 Ocean Terrace in Ormond Beach, and we
24    had physically arrested him at that same address when we
25    arrested him.
```

```
 1   Q     Did you ask the defendant about a person named Herman
 2   Jones?
 3   A     I did.
 4   Q     What did he say?
 5   A     He said he did not know of Herman Jones.  And then he
 6   later stated he might have had a teacher that was Herman
 7   Jones.
 8   Q     Did you determine if the statement of whether he knew
 9   Herman Jones was untrue?
10   A     Yes.
11   Q     How?
12   A     When we arrested him, Herman Jones, who owns the
13   residence that we went to, was physically there at
14   119 Ocean Terrace in Ormond Beach, Florida.
15   Q     In the interview you asked the defendant about whether
16   he's ever called Nancy Pelosi; is that correct?
17   A     Yes.
18   Q     Were you able to determine if this was untrue?
19   A     Yes.
20   Q     What did he say?
21   A     So he said he did not call Nancy Pelosi's office, or
22   that he can recall.
23   Q     And how did you determine if that was untrue?
24   A     So from the phone records, I was able to determine
25   that his phone that he admitted that he's the only one that
```

```
1    uses made at least ten calls to offices belonging to

2    Congresswoman Nancy Pelosi.

3    Q    And did he say anything on the call about if anybody

4    else uses the phone?

5    A    No.  He said he's the only one that uses the phone.

6         MS. DANIELS:  Your Honor, I tender this witness

7    for cross-examination.

8         THE COURT:  Thank you.

9         Would you clean your area before you leave there,

10   Ms. Daniels, and take your microphone cover off.

11        Mr. Ryan, cross-examination.

12        Would you replace the microphone cover before you

13   begin your cross-examination.

14        Thank you.

15        MR. RYAN:  Thank you, Your Honor.
```

**CROSS EXAMINATION**

```
17   BY MR. RYAN:

18   Q    Good morning.

19   A    Good morning.

20   Q    So Mr. Lapin variously denied making the calls and

21   telling you he doesn't remember; is that correct?

22   A    What are you talking about?

23   Q    Do you remember the voice mails?

24   A    Okay.  So you're saying --

25   Q    Do you remember the voice mails that we've been
```

```
 1   talking about, the prosecutor asked you about?
 2   A    Right.
 3        So what I'm saying, the question, you're saying he
 4   vehemently denied.  Are you talking about in the voice
 5   mails?
 6   Q    During your interview on May 18th --
 7   A    Okay.
 8   Q    -- he variously denied making -- leaving the voice
 9   mails and telling you he didn't remember; is that correct?
10   A    That's correct.
11   Q    You obtained his phone number on February 24th,
12   2020; is that correct?
13   A    That's correct.
14   Q    You were able to ascertain subscribership information
15   by about March 6th, I believe, 2020?
16   A    That's correct.  About that.
17   Q    And you called him on May 18th, 2020?
18   A    That's correct.
19   Q    And arrested him on June 18th, 2020?
20   A    That's correct.
21   Q    During the arrest, a search was conducted, correct?
22        MS. DANIELS:  Objection, Your Honor.  This is
23   outside the scope of direct examination.
24        THE COURT:  Objection is overruled.
25        THE WITNESS:  Can you repeat your question?
```

```
 1   BY MR. RYAN:

 2   Q     Sure.

 3         When you arrived at the home where Mr. Lapin was

 4   arrested, you and your colleagues who were there that day

 5   searched the house, correct?

 6   A     That's partially correct.

 7   Q     Okay.

 8   A     Because we --

 9   Q     That you partially searched or you partially didn't?

10   A     So just to explain, at the time that we went to arrest

11   him, we did not have a search warrant.  So we retained what

12   we call consensual search, which is authorized by the owner

13   of the residence.

14         But when it comes to consensual searches, we can only

15   search limited areas that are controlled by the owner that

16   allows them to.

17         So in this particular case, we searched areas that we

18   had consent to, but because there was indication that James

19   Lapin had certain other areas, we can't actually search his

20   specific areas without his consent.

21         And at that time, he was actually under arrest.  So we

22   actually can only do a limited search based on what the

23   homeowner is allowing us to search so we did not search the

24   whole premises.

25   Q     So that's a long explanation to tell us that you did
```

1    not search James Lapin's bedroom; is that correct?

2    A    That is correct.

3    Q    And you did not seek a court order permitting you to

4    search that bedroom, did you?

5    A    No.  That's correct.

6    Q    You did search the truck, though, right?

7    A    Yes, we did.

8    Q    And what did you find in the truck?

9    A    I actually don't recall.  There wasn't -- it was -- I

10   don't recall.

11   Q    You don't recall because you found nothing of

12   evidentiary value, correct?

13   A    That's correct.

14   Q    You found nothing of evidentiary value in the

15   consensual search of the home, correct?

16   A    That is not totally correct.

17   Q    Okay.  What's partially correct about it?

18   A    So in the residence at the time of arrest, James

19   Lapin's cell phone was located in the residence in an area

20   that we could search.

21   Q    In fact, James Lapin was sitting right there near the

22   phone, correct?

23   A    That's correct.

24   Q    And he didn't do anything to try to hide the phone,

25   correct?

```
 1   A     That I'm aware.

 2   Q     He didn't deny that it was his phone?

 3   A     That's correct.

 4   Q     In fact, he asked you folks --

 5         MS. DANIELS:  Objection, Your Honor.

 6   Q     -- after you had him in custody --

 7         MS. DANIELS:  Objection.

 8         THE COURT:  I'm sorry.

 9         MS. DANIELS:  That calls for hearsay.

10         THE COURT:  Objection is overruled.

11   BY MR. RYAN:

12   Q     In fact, when you folks were taking him into custody,

13   he was concerned about a family member and asked to use the

14   phone, did he not?

15         MS. DANIELS:  Objection, Your Honor.

16         THE COURT:  Hearsay again?

17         MS. DANIELS:  Hearsay.

18         THE COURT:  Overruled.

19         THE WITNESS:  Can you rephrase -- repeat the

20   question.

21   BY MR. RYAN:

22   Q     When you were taking Mr. Lapin into custody, he

23   actually asked for the phone, he identified the phone as

24   his phone, and said, May I use the phone, I need to make a

25   phone call.
```

```
 1        Correct?
 2   A    That is correct.
 3   Q    But Mr. Lapin never denied that the phone belonged to
 4   him?
 5   A    That's correct.
 6   Q    The phone, you also obtained a lot of data on the
 7   phone, correct?
 8   A    Correct.
 9   Q    Did that include data like text messaging, social
10   media posts, and things of that nature?
11   A    The text messaging, yes.  And other stuff, I'm not --
12   I don't believe -- I'm not really 100 percent on the social
13   media.
14   Q    So when he told you that he was in Washington, D.C.,
15   did you have any evidence that he went to Washington,
16   D.C. -- let me start over.  I'm sorry.
17        When he told you that he went to Washington, D.C., to
18   protest Nancy Pelosi, was there any evidence?  Did you find
19   any evidence anywhere that corroborated that?
20   A    Yes.
21   Q    That he went to Washington, D.C.?
22   A    Yes.
23   Q    Oh, what is that?
24   A    He told me on the phone that he did.
25   Q    Okay.  So other than what James told you, you were not
```

```
1    able to confirm or deny that statement, correct?

2    A    That is correct.

3    Q    Got it.

4         You were not able to confirm that, in fact, James

5    Lapin did or did not go to Washington, D.C.?

6    A    That is correct.

7    Q    There is no information on the phone, such as text

8    messaging, indicating that he was there?

9    A    That I can tell.

10   Q    There was no social media posts indicating that he was

11   there?

12   A    That I can tell.

13   Q    Nothing suggesting that he was celebrating the

14   protests against Nancy Pelosi on that cell phone?

15   A    So there are references to Nancy Pelosi on the cell

16   phone.

17   Q    I'm talking about when he claimed to be in Washington,

18   D.C.

19   A    Not that I can tell.

20   Q    You mentioned memes.

21        There are memes found on the phone referencing Nancy

22   Pelosi, correct?

23   A    I didn't mention memes.

24   Q    I thought you did.

25   A    I did not.
```

```
 1   Q    Are there memes on the phone mentioning Nancy Pelosi?

 2   A    No.  I said that there's statements mentioning Nancy

 3   Pelosi.  I didn't mention memes.

 4   Q    Are there memes on the phone that you found mentioning

 5   Nancy Pelosi?

 6   A    No.  I don't recall that.

 7   Q    You don't recall.

 8        So you didn't find any memes or cartoons of Nancy

 9   Pelosi with like a target on her face?

10   A    Can you repeat that?  I'm not sure --

11   Q    You didn't find any memes or cartoons of Nancy Pelosi

12   suggesting that she should be killed or murdered or hung or

13   anything like that, did you?

14   A    Well, I mean, I received statements to that effect.

15   Q    You didn't spot any memes or cartoons or things on the

16   cell phone suggesting that Nancy Pelosi should be killed,

17   such as a meme with a bull's-eye in the middle of her face,

18   did you?

19   A    No.  That's correct.

20   Q    Or a meme with Nancy Pelosi and a noose?

21   A    I don't -- on the cell phone, no.

22   Q    Other than the voice mails, there's no indication that

23   Mr. Lapin suggested similar sentiments against Nancy

24   Pelosi, is there?

25   A    Similar to what?
```

```
1    Q    Similar to the voice mails.

2    A    I don't recall.

3    Q    He didn't post on social media "let's go get Nancy

4    Pelosi," did he?

5    A    I wouldn't -- I wouldn't know.  I'd have to go through

6    a whole bunch -- I don't know.

7    Q    You didn't investigate his social media?

8    A    I did.  Well, some of it.  I don't know all his social

9    media.

10   Q    Now, getting back to Washington, D.C., all the

11   location data that you had on that phone, is there any

12   location data ever suggesting that the phone was in

13   Washington, D.C.?

14   A    Not that I could find.

15   Q    There was no -- there was no information, you found no

16   evidence, you found nothing suggesting that James Lapin was

17   tracking Nancy Pelosi, did you?

18   A    So that's not -- that's not totally true.

19   Q    Okay.  How is it totally -- how is it partially true?

20   A    So when we're looking at phone numbers, we have to be

21   able to see what the person's doing and the conduct as part

22   of the factual threat investigation.

23        In this particular case, we look at the intensity of

24   effort.  So there's several calls, but they also were

25   sporadic to different locations.  So the individual is
```

```
 1   researching the actual target of his threats.
 2       So that's what we're looking for.  So that's why, to
 3   your answer, there was information suggesting that he did
 4   research the target of his threats.
 5   Q    You're telling us that the fact that he made a few
 6   phone calls to Nancy Pelosi's office is equivalent to
 7   researching her location?
 8   A    That's correct.
 9   Q    Is that what you just told me?
10   A    That is correct.
11   Q    But there's no information that he was following her
12   public appearances schedule, was there?
13   A    I'm not part of the office to know that.
14   Q    Did you research or investigate whether or not he was
15   attempting to locate Nancy Pelosi's physical locations?
16   A    Well, by her office, by researching the offices, he's
17   locating the addresses and the phone numbers of that
18   office.  So --
19   Q    So you either never looked for or uncovered any
20   information that James Lapin was attempting to confront
21   Nancy Pelosi in person such as by finding out and appearing
22   at her public appearances?
23   A    So that also -- by his own statements in the
24   threatening voice mail, it indicates "we're coming for
25   you," so that indicates to us that the person making the
```

```
1    threat is actually wanting to approach and carry out the

2    threat that they are claiming on the voice mail.

3    Q    But there's no information that James Lapin ever

4    attempted to even ascertain one public appearance by Nancy

5    Pelosi, is there?

6    A    It's not -- I don't have access to that information.

7    Q    So you didn't seek to understand Nancy Pelosi's

8    scheduling during the relevant time period?

9    A    So I can't go into certain aspects because of security

10   concerns.  So I can't go into certain aspects of that

11   question.  I don't --

12   Q    But at the end of the day you don't have any evidence

13   to present to our jury that, in fact, James Lapin in any

14   way, shape, or form attempted to actually locate Nancy

15   Pelosi's physical location, do you?

16   A    So like I just stated, he researched the phone numbers

17   and the addresses to actually ascertain where her offices

18   are.  So she does work out of those offices.

19   Q    I think I may have asked this, but I'll ask again.

20        So no -- all the location data in the phone, all the

21   location data in the phone, all of it, there's not one time

22   the phone appears, pings, or appears to be in Washington,

23   D.C., correct?

24   A    That is correct.

25   Q    And you consider Mr. Lapin a liar, don't you?
```

```
1    A    I consider that he made false statements.

2    Q    So you have no reason to believe anything other than

3    the fact that this Washington, D.C., statement is also a

4    false statement, correct?

5    A    Can you repeat that?

6    Q    You have no reason to understand that the Washington,

7    D.C., statement isn't anything other than another lie,

8    correct?

9    A    Well, I don't know.  If somebody is saying that we're

10   coming for you and then we're getting information from the

11   actual person that is identified as calling saying that

12   they were actually physically there, I don't know.

13   Q    Did you research airlines to see if he took a plane to

14   Washington, D.C.?

15   A    No, I did not.

16   Q    Did you research Amtrak or bus lines to see if he

17   bought tickets in that way?

18   A    I did not.

19   Q    Did you look at his credit card records and ATM

20   records to see if he was utilizing them to travel to and

21   from Washington, D.C.?

22   A    No.

23   Q    He said that he was in Washington, D.C., apparently

24   during a time when there were 50 -- at one point, he said

25   50,000 protesters, that we are protesting.
```

```
 1        Do you recall those statements?
 2   A    Yes.
 3   Q    Was there a protest of 50,000 people during the
 4   impeachment time in Washington, D.C., that you know of?
 5   A    So I know that there were protests.  I can't speak to
 6   actually a specific protest.  It's not -- it's outside
 7   of --
 8   Q    Wouldn't a 50,000-numbered protest on the Capitol be a
 9   large one?
10   A    So, again, it's not something -- we have different
11   people that do different things.  So in my case, I know
12   that stuff is going on, but it's not something that I would
13   specifically --
14   Q    Wouldn't that be something that would be well known by
15   the United States Capitol Police if there was a protest
16   numbering upwards of 75,000 during the impeachment
17   proceedings?
18        MS. DANIELS:  Your Honor, objection.
19   Argumentative, calls for --
20        THE COURT:  Sustained.  Sustained.
21   BY MR. RYAN:
22   Q    Let's talk about the address a little bit.
23        He never changed -- well, since October of 2018, the
24   address on the driver's license, on the Florida driver's
25   license has been the same; is that correct?
```

```
 1   A     Based on records that I reviewed.

 2   Q     Okay.  Does the address remain the same on the

 3   driver's license since October 2018?

 4   A     From the records.

 5   Q     He didn't try to change that?

 6   A     That I know of.

 7   Q     There's no indication that he avoided the address

 8   after your phone call, is there?

 9   A     I wasn't always -- I wasn't physically there always so

10   I wouldn't know.

11   Q     Do you have any evidence that Mr. Lapin was in any way

12   avoiding the address after your phone call in May of 2018?

13   A     I do not.

14   Q     There's no indication that he stayed at hotels?

15   A     Stayed at hotels?

16   Q     There's no indication that after your May 28th --

17   sorry, May 18th, 2020, call that he started to avoid

18   the address by staying at hotels?

19   A     I wouldn't know.  I mean, I wouldn't know.  I didn't

20   check his credit cards.

21   Q     Or staying with friends?

22   A     I wouldn't know.

23   Q     You conduct -- the surveillance that you did conduct

24   indicated that he was at the house, in fact?

25   A     That is correct.
```

```
 1   Q    In fact, he told you that there were -- you know, they
 2   were roofing, there were workers working on the roof,
 3   banging on the roof.
 4        Do you recall that?
 5   A    I do.
 6   Q    And, in fact, there were people roofing that
 7   particular house, correct?
 8   A    You said if, in fact --
 9   Q    There were people working on the roof, wasn't there?
10   A    So we did learn information about that, yes.
11   Q    You, in fact, confirmed that there were people working
12   on the house, banging on the house, correct?
13   A    I obtained information that suggested that, yeah,
14   correct.
15   Q    You called the company that was -- whose truck was
16   parked in front and confirmed -- or you had law enforcement
17   in Ormond Beach do that, to confirm that, in fact, there
18   were workers working on the roof?
19   A    That is correct.
20   Q    Okay.  And so the whole time we're listening to that
21   call, we hear the banging on the roof, don't we?
22   A    Yes.
23   Q    You, in fact, had someone drive by and talk to the
24   postman even?
25   A    Yes.  That's correct.
```

```
 1   Q    And he said James Lapin was fine.  No issues with
 2   James Lapin, correct?
 3           MS. DANIELS:  Objection, Your Honor.  This calls
 4   for hearsay.
 5           THE COURT:  Sustained.
 6   BY MR. RYAN:
 7   Q    You went by the postal -- you actually talked to the
 8   postman for that address, correct?
 9   A    I did not.
10   Q    You had someone talk to the postman, did you not?
11   A    I had somebody -- yeah, I did contact somebody to
12   speak to the postal person.
13   Q    And when you showed up on June 18th, Mr. Lapin was
14   there, correct?
15   A    That is correct.
16   Q    When you came in the house, he didn't try to run in
17   the bathroom or run out a side door or anything like that,
18   did he?
19   A    No, he did not.
20   Q    He made no attempt to evade detection or even avoid
21   arrest?
22   A    That's correct.
23   Q    He was polite?
24   A    He was cooperative.
25   Q    And even deferential?
```

```
 1   A     He was cooperative.

 2   Q     He made a number of statements telling law enforcement

 3   how appreciative he was of them, did he not?

 4   A     He did.

 5   Q     The voice mails end on January 16th, 2020; is that

 6   correct?

 7   A     That is correct.  That we could tell, yes.

 8   Q     Pardon?

 9   A     Yes, that's correct.  From what we could tell, yes.

10   Q     Do you have any other voice mails after

11   January 16th, 2020?

12   A     No, I do not.

13   Q     Did you look for other voice mails?

14   A     Yes, we did.

15   Q     And you found them?

16   A     From the time period, correct.

17   Q     After January 16th, 2020, until your phone call,

18   say, May 18th, 2020, did anybody reach out to Mr. Lapin

19   and say, Please stop calling Nancy Pelosi -- please stop

20   leaving voice mails on Nancy Pelosi's phone?

21   A     I'm sorry.  Repeat.  Repeat your question for me.

22   Q     Sure.

23         From the last voice mail on January 16th, 2020,

24   until your phone call, say, May 18th, did anybody reach

25   out to James Lapin and say, Please stop calling Nancy
```

```
 1   Pelosi, please stop leaving voice mails?

 2        Did anybody do that?

 3   A    We wouldn't have done that because he made a threat.

 4   Q    So that means you didn't?

 5   A    We wouldn't have done that.  That's correct.

 6   Q    So he stopped leaving voice mails on his own?

 7   A    He -- that we could tell.  There were still additional

 8   calls after the January 16th.  But voice mails, that's

 9   what we could tell.

10   Q    He stopped leaving voice mails all on his own; is that

11   correct?

12   A    We could not obtain that information, but we don't

13   know if he did or not.

14   Q    Let's talk about the May 18th interview.  Okay?

15        You never played any of the voice mails for Mr. Lapin,

16   did you?

17   A    No, I just spoke about the statements that were in it.

18   Q    And you were calling from a spam -- yeah, a spam

19   phone, correct, number -- spam phone number?

20   A    I don't recall what specific number I used.  It's just

21   something that he said.

22   Q    Okay.  So is this one of the true things he says or

23   one of the lying things he says when he picked up the phone

24   and said, Hello, potential spam?

25   A    It's a spontaneous statement that he's making.
```

```
 1   Q     Don't you folks use like a -- when you make phone
 2   calls, you use numbers that are designed to conceal that
 3   you're calling from law enforcement?
 4   A     No.  We generally want to let people know because --
 5   especially if I'm calling on the phone, the person -- I
 6   generally want them to know.  So it just depends.
 7   Q     So if we looked at his phone, the caller I.D. would
 8   say U.S. Capitol Police when you called him on May 18,
 9   2020?
10   A     It would show a number.
11   Q     A phone number.  And according to his phone, it
12   indicated it was spam.
13         Do you have any reason to disregard that?
14   A     I didn't see that record so I don't know.
15   Q     Did you look?
16   A     Look at how the phone looked to him on that date?
17   Q     Yeah.  Yeah.
18   A     I didn't look for my call.
19   Q     He tells you a number of times -- oh, let's talk about
20   Herman Davis quickly.
21         So when Mr. Lapin is arrested, at one point he
22   actually identified Herman Davis Jones as his husband, did
23   he not?
24   A     That is correct.
25   Q     When you asked him several -- I mean, a few times, you
```

```
 1   asked him -- do you remember saying, We're fucking coming
 2   for you, cunt; we're fucking coming for you and your
 3   bullshit mother fucking ass, bitch?
 4        Do you remember asking him that?
 5   A    Yes.
 6   Q    And his response was yes, we protested, didn't we?
 7        Do you recall that answer?
 8   A    I do.
 9   Q    Did you ask him who the "we" was?
10   A    I didn't need to.
11   Q    You what?
12   A    I didn't need to.
13   Q    Okay.  How come?
14   A    Because in the threatening voice mail, he's saying,
15   We're coming for you.  When "we" -- that's including him.
16   So he's part of the group that's coming for -- at least by
17   his words, coming to cause harm.
18   Q    So you had no concern that Mr. Lapin was working with
19   others, did you?
20   A    That's part of our investigation.  We're going to
21   exhaust all those leads.
22        But he -- at a minimum, he's going to be a part of
23   that.  So the fact that he's saying "we" -- as part of our
24   training, content analysis is required.  So we're going to
25   do the content analysis on the voice mail that shows that
```

1   "we" is including him, because he's owning it.

2      And he also says "me," as you work for me.  So he's

3   owning it and he's saying he's going to cause harm to her.

4   Q    Did you ask Mr. Lapin who the "we" was, who his

5   cohorts might have been?

6   A    No.

7   Q    You didn't because you knew that the "we" was a

8   generalized expression, correct?

9   A    A generalized expression?

10  Q    You knew he was talking in a figurative sense when he

11  said we?

12  A    I don't know what's in his head, so I wouldn't know

13  that he was differentiating --

14  Q    You don't know what's in his head and you didn't ask

15  either, did you?

16  A    That's correct.  I didn't ask the question.

17  Q    You didn't do any investigation at all into the idea

18  that there were others working with James Lapin, did you?

19  A    Did I do investigation into if other people were

20  working with him?

21      I mean, part of the investigation does encompass that,

22  yes.

23          MR. RYAN:  Object to the narrative.

24          THE COURT:  Listen to the question, Special Agent,

25  and answer the question as directly as you can.

```
 1              Do you want to restate the question, Mr. Ryan, or
 2      do you want to move on?
 3              MR. RYAN:  Certainly.  Thank you.
 4      BY MR. RYAN:
 5      Q    You did not do any investigation into the idea that
 6      Mr. Lapin was working with others, did you?
 7      A    I don't know how to -- we do an overall investigation.
 8      So the one part -- we're looking at the totality of
 9      circumstances.
10              THE COURT:  So the question, Special Agent, is,
11      did your investigation include in any respect an
12      investigation into the possibility that Mr. Lapin was
13      working in concert or cohort with others?
14              Yes or no?
15              THE WITNESS:  Yes.
16      BY MR. RYAN:
17      Q    Okay.  How so?
18      A    So looking at the phone records, we would look at the
19      calls that are being made.  But also, as I previously
20      mentioned, I look at -- we did look at social media.
21          So through social media, we're going to also look at
22      if that person is saying anything or making statements in
23      conjunction with other people.
24          So we do have to kind of look at the totality of the
25      circumstances to determine if there are other people
```

```
 1   through social media, which is a -- at least these days, a
 2   primary way of people communicating.
 3   Q    And that component of your investigation came to the
 4   conclusion that James Lapin was not working with any other
 5   people, correct?
 6   A    That is correct.
 7   Q    So "we" is being expressed in a figurative sense.
 8   Wouldn't you agree to that?
 9   A    No, I would not agree to it.
10   Q    It goes on in that same line that the protest is how
11   Americans come for elected officials who are above the
12   people.
13        Do you recall him saying that?
14   A    I do.
15   Q    He asks you, Is Nancy Pelosi above the people?
16   A    He does.
17   Q    He again tells you in this same line, Well, we
18   protested -- we protested outside of her office, didn't we?
19   Did we not?
20        Do you recall that?
21   A    I do.
22   Q    And you asked him, Who are you talking about?
23        I don't know.  I don't know what people.
24        So who protested outside of her office?
25        He answers, Everybody.  Who didn't?
```

```
 1   A    He did.
 2   Q    Suggesting that he's speaking to you in a figurative
 3   political ideological sense, wouldn't you say?
 4   A    I don't differentiate the politics, but he does make
 5   statements about the protests.  So he is speaking about
 6   that.
 7   Q    There were 50,000 people there protesting the
 8   impeachment.
 9        Do you recall him saying that?
10   A    Yes.
11   Q    But you don't recall this protest?
12   A    I wasn't -- I don't know if I -- I wasn't a part of
13   that or involved in that.
14   Q    In fact, several times he said we protested outside
15   the Capitol?
16   A    Yes, he said that.
17   Q    He told you that we were protesting outside the
18   Capitol in November when they were trying to impeach the
19   president with no evidence, correct?
20   A    He says that.
21   Q    It was just the idea that anybody said anything about
22   Nancy Pelosi being dead, correct?
23   A    That's correct.
24   Q    In fact, he says, Nobody said anything about she's
25   dead.  And I didn't say anything on that phone call, did I?
```

```
1    A     He did say that.

2    Q     He told you he's a Pulse Nightclub survivor?

3    A     He does.

4    Q     Did you investigate whether or not there was truth to

5    that statement?

6    A     We did.

7    Q     And?

8    A     It was determined -- through investigation and the

9    interviews, it was determined that to be not true.

10   Q     And you got the similar information that it wasn't

11   true in the same interviews that it wasn't true that he

12   went to Washington, D.C., correct?

13   A     Well, no.  The interview of him, he's talking to me

14   directly.  These were separate individual interviews of

15   other individuals that have knowledge of him that actually

16   told us that that's not true.

17   Q     Correct.

18         And in those collateral or interviews other than with

19   James Lapin, those interviewees told you the same thing,

20   that they had no knowledge of James Lapin ever going to

21   Washington, D.C.?

22   A     That's correct.

23   Q     In the very same interviews that you're using to

24   confirm that he never was a Pulse survivor?

25   A     Yes.  That's correct.
```

```
1    Q    And he's adamant in this interview that Nancy Pelosi
2    is some sort of traitor deserving to be charged with
3    treason, correct?
4    A    He does make those statements.
5    Q    Same kind of statements he makes in the voice mails,
6    correct?
7    A    Which voice mail?  Which particular voice mails?
8    Q    The December 19th voice mail.
9              MR. RYAN:  Can we have the transcript of that?
10             Can we publish it?
11             MS. MOUAKAR:  Joint Exhibit 2.
12             MR. RYAN:  2.
13             MS. MOUAKAR:  10485.
14             MR. RYAN:  Oh, I'm sorry.  The Bates Number.  I'm
15   sorry.  10485.
16             No, no, no, no.  10484.  That's the wrong one.
17   I'm sorry.
18             Yeah.  10484.
19   BY MR. RYAN:
20   Q    He says the same thing in the December 19, 2019, voice
21   mail, right, accusing Nancy Pelosi of treason, that she
22   should be hung for treason, correct?
23   A    Yes, he does.
24   Q    And he's repeating that same thing with you on the
25   phone five months later on May 18th, 2020, correct?
```

```
 1    A    Repeating that she should be hung for treason?

 2    Q    Repeating the themes of Nancy Pelosi being a traitor.

 3    A    I would have to go back through, but he does make --

 4    he does make statements about Nancy Pelosi and his dislike

 5    for her.

 6    Q    Like we were just going over it, he says that he

 7    proudly tells you I remember protesting with a sign that

 8    says fuck Nancy Pelosi, she's a traitor?

 9    A    Okay.  That's correct.

10    Q    That's what he tells you on May 18th?

11    A    That's correct.

12    Q    And he repeats the fact, he repeats his allegation

13    about Nancy Pelosi being a traitor in this May 18th

14    statement, doesn't he?

15    A    I believe so.

16    Q    And, again, he uses the expression she's a traitor to

17    the people.  She's committed treason against the people.

18    And I'm quoting.

19         Do you recall that?

20    A    Yes, I do.

21    Q    Even wonders why you, as a federal agent, aren't

22    investigating elected officials committing treason against

23    the people.

24         Doesn't he say that to you?

25    A    He does.
```

```
1    Q    And you're trying to figure out if he's threatening

2    Nancy Pelosi.  And you ask him again about -- you and he

3    start talking about what freedom of speech means and

4    whether threatening, making threats is part of that.

5    Right?

6         Do you remember that?

7    A    I do.

8    Q    So you're having this discussion about freedom of

9    speech and threats, and James says, Nobody's threatening

10   Nancy Pelosi.  I never threatened anyone.

11        So I said, fuck Nancy Pelosi.  She should be charged

12   with treason.

13        He says it again, right?

14   A    He says it during the interview, yes.

15   Q    And he point blank denied to you that he was

16   threatening Nancy Pelosi?

17   A    That's the statement -- that's one of the statements

18   he made, yes.

19   Q    But it's not one of the statements that you considered

20   to be true.  It's one of the statements you considered to

21   be false?

22   A    Well, the statement that he's making during the

23   interview is not the same as the voice mail that I've

24   heard.

25   Q    He wonders why you're not investigating Nancy Pelosi?
```

```
 1   A     That's correct.
 2   Q     And he sort of sums up at the end.
 3         I can't believe you would actually call the citizen
 4   telling Nancy Pelosi to go fuck herself for treason.  But
 5   whoever it was, good for them.
 6         Right?  That's almost the end of the interview.
 7   A     Yes.  That's correct.
 8   Q     So throughout the interview, he's repeating the themes
 9   over and over again that he believes Nancy Pelosi to have
10   committed treason and that the people were going to somehow
11   respond to that, correct?
12   A     I wouldn't necessarily -- that's a characterization
13   that I wouldn't necessarily fully -- I can't accept it
14   because I don't really understand exactly that's what he
15   was doing.  I know he's making themes.
16              MR. RYAN:  Thank you.
17              THE COURT:  Mr. Ryan, if you're through with your
18   examination, would you remove your cover for me, please,
19   and dispose of it and wipe the area.
20              And then I'll invite Ms. Daniels up for redirect
21   if she has any.
22              Ms. Daniels, redirect.
23              MS. DANIELS:  Very briefly, Your Honor.
24
25
```

1   **REDIRECT EXAMINATION**

2   BY MS. DANIELS:

3   Q    Agent Anyaso, you were asked about interviews

4   conducted with other people about whether the defendant had

5   traveled to D.C. and was a Pulse Nightclub survivor.

6        When did those interviews take place?

7   A    Well, they happened on June 18th, the same day I

8   arrested him.

9   Q    Now, I believe you have a binder up there with the

10  exhibits in it.

11       Could you please turn to Exhibit 15.

12  A    There's two.

13  Q    The black one.

14       MS. DANIELS:  Your Honor, may I have permission to

15  publish the interview?

16       THE COURT:  Is that in evidence?

17       MS. DANIELS:  Yes.

18       THE COURT:  Yes.  You may proceed.

19       THE WITNESS:  You said Exhibit 15?

20       MS. DANIELS:  Yeah.  I believe it's Exhibit 15.

21       THE COURT:  14 is the actual audio, and 15 is the

22  transcript.

23       MS. DANIELS:  Transcript.  That's correct, Your

24  Honor, yes.

25       THE COURT:  Okay.  Thank you.

1          MS. DANIELS:  Thank you.

2          Ms. Valente, could you please publish page 10496.

3          And then it will be on the bottom.

4    BY MS. DANIELS:

5    Q    Now, Agent Anyaso, what conversation was taking place

6    on this page?

7    A    James Lapin is talking about protesting the

8    impeachment.

9    Q    In this page, do you see -- have you been talking

10   about whether, you know, we are protesting?

11   A    So yes, I asked about who is -- I don't know who, what

12   people he's talking about.

13   Q    Okay.  Do you ask him whether he protests, whether he

14   came and protested in D.C.?

15   A    I do.

16   Q    And what does he say?

17   A    He said yes, he did.

18   Q    What does he say exactly?

19   A    Absolutely.

20   Q    Do you understand that to mean that he, Mr. Lapin, was

21   present protesting with the we?

22   A    That is correct.

23          MS. DANIELS:  No other questions.

24          THE COURT:  Thank you.

25          You can step down, Special Agent.

1          We're going to take our morning break,

2    Ms. Daniels.

3          Well, I'll take that up with you after the jury is

4    out.

5          Ladies and gentlemen, let's take our mid-morning

6    break.  I think Mr. Carter has made some coffee for you

7    back there.  So we'll see you in 15 minutes.

8          (Jury exited the courtroom at 10:30 a.m.)

9          THE COURT:  Does the Government have any

10   additional witnesses, Ms. Daniels?

11         MS. DANIELS:  No, Your Honor.

12         THE COURT:  All right.  So is the Government

13   prepared to rest?

14         MS. DANIELS:  Yes, Your Honor.

15         THE COURT:  Are you going to have Rule 29 motions,

16   Mr. Ryan?

17         MR. RYAN:  Yes, Your Honor.

18         THE COURT:  Okay.

19         MR. RYAN:  Thank you.

20         THE COURT:  Let me give you all an opportunity to

21   take a break and then we'll come back.

22         And, Ms. Daniels, I'm going to give you an

23   opportunity to rest your case in front of the jury, but I'm

24   going to take advantage of this time while they're out to

25   take up their Rule 29 motion.

 1          So the Government has represented that it's

 2    concluded its case in chief.  I'll give you an opportunity

 3    to make your Rule 29 argument.  And then depending on the

 4    disposition, if we move forward, I'll give Ms. Daniels an

 5    opportunity to announce rest.

 6          How do you stand with respect to the availability

 7    of your witnesses, Mr. Ryan?

 8          MR. RYAN:  I think we're good.  I believe that

 9    we're good.

10          THE COURT:  Okay.

11          The Government raised a question or concern about

12    the scope of Dr. Rapa's testimony.  I have had an

13    opportunity to revisit my ruling there.

14          I'm going to permit, as I said in my written

15    order, Dr. Rapa to testify with respect to the manic

16    depressive -- I'm sorry, the bipolar disorder and the fact

17    that he was in a manic phase of bipolar disorder because in

18    my judgment that goes -- that tends to negate the element

19    of the Government's offense charged in count two with

20    respect to whether or not the threat was knowingly

21    transmitted.

22          That's the only thing that she's going to be

23    permitted to testify about.  She won't be permitted to

24    testify about narcissism, which I think was clear in my

25    order.

```
 1              But you did make reference to other things in your

 2      opening statement.  So I want to make sure you understand

 3      the scope of Dr. Rapa's testimony is narrow.

 4              My ruling was that she can testify that he suffers

 5      from a bipolar disorder, that it's her opinion that at the

 6      time of the commission of the offense he was in a manic

 7      phase with his bipolar disorder, which caused him to speak

 8      in hyperbolic terms that he would not have otherwise used.

 9              So don't go outside that area of inquiry with

10      Dr. Rapa.

11              MR. RYAN:  All right.  May I have further

12      clarification then?

13              May I ask her about habitual lying being a feature

14      of bipolarism?

15              THE COURT:  No, you may not.  You may ask her

16      exactly what I told you you might ask her and nothing else.

17              MR. RYAN:  Okay.

18              THE COURT:  All right.  We'll be in recess.

19              Let's come back -- we'll come back at 10:45.

20              I'm going to ask Mr. Carter to let the jurors know

21      we're going to be delayed a little bit longer than

22      15 minutes so that I can take up your Rule 29 motion.

23              (Recess taken at 10:33 a.m. to 10:47 a.m.)

24              THE COURT:  All right.  Back on the record in

25      United States versus Lapin, 6:20-cr-89.
```

```
 1          All counsel and the defendant are present.

 2          Mr. Ryan, does the defense have a Rule 29 motion?

 3          MR. RYAN:  We do, Your Honor.

 4                    RULE 29 MOTION

 5          MR. RYAN:  Judge, the defense asks that the Court

 6   enter a judgment of acquittal for both offenses because

 7   there is insufficient evidence to sustain a conviction.

 8          You have a lot of discussion about language and

 9   what it means, but there is no clear-cut threat here for

10   which a jury could reasonably convict Mr. Lapin.

11          THE COURT:  All right.  Motion denied.

12          Is the jury ready, Mr. Carter?

13          Bring them in, please.

14          I'm going to call on you, Ms. Daniels, to call

15   your next witness.  I expect you'll announce that you rest.

16          I'll explain to the jury that I've taken care of

17   the procedural issues already, and then I'll look to the

18   defense to call their first witness.

19          MS. DANIELS:  Thank you, Your Honor.

20          (Jury entered the courtroom at 10:50 a.m.)

21          THE COURT:  Let me know on our next break if that

22   works out for you.

23          Call your next witness, Ms. Daniels.

24          MS. DANIELS:  Your Honor, the Government rests.

25          THE COURT:  All right.  So ladies and gentlemen,
```

1    the Government has rested its case in chief.

2           You might remember that I mentioned to you that

3    ordinarily I have to take up some procedural issues at this

4    juncture of the trial.  I took advantage of the break that

5    you were just on to do that.  So that's now been resolved.

6           So we're ready to move on to the defense case.

7           Mr. Ryan, is the defense ready to proceed?

8           MR. RYAN:  Yes, Your Honor.

9           THE COURT:  All right.  Call your first witness.

10          MS. MOUAKAR:  Yes, Your Honor.

11          The defense calls Ms. Pamela Nichole Lapin.

12          THE DEPUTY CLERK:  Ms. Lapin, please come forward

13   to be sworn.

14          And stop right there.  Raise your right hand.

15          Do you solemnly swear or affirm under penalty of

16   perjury the testimony you will give will be the truth, the

17   whole truth, and nothing but the truth?

18          THE WITNESS:  Yes, ma'am.

19          (Witness sworn.)

20          THE DEPUTY CLERK:  Please have a seat in the

21   witness box over here to my left.

22          Once you're seated, just adjust the microphone so

23   that the court reporter can hear you.

24          And once you're settled, please state and spell

25   your name for the record.

```
 1              THE WITNESS:  My full name is Pamela Nichole

 2    Margeson.

 3              THE COURT:  Ma'am, if you're comfortable removing

 4    your mask, you may do so.  If you're not comfortable, you

 5    can leave it on.  It's your choice.

 6              THE WITNESS:  Thank you.
```

**DIRECT EXAMINATION**

```
 8    BY MS. MOUAKAR:

 9    Q    Ma'am, I just want to clarify your name again.

10         Do you go by Ms. Lapin or Ms. Margeson?

11    A    I'm married.  I go by my married name, Margeson.  And

12    I go by my middle name Nichole.

13    Q    All right.  So, Ms. Margeson, I have a couple of

14    questions for you.

15         First, can you tell us where you live.

16    A    Orlando, Florida.

17    Q    And have you lived here in Orlando, Florida, for most

18    of your life?

19    A    Yeah.  When I was a kid I moved to South Carolina for

20    a few years and then back.

21    Q    So approximately how long have you been living in

22    Florida?

23    A    Probably 35 of my 38 years.

24    Q    Where do you work now?

25    A    For Total Enviro Services.  It's a family septic
```

```
 1   plumbing company in Orlando.

 2   Q    And so you have a family business; is that right,

 3   ma'am?

 4   A    Yes, ma'am.

 5   Q    And how long has that family business been in the

 6   family?

 7   A    Since 1992.

 8   Q    Do other members of your family work with you?

 9   A    Yeah.  Currently my stepbrother, my father, my

10   husband, and my sister.

11   Q    Now, I want to make clear for the jury, what is your

12   relationship to Mr. Lapin?

13   A    I call him Jimbo.  He's my youngest brother.

14   Q    And so how many siblings are there?

15   A    Of my mother and father, I have a younger sister and

16   Jimbo.

17   Q    Is your brother the youngest; is that right?

18   A    Yes, ma'am.

19   Q    Okay.  And then are you the oldest?

20   A    Yes, ma'am.

21   Q    So did you spend your childhood -- did you grow up

22   with your brother?

23   A    Yes, ma'am.

24   Q    Were you raised in the same household?

25   A    Yes, ma'am.
```

```
1    Q    You mentioned earlier that there was a short period of

2    time that you moved to South Carolina.

3    A    My parents got divorced when I was about 10 or 12.

4    We -- she remarried.  We moved to South Carolina for three

5    or four years.

6         Halfway there -- my brother didn't like living there,

7    so he moved back to Florida with my dad.  But with custody

8    arrangements, we seen each other on a monthly basis.

9    Q    So how would you describe your relationship to your

10   brother, Mr. Lapin?

11   A    A loving relationship, yeah.  I love him.

12   Q    Would you consider yourselves close?

13   A    Yes, ma'am.

14   Q    Has there ever been a time in your life where you have

15   been distant from each other?

16   A    Not over a period of time, no.

17   Q    So are you familiar with his kind of day to day --

18   maybe not exactly what he's doing day to day but --

19   A    Yeah.  We're working adults.  He lives a couple

20   counties away.  We speak to each other a few times a month.

21   Q    So do you visit each other often?

22   A    Yeah.  When he comes to Orlando, he always -- we eat

23   lunch a couple times a month together, because dinner,

24   trying to line up the family and everything is just hard.

25   Q    Understood, with your other family responsibilities.
```

```
 1    A    Yes, ma'am.

 2    Q    Do you have children?

 3    A    I have one daughter.

 4    Q    Okay.  And then work full time as well?

 5    A    And work full time, yes, ma'am.

 6    Q    So in your relationship with your brother, how would

 7  you describe your brother?  What type of individual is he?

 8    A    Jimbo is very outgoing.  He's very opinionated.

 9         He runs a Pokémon card shop where people come and play

10  games and swap Pokémon cards with each other and action

11  figures.

12         He loves animals.

13         He's the fun uncle.  He has no children.  So all of my

14  nieces and nephews, he's got the coolest action figure

15  stuff every year.  So he's the popular one.

16         He's dramatic at times.  Like a light switch.

17    Q    So let's talk about -- you said a lot there.

18         So one, Mr. Lapin, you said, he works at -- where does

19  he work, ma'am?

20    A    A Pokémon shop.  I believe the name of it is Geek

21  Nation or Geek Squad something.  Geek something.

22    Q    And maybe for those that may not have kids or not know

23  what Pokémon is, can you describe that a little bit.  What

24  exactly is that?

25    A    It's a game that adults and children play.  You have
```

```
 1    powers, and it's like fantasy fiction comic book style
 2    stuff.
 3    Q    So is it similar to a store called GameStop, something
 4    like that, except that there's a place that you go?
 5    A    I think GameStop, you buy video games there.
 6         I don't know if you buy video games there, but you can
 7    actually come in and like sell and swap cards.  Like people
 8    would do baseball cards.  You just do them with Pokémon.
 9    Q    So more like a comic shop?
10    A    Yeah.
11    Q    Okay.  And how long has your brother been working
12    there?
13    A    I would say three years, since he's been in
14    Ormond Beach.
15    Q    And you also mentioned, when you were describing your
16    brother, dramatic.
17         What do you mean by that, ma'am?
18    A    He's slightly flamboyant, so at times he will just --
19    a shiny object appears, and he might rant over it; or oh,
20    my gosh, and flap his arms and --
21    Q    Has your brother always been that way?
22    A    Yes, ma'am.
23    Q    You also described him as opinionated.
24    A    Yes, ma'am.
25    Q    Has your brother always been opinionated?
```

```
 1   A     Yes, ma'am.
 2   Q     And what is -- and how do you perceive, why do you
 3   perceive him as being opinionated?
 4   A     Because he says some things that a lot of people would
 5   not.  He doesn't really hold back.  When he has something
 6   to say, he tells you about it.
 7   Q     And how receptive are you and family members about his
 8   opinions?
 9   A     At times it can be inappropriate, if it was like, you
10   know, your grandma around.  But even my grandma is used to
11   him being a little extra.
12   Q     How would you describe the way that he verbalizes his
13   opinions?
14   A     It has to be loud enough so everybody in the room can
15   hear him, because he loves to be the center of attention.
16   And he likes to use his hands.  And sometimes the language
17   isn't the best.
18   Q     In describing his opinions, you also described that he
19   becomes argumentative.
20   A     Yes, ma'am.
21   Q     When you say "argumentative," does he become --
22   describe that for me.  What do you mean by argumentative?
23   A     Like he wants you to see it his way.  And the more you
24   try to talk him out of it or show him your opinion, he'll
25   just talk a little louder.  And so you -- sometimes you
```

1    just give up because it's not worth it.

2    Q    Is he aggressive?

3    A    No.

4    Q    Does he become violent?

5    A    No, ma'am.

6    Q    Have you ever seen your brother get into a physical

7    altercation over an opinion or becoming argumentative?

8    A    No, ma'am.  He wouldn't hurt a fly.

9    Q    Let's talk a little bit about your brother's character

10   trait for truthfulness.

11        Do you consider your brother to be a truthful person?

12        MS. DANIELS:  Objection, Your Honor.  Improper

13   characterizing.

14        THE COURT:  Let's have a quick sidebar.

15        (Discussion at sidebar on the record.)

16        THE COURT:  All right.  Are you on, Ms. Daniels?

17        MS. DANIELS:  Yes, Your Honor.

18        THE COURT:  Are you on, Ms. Mouakar?

19        MS. MOUAKAR:  Yes, Your Honor.

20        THE COURT:  Ms. Daniels, why would this not be

21   admissible under 608?

22        MS. DANIELS:  Your Honor --

23        THE COURT:  So let me tell you what my thinking

24   is, and then I'll give you a chance to respond.

25        It seems to me that Mr. Lapin's truthfulness has

1    been put at issue by the testimony of the special agent,

2    among other things.

3           So at first blush, it looks to me like his

4    reputation or character for truth-telling has been attacked

5    by the Government's case in chief.

6           And so under Rule 608, evidence of truthfulness --

7    I presume that is where Ms. Mouakar is going -- maybe the

8    testimony is going to be consistent with Agent Anyaso, the

9    testimony that he's not truthful.

10          Why is it not admissible under 608 or some other

11   provision of the rule?

12          MS. DANIELS:  Your Honor, my real concern was that

13   under the character evidence that his truthfulness is not

14   an element of this case.  And so I would think this would

15   be excludable under that.

16          THE COURT:  All right.  Well, I respectfully

17   disagree.

18          I think that the special agent's testimony, among

19   other things, has put the question of whether or not

20   Mr. Lapin has been truthful on a number of instances.

21          So I'm going to overrule the Government's

22   objection.

23          I just wanted to give you a chance to make your

24   record.

25          MS. DANIELS:  Thank you, Your Honor.

```
 1            THE COURT:  So objection is overruled.

 2            (End of discussion at sidebar.)

 3            THE COURT:  You may inquire, Ms. Mouakar.

 4            MS. MOUAKAR:  Thank you, Your Honor.

 5   BY MS. MOUAKAR:

 6   Q    Ma'am, I was asking in regards to your brother's

 7   character for truthfulness.

 8        In the years that you've been with him, can you

 9   describe what is your opinion for his character for

10   truthfulness?

11   A    He loves to exaggerate, even the simplest things.

12        I could tell him the sky was light blue and he'd say

13   it's medium light blue.

14        He does like to story-tell.

15   Q    Ma'am, is that your way of saying that he's not always

16   truthful?

17   A    Yes, ma'am.

18   Q    And what kind of things, if you can recall or if you

19   can -- you know, what would he be untruthful about?  Why

20   does he become untruthful?

21   A    I think he wants to be something more than he is.

22        He might say that I got a $100 suit on and it was

23   really $79.

24        You know what I mean?  Like he wants to be bigger than

25   he really is.
```

```
 1   Q     Has that been a constant in the years that you've
 2   known him?
 3   A     Yes, ma'am.
 4   Q     Do you know whether or not your brother has ever
 5   traveled to Washington, D.C.?
 6   A     No, he has never traveled there.
 7   Q     How do you know that?
 8   A     He's not very close with our parents.  So anytime he
 9   travels, he'll tell me or my other sister what he's doing.
10   Q     Now, I'm going to be more specific.  Do you have any
11   reason to believe that he ever traveled to Washington,
12   D.C., in December of 2019?
13   A     No, ma'am.
14   Q     Is your brother opinionated about politics?
15   A     Recently.  And -- yes.
16   Q     And when you say "recently," is that within -- can you
17   give me a more specific time frame?
18   A     He's never -- I think his first time he ever voted was
19   in the last election, not this most recent one but in the
20   last one.
21         And he might have found a home with other people who
22   have -- are liked-minded.  So he felt like he was a part of
23   it.  So he was trying to be a part of a movement.
24         He is a very red-blooded Republican.  He thinks his
25   voice is constantly being -- his opinions are not viewed by
```

```
 1   everybody else.  He thinks he's constantly being muffled.
 2   Q    Are you familiar with the Pulse Nightclub shooting?
 3   A    Yes, ma'am.
 4   Q    Do you know whether your brother was involved or was
 5   actually there when the Pulse Nightclub shooting occurred?
 6   A    He was not.
 7   Q    And how do you know that, ma'am?
 8   A    I woke up on a weekend, and I turned the news on like
 9   every Sunday at -- or maybe it was Saturday -- it was
10   Sunday or Saturday -- every weekend at 7:00 a.m.
11       I seen it.  It was the first thing on the news.  I
12   immediately called him because he frequents there a lot.
13   He answered the phone.  I told him.  He said, Oh, my God.
14   And he hung up and I'm assuming started calling around.
15   Q    So did he know other people who also frequented the
16   Pulse Nightclub?
17   A    Yes.
18           MS. DANIELS:  Objection.
19   BY MS. MOUAKAR:
20   Q    Do you know if he knows individuals --
21           THE COURT:  I'm sorry.  Just a second.  There's an
22   objection.
23           MS. DANIELS:  The objection, Your Honor, is
24   relevance.
25           THE COURT:  Sustained.
```

1    BY MS. MOUAKAR:

2    Q    Did he have a close connection to individuals from the

3    Pulse Nightclub shooting?

4            MS. DANIELS:  Objection, Your Honor, relevance.

5            THE COURT:  Sustained.

6    BY MS. MOUAKAR:

7    Q    To your knowledge, has Mr. Lapin ever had any issue

8    with neighbors or friends?  Has he ever been physical or

9    violent towards any friends or neighbors?

10   A    No, ma'am.

11   Q    Has he ever been physical or violent with anybody in

12   your family?

13   A    No, ma'am.

14   Q    You were interviewed in this case; is that right,

15   ma'am?

16   A    Yes, ma'am.

17   Q    By agents involved with the Capitol Police or part of

18   Capitol Police?

19   A    Yes, ma'am.

20   Q    You sat and spoke with them?

21   A    Yes.  They came to our place of work to interview me

22   and my sister.

23   Q    Would you describe yourself as being cooperative

24   during that interview?

25   A    Absolutely.

1    Q     Were you truthful with them?

2    A     Yes, ma'am.

3    Q     If you thought that your brother, Mr. Lapin, was a

4    danger, would you have told them that?

5             MS. DANIELS:  Objection, Your Honor.

6             THE COURT:  Sustained.

7    BY MS. MOUAKAR:

8    Q     Ma'am, do you understand the seriousness of this case?

9             MS. DANIELS:  Objection, Your Honor.

10            THE COURT:  Grounds?

11            MS. DANIELS:  Relevance.

12            THE COURT:  Sustained.

13            MS. MOUAKAR:  Just a moment, Your Honor.

14            THE COURT:  Yes.

15            MS. MOUAKAR:  I have no further questions.

16            Thank you.

17            THE COURT:  Thank you, Ms. Mouakar.

18            Would you mind disposing of your microphone cover

19   and wiping the area down before I invite Ms. Daniels up.

20                    **CROSS EXAMINATION**

21   BY MS. DANIELS:

22   Q     Good afternoon, Ms. Margeson.

23         Is that how you pronounce it?

24   A     (Nods head.)

25   Q     Ms. Margeson, you're Mr. Lapin's older sister; is that

```
 1   correct?

 2   A    Yes, ma'am.

 3   Q    You were also interviewed by law enforcement on the

 4   day Mr. Lapin was arrested?

 5   A    Yes, ma'am.

 6   Q    During that interview, you referred to Mr. Lapin as an

 7   internet tough guy; is that correct?

 8   A    Yes, ma'am.

 9   Q    You mentioned that his outspokenness is one of the

10   reasons he doesn't work for the family business anymore?

11   A    Yes, ma'am.

12   Q    You stated that this outspokenness is one of the

13   reasons you don't call him very often?

14   A    I don't remember saying that.

15   Q    Would a transcript of that maybe refresh your

16   recollection?

17   A    Sure.

18         MS. DANIELS:  Your Honor, may I approach the

19   witness?

20         THE COURT:  Yes.

21         MS. DANIELS:  239.

22         MS. MOUAKAR:  Do you know what Bates Number that

23   is.

24         MS. DANIELS:  Yes.

25   BY MS. DANIELS:
```

```
 1   Q    Okay.  Ms. Margeson, has your recollection been
 2   refreshed?
 3   A    Yes, ma'am.
 4   Q    Go ahead and turn that transcript upside down.
 5   A    (Complying.)
 6   Q    Now, did you state that his outspokenness is one of
 7   the reasons you don't call him very often?
 8   A    Yes, ma'am.
 9   Q    You mentioned that he's very sharp-tongued and it's
10   hard to deal with?
11   A    Yes.
12   Q    In that interview you were also asked about his mental
13   health; is that right?
14   A    I asked about it?
15   Q    No.  You were asked about it.
16   A    Yes.
17   Q    During the interview, you mentioned that you don't
18   think he's mental, just extra?
19         MS. MOUAKAR:  Objection, Your Honor.
20         THE COURT:  Grounds?
21         MS. MOUAKAR:  Foundation and outside the scope.
22         THE COURT:  Objection is overruled.
23   BY MS. DANIELS:
24   Q    During the interview you mentioned that you don't
25   think he's mental, just extra; is that correct?
```

```
 1   A    Yes, ma'am.

 2   Q    You told the agents that Mr. Lapin doesn't think of

 3   consequences and does whatever he wants without thinking of

 4   tomorrow?

 5   A    Yes, ma'am.

 6   Q    Do you know a person named Herman Jones?

 7   A    Yes, ma'am.

 8        MS. MOUAKAR:  Objection, Your Honor.  Outside the

 9   scope.

10        THE COURT:  Do you want an opportunity to address

11   that?

12        MS. DANIELS:  Yes.

13        (Discussion at sidebar on the record.)

14        THE COURT:  Are you on?

15        Tell me what portion of the direct examination

16   this is relevant to, either directly or inferentially.

17        MS. DANIELS:  Your Honor, this goes to his

18   character of truthfulness again.  So it talks about that.

19   And also it was discussed within the interview that

20   Ms. Mouakar brought up on his direct examination.

21        MS. MOUAKAR:  If I may respond, Your Honor.

22        THE COURT:  Yes, you may.

23        MS. MOUAKAR:  I believe that this was just -- I

24   mean, we basically established that he's not truthful.  So

25   I don't know that it's -- I don't know that it's relevant.
```

1          I think it's going beyond the scope, but I also

2   think, again, we didn't bring up this specific individual.

3          So I'm not really sure the line of questioning

4   to -- you know, again, our testimony through the witness

5   was that he's not always truthful.  So I'm not sure that

6   it's additionally contradicting what was said previously.

7          But specifically as to the gentleman, Mr. Jones,

8   again, I don't know that it's relevant.  It's beyond the

9   scope.

10          THE COURT:  Well, I think the issue of Mr. Lapin's

11   truthfulness or untruthfulness has certainly been joined by

12   both sides, specific instances of truthfulness or

13   untruthfulness.  Once the issue has now been raised by both

14   parties, I think it's admissible, at least to a limited

15   extent.

16          So I'm going to overrule the objection as it

17   relates to scope and foundation and permit you to proceed

18   on the question that you have pending, Ms. Daniels, with

19   respect to Mr. Jones.

20          MS. DANIELS:  Thank you, Your Honor.

21          (End of discussion at sidebar.)

22          THE COURT:  Objection is overruled.

23          You may inquire.

24   BY MS. DANIELS:

25   Q    So you know someone named Herman Jones; is that

```
 1  correct?

 2  A     Yes, ma'am.

 3  Q     You know him as Davis; is that correct?

 4  A     Yes, ma'am.

 5  Q     You refer to Mr. Jones as Mr. Lapin's sugar daddy; is

 6  that correct?

 7          MS. MOUAKAR:  Objection, Your Honor.  Relevance

 8  and 403.

 9          THE COURT:  Sustained.

10  BY MS. DANIELS:

11  Q    You mentioned that as of the date that you were

12  interviewed they had been in a relationship for a couple

13  of years?

14          MS. MOUAKAR:  Objection, Your Honor.  401 and 403.

15          THE COURT:  Sustained.

16  BY MS. DANIELS:

17  Q     You also mentioned that Mr. Jones lets Mr. Lapin drive

18  his vehicle?

19  A     Yes.

20  Q     And you were asked specifically if Mr. Lapin cycles

21  through emotions where he's more sharp-tongued and hyper?

22  A     I don't remember that.

23  Q     Would a transcript of that maybe refresh your

24  recollection?

25  A     Yes.
```

```
 1   Q      If you will turn to page 9 on minute 12.

 2   A      (Complying.)

 3   Q      And just go ahead and look up at me when your

 4   recollection has been refreshed.

 5   A      Which number did you say it was?

 6   Q      Page 9, right around minute 12.

 7          Sorry, 11:41, I believe your answer is.

 8   A      Yes.  I was asked if he goes through cycles.

 9   Q      And you told law enforcement that Mr. Lapin is normal,

10   correct?

11   A      Yes.

12   Q      Meaning he doesn't go through cycles?

13   A      Yes.

14   Q      Now, you describe Mr. Lapin as someone who tries to

15   push his opinions on others; is that correct?

16   A      Yes.

17   Q      And you were not present when he left the voice mails

18   at issue in this case?

19   A      No, ma'am.

20          MS. DANIELS:  Your Honor, may I just have a brief

21   second to confer with co-counsel?

22          THE COURT:  Yes.

23   BY MS. DANIELS:

24   Q    Ms. Margeson, do you know who Herman Jones is?

25          MS. MOUAKAR:  Objection.  Relevance.
```

```
 1              THE COURT:  Overruled.
 2   BY MS. DANIELS:
 3   Q     Who is Herman Jones?
 4   A     He's my brother's partner.
 5              MS. DANIELS:  Thank you.
 6              Your Honor, I don't have any other questions at
 7   this time.
 8              Thank you.
 9              THE COURT:  If you'll dispose of your cover and
10   wipe the area before I let Ms. Mouakar return.
11                    REDIRECT EXAMINATION
12   BY MS. MOUAKAR:
13   Q     Ms. Margeson, you're not a psychologist; is that
14   right, ma'am?
15   A     No, ma'am.
16   Q     So when you were asked about your brother's mental
17   health, you're saying that as --
18   A     As his sister.
19   Q     Now, you were specifically asked on cross-examination
20   about your brother having this sharp tongue.  And you
21   describe him as he comes down and he goes up.
22         So even though you just testified about cycling, does
23   he, in fact, go through ups and downs?
24   A     Yes, when he's set off.
25   Q     So can you describe that a little bit more.  What is
```

```
 1   it like when you're saying he's going up and down?
 2   A    Like when he doesn't hear -- something that he doesn't
 3   really like, it just might set him off into a tangent on
 4   other things that really don't even have anything to do
 5   with it.
 6   Q    You have described him as being hot and cold.
 7        Can you tell us a little bit about that.
 8   A    Yeah.  One time when you see him and approach him, he
 9   might just be calm and cool.  And then depends on what just
10   came across the news station before I seen him at wherever
11   he was, he might be hot and worked up about whatever he
12   just seen on the news.
13   Q    So as far as mental health, are you familiar that he's
14   been diagnosed with mental health issues?
15            MS. DANIELS:  Objection, Your Honor.
16            THE COURT:  I'm going to sustain the objection.
17            MS. MOUAKAR:  Your Honor, if I may be heard.
18            THE COURT:  Okay.
19            (Discussion at sidebar on the record.)
20            MS. MOUAKAR:  Can you hear me?
21            THE COURT:  Yes.
22            MS. MOUAKAR:  The only question that I expect to
23   ask her, is she familiar whether he's been diagnosed?
24            I think it was put into question whether or not he
25   has mental health issues.  So I think that the Government
```

```
 1   opened that door through cross-examination.

 2           I'm not going to get into his diagnosis or

 3   elaborate any more on that.  That would be the extent of

 4   the questioning.

 5           THE COURT:  Ms. Daniels.

 6           MS. DANIELS:  Your Honor, I apologize.  I missed

 7   the first part of Ms. Mouakar's argument because my thing

 8   wasn't on.

 9           THE COURT:  Let me see if I can restate it.  She

10   can correct me if I'm wrong.

11           But essentially the defense position is the

12   question of whether or not the defendant has mental health

13   issues has been joined by the Government and that she

14   intends to ask this witness, as I gather, just the

15   threshold question of whether she's aware that he was

16   diagnosed with mental health issues and not pursue what the

17   issues are or what the nature of the diagnosis is.

18           MS. DANIELS:  Yes, Your Honor.

19           So that answer, that question would call for

20   hearsay about what she had heard about his diagnosis.

21           And in addition -- or the question as posed to her

22   when she was interviewed on June 18th of 2020 was

23   whether she said that he has mental health issues and what

24   she knew at that time.

25           So the Government's argument did not open the
```

```
 1    door.
 2           Now, whether she knows he's been diagnosed with a
 3    mental health condition which would, of course, again be
 4    hearsay.
 5           THE COURT:  Again, I'm going to sustain the
 6    objection.
 7           I think it likely is to call for hearsay.  And I
 8    think it's marginally relevant, if at all, with respect to
 9    what this witness knows.
10           So I'm going to sustain the Government's objection
11    and direct you to proceed with a new question, Ms. Mouakar.
12           MS. MOUAKAR:  Your Honor, thank you.
13           (End of discussion at sidebar.)
14    BY MS. MOUAKAR:
15    Q    Ma'am, last question.
16         Despite all of your brother's sharp tongue and
17    different things that were described on cross-examination,
18    his opinions and argumentive, has your brother ever acted
19    in a violent manner towards people that disagree with his
20    opinions or his being argumentative?
21    A    No, ma'am.
22    Q    Is he at all -- do you consider his -- people who are
23    of a different opinion or a different stance for them to be
24    in danger?
25           MS. DANIELS:  Objection, Your Honor.
```

```
 1          THE COURT:  Sustained.

 2          MS. MOUAKAR:  I have no further questions.

 3          THE COURT:  May this witness be excused?

 4          MS. MOUAKAR:  Yes, Your Honor.

 5          THE COURT:  Ms. Daniels?

 6          MS. DANIELS:  Yes, Your Honor.

 7          THE COURT:  All right.  Thank you, ma'am.

 8          And if you're here under subpoena, you're released

 9    from it.

10          If you would do me a favor and discard that

11    microphone cover.  There's a trash can underneath you.  And

12    then take a couple of those wipes, if you would, and wipe

13    your area down.  I would appreciate it.

14          Thank you.

15          Ms. Daniels, do you want to retrieve your exhibit?

16          MS. MOUAKAR:  Your Honor, since she's been

17    released from subpoena, she's going to stay in the

18    courtroom for the Government.

19          THE COURT:  Yes.

20          MS. MOUAKAR:  Thank you.

21          THE COURT:  Call your next witness.

22          MS. MOUAKAR:  Your Honor, the defense calls

23    Ms. Marie Lynn Neer.

24          THE DEPUTY CLERK:  Ms. Neer, please come forward

25    to be sworn.
```

```
 1              You can stop right there.  Raise your right hand.
 2              Do you solemnly swear or affirm under penalty of
 3    perjury that the testimony you will give will be the truth,
 4    the whole truth, and nothing but the truth?
 5              THE WITNESS:  I do.
 6              (Witness sworn.)
 7              THE DEPUTY CLERK:  Please have a seat in the
 8    witness box over here to my left.
 9              Once you're seated, just adjust the microphone so
10    that the court reporter can hear you.
11              And state and spell your name for the record,
12    please.
13              THE COURT:  Ma'am, if you're comfortable removing
14    your face covering, you can remove it while you're
15    testifying.
16              THE WITNESS:  Thank you.
17              Marie Neer, M-A-R-I-E.  Neer, N, like Nancy,
18    E-E-R.
```

<b><u>DIRECT EXAMINATION</u></b>

```
20    BY MS. MOUAKAR:
21    Q    Good afternoon, Ms. Neer.  How are you?
22    A    Good.  How are you?
23    Q    Good.  Thank you.
24         Can you please tell the jury what is your relationship
25    to Mr. Lapin.
```

```
 1   A     He is my youngest sibling.

 2   Q     Is it right that there's three siblings?

 3   A     Yes.

 4   Q     Are you the middle?

 5   A     Yes.

 6   Q     And, ma'am, where do you live?

 7   A     I live in Orlando.

 8   Q     Have you lived in Orlando for a significant period of

 9   time?

10   A     Yes.

11   Q     How long have you lived here?

12   A     Most of my life.  For a few years I lived in

13   South Carolina as a child, but we came back here.  So

14   pretty much my whole life except for those few years.

15   Q     Did you grow up with your brother?

16   A     Yes.

17   Q     And did you have a close relationship throughout

18   the years?

19   A     Yes.  I am close with my brother.  We are close.

20   Q     Has there ever been a period of time where you all

21   were distant from each other?

22   A     He moved back to Florida to live with our father from

23   South Carolina for a few years after we had been living

24   there, but when we came back, no.  Only as adults have we,

25   you know, lived separately.
```

```
 1   Q    But even now as adults, while you live separate, how
 2   would you describe your relationship to Mr. Lapin?
 3   A    Jimbo -- we call him that -- and I are very close.
 4   Him and I.
 5   Q    So you communicate often?
 6   A    Yes, weekly.  If not weekly, only because I'm busy.
 7   Every other week.
 8   Q    Do you see each other often?
 9   A    Not as often as I'd like.
10   Q    But you do communicate often.  Weekly, you said?
11   A    Yes, ma'am.
12   Q    So in growing up with your brother, how would you
13   describe your brother as a person?
14   A    He is very outgoing.  He is fun.  He's definitely the
15   fun uncle.  If you had to say, the favorite uncle.
16        He's a nice guy.  He's a good person.  He's very
17   opinionated.
18   Q    And so you say he's fun uncle.
19        Do you have children, ma'am?
20   A    Yes, I have two.
21   Q    And they both spend time with Mr. Lapin from time to
22   time?
23   A    Yes.
24        MS. DANIELS:  Objection, Your Honor.  Relevance.
25        MS. MOUAKAR:  It's foundational, Your Honor.
```

```
 1              THE COURT:  Objection is overruled.
 2              Limited foundation, Ms. Mouakar.
 3         MS. MOUAKAR:  Yes, Your Honor.
 4         THE WITNESS:  My two children and my three
 5    soon-to-be stepchildren all spend time with him, yes.
 6    BY MS. MOUAKAR:
 7    Q    And then as far as your interactions with him, you
 8    kind of started describing him as opinionated.
 9         Can you tell us a couple other words used to describe
10    him.  You said dramatic?
11    A    He is dramatic.  I would definitely say he has a
12    tendency to be over the top.
13    Q    And despite all of his opinions, has your brother ever
14    been physical with someone who disagrees with his opinions?
15    A    Not that I know of.
16              MS. DANIELS:  Objection.  Improper evidence under
17    404.
18              MS. MOUAKAR:  Your Honor, I would say it's a
19    pertinent trait.  It has been raised by the charges in the
20    case.
21              THE COURT:  Objection is overruled.
22              MS. DANIELS:  Your Honor, may I have an
23    opportunity to respond?
24              THE COURT:  I don't need to hear any further
25    argument on it, but the objection is overruled.
```

BY MS. MOUAKAR:

Q    I'm sorry, ma'am.  If you can answer the question.

A    Can you repeat the question?  I'm sorry.

Q    Yes.

So despite his opinions -- and I'm sorry.  I'm going to try to recall the question exactly.

But has he ever been violent or aggressive with anybody whose -- or physically aggressive towards anybody?

A    No, ma'am.

Q    Is your brother, in particular, opinionated by certain topics or about everything?  What is he opinionated about?

A    He's opinionated about everything.  There's not one specific thing -- everybody gets an opinion, but his is the highest, the loudest.

Q    I want to talk to you a little bit about your brother's character for truthfulness.

How would you describe your brother for his character for truthfulness?

A    My brother likes to stretch the truth about small things, any -- I mean, it can seem small to some people.  You know, some people it may be a big deal to.  But even the smallest things, he's known to stretch the truth on, yes.

Q    And why does he do that?

A    I think he does it for attention.  I think he craves

1  attention.

2  Q    How would you describe your brother -- your brother's

3  interactions when he's talking with you?  Have you ever --

4  just all around being -- let's see.  Let me rephrase it.

5      Are you familiar with whether your brother has mental

6  health issues?

7  A    I'm not a doctor.  I'm not a doctor.  I'm not sure.

8  Q    Does your brother become hot or cold with you at

9  times?

10 A    Yes.  Very -- yes.  He can be very quick to switch.

11 Yes.

12 Q    And you were interviewed by law enforcement in this

13 case, correct?

14 A    Yes, ma'am.

15 Q    And you described those types of interactions that

16 your brother may have during conversations where he may

17 think you're the world's best sister a moment and then the

18 world's worst sister the other moment?

19 A    Yes, ma'am.

20 Q    Has he been like that throughout his lifetime with

21 you?

22 A    Yes, ma'am.

23 Q    And so you've never recognized this as potential

24 mental health; is that right?

25 A    No, ma'am.

```
 1   Q     Okay.  So like you said, you're not a psychologist?

 2   A     No, I'm not.

 3              MS. DANIELS:  Objection, Your Honor, leading.

 4              THE COURT:  Sustained.

 5   BY MS. MOUAKAR:

 6   Q     Have you ever been trained in psychology, ma'am?

 7   A     No, ma'am.

 8   Q     Do you know whether your brother has ever traveled to

 9   Washington, D.C.?

10   A     No, ma'am.

11   Q     You don't know or he has not?

12   A     I do not know that he has.  Usually if he ever goes

13   out of town, he lets me know if he's going anywhere.  He

14   doesn't travel often.

15         If there was an emergency --

16   Q     Would you have known if he traveled to Washington,

17   D.C., in the last year?

18   A     Yes.

19   Q     What makes you say that?

20   A     Because he tells me when he goes somewhere.

21              MS. MOUAKAR:  Just a moment, Your Honor.

22              THE COURT:  Yes.

23              MS. MOUAKAR:  I have no further questions.

24              Thank you.

25              THE COURT:  Can you tidy up there, Ms. Mouakar,
```

```
 1   before I invite Ms. Daniels up for cross-examination.
 2           MS. MOUAKAR:  Thank you for the reminder,
 3   Your Honor.
 4                     CROSS EXAMINATION
 5   BY MS. DANIELS:
 6   Q    Good afternoon, Ms. Neer.
 7   A    Hi.
 8   Q    Ms. Neer, so you were also interviewed by law
 9   enforcement in June; is that correct?
10   A    I believe so, yes.
11   Q    You said that you speak with the defendant every week
12   or so?
13   A    Yes, ma'am.
14   Q    You would say that you and the defendant have a good
15   relationship?
16   A    Yes, ma'am.
17   Q    You even say you know him well?
18   A    Yes.
19   Q    And you were asked if the defendant struggles with any
20   sort of mental illness; is that correct?
21   A    Yes.
22   Q    And you told law enforcement that he does not; is that
23   correct?
24   A    Yes.
25   Q    You were asked if he struggles with depression or
```

1    anything like that?

2    A    I believe so, yes.

3    Q    And you told law enforcement that you had never

4    observed anything like that; is that correct?

5    A    I would have to read my statement.

6         MS. DANIELS:  Your Honor, may I have permission to

7    approach the witness?

8         THE COURT:  Yes, you may.

9         THE WITNESS:  Thank you.

10   BY MS. DANIELS:

11   Q    You're looking at page 3, about minute 2:16.

12   A    2:16.

13        I don't think he has -- I don't think so.  He's always

14   been really happy-go-lucky around the kids.

15   Q    Okay.  So has your recollection been refreshed?

16   A    Yes.

17   Q    If you can go ahead and turn that transcript over.

18   A    Okay.

19   Q    Okay.  So you told law enforcement that you had never

20   observed anything like depression or anything else in

21   Mr. Lapin; is that correct?

22   A    Right.

23   Q    And you told them that he was always happy-go-lucky

24   around your family?

25   A    At that point in time, yes, during my interview.

```
 1   Q    During your interview?

 2   A    Uh-huh.

 3   Q    And you stated that he had never mentioned any mental

 4   health problems to you; is that correct?

 5   A    Yes.

 6   Q    And you know Mr. Lapin's partner, Herman Jones; is

 7   that correct?

 8   A    Yes.  I've met him.

 9   Q    You know him by the name of Davis?

10   A    Yes.

11   Q    And you know that they've been in a relationship

12   for years at the time of your interview; is that right?

13          MS. MOUAKAR:  Objection, Your Honor, 401, 403.

14          THE COURT:  Objection is overruled.

15   BY MS. DANIELS:

16   Q    Do you need me to rephrase?

17   A    Yes.  I'm sorry.

18   Q    You know that they had been in a relationship

19   for years at the time you were interviewed by law

20   enforcement?

21   A    Yes.

22   Q    You told law enforcement that Mr. Lapin was with

23   Mr. Jones?

24   A    Correct.

25          At that point in time?
```

```
 1   Q    Yes, in your interview.
 2   A    Yes.
 3   Q    Yes.
 4        And you believed that at that time of your interview
 5   he had lived with Mr. Jones for years?
 6   A    It had been a few years, yes.  I wasn't positive how
 7   long -- exactly how long it has been.
 8   Q    And when you were asked, you told law enforcement that
 9   your brother was not at the Pulse Nightclub the night of
10   the shooting?
11   A    Correct.
12            MS. MOUAKAR:  Objection, Your Honor.
13            THE COURT:  Overruled.
14   BY MS. DANIELS:
15   Q    I'm sorry.  What was your answer?
16   A    Correct.
17   Q    You also mentioned that your brother drives a Chevy
18   truck?
19   A    Correct.
20   Q    You told law enforcement on your interview that your
21   brother has a big mouth?
22   A    I did.
23   Q    And that his biggest issue is his mouth?
24   A    I did.
25   Q    You mentioned that he gets in fights with people
```

```
 1   online and over the phone?

 2   A    I did.

 3   Q    You told the agents that the defendant is very

 4   opinionated and everyone is going to know his opinion

 5   whether they want to or not?

 6   A    I did.

 7   Q    You had mentioned that this behavior might have gotten

 8   him kicked off a Facebook group?

 9   A    Yes.

10   Q    And I believe you refer to this as Facebook Jail.

11   A    Yes.

12   Q    Is that correct?

13   A    Yeah.

14   Q    When you were speaking with agents, you stated that

15   the defendant does not know a boundary when he has his

16   attitude going; is that correct?

17   A    Yes.

18   Q    And finally, near the end of the interview, you told

19   the agents that you didn't think your brother had a mental

20   illness; he just has a big mouth?

21   A    Yes.

22        MS. DANIELS:  May I confer with counsel,

23   Your Honor?

24        THE COURT:  Yes.

25        MS. DANIELS:  No other questions at this time,
```

```
1    Your Honor.
2             THE COURT:  Redirect, Ms. Mouakar?
3             MS. MOUAKAR:  Yes, Your Honor.
4                    REDIRECT EXAMINATION
5    BY MS. MOUAKAR:
6    Q    Ms. Neer, have you learned since you were interviewed
7    by law enforcement --
8             MS. DANIELS:  Objection.
9    Q    -- whether or not your brother suffered from mental
10   health?
11            MS. DANIELS:  Objection.
12            THE COURT:  Sustained.
13            MS. MOUAKAR:  Your Honor, I believe the Government
14   has opened the door to this line of questioning through
15   their cross-examination and that the witness should be
16   allowed to answer.
17            THE COURT:  I appreciate your position.
18            My ruling stands.  Objection sustained.
19            MS. MOUAKAR:  Thank you, Your Honor.
20   BY MS. MOUAKAR:
21   Q    Was your brother close to Pulse Nightclub shooting
22   survivors?
23            MS. DANIELS:  Objection, Your Honor.
24            THE COURT:  Do you want to be heard on the
25   relevance of this, Ms. Mouakar?
```

1        MS. MOUAKAR:  Yes, Your Honor.  They opened the

2   door during cross-examination.

3        THE COURT:  Objection is overruled.

4        Not on that point.  His relative closeness or

5   distance to people there, I don't see the connection.

6        MS. MOUAKAR:  I'm sorry.  So you said overruled or

7   sustained?

8        THE COURT:  I'm sorry.  Objection is sustained.

9   I'm sorry if I misspoke.

10       I don't see -- the connection is not readily

11  apparent to me.

12  BY MS. MOUAKAR:

13  Q    When you mentioned that your brother was put in

14  Facebook Jail, can you explain what you meant by that?

15  A    He -- so sometimes -- I guess there's not really a

16  Facebook Jail, but people get censored on Facebook.  And

17  maybe he was censored on Facebook or his posts were removed

18  or not able to, you know, post something.

19  Q    Do you know whether he was ever censored for making

20  any sort of comments or threats to Nancy Pelosi?

21  A    No.

22       MS. MOUAKAR:  I have no further questions.

23       THE COURT:  Thank you.

24       May this witness be excused?

25       MS. MOUAKAR:  Yes, Your Honor.

```
 1            MS. DANIELS:  Yes, Your Honor.

 2            THE COURT:  All right.  Thank you, ma'am.  You're

 3    excused.

 4            And if you're here under subpoena, you're released

 5    from it.  You can go on about your business.

 6            If you would do me a favor and dispose of that

 7    microphone cover.  Take one of those wipes and just kind of

 8    generally wipe down your area before you leave, I'd be

 9    appreciative.

10            MS. MOUAKAR:  And, Your Honor, we'll ask if the

11    witness can remain in the courtroom with the Government.

12            THE COURT:  She may.

13            MS. MOUAKAR:  Thank you.

14            THE COURT:  Call your next witness.

15            MR. RYAN:  Your Honor, our next witness is Sheila

16    Rapa.

17            In light of our conversations today, may I have a

18    few moments with her before we bring her out?

19            THE COURT:  How many moments do you need?

20            MR. RYAN:  Oh, five.

21            THE COURT:  Okay.  Let's take a short recess,

22    ladies and gentlemen.  And we'll come back --

23            How long do you think this witness' testimony is

24    likely to take?

25            MR. RYAN:  On direct, maybe 20 minutes, 30.
```

1          THE COURT:  I'll tell you what, why don't we do

2   this, ladies and gentlemen.  It's a little bit early, but

3   let's take our lunch break and that way we can get these

4   things done and not have you all just wasting time back

5   there in the jury room.

6          So let's go ahead and adjourn for lunch.  It's

7   11:45.  Let's come back at 1:00 and we'll resume with the

8   defense case.

9          (Jury exited the courtroom at 11:43 a.m.)

10          THE COURT:  So just to take a quick opportunity

11   for this break, not that you need it necessarily, but to

12   the extent that it might be of any utility to the Eleventh

13   Circuit, there are a couple of rulings that I wanted to

14   give you, give my -- the basis for my rulings on the

15   record.

16          With respect to the Government's hearsay objection

17   to -- I'll call them the self-exculpatory statements made

18   by the defendant to the officer at the time of the

19   interview.  I admitted those not because -- not because I

20   didn't recognize his self-exculpatory statements are not

21   admissible as admissions against the interest of the

22   defendant but because I did not perceive them to be offered

23   for the truth of the matter asserted.

24          I perceived them to be offered to establish that

25   Mr. Lapin was cooperative.  Whether he actually needed to

 1    call somebody on the phone or not was not the point.  The

 2    point was whether or not he was cooperative with law

 3    enforcement during the time that they were executing their

 4    search.

 5            So that was the basis for my ruling there.

 6            With respect to the objection made by the

 7    Government, the testimony about Mr. Lapin's trait for

 8    violence, I admitted that testimony and overruled the

 9    objection pursuant to Rule 404.

10            And with respect to the defense objection to -- or

11    the Government's objection to the relationship of Mr. Lapin

12    with the people that had gone to the -- had been victims of

13    the Pulse Nightclub, I sustained that objection because the

14    original point of the testimony was to show that Mr. Lapin

15    had been untruthful in his statement given to the law

16    enforcement officers.

17            So whether he was present or not is relevant to

18    that issue.  Whether he has some close relationship to

19    people at Pulse does not have any relevance to the question

20    of whether he was truthful, at least in my mind.

21            So those are the bases for my rulings on those

22    things that came up during the course of the testimony this

23    morning.

24            We'll be in recess.  I'll see you back here at

25    1:00.

```
 1              Yes, sir.

 2              MR. RYAN:  Can I ask you a question?

 3              I presented the Government on the deadline for

 4   demonstrative exhibits some demonstrative exhibits.  I have

 5   received no objections.

 6              So may I assume that I can use those without there

 7   being an issue, or would you like to see them first?

 8              THE COURT:  I would like to see them and see if

 9   there is going to be an issue.

10              MS. DANIELS:  Has the time line been -- I think

11   you did get an objection to the time line.  Has that been

12   revised now that the Court has ruled on judicial notice?

13              MR. RYAN:  I don't know.

14              One would be this time line, Your Honor, that has

15   the one, two, three, four, five, six, seven data points

16   that you agreed to judicially notice about the time frames

17   of the impeachment proceedings at the bottom.

18              And then on the top are the --

19              And get ready to switch over to your side because

20   I have to show him stuff on ours.

21              -- and on the top are the voice messages, when

22   they were left.

23              THE COURT:  Okay.  And what witness do you intend

24   to use that exhibit with?

25              MR. RYAN:  No, in closing.
```

```
 1              THE COURT:  In closing.  Okay.

 2              Do you have an objection to that, Ms. Daniels?

 3              MS. DANIELS:  Yes, Your Honor.

 4              So the original objection was I was asked whether

 5    I thought this graph was judicially noticeable.  And so now

 6    the Court has ruled on that.

 7              But I do believe that the statements -- I believe

 8    they are statements from September 24th, October -- I'm

 9    sorry, which October date?  October 31st.  And

10    December 3rd.

11              I don't believe that those are relevant to the

12    offenses charged here.  They happened so far in time.  I

13    understand that they are judicially noticeable facts.  But

14    I don't believe they meet the relevance threshold because

15    they happened so early in time from when the first voice

16    mail was left as to be irrelevant.

17              THE COURT:  Okay.  I think they certainly have

18    enough marginal relevance to overcome a general relevance

19    objection.

20              I'm going to overrule the Government's objection.

21              And I don't see anything objectionable about their

22    demonstrative aid.  It seems to me that it fairly and

23    accurately reflects the facts through the evidence in the

24    case, at least what the evidence will be, I think, as

25    represented by the lawyers at the time of closing.
```

```
 1              So unless something doesn't happen that's

 2    reflected on your chart or is not admitted, which I think

 3    it's all happened already, then I have no problem with it.

 4              So I'll overrule the Government's objection to

 5    your use of that during closing.

 6              MR. RYAN:  Okay, Your Honor.  I also have some

 7    others, but they're all in the same style.

 8              (Conferring.)

 9              MR. RYAN:  For example, Your Honor, this is

10    another demonstrative I'd like to use in closing.  I have a

11    whole series of these.

12              They are essentially the transcripts of the voice

13    mails where I've emphasized the words I choose to emphasize

14    in my closing.

15              THE COURT:  Does the Government object to this

16    exhibit?

17              MS. DANIELS:  No, Your Honor.

18              THE COURT:  Okay.

19              MR. RYAN:  And there's four more if you want to

20    see each of them in the same style.

21              THE COURT:  I'm happy to accept your

22    representation that they are verbatim transcripts of the

23    voice mails that are in evidence and that all you've done

24    is enlarge certain words for emphasis.

25              If that's your representation, I don't have a
```

```
 1   difficulty with them.  And I gather the Government does not
 2   either.
 3            MS. DANIELS:  That's correct, Your Honor.
 4            THE COURT:  Other than Dr. Rapa, while we have an
 5   opportunity here, have you had a chance to discuss with
 6   Mr. Lapin whether he intends to testify?
 7            MR. RYAN:  Uh-huh.
 8            THE COURT:  And has he reached a decision about
 9   that?
10            MR. RYAN:  We have.  He's not going to testify.
11            THE COURT:  He is not going to testify.  Okay.
12            At the appropriate time, Mr. Lapin, whenever that
13   is --
14            Will Dr. Rapa be your last witness?
15            MR. RYAN:  Yes.
16            THE COURT:  Why don't we take care of this right
17   now since we have the opportunity.
18            MR. RYAN:  Yes.
19            THE COURT:  And that will allow me just to ask you
20   to affirm it for me later on, Mr. Lapin.
21            But my question to you is, as you know, you have a
22   right to remain silent.  No one can force you to testify.
23   You cannot be compelled to testify in any respect.
24            THE DEFENDANT:  Yes, Your Honor.
25            THE COURT:  You also, however, have a right to
```

```
 1   testify if you choose to do that.

 2            But the question I have for you, have you had a

 3   chance to talk it over with your lawyers, to discuss the

 4   pros and cons of testifying in your own behalf?

 5            THE DEFENDANT:  Yes, Your Honor.

 6            THE COURT:  And have you reached a decision as to

 7   whether or not you wish to testify?

 8            THE DEFENDANT:  Yes, Your Honor.

 9            THE COURT:  And what is your decision?

10            THE DEFENDANT:  I trust my lawyer has my best

11   interest.

12            THE COURT:  All right.  And so tell me what that

13   means as far as your decision to testify?

14            Do you wish to testify, or do you wish to not

15   testify?

16            THE DEFENDANT:  I wish to not testify.

17            THE COURT:  Okay.  Great.  Thank you very much.

18            THE DEFENDANT:  Thank you.

19            THE COURT:  So I'll see you all back here at 1:00.

20            We'll take Dr. Rapa's testimony.  I don't know

21   whether the Government will have any rebuttal evidence.  I

22   need to go over with you the jury instructions.  So we'll

23   probably take a recess after Dr. Rapa's testimony.

24            But I would encourage you to take a look at the

25   jury instructions.  Also take advantage of the lunch break
```

```
 1    so that we'll -- because we'll move quickly through this
 2    charge conference.  I don't expect there's going to be a
 3    lot of controversy about the jury instructions, but we will
 4    take that up pretty immediately after you close the
 5    testimony.
 6             All right?
 7             MS. DANIELS:  Thank you, Your Honor.
 8             THE COURT:  We'll be in recess.  I'll see you at
 9    1:00.
10             (Luncheon recess at 11:53 a.m. to 1:02 p.m.)
11             (Jury entered the courtroom at 1:00 p.m.)
12             (Testimony of Dr. Sheila Rapa has been previously
13              transcribed and filed at docket 93.)
14             (1:26 p.m.)
15             THE COURT:  Call your next witness.
16             MR. RYAN:  Defense rests, Your Honor.
17             THE COURT:  Does the Government have any rebuttal
18    evidence, Ms. Daniels?
19             MS. DANIELS:  No, Your Honor.
20             THE COURT:  So, ladies and gentlemen, the defense
21    has now rested.  The Government's rested, indicated they
22    don't have any additional evidence.
23             So I need to take up a couple of procedural things
24    with the lawyers, go over some notes with them about how I
25    intend to instruct you in terms of the law.
```

```
 1              So I'm going to ask you to step out with
 2   Mr. Carter for a few minutes.  This won't take too long.  I
 3   would anticipate we'll be back with you probably in 15 to
 4   30 minutes max.  So we're making good progress.
 5              When you all come back, the next thing that will
 6   happen is I'll give you your instructions on the law.  And
 7   then after I finish that, the lawyers will have an
 8   opportunity to make their closing arguments.  And I'll come
 9   back to you with a couple of little housekeeping
10   suggestions, and then you'll be discharged to begin your
11   deliberations.
12              So we're on track.  We're making good progress.
13   And I'll be back with you, as I said, probably 15 or
14   30 minutes.
15              Thank you, Mr. Carter.
16              (Jury exited the courtroom at 1:27 p.m.)
17              THE COURT:  Mr. Ryan, do you wish to renew your
18   Rule 29 motion?
19              MR. RYAN:  I do, Your Honor.
20              Thank you.
21              THE COURT:  It's denied.
22         Have you all had a chance to go through the jury
23   instructions?
24              MR. RYAN:  Yes, Your Honor.
25              THE COURT:  Okay.  Let's turn to those, if we
```

```
 1   could.

 2           You haven't gotten copies yet?

 3           MS. MOUAKAR:  No, Your Honor.

 4           THE COURT:  Oh, okay.  Thank you.

 5           Just be at ease for a minute.  My courtroom deputy

 6   is going to run and collect those for you.

 7           While we have this lull and the jury is out,

 8   Mr. Lapin, now that the evidence is all concluded, let me

 9   just ask you to reaffirm for me, if you would, your

10   decision not to testify.

11           We don't need to go back through the exchange, but

12   I just want to ask you again to confirm for me that you,

13   after consulting with your lawyer, have elected not

14   testify.

15           THE DEFENDANT:  Yes, Your Honor.

16           THE COURT:  All right.  Thank you.

17           You can have a seat.

18           MR. RYAN:  Oh, Judge, while we have this lull, may

19   I ask another?

20           THE COURT:  You can.  But I'd like for you --

21   let's wait until my courtroom deputy gets back just so it

22   doesn't get lost in the minutes.

23           MR. RYAN:  It's just about the easel and the

24   demonstrative exhibit.

25           THE COURT:  Okay.  Yeah, you can go ahead then.
```

 1          MR. RYAN:  It didn't come out exactly like I was

 2     hoping.  It's a little small.

 3          I'm wondering if the Court would permit me to

 4     stand out here with it and talk to them about what

 5     information is contained in these boxes.

 6          THE COURT:  You keep that right next to the

 7     podium, where you can be touching the podium to reach that,

 8     then yes, I'll allow you to do that.

 9          Here's the thing.  I don't want to interrupt you

10     and tell you to get back to the microphone because I know

11     that's distracting.  But I am going to do that if you get

12     away from the microphone because it's very challenging for

13     the court reporter.  Very challenging.

14          MR. RYAN:  I understand.

15          THE COURT:  So I'm not going to -- I just want to

16     tell you now before you get started with your argument that

17     you need to be, you know, be situationally aware of where

18     you are.

19          Don't keep scooting it in.  We're going to turn

20     the podium.

21          You can have that thing with you next to you so

22     you can reach it from the podium, but you can't leave that

23     area.  And you must use the microphone.

24          MR. RYAN:  Okay.

25          Thank you.

```
 1            THE COURT:  You're welcome.
 2                      CHARGE CONFERENCE
 3            THE COURT:  All right.  So let me turn to the
 4   instructions now.
 5            Consistent with my practice, I've prepared a table
 6   of authority and revisions that will be made a part of the
 7   record along with the instructions.
 8            It includes a discussion of each one of the
 9   instructions; and if I've modified the requests that were
10   submitted by the parties, how I've modified it and why I've
11   modified it; if I've rejected requests from the parties, it
12   indicates that I've rejected them and why I've rejected
13   them.
14            So I would encourage you to use that to read along
15   if you need to in connection with my proposed instructions.
16            You all can remain seated during this portion of
17   our exchange.
18            I'm going to go through these instructions one at
19   a time.  And I'm going to ask, starting with the
20   Government, whether there's any objection to Court's number
21   one and then I'll move all the way through.  And if you
22   have no objection, just say none.  And then if you have one
23   that you want to have some argument about, we will stop and
24   take it.
25            Do you have your set of Court's instructions in
```

 1   front of you, Ms. Daniels?

 2          MS. DANIELS:  Yes, Your Honor.

 3          THE COURT:  I will tell you that also if you look

 4   at the table of authorities and revisions you will see that

 5   there's not been any real dramatic change from what you've

 6   all submitted and raised with me in your submissions.  From

 7   my point of view.  You may disagree.  But from my point of

 8   view.

 9          So what says the Government to the Court's

10   proposed instruction number one, the introductory

11   instruction?

12          MS. DANIELS:  No objection.

13          THE COURT:  The defense?

14          MR. RYAN:  No objection.

15          THE COURT:  Court's instruction number two, basic

16   instruction on the presumption of innocence when the

17   defendant does not testify, basic pattern instruction 2.2

18   from the 2003 edition.

19          Any objection from the United States?

20          MS. DANIELS:  No, Your Honor.

21          THE COURT:  From the defense?

22          MR. RYAN:  No, Your Honor.

23          THE COURT:  Thank you.

24          The Court's instruction proposed number three on

25   the definition of reasonable doubt.

1        Any objection from the Government?

2        MS. DANIELS:  No, Your Honor.

3        THE COURT:  From the defense?

4        MR. RYAN:  No.

5        THE COURT:  Court's instruction proposed number

6   four, basic instruction on direct and circumstantial

7   evidence.

8        Any objection from the Government?

9        MS. DANIELS:  No.

10        THE COURT:  From the defense?

11        MR. RYAN:  No, Your Honor.

12        THE COURT:  Court's proposed instruction number

13   five is the basic pattern instruction on credibility of

14   witnesses.

15        Any objection from the Government?

16        MS. DANIELS:  No, Your Honor.

17        THE COURT:  From the defense?

18        MR. RYAN:  No, Your Honor.

19        THE COURT:  Court's proposed instruction number

20   six, which is the pattern instruction 6.1, impeachment

21   through inconsistent statement.

22        Any objection from the Government?

23        MS. DANIELS:  No, Your Honor.

24        THE COURT:  From the defense?

25        MR. RYAN:  None.

```
 1          THE COURT:  Court's proposed instruction number
 2   seven on expert witnesses.
 3          Any objection from the Government?
 4          MS. DANIELS:  No, Your Honor.
 5          THE COURT:  From the defense?
 6          MR. RYAN:  None.
 7          THE COURT:  Court's proposed instruction number
 8   eight, the instruction requested by the United States as to
 9   their obligation or the lack of any obligation to call all
10   witnesses.
11          I know you objected to that in your submission,
12   Mr. Ryan.
13          I'm going to overrule your objection.  If you want
14   an opportunity to make some additional record, I'll give
15   you a chance to do that.
16          MR. RYAN:  I'll just stand on my objection as I
17   wrote it.
18          THE COURT:  All right.  That objection is
19   overruled.
20          Court's instruction proposed number nine, the
21   instruction that relates to the statement of defendant.
22          I noticed that you objected to the reference of
23   the word "confession," Mr. Ryan.  I'll just point out to
24   you that the headers are all stripped from these
25   instructions.  That's not a part of the instruction.  It's
```

1    simply an identifier that defines it.  So the word

2    "confession" will not appear anywhere in the instructions.

3              MR. RYAN:  Very good.  Thank you, Your Honor.

4              THE COURT:  Any objection from the Government?

5              MS. DANIELS:  No, Your Honor.

6              THE COURT:  From the defense?

7              MR. RYAN:  None.

8              THE COURT:  Thank you.

9              Court's proposed instruction number 10, special

10   instruction with the defendant making an allegedly false

11   exculpatory statement.

12             Any objection from the Government?

13             MS. DANIELS:  No, Your Honor.

14             THE COURT:  From the defense?

15             MR. RYAN:  Just the objection, my written

16   objection.

17             THE COURT:  Okay.  As you'll see in my notation,

18   I've overruled your objection based on United States versus

19   Almanzar, 634 F.3d 1214 at 1222, Eleventh Circuit 2011.

20             Court's proposed instruction number 11, I gave

21   this instruction already, or a form of it, at the time that

22   this testimony was received.  I don't think it does any

23   harm, frankly, to do it again.  I'm happy to do it again,

24   unless either of you have an objection.

25             So Ms. Daniels?

```
 1          MS. DANIELS:  Your Honor, I don't have an

 2   objection, but it looks like Exhibit 14 and 15 were left

 3   off.

 4          THE COURT:  You're right.  Good catch.  Thank you.

 5          Exhibits 14 and 15.

 6          So double-check this because I have not.  So the

 7   transcript instructions should go along with the audio

 8   evidence.  And right now I have it identified as 2, 4, 6,

 9   8, 10, 14, and 15.

10          Can you all check and make sure that's correct and

11   corresponds with the evidence.  It should be the audio

12   evidence, the transcripts that are related to the audio

13   evidence that was received.

14          MS. DANIELS:  Yes, Your Honor.  So it looks like

15   15 should be in the first line.  And 14 should be at the

16   bottom.  Because 15 is the transcript, and 14 is the audio.

17          THE COURT:  Okay.  So 15 at the top.  And 14 --

18   15 in line 1, and 14 in line 3?

19          MS. DANIELS:  Yes, Your Honor.

20          THE COURT:  Okay.

21          Does that look right to you, Mr. Ryan?

22          MR. RYAN:  It does.  Thank you.

23          THE COURT:  All right.  So I'll make that change

24   and add -- so the first line will now read 2, 4, 6, 8, 10,

25   and 15.  And the third line will now read 1, 3, 5, 7, 9,
```

1    and 14.

2         All right.  The Court's proposed instruction

3    number 12, charts and summaries, I'm assuming that this

4    relates to the special agent's testimony that portions of

5    the phone records were extracted and reduced to a summary.

6    So it seems appropriate to me.

7         Any objection from the Government?

8         MS. DANIELS:  No, Your Honor.

9         THE COURT:  Any objection from the defense?

10        I know you lodged an objection initially.  Maybe

11   you didn't know what the evidence was going to be, but it

12   seems to me that it's appropriate.  I'll give you a chance

13   to persuade me I'm wrong.

14        MR. RYAN:  Yeah, that's fine, Your Honor.

15        THE COURT:  All right.  Court's proposed

16   instruction number 13, just the introductory --

17   introduction to the substantive offense instructions.

18        Any objection from the Government?

19        MS. DANIELS:  No, Your Honor.

20        THE COURT:  From the defense?

21        MR. RYAN:  I'm sorry, Your Honor.  We're on 13?

22        THE COURT:  We are on 14.  No, I'm sorry, you're

23   right.  13.  Yes, 13.

24        MR. RYAN:  Yeah.  You're on 13.

25        THE COURT:  Okay.  Court's proposed instruction

```
1    number 14, that's basic instruction 9.2 where knowingly is
2    an element.   Knowingly is an element of the count two
3    offense.
4            Any objection from the Government?
5            MS. DANIELS:  No, Your Honor.
6            THE COURT:  Any objection from the defense?
7            MR. RYAN:  No.
8            THE COURT:  Court proposed instruction number 15
9    on the conjunctive charge.  I know you objected to that in
10   your papers, Mr. Ryan.
11           I'm going to overrule the objections you made in
12   your papers and give that at the request of the Government.
13           Do you want to make any further argument on that?
14           MR. RYAN:  No further argument.
15           THE COURT:  All right.  Court's proposed
16   instruction number 16, I have reversed the order of the
17   instructions that you submitted to make them follow the
18   Indictment.
19           You all submitted them in the opposite order with
20   count two first and count one second.  So I took the
21   liberty of reversing those to make them follow the
22   Indictment.
23           So the first instruction is a non-pattern
24   instruction because there's not one on Title 18 of the
25   United States Code, Section 115(a)(1)(B).
```

```
 1              Let me just point out a couple of things to you
 2    both.  And that is that in this particular instruction, the
 3    definition of true threat that appears now on page 19, the
 4    last paragraph of that particular instruction, I have taken
 5    the liberty of modifying that from the submission that was
 6    made by the United States because the United States in the
 7    instruction that they submitted on the 875 charge provided
 8    a definition where there is a pattern instruction.
 9              Here you didn't use the pattern language
10    instruction, even though you didn't tell me that.  You
11    changed the pattern instruction.
12              I've changed it back to make it consistent with
13    the pattern instruction, which now reads:  A true threat is
14    a serious threat, not idle talk, a careless remark, or
15    something said jokingly that is made under circumstances
16    that would place a reasonable person in fear of being
17    injured.
18              That's the pattern instruction language and that's
19    the language that I intend to use, although I will give you
20    an opportunity to argue for your language if you want to do
21    that, Ms. Daniels.
22              And just -- it's worrisome to me when the
23    Government, or either party, submits an instruction to me
24    with the representation that it's the pattern instruction
25    when, in fact, it is not.
```

 1          MS. DANIELS:  Your Honor, I apologize.  I

 2   apologize.  That was not my intent to mislead the Court.

 3          THE COURT:  I'm not suggesting that it was

 4   intentional.  I'm just telling you that it's -- I flyspeck

 5   these anyway because that's my job.  But when you represent

 6   to me that's the pattern instruction, I don't expect to

 7   have to make sure that it is.

 8          So anyway, the point of that preamble was that

 9   I've reversed the order, as I've already said.

10          So now we're on the instruction that relates to

11   count one of the Indictment.  That's the 115(a)(1)(B)

12   charge.

13          And, Mr. Ryan, I noticed in your papers that you

14   asked that the section under 2A read "and" as opposed to

15   "or."  I'm going to overrule that objection or that request

16   because the statute is "or" not "and."

17          And the Government is entitled to charge in either

18   the conjunctive or the disjunctive and prove it up in any

19   way that it is consistent with the evidence.

20          So I'm going to overrule your request that I

21   change "or" to "and."

22          Other than that, I don't think I've changed what

23   you all submitted.  So now let me give you, Ms. Daniels, an

24   opportunity to tell me if you object to the Court's

25   instruction number 16 as modified.

```
 1              MS. DANIELS:  No, Your Honor.

 2              THE COURT:  Mr. Ryan?

 3              MR. RYAN:  Your Honor, I may not have included

 4    this in my papers, and it's come to me since then.

 5              This seems to me a true threat, the bottom of

 6    page 19, I think -- my concern is if they only see idle

 7    talk, careless remark, or jokes, they may not think that

 8    extreme hyperbolic political language is included.

 9              THE COURT:  I'm going to leave that to your

10    advocacy skills, Mr. Ryan.  I'm going to use the pattern

11    instruction in the definition of true threat.

12              So that is the language from the pattern

13    instruction as it relates to 18 U.S.C. 875 and is

14    appropriate in my judgment to use it here for the alleged

15    violation under 115(a)(1)(B).

16              So I'm not going to augment it per your request.

17              MR. RYAN:  Okay.  Thank you.

18              THE COURT:  You're welcome.

19              MR. RYAN:  Other than that, for the record, there

20    should be something that corresponds with the defendant's

21    case.  But okay.

22              THE COURT:  Court's instruction number 17, this is

23    the substantive offense instruction on 18 U.S.C. 875(c),

24    count two of the Indictment.

25              This is the pattern instruction.  As I've already
```

 1    said, I modified the true threat language to make it

 2    consistent with the pattern.  So to the extent the

 3    Government requested a change in the true threat language,

 4    I'm going to deny that request and revert back to the

 5    pattern.

 6              Any objection, further objection, Ms. Daniels?

 7              MS. DANIELS:  No, Your Honor.

 8              THE COURT:  Mr. Ryan, any further objection on --

 9    so in other words, this is the first time we're taking this

10    up, but I don't want to reargue the true threat language.

11              Any other objections to the Court's 17?

12              MR. RYAN:  No further objections.

13              THE COURT:  All right.

14              Court's proposed instruction number 18, pattern

15    instruction with respect to avoiding consideration of

16    punishment, any objection from the United States?

17              MS. DANIELS:  No, Your Honor.

18              THE COURT:  From the defense?

19              MR. RYAN:  No.

20              THE COURT:  Court's proposed instruction

21    number 19, related to notetaking, any objection from the

22    Government?

23              MS. DANIELS:  No.

24              THE COURT:  From the defense?

25              MR. RYAN:  No, Your Honor.

```
 1            THE COURT:  Court's proposed instruction number 20

 2    on avoiding electronic means or resources during their

 3    deliberations, any objection from the Government?

 4            MS. DANIELS:  No, Your Honor.

 5            THE COURT:  From the defense?

 6            MR. RYAN:  No, Your Honor.

 7            THE COURT:  Court's instruction number 21 proposed

 8    on the duty to deliberate, any objection from the

 9    Government?

10            MS. DANIELS:  No, Your Honor.

11            THE COURT:  From the defense?

12            MR. RYAN:  No, Your Honor.

13            THE COURT:  And Court's proposed instruction

14    number 22 is the basic instruction pertaining to the

15    consideration of the verdict form.

16            Any objection from the Government?

17            MS. DANIELS:  No, Your Honor.

18            THE COURT:  From the defense?

19            MR. RYAN:  No, Your Honor.

20            THE COURT:  Take a quick look at the verdict form.

21            I think the verdict form is in the same form that

22    it was that you all submitted.  I don't think I've done

23    anything to it.  I'm looking back through my clerk's notes.

24            Any objection to the proposed verdict form,

25    Ms. Daniels?
```

```
 1          MS. DANIELS:  No, Your Honor.

 2          THE COURT:  Mr. Ryan?

 3          The only modification -- I'm looking at my clerk's

 4   notes now.  The only modification was a formatting change.

 5   So no substantive change to what you all submitted.

 6          I didn't get your answer on the verdict form,

 7   Mr. Ryan.

 8          MR. RYAN:  Well, my concern possibly is with

 9   count one there.  It doesn't note intimidating, but I guess

10   they'll have the Indictment.  Because it's with intent to

11   intimidate.

12          THE COURT:  Well, let me go back and look at the

13   substantive instruction on the offense and see if it's

14   consistent with what's in the verdict form.

15          So the statutory language is intent to impede,

16   intimidate, or interfere with such official while engaged

17   in the performance of official duties.

18          MR. RYAN:  Also, the word "influencing" is not

19   part of this statute, I don't believe, or the Indictment.

20          THE COURT:  Why don't we talk about this.

21          I confess that since it was a joint submission

22   with no objections lodged that I did not flyspeck the

23   verdict form, but it does appear now that it's not exactly

24   consistent.

25          MR. RYAN:  My apologies, Your Honor.  That's my
```

```
 1   fault.
 2          It appears, Your Honor, we may have lifted -- the
 3   language may have been lifted from the title of the
 4   statutes but not the statute itself.
 5          THE COURT:  All right.  Give me just a minute to
 6   focus on it, and you all do the same.  And I'll be back to
 7   you shortly.
 8          (Pause in proceedings.)
 9          THE COURT:  All right.  Here's the language that I
10   propose for the verdict form.  So listen up.  I know it's
11   hard to do this sometimes if you don't have it in written
12   form in front of you, which I'll give you before we
13   proceed.
14          But I propose the verdict form read as follows:
15          Verdict.  One.
16          Count one of the Indictment.
17          As to the offense of making a true threat with
18   intent to impede, intimidate, or interfere, or retaliate
19   against an official engaged in the performance of official
20   duties, we, the jury, find the defendant, James Lapin,
21   either guilty or not guilty.
22          Count two of the Indictment.
23          As to the offense of -- and insert the word
24   knowingly -- transmitting a threat in interstate commerce
25   to injure, in violation of 18 U.S.C. -- that in violation
```

1    language would also be in count one -- we, the jury, find

2    the defendant, James Lapin, guilty or not guilty.

3             Does the Government have any objection to that?

4             MS. DANIELS:  No, Your Honor.

5             THE COURT:  Mr. Ryan?

6             MR. RYAN:  No, Your Honor.  Thank you.

7             THE COURT:  Okay.  Here's what I need to do while

8    I give you all an opportunity to get the furniture arranged

9    and collect your thoughts for closing arguments.

10            I'm going to have -- I think my clerk is likely

11   busily working on making these changes.  She's listening

12   in.

13            When I come back, I will have a booklet form of

14   the instructions that will be stripped of all of the

15   headers.  So none of the headings or introductory language

16   will be there.  It will just be simply -- it will be just a

17   book of instructions that are unbroken.  It will match what

18   I read to the jury.

19            My practice is to give the jury two copies of the

20   instructions along with one verdict form.

21            Of course, I'll need a copy of the Indictment.  I

22   don't know if the Indictment needs to be redacted.  If

23   there's any forfeiture language or anything in the

24   Indictment, that will need to be redacted.

25            But I'll count on you, Ms. Daniels, to have a copy

```
 1   of the Indictment for my courtroom deputy to take back when

 2   closing arguments are finished.

 3           How much time do you think you'll need for

 4   closing, Ms. Daniels?

 5           MS. DANIELS:  Oh.  Your Honor, I would request

 6   about 45 minutes.

 7           THE COURT:  Okay.

 8           How about you, Mr. Ryan?  How much time do you

 9   think you'll need?

10           MR. RYAN:  I'm hoping I can do it in about 30.

11           THE COURT:  Okay.  Why don't I allocate 30 minutes

12   each.  You know, you all have been doing fine in terms of

13   moving along.  I don't have any real concerns about where

14   we are time-wise.

15           I will -- what I'll do, Ms. Daniels, unless you

16   don't -- some lawyers don't like to be interrupted, so I

17   like to respect that.

18           But if you would like to have my courtroom deputy

19   give you a warning at, say, 20 or 25 minutes, I'm happy to

20   ask her to do that.

21           MS. DANIELS:  Your Honor, can I ask, the

22   45 minutes was to allocate 30 for my first closing argument

23   and about 15 for rebuttal.  That was really what I was

24   looking for.

25           So is the Court's ruling it will be 30 total?
```

```
 1          THE COURT:  Well, as I said, I don't want to
 2   hamstring you in terms of your arguments.  You know the old
 3   adage, no souls are saved after the first 20 minutes.  I'm
 4   a firm believer in that.
 5          But if you want 45 total, I'll, of course, give
 6   Mr. Ryan the same amount of time.  I don't suspect that
 7   you're going to need that amount of time.
 8          But do you want to be interrupted at 30 minutes?
 9          MS. DANIELS:  Yes, please.
10          THE COURT:  Okay.  I'll ask my courtroom deputy
11   then to give you a heads-up that 30 minutes have expired.
12   I'm not going to stop you at 30 minutes.  So if you
13   continue -- if you go through the warning, you do that at
14   your own risk.
15          And then 45 minutes for you, Mr. Ryan, which I am
16   hopeful that you won't need it all, but you have it if you
17   do need it.
18          So let's take a recess.  It's 2:00.
19          Mr. Carter, if you can let the jurors know that
20   we're going to be here another 15 minutes.
21          COURT SECURITY OFFICER:  Yes, sir.
22          THE COURT:  I think I'll be ready in 15 minutes.
23   If for some reason -- I'm subject to the vagaries of the
24   printer.  So if the printer is working properly and I have
25   the printed copies, I'll be back and ready to roll at 2:00.
```

```
 1   And if I encounter a problem, I'll send word out to you
 2   all.
 3           Let's prepare to resume at 2:00.
 4           MR. RYAN:  At 2:00, Your Honor?
 5           THE COURT:  Oh, I'm sorry.  2:15.  2:15.  Wishful
 6   thinking.
 7           (Recess taken at 1:59 p.m. to 2:27 p.m.)
 8           THE COURT:  All right.  We're back on the record
 9   in United States versus Lapin, 6:20-cr-89.
10           All counsel and the defendant are present.
11           Well, two things.
12           One, my courtroom deputy reminded me that the
13   better practice is to give all the jurors a copy of the
14   instructions in our safety-conscious era so that they don't
15   have to pass the paperwork.
16           So I know I told you two out of habit because
17   that's what I do in normal circumstances.  We're not in
18   normal circumstances.  So that's a change.  I'm going to
19   give them each a copy of the instructions.
20           I did make the changes I mentioned to the verdict
21   form.  I want to give you all a chance to look at that one
22   last time and make sure that it's consistent with what I
23   told you I was going to do.  I think it is.
24           Any problems with the verdict form now that it's
25   in its final form?
```

 1           MS. DANIELS:  No, Your Honor.

 2           THE COURT:  Mr. Ryan?

 3           MR. RYAN:  No, Your Honor.

 4           THE COURT:  All right.  Then are you both ready to

 5    proceed with closing argument?

 6           I can't hear you.  I'm sorry.

 7           MS. DANIELS:  When I was looking at the

 8    instructions, I noticed that each instruction does not have

 9    its own page.  It's just continuous.

10           Is that how it will go back to the jury?

11           THE COURT:  Yes, yes.

12           MS. DANIELS:  Thank you.

13           THE COURT:  So it will be -- like I said, it's

14    just in booklet form, no headers on it, it's not broken up

15    into different instructions.

16           All right.  Let's bring our jurors back, if we

17    could, Mr. Carter.

18           (Jury entered the courtroom at 2:30 p.m.)

19           THE COURT:  Welcome back, ladies and gentlemen.

20           It took a little bit longer than I anticipated.

21    So thank you for your patience with me.

22           Some of you have been very dutiful in your

23    notetaking.  I've been watching you during the course of

24    the trial.  But if you'll do me a favor and put your

25    notepads down now, I'm going to ask you to give me your

1    undivided attention.

2         I want to tell you what the -- I'm instructing the

3    law that you must apply to the facts of the case.  And I

4    want to give you, I hope, some comfort about not worrying

5    too much about remembering.  I'm going to give each of you

6    a written copy of these instructions to take with you back

7    to refer to should that become necessary during your

8    deliberations.

9         I give the jury instructions -- my own practice is

10   to do it in advance of the lawyers' closing arguments

11   because I find that over the years that it's helpful for

12   the jurors to know what the law is that's going to apply to

13   the facts of the case before the lawyers have an

14   opportunity to make their arguments.

15        I think it makes a little bit more sense to do it

16   in that order.  So that's just been my practice over

17   the years.

18                           **JURY CHARGE**

19        THE COURT:  So, members of the jury, it's now my

20   duty to instruct you on the rules of law that you must

21   follow and apply in deciding this case.

22        When I have finished, you will go to the jury room

23   and begin your discussions, what we call your

24   deliberations.  It will be your duty to decide whether the

25   Government has proved beyond a reasonable doubt the

1    specific facts necessary to find the defendant guilty of

2    the crimes charged in the Indictment.

3          You must make your decision only on the basis of

4    the testimony and any other evidence presented here during

5    the trial.  And you must not be influenced in any way by

6    either sympathy or prejudice for or against the defendant

7    or the Government.

8          You must also follow the law as I explain it to

9    you, whether you agree with that law or not.  And you must

10   follow all of my instructions as a whole.  You may not

11   single out or disregard any of the Court's instructions on

12   the law.

13         The Indictment or formal charge against any

14   defendant is not evidence of guilt.  Indeed, every

15   defendant is presumed by the law to be innocent.  The law

16   does not require a defendant to prove innocence or to

17   produce any evidence at all.  And if a defendant elects not

18   to testify, you cannot consider that in any way during your

19   deliberations.

20         The Government has the burden of proving a

21   defendant guilty beyond a reasonable doubt.  And if it

22   fails to do so, you must find that defendant not guilty.

23         Thus, while the Government's burden of proof is a

24   strict or heavy burden, it is not necessary that a

25   defendant's guilt be proved beyond all possible doubt.  It

1    is only required that the Government's proof exclude any

2    reasonable doubt concerning the defendant's guilt.

3            A reasonable doubt is a real doubt, based upon

4    reason and common sense after careful and impartial

5    consideration of all of the evidence in the case.

6            Proof beyond a reasonable doubt, therefore, is

7    proof of such a convincing character that you would be

8    willing to rely and act upon it without hesitation in the

9    most important of your own affairs.

10           If you are convinced that the defendant has been

11   proved guilty beyond a reasonable doubt, say so.  If you

12   are not convinced, say so.

13           As I said before, you must consider only the

14   evidence that I have admitted in the case.  Evidence

15   includes the testimony of witnesses and the exhibits

16   admitted, but anything the lawyers say is not evidence and

17   is not binding on you.

18           You should not assume from anything I have said

19   that I have any opinion about any factual issue in this

20   case.  Except for my instructions to you on the law, you

21   should disregard anything I may have said during the trial

22   in arriving at your own decision concerning the facts.

23   Your own recollection and interpretation of the evidence is

24   what matters.

25           In considering the evidence, you may use reasoning

1    and common sense to make deductions and reach conclusions.

2    You should not be concerned about whether the evidence is

3    direct or circumstantial.  Direct evidence is the testimony

4    of a person who asserts that he or she has actual knowledge

5    of a fact, such as an eyewitness.  Circumstantial evidence

6    is proof of a chain of facts and circumstances that tend to

7    prove or disprove a fact.  There is no legal difference in

8    the weight you may give to either direct or circumstantial

9    evidence.

10           Now, in saying that you must consider all of the

11   evidence, I do not mean that you must accept all of the

12   evidence as true or accurate.  You should decide whether

13   you believe what each witness had to say and how important

14   that testimony was.

15           In making that determination, you may believe or

16   disbelieve any witness in whole or in part.  Also, the

17   number of witnesses testifying concerning any particular

18   dispute is not controlling.

19           In deciding whether you believe or do not believe

20   any witness, I suggest that you ask yourself a few

21   questions.

22           Did the witness impress you as one who was telling

23   the truth?

24           Did the witness have any particular reason not to

25   tell the truth?

1          Did the witness have a personal interest in the

2     outcome of the case?

3          Did the witness seem to have a good memory?

4          Did the witness have the opportunity and ability

5     to observe accurately the things he or she testified about?

6          Did the witness appear to understand the questions

7     clearly and answer them directly?

8          Did the witness' testimony differ from other

9     testimony or other evidence?

10          You should also ask yourself whether there was

11     evidence tending to prove that a witness testified falsely

12     concerning some important fact or whether there was

13     evidence that at some other time a witness said or did

14     something or failed to say or do something which was

15     different from the testimony the witness gave before you

16     during the trial.

17          You should keep in mind, of course, that a simple

18     mistake by a witness does not necessarily mean that the

19     witness was not telling the truth as he or she remembers it

20     because people naturally tend to forget some things or

21     remember other things inaccurately.

22          So if a witness has made a misstatement, you need

23     to consider whether it was simply an innocent lapse of

24     memory or an intentional falsehood.  And the significance

25     of that may depend on whether it has to do with an

1     important fact or with only an unimportant detail.

2          When knowledge of a technical subject matter might

3     be helpful to the jury, a person having special training or

4     experience in that technical field is permitted to state an

5     opinion concerning those technical matters.  Merely because

6     such a witness has expressed an opinion, however, does not

7     mean that you must accept that opinion.  The same as with

8     any other witness, it is up to you to decide whether to

9     rely upon it.

10          The law does not require the prosecution to call

11    as witnesses all persons who may have been present at any

12    time or place involved in the case or who may appear to

13    have some knowledge of the matter at issue at the trial,

14    nor does the law require the prosecution to produce as

15    exhibits all papers and things mentioned in the evidence.

16          When the Government offers testimony or evidence

17    that a defendant made a statement or admission to someone

18    after being arrested or detained, the jury should consider

19    the evidence concerning such a statement with caution and

20    great care.  It is for you to decide whether the defendant

21    made the statement; and if so, how much weight to give it.

22          In making these decisions, you should consider all

23    of the evidence about the statement including the

24    circumstances under which the defendant may have made it.

25          You have heard testimony that the defendant made

certain statements outside the courtroom to law enforcement

authorities in which the defendant claimed that his conduct

was consistent with innocence and not with guilt.  The

Government claims that these statements in which he

exonerated or exculpated himself are false.

If you find the defendant gave a false statement

in order to divert suspicion from himself, you may, but are

not required to, infer that the defendant believed that he

was guilty.

You may not, however, infer on the basis of this

alone that the defendant is, in fact, guilty of the crime

for which he is charged.

Whether or not the evidence as to defendant's

statement shows that the defendant believed that he was

guilty, and the significance, if any, to be attached to

such evidence, are matters for you, the jury, to decide.

As you have heard in the presentation of the

evidence, Exhibits 2, 4, 6, 8, 10, and 15 have been

identified as a typewritten transcript of the oral

conversation that can be heard on the tape recording

received in evidence as Exhibits 1, 3, 5, 7, 9, and 14.

The transcript also purports to identify the speakers

engaged in such conversation.

As I mentioned to you previously, I have admitted

the transcript for the limited and secondary purpose of

1    aiding you in following the content of the conversation as

2    you listen to the tape recording and also to aid you in

3    identifying the speakers.

4           However, you are specifically instructed that

5    whether the transcript correctly or incorrectly reflects

6    the content of the conversation or the identity of the

7    speakers is entirely up to you to determine based upon your

8    evaluation of the testimony you have heard concerning the

9    preparation of the transcript and from your own examination

10   of the transcript in relation to your hearing of the tape

11   recording itself as the primary evidence of its own

12   contents.  And if you should determine that the transcript

13   is in any way or in any respect incorrect or unreliable,

14   you should disregard it to that extent.

15          Certain exhibits in the form of charts, summaries,

16   calculations, and the like have been received in evidence.

17   Such exhibits are received in evidence where voluminous

18   writings, documents, and records are involved.  These

19   exhibits are available for your assistance and convenience

20   in considering the evidence.

21          At this time I will explain the Indictment which

22   charges two separate offenses called counts.  I will not

23   read it to you at length because you will be given a copy

24   of the Indictment for reference during your deliberations.

25          You will note that the Indictment charges that the

offense was committed on or about a certain date.  The
Government does not have to prove with certainty the exact
date of the alleged offense.  It is sufficient if the
Government proves beyond a reasonable doubt that the
offense was committed on a date reasonably near the date
alleged.

The word "knowingly," as that term has been used
in the Indictment or in these instructions, means that the
act was done voluntarily and intentionally and not because
of mistake or accident.

Where a statute specifies several alternative ways
in which an offense may be committed, the Indictment may
allege the several ways in the conjunctive, that is, by
using the word "and."  Therefore, if only one of the
alternatives is proved beyond a reasonable doubt, that is
sufficient for conviction so long as the jury agrees
unanimously as to at least one of the alternatives.

It is a federal crime to threaten to assault,
kidnap, or murder a United States official with the intent
to impede, intimidate, or interfere with the official
performance of official duties or with the intent to
retaliate against the official on account of the official's
performance of official duties.  A Representative of the
United States House of Representatives is a United States
official.

The defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

One, the defendant knowingly made a true threat to assault, kidnap, or murder the official described in the Indictment.

Two, the defendant made the true threat with either, A, the intent to impede, intimidate, or interfere with such official while she was engaged in the performance of official duties; or, B, with the intent to retaliate against such official on account of the performance of official duties.

The Government must prove beyond a reasonable doubt that the victim was a United States official.  It does not matter whether the defendant knew at the time of the alleged threat that the victim was a United States official.

The Government does not have to prove that the defendant intended to carry out the threat.  A true threat is a serious threat, not idle talk, a careless remark, or something said jokingly, that is made under circumstances that would place a reasonable person in fear of being injured.

It is a federal crime to knowingly send interstate -- to send in interstate commerce a true threat to injure

1  any person.

2       The defendant can be found guilty of this crime

3  only if the following facts are proved beyond a reasonable

4  doubt:

5       One, the defendant knowingly sent a message in

6  interstate commerce containing a true threat to injure the

7  person of another; and, two, the defendant sent the message

8  with the intent to communicate it through threat or with

9  the knowledge that it would be viewed as a true threat.

10      The Government does not have to prove that the

11  defendant intended to carry out the threat.

12      To transmit something in interstate commerce means

13  to send it from a place in one state to a place in another

14  state.

15      A true threat is a serious threat, not idle talk,

16  a careless remark, or something said jokingly that is made

17  under circumstances that would place a reasonable person in

18  fear of being injured.

19      A separate crime or offense is charged in each

20  count of the Indictment.  Each charge and the evidence

21  pertaining to it should be considered separately.

22      The fact that you may find the defendant guilty or

23  not guilty as to one of the offenses charged should not

24  affect your verdict as to any other offense charged.

25      I caution you, members of the jury, that you are

1    here to determine from the evidence in this case whether

2    the defendant is guilty or not guilty.  The defendant is on

3    trial only for the specific offense alleged in the

4    Indictment.

5            Also, the question of punishment should never be

6    considered by the jury in any way in deciding the case.  If

7    the defendant is convicted, the matter of punishment is for

8    the judge alone to determine later.

9            Now, in this case you've been permitted to take

10   notes during the course of the trial.  And most of you,

11   perhaps all of you, have taken advantage of that

12   opportunity and have made notes from time to time.

13           You will have your notes available to you during

14   your deliberations, but you should make use of them only as

15   an aid to your memory.  In other words, you should not give

16   your notes any precedence over your independent

17   recollection of the evidence or the lack of evidence.  And

18   neither should you be unduly influenced by the notes of

19   other jurors.

20           I emphasize that notes are not entitled to any

21   greater weight than the memory or impression of each juror

22   as to what the testimony may have been.

23           During your deliberations, you must not

24   communicate with or provide any information to anyone by

25   any means about this case.

1          You may not use any electronic device or media,

2     such as the telephone, a cell phone, smartphone, iPhone,

3     BlackBerry, or computer; the internet or any internet

4     service; or any text or instant messaging service; any

5     internet chat room, blog, or website, such as Facebook,

6     LinkedIn, Snapchat, YouTube, Twitter, etc., to communicate

7     with anyone any information about this case or to conduct

8     any research about this case until I accept your verdict.

9          In other words, you cannot talk to anyone on the

10    phone, correspond with anyone, or electronically

11    communicate with anyone about this case.  You can only

12    discuss the case in the jury room with your fellow jurors

13    during deliberations.

14         And I would expect you to inform me should you

15    become aware of any other juror's violations of these

16    instructions or your own inadvertent violation of these

17    instructions.

18         You may not use these electronic means to

19    investigate or communicate about the case because it is

20    important that the case be decided based solely on the

21    evidence presented here in this courtroom.

22         Information on the internet or available through

23    social media might be wrong, incomplete, or inaccurate.

24    You are only permitted to discuss the case with your fellow

25    jurors during deliberations because they have seen and

1    heard the same evidence you have.

2         In our judicial system, it is important that you

3    are not influenced by anything or anyone outside of this

4    courtroom.  Otherwise, your decision may be based on

5    information known only by you and not your fellow jurors or

6    the parties in the case.  This would unfairly and adversely

7    impact the judicial process.

8         Any verdict that you reach in the jury room,

9    whether guilty or not guilty, must be unanimous.  In other

10   words, to return a verdict, you must all agree.

11        Your deliberations will be secret.  You will never

12   have to explain your verdict to anyone.  It is your duty as

13   jurors to discuss the case with one another in an effort to

14   reach agreement if you can do so.

15        Each of you must decide the case for yourself, but

16   only after full consideration of the evidence with the

17   other members of the jury.

18        While you are discussing the case, do not hesitate

19   to reexamine your own opinion and change your mind if you

20   become convinced that you were wrong.  But do not give up

21   your honest beliefs solely because others think differently

22   or merely to get the case over with.

23        Remember that in a very real way, you are judges,

24   judges of the facts.  Your only interest is to seek the

25   truth from the evidence in the case.

1           When you go to the jury room, you should first

2    select one of your members to act as your foreperson.  The

3    foreperson will preside over your deliberations and will

4    speak for you here in court.

5           There's a verdict form that's been prepared for

6    your convenience.  I'm going to go over that with you in

7    more detail after the lawyers finish their closing

8    arguments.

9           But essentially the verdict form is in what we

10   call interrogatory or question form.  And it asks you to

11   answer question one, which relates to count one of the

12   Indictment, gives you a place to record your verdict,

13   either guilty or not guilty.

14          Question two pertains to count two of the

15   Indictment and gives you a place to answer or to indicate

16   your verdict, either guilty or not guilty.

17          I'm going to get back to you with some

18   housekeeping questions about should you need to communicate

19   with me at any time during your deliberations and things of

20   that sort and give you some advice and direction in that

21   connection.

22          But in the meantime, I want you to give your

23   attention, if you would, to Ms. Daniels.  She's going to

24   make the initial argument on behalf of the United States.

25   After Ms. Daniels concludes her opening presentation, then

1    Mr. Ryan -- I believe Mr. Ryan, yes -- will be making the

2    closing argument on behalf of the defendant.  After

3    Mr. Ryan's argument, Ms. Daniels will have an opportunity,

4    if she saves some time, to come back and make some brief

5    rebuttal remarks.

6          At the conclusion of that, I'll give you a couple

7    quick housekeeping notations and then send you off to begin

8    your deliberations.

9          So if you'll give your attention now to

10    Ms. Daniels.

11          Ms. Daniels, I'll invite you to the podium for the

12    argument on behalf of the United States.

13          MS. DANIELS:  Thank you, Your Honor.

14                 **CLOSING ARGUMENT BY THE GOVERNMENT**

15          MS. DANIELS:  Ladies and gentlemen of the jury,

16    thank you for your time and attention.

17          In opening statement, I told you that at the close

18    of this case I would stand before you and ask you to return

19    the only verdict that fits the evidence in this case.

20          The Court has just instructed you on the elements

21    the Government must prove beyond a reasonable doubt for you

22    to find the defendant guilty, and that is what the evidence

23    here has done.

24          The evidence in this case that you have been shown

25    support these charges is simple and conclusive.  You know

1    that this offense happened in the Middle District of

2    Florida and that this threat was transmitted through

3    interstate commerce because the evidence indicates the

4    defendant was living here when he made the calls to the

5    Speaker at her offices in Washington, D.C., and

6    San Francisco.

7           And you know this because you saw phone records

8    that indicate that the cell tower used to place the call

9    was in Ormond Beach and that Agent Anyaso testified that

10   Ormond Beach is in the Middle District of Florida.

11          You also know that the person making the call was

12   the defendant, and you know that because the calls come

13   from a phone number registered to the defendant.  The

14   records show that the account was registered to him.  And

15   during the interview with Agent Anyaso, the defendant says

16   he's the only person that uses this number.

17          And you even know why the defendant was making the

18   call.  You know that it's to intimidate and retaliate

19   against the Speaker for her role in the impeachment.  And

20   you know that because the defendant tells you so himself.

21          He references the impeachment in the December 20th

22   call.  Specifically, he says, How dare you impeach our

23   president, making it clear that he is calling to threaten

24   retaliation on account of Speaker Pelosi's performing her

25   official duties at this time.

1           This is not a case of whodunit, where, or why.

2    This case really is going to come down to whether or not

3    you believe the defendant made true threats.

4           And to that end, I would like to ask Ms. Valente

5    to play Exhibits 1 and 2 one more time for your

6    consideration.

7           Ms. Valente, could you please play that.

8           (Playing audio exhibit.)

9           MS. DANIELS:   Thank you, Ms. Valente.

10          Could you please pull up Bates Number 10485, the

11   transcript of this interview.

12          Thank you.

13          Now, you are asked to determine whether or not

14   this call would place a reasonable person in fear of being

15   injured.

16          When assessing the call itself, some of the things

17   you may consider is the reaction of those who heard the

18   threat; whether the threat was conditional, meaning whether

19   something must happen in order for it to take place; or

20   whether the threat was communicated directly to the

21   Speaker; or the context of the threat as it was made.

22          Now, you heard when the Court read you the jury

23   instructions that the Government is not required to prove

24   that the defendant intended to carry out this threat.  And

25   that's important.  So let me say that again.  The

1   Government does not have to prove that the defendant

2   intended to carry out this threat.

3        And that is due to the importance of protecting

4   individuals from either fear of violence, which has the

5   potential of disrupting a person's life, and causing fear

6   even if the threat is not carried out.

7        So let's talk about these factors.  The evidence

8   before you today proves beyond a reasonable doubt that the

9   defendant communicated a true threat on December 20th,

10  2019.  The voice mail itself shows you that the defendant

11  attempted to contact the Speaker directly and that his

12  threat was not conditioned on anything happening.

13       You could hear it for yourself in the defendant's

14  tone, volume, emotion, and words.  You can also hear the

15  differences between the voice mails.  All five voice mails

16  have been played for you at this point and you can see how

17  the voice mail on the 20th is different than the other

18  voice mails, and how the voice mail on the 20th is not

19  just an angry voice mail but it's a criminal threat to harm

20  the Speaker.

21       So by way of summary, the voice mail on

22  January 16th, for example, discusses that the defendant

23  is angry about the cost of certain pens.

24       On January 11th, the defendant is mad about a

25  comment made by Maxine Waters.

1              On December 19th, the defendant accuses the

2       Speaker of treason.

3              But on December 20th, he threatens to kill her.

4       He tells her she needs to have a bulletproof vest.  He

5       tells her he's going to hang her dentures above the Capitol

6       building, and he tells her she's dead.  And that language

7       does not appear in any other voice mail.

8              When all the voice mails are considered together,

9       the voice mail from the 20th clearly stands out and

10      apart from the others because it threatens specific harm.

11      He tells her "we're coming for you" multiple times.

12             In the defense counsel's opening, the defense

13      attorney stated that the defendant is not talking about

14      Ms. Pelosi's well-being.  He's talking about her political

15      career.

16             And you can use your common sense to determine

17      whether or not you think on the 20th he's talking about

18      her physical well-being, whether a bulletproof vest is

19      about someone's political career or their physical

20      well-being.  The implication, of course, of a bulletproof

21      vest being that someone is going to be shot and that they

22      need a bulletproof vest.

23             The other statement that he's going to hang her

24      dentures above the Capitol building, again, you can use

25      your common sense to determine whether that's about her

political career or about her physical well-being.

And finally, the defendant ends the call with the exclamation, You're dead.  And, again, you can use your common sense to determine whether that is about her political career or her physical well-being.  I think common sense would dictate that it is about her physical well-being.

The December 20th voice mail is different from the others.  And although all the others express anger, they do not express a threat to harm like the one on December 20th.

This is one way that you can know that the defendant had the intent to communicate a true threat. However, there's other ways, and you have other evidence on the defendant's intent here.

You can look at the number of ways and times the defendant attempted to reach out to Speaker Pelosi because this gives you a context in which he was making his threat. This is not a one-and-done situation.  He didn't call her once and give up.  He leaves her five voice mails all during business hours.

He calls her on every line he can think of.  He calls her on her leadership line.  He calls her at her personal office.  He calls her in San Francisco.  He calls her ten times.

1          But you don't just have to consider the calls and

2     the voice mails.  You can consider the reaction of those

3     who heard the voice mail.

4          You heard testimony from Ms. Beltran who testified

5     that as soon as she heard the voice mail she forwarded it

6     along to the threat assessment unit because she heard the

7     phrases "we're coming for you," "get a bulletproof vest,"

8     and "you're dead."

9          In her own words, she told you that she understood

10    this statement as a threat.  She told you that as soon as

11    she heard this voice mail in February she forwarded it to

12    the Capitol Police.

13         Now, you also heard from Dr. Rapa who claims that

14    she listens to the voice mails and gave an opinion stating

15    that the defendant is bipolar, that she believes he was

16    going through a manic stage when he left the voice mails,

17    and that the defendant's manic state made him irritable and

18    impulsive, that he fails to consider the consequences of

19    his actions when he's in one of these stages.

20         You heard -- what else did you hear from Dr. Rapa,

21    though?  You heard she has limited experience with the

22    defendant after he was indicted.  You heard that's when her

23    interview took place, when he self-reported the answers to

24    these assessment tests that she doesn't score.

25         And what did she say?  She said he does not suffer

 1    from visual hallucinations.  He doesn't see things that

 2    aren't there.  He doesn't suffer from auditory

 3    hallucinations or he does not hear things that aren't

 4    there.  And that he maintained control of his behavior.  So

 5    even while manic, he is able to control his behavior.  And

 6    she tells you he maintains volitional control.

 7            And she was asked, by this do you mean he's able

 8    to control what he does and says?

 9            And she answered, Yes.

10            When she was asked if he knows what he's saying,

11    she said yes.

12            So even if he is in a manic state, Dr. Rapa's

13    opinion stands for the proposition that he certainly had

14    the capacity to make true threats.  And as I explained

15    earlier, that's exactly what he did here.  He made true

16    threats, which are a serious threat -- not idle talk, a

17    careless remark, or something said jokingly -- that is made

18    under the circumstances that would place a reasonable

19    person in fear of being injured.

20            You may also consider the defendant's phone

21    interview with Special Agent Anyaso.  In this interview,

22    even months later, the defendant has the presence of mind

23    to lie because he knows he needs to lie because he knows

24    what he said was a threat.  And so he lies about his crime

25    to avoid being caught.

1        And he slips up and he admits to certain

2   statements within the voice mail.  And you heard it for

3   yourself.

4        Agent Anyaso asked the defendant, Did you tell

5   Speaker Pelosi she needs a bulletproof vest?

6        And he said, No.  I said I hope she needs a -- I

7   hope she has a bulletproof vest.

8        Even months later he still remembers his words.

9   He remembers exactly what he said, because out of the five

10  voice mails he knows that the one on the 20th, the one he's

11  being asked about, is a true threat.  So he lies to cover

12  it up.

13        And you know he's lying to cover it up because you

14  can look at what he's lying about.  He lies about facts

15  that could be used to identify him.  And you can see that

16  these are lies based on the black-and-white records that

17  you have been shown.

18        The defendant denies, for example, ever living in

19  Ormond Beach and claims he lives in Orlando.  But you know

20  that's not true.  And you know it hasn't been true

21  for years prior to making the -- having the interview.

22        You saw the driver records.  You saw the phone

23  records, the account holder information, the cellular tower

24  data, including the map of how close that cellular tower

25  was to the defendant's address.  And you heard testimony

1    that when he was arrested he was living at this location.

2            The defendant denies not just living at Ormond

3    Beach but living at the specific address.  And again, you

4    can see that he's not moving around in Ormond Beach.  He's

5    been living at this address for years.

6            And again, you can see it from the driver's

7    records, the phone records, the cellular tower information,

8    and the arrest location.

9            The defendant denies living with his partner,

10   Herman Jones.  He claims he's never even met him.  You

11   heard from the defendant's sisters that he's been --

12   Mr. Jones was Mr. Lapin's partner for years prior to his

13   interview.  He certainly knows him.

14           You heard that Mr. Jones was present when the

15   defendant was arrested.  So there's no doubt that Mr. Lapin

16   knows exactly who Mr. Jones is.  In fact, when Agent Anyaso

17   was asked, Agent Anyaso said that the defendant told him

18   that Mr. Jones is his husband.

19           The defendant claims that he doesn't drive a truck

20   and that he instead drives an Escalade.  You know this is

21   not true.  You saw the photo of the silver truck.  You

22   heard Agent Anyaso say that he saw the defendant drive to

23   court in that truck.  And you heard the defendant's sister

24   say, yeah, Mr. Jones allows the defendant to drive that

25   truck.

1          And finally, the defendant claims he never called

2     the Speaker.  And you know for a fact that is not true

3     because you saw the phone records.  You heard the interview

4     with the agent where he claims that he's the only person

5     that uses that phone number.  You heard the voice between

6     the voice mails and the interview.  And he makes this claim

7     on the same call where he also corrects the agents about

8     statements in the voice mails.

9          And the defendant -- why is the defendant lying?

10    The defendant is lying because he communicated a true

11    threat to harm Speaker Pelosi.

12          These lies are not acts of an innocent mind.  And

13    in the lies the defendant lays bare for you his guilty

14    conscious.  And it's one of the clearest ways you can know

15    the defendant's intent and that the defendant knows right

16    from wrong, because he has the presence of mind to lie

17    throughout this interview.  He lies about facts that could

18    be used to identify him, and he makes comments that only

19    someone who made the threats would know.

20          As jurors, you do not have to check your common

21    sense at the door.  You should use it in considering the

22    threats issued to the Representative in this case.  You

23    should use it in evaluating the witnesses here.  And you

24    should use it in considering all of the evidence you have

25    seen during this trial.

1          If you do that, there can be no reasonable doubt

2    that the defendant committed the offenses charged here.

3          Thank you.

4          THE COURT:  Thank you, Ms. Daniels.

5          Do you mind tidying up there before I invite

6    Mr. Ryan up.

7          Thank you.

8          Mr. Ryan?

9          MS. MOUAKAR:  Your Honor, can you turn the switch

10   on for our equipment to be on.

11         Thank you so much.

12         THE COURT:  Do you need a minute or no?

13         MR. RYAN:  I'm good.

14                **CLOSING ARGUMENT BY THE DEFENSE**

15         MR. RYAN:  James Lapin is a patriot in his mind

16   and protested Nancy Pelosi's spearheading of the

17   impeachment of Donald Trump.  And he did it in a crude,

18   crass, unacceptable, ungentlemanly way, by leaving nasty

19   voice mails on her -- on her phone.

20         But he wasn't trying to threaten anyone.  They

21   were not true threats.  It was, as the prosecutor pointed

22   out, political metaphor, political expression of his

23   registering his protest against Nancy Pelosi's and the

24   House of Representatives' impeaching Donald Trump.

25         And he never attempted to directly contact the

 1    Speaker.  In fact, there's no evidence of that.  I even

 2    asked the agent about that.  Is there any evidence he tried

 3    to use a back line to get to Nancy Pelosi directly?  Did he

 4    reach out on Facebook?  Did he reach out on social media?

 5         In fact, you know darn well that he didn't try to

 6    directly reach Nancy Pelosi because of the outgoing voice

 7    mail choices that he had when he called the office.  We

 8    tried to play it during the testimony, but we'll play it

 9    now.

10         Defendant's Exhibit 6.  5, which has been admitted

11    into evidence.  The phone, the outgoing phone tree,

12    whatever you call it, when you get -- when you call Nancy

13    Pelosi's Washington, D.C., office.  Let's listen to that.

14         (Playing audio exhibit.)

15    MR. RYAN:  So he's leaving a voice mail to express

16    his opinion as instructed by the message by pressing one,

17    voice your opinion.

18         May we show the transcript of that outgoing

19    message?

20         If he wanted to get ahold of Nancy Pelosi in some

21    way directly, he could have pressed four.  But he left the

22    message by pressing one.

23         Probably.  I believe Ms. Beltran testified she

24    wasn't really sure what number he left -- or what button he

25    pushed.

1    Thank you.

2         So the idea that there's evidence that Mr. Lapin

3    attempted to contact Nancy Pelosi directly just isn't in

4    the record.  Just isn't part of our case.  In fact, I

5    crossed on that to some extent with the agent.

6         Now, it's interesting how the prosecutor tells you

7    that the first message on December 19th is just an

8    angry message.  The messages on January 11th and

9    16th -- there's three there, two on the 16th -- are

10   just angry messages.  But just the one on -- the

11   December 20th, it's different and outstanding.  That

12   one leaves criminal words on a voice mail.

13        So ask yourself how does that work?  How does that

14   jibe, then, with the idea that they don't even discover the

15   messages until February 24?

16        So if he's leaving the scary message on the

17   20th and then follows up with three non-scary ones and

18   then there's a non-scary one to begin with, why is this one

19   so bad?

20        I grant you, it's the harshest one.  He uses the

21   C-word a lot.  And he talks about we're coming for you.

22        But you know by the February 24th that this is

23   just some crackpot, cranky guy leaving his opinions on the

24   voice mails.  He's not truly threatening Nancy Pelosi.  He

25   doesn't have a gang.  He doesn't have cohorts.  There's no

1    one coming with him to go to Washington, D.C.  Nobody.

2    That this is just a mentally ill guy, not hugely -- a

3    mentally ill guy protesting in the way he knows how to do

4    it by calling on the public line of Washington, D.C.

5            So let's look at our version of the

6    December 19th, at the first one, the voice mail.

7            I asked you in opening and I'll ask you again.

8    This case is about language.  So it causes us to take a

9    moment, to take a moment to understand the language.

10           Is Mr. Lapin talking literally, or is he talking

11   figuratively?  Is he truly out to scare or frighten or

12   intimidate the Speaker, or is he ranting and raving about

13   his particular political position?

14           This is serious for him.  This is a serious case

15   actually.  So let's look at the language.

16           What is he talking about?  And who is he talking

17   about?

18           So here's the December 19th message.  I've

19   tweaked it a little to emphasize what I think is important

20   about it.

21           So when do we try Nancy Pelosi for treason and

22   hang her for treason against the people of our country?

23   She forgot she works for us.  Right?  She works for the

24   American people.  Right?  Not her son working over in the

25   Ukraine for Joe Biden's son.  No, that couldn't be why she

1   tried to impeach our president.  That bitch is a traitor.

2   And so is the entire DNC.  It's time to abolish the DNC.

3   Pulse Nightclub survivors for Trump 2020.

4          They just told you this is not a threatening

5   statement.  It's just I guess anger, according to the

6   prosecutor.

7          But it's on December 19th, and that's an

8   important date for this case.  On December 18th, Donald

9   Trump was impeached by the House of Representatives.

10         You heard testimony from Mr. Lapin's sisters and

11  from Dr. Rapa that one of the triggers of a manic state for

12  a bipolar person could be the news.  We've all seen that

13  guy who gets all upset about the news.

14         But this tells you what this case is about.  It's

15  about Mr. Lapin protesting Nancy Pelosi's impeachment of

16  the president which he rates is equivalent to being a

17  traitor.

18         And he leaves it on a voice mail that invites you

19  to leave your opinion.  There's no evidence that he tried

20  to reach out to Nancy Pelosi directly.  No evidence that he

21  tried to ascertain her public appearances schedule.

22         All the evidence points to the fact that he never

23  went to Washington, D.C.  All the evidence, location data,

24  that they are making much ado about is that he was here the

25  entire time near Ormond Beach.

```
 1              And they want you to convict him because James

 2   Lapin is a liar.  Unfortunately, he is a liar.  He's been a

 3   liar his whole life.  He's a habitual liar.  You heard that

 4   from his sisters.  Small things and little things.  Why?

 5   His way of gaining attention.

 6              He wasn't lying to avoid detection.  If he was

 7   lying to avoid detection in this case, he would have

 8   attempted to avoid detection.  But he didn't.  He didn't

 9   move.  He didn't leave the address.  He was called by

10   Agent Anyaso here on May 18th.  All right?

11              Why were you threatening Nancy Pelosi?

12              And he says he wasn't.  I wasn't doing that.

13              But he was on notice that law enforcement was on

14   his tail, right?  He didn't try to leave.  He didn't go

15   anywhere.  He didn't go into hotel rooms or stay with

16   friends or go to the sisters' homes, all of a sudden he's

17   not available at that location.

18              If he were trying to avoid detection, he would

19   have done something else.  He would have done something

20   else.  Not just said something.  Actions speak louder than

21   words.  We all hear that phrase.

22              The next one, on December 20th, the day after

23   -- or two days after the impeachment, he calls again.  And

24   he leaves this nasty message.

25              Now, we know the "we" does not mean anybody with
```

1    Mr. Lapin, no cohorts, no co-conspirators, no gang.  He's

2    not talking about his friends or a group of people.  He

3    didn't post on Facebook.  There's no email.

4           There is not one shred of other indications that

5    Mr. Lapin even wanted to scare the Speaker.  Not a Facebook

6    post.  Not a Twitter.  Not an email.  Not a snail mail.  No

7    attempt to locate her.  No showing up at her office.

8    Nothing.  Because he wasn't.  That's not what he does.

9           What he does is he rants and raves like an idiot.

10   And it's not nice.  And we're not condoning it.  But it's

11   not a crime.

12          And he says -- I counted five times -- we're

13   coming for you.  You heard it so many times.  You probably

14   don't need to hear me say it again.

15          We are fucking coming for you.  We're coming for

16   you.  Our president.  We're coming for you.  We're coming

17   for you.  To hang your dentures above the Capitol.

18          So you have to ask yourself is he speaking

19   literally, figuratively?  And we know it's a figure of

20   speech because the "we" is nobody, is not for real.  It's

21   metaphor.  And it's not nice, but he's speaking a political

22   metaphor.

23          He's talking about Nancy Pelosi's political life

24   and the retribution of the people who supported the

25   president and were against the impeachment will one day

```
1    extract from her the loss of her political career.  You're

2    fucking dead.  We know that's what he meant.

3              We go on to the next one.

4              Now we're back, according to the Government's own

5    statements, to nothing wrong with this.  Okay to be leaving

6    these kinds of statements with Nancy Pelosi's office.

7              He's talking about me and 6,000 other citizens.

8    Did we see -- we're going to file lawsuits against the DNC

9    for violating -- again, he's speaking about "we" and "our"

10   and "us."  We're suing you for defamation of character.

11   Call us racist.  Our constitutional rights.

12             He's always placing himself within a much larger

13   context because he's not talking really about himself.

14   He's talking about "we," the Bobby politic, the group that

15   shares his views of the political norm or the political

16   time.  He's talking about a political process, a legal

17   process in his way.  And they know it because they didn't

18   do anything about it.

19             That's the other thing.  They didn't do anything

20   about it.  February 24th is when they first realize it.

21             And I disagree with the prosecutor, but you're the

22   deciders.  I don't think Ms. Beltran came up here and told

23   you that she was afraid of the message and that's why she

24   sent it off to the threat assessment section.  I don't

25   think she said that.  But you get to decide.
```

1          I think what we heard her say was that, first of

2     all, that's her job, is to sit there and screen those voice

3     mails, that they do -- there's thousands a week coming in.

4          And they're plucking out buzzwords.  And she found

5     the buzzwords.  And then the buzzwords required her to

6     search the phone number, and we got the other messages.

7     And, boom, it gets shipped off to threat assessment.

8          And, in fact, if you ask me, nobody from Nancy

9     Pelosi -- sorry.  Let me say it this way.  There was no

10    evidence or testimony presented to you that anybody in

11    Nancy Pelosi's office felt momentarily fear in any way.

12         I don't think we got that from Ms. Beltran.  It's

13    up for you to decide.  You certainly didn't hear that the

14    Speaker herself felt fear or concern or intimidated.

15         Go on to the next one.

16         Again, she's talking about treason -- I'm sorry.

17    Mr. Lapin is talking about treason.  And us.  Us and

18    treason.  We.  Our.  The people.  The American people.  He

19    says it over and over again.

20         This is on January 16th.  By the way, a

21    significant event happens on January 16th in the

22    impeachment.  That's when the impeachment articles were

23    delivered to the U.S. Senate sort of initiating the formal

24    process of what's called the trial in the Senate.

25         So obviously Mr. Lapin was keenly aware of the

1    issues going on with the impeachment.  So another high

2    point in impeachment in which Mr. Lapin was likely in a

3    manic phase calling, leaving messages in a manic phase, in

4    a bipolar condition.  Utilizing language that he never

5    would use in real life.  He would never, in person.  We

6    heard that in person he's polite.  Fun, you know.

7    Enjoyable, you know.

8          This is -- he thinks that he can leave this

9    message and really give it to her because, you know, he's

10   not going to hear any feedback.

11         Then on the last message, he's talking about us

12   taxpayers and how much Nancy Pelosi spent on the

13   impeachment pens and the impeachment bullshit.  And, again,

14   we're coming for you.  And you will hang for treason.

15   Treason.

16         And, you know, months later, can you imagine the

17   type of character that Mr. James Lapin is, this

18   hyper-supporter of Donald Trump, this guy kind of whacked

19   out on politics, gets a call out of the blue from someone

20   purporting to be an agent to talk about the impeachment

21   process.  It must have been quite an exciting phone call

22   for Mr. Lapin.  That doesn't happen to him very often.

23         And what did he talk about again?  We went through

24   it with the -- during the testimony.  He talked about

25   treason and traitor.  And Nancy Pelosi being a traitor for

1    impeaching Donald Trump.  And we protest.  We protest.

2         He claimed that he went to Washington, D.C.  His

3    sister says that's not possible.  He would have told us.

4    And not one shred of evidence to suggest that he did.  And,

5    in fact, all the evidence that they're making much ado

6    about is that all the location data shows that he was at

7    Ormond Beach.  Ormond Beach.

8         So he's a big fat liar, according to the

9    Government, when it comes to his significant other and when

10   it comes to his address.  But when it comes to going to

11   Washington, D.C., oh, no, all of a sudden now that's good

12   evidence.  That's good evidence he went to Washington.

13   It's not.  And he, unfortunately, lies.  But he doesn't

14   threaten government officials.  That's not James Lapin.

15        And he does have mental health issues.  Shield the

16   language, shield the nasty language, the hyperbolic

17   language.  But it's not just the language or Mr. Lapin's

18   mental health issues.  His other actions demonstrate that

19   no true threats were made here.

20        Did somebody tell Mr. Lapin to stop making those

21   calls?

22        No.  He did that all on his own.  He just stopped

23   calling.  Because impeachment was over.  Impeachment ends

24   on February 5th.  February 5th.  Donald Trump is

25   acquitted in the Senate.

```
 1             Here's this guy threatening the official in our
 2   Government who's number two in line for the presidency, the
 3   Speaker of the House.  It goes president, vice president
 4   and then Speaker of the House if, God forbid, somehow two,
 5   our president and vice president, at the same time would
 6   become incapacitated.
 7             So you don't search the guy's bedroom?  You would
 8   search his bedroom.  You would go get a search warrant.
 9   You want to make sure this guy isn't for real.
10             Or they want to tell you how they don't have the
11   burden to prove that he wasn't really going to do it.  They
12   want to try to make you think that their burden is less
13   significant than it is.  But it's proof beyond a reasonable
14   doubt that he intended to threaten, intended to threaten
15   Nancy Pelosi, whether he intended to do that on purpose and
16   knowingly and intentionally.
17             Is this the man who during manic phases was
18   leaving stupid messages about his politics on Nancy
19   Pelosi's phone really intending to do that on purpose and
20   knowingly and intentionally to hurt and scare and frighten
21   Nancy Pelosi?  No.  It's just his way of talking.  You
22   heard that from the sisters.
23             And you would search that bedroom.  You would get
24   a search warrant.
25             When he was arrested, the phone was right there.
```

```
1   They're making a dig deal about the phone, about whether he
2   claimed -- oh, by the way, all the thing about his -- you
3   know, during the interview with Agent Anyaso, he didn't
4   deny his name, his date of birth, and that the phone was
5   his and that only he used the phone.
6          Well, that's the instrumentality of the action in
7   this case for which he's being brought to this Court.  So
8   that's what matters, not that he disavowed his significant
9   other over the telephone, for whatever reason, who was
10  sitting right there when he got arrested.
11         Or that Mr. Lapin, when he got arrested, didn't
12  try to ditch the phone, disavow the phone, hide the phone.
13  He did nothing like that.
14         Because he's not guilty.  Because he doesn't have
15  a guilty mind.  He didn't think anything about the phone.
16  He didn't think anything about the phone after he talked to
17  Agent Anyaso a month earlier.
18         It took them six months to arrest this guy that
19  they say is threatening the Speaker of the United States
20  House of Representatives.
21         In fact, he asked to use the phone and they gave
22  it to him.  He made a call.
23         On the way -- after being taken into custody, he
24  doesn't disavow Davis or Jones, Mr. Jones, calls him Davis,
25  his partner.  In fact, he called him his husband.
```

1    Well, why he said what he said over the phone, we

2    don't know.  And it doesn't matter.  It doesn't go to

3    anything here.  They want to make him a liar to you and

4    urge you to convict him because he's a liar, but there's

5    just nothing about the case that is about lying.

6    This isn't a theft case, a fraud case, a credit

7    card fraud case.  He wasn't stealing from widows and

8    orphans.  Nothing like that.

9    There's nothing about the charges that you're

10   being told to consider here that involves him lying.  He

11   lies as a matter of habit.  He's done it throughout his

12   life.

13   But on the important stuff, he didn't because he

14   doesn't have a guilty mind.  He didn't disavow his phone,

15   even after the May 20th -- May 18th call.

16   And after May 18th, he could have taken lots

17   of evasive actions to try to confuse law enforcement, get

18   rid of the phone, move to another location, seek the

19   shelter with his sisters who are still here in the

20   courtroom with us.  But he didn't do any of that stuff.  He

21   went about his business and stayed right there in front of

22   the house.

23   Why?  Because he's not guilty.

24   Like I said, we heard little to no evidence, that

25   I heard, from anybody in Nancy Pelosi's office even paused

1    over this, except for the routine matter that Ms. Beltran

2    had to -- sent forward -- if I said email -- the voice mail

3    to law enforcement.  And that's compelling evidence that

4    actions speak so much louder than the words here.

5         We're talking about a case and talking words and

6    actions, and actions being more important than the words.

7    Yeah, they don't have to prove that he was doing anything

8    to actually execute some plan.  Because, of course, the

9    reason they emphasize that, of course, is because there's

10   no such evidence.  There's not even a tweak Nancy Pelosi

11   should hang for treason.  Not a meme showing Nancy Pelosi

12   with a bullet -- you know, a bull's-eye on her face.

13        Why?  Because he wasn't thinking of those messages

14   as conveying a threat.  He only thought of those messages

15   as conveying a political thought because he's not guilty.

16        He's not guilty.

17        Thank you.

18        THE COURT:  Thank you, Mr. Ryan.

19        Would you tidy up there on your way out before I

20   invite Ms. Daniels back to the podium.

21        MR. RYAN:  Yes, sir.

22        THE COURT:  Thank you.

23        MR. RYAN:  All yours.

24        THE COURT:  Ms. Daniels.

25        MS. DANIELS:  Thank you, Your Honor.

1          **REBUTTAL BY THE GOVERNMENT**

2          MS. DANIELS:   The defense attorney says that

3    actions speak louder than words, but words are why we're

4    here.  Words matter.  In fact, words are the most important

5    thing in this case because, as the Court has instructed

6    you, you are here to consider the defendant's words.

7          And the jury instructions are going to tell you

8    that the Government does not have to prove that the

9    defendant intended to carry out his threat.  That's because

10   threats to intimidate disrupt people's lives.  And that's

11   what this statute criminalizes.

12         So it may be the case that actions speak louder

13   than words, but words are exactly why we're here.  And they

14   are paramount in this case.  Do not get confused about what

15   matters in this case.

16         What matters in this case is the evidence that was

17   presented to you.  And the evidence that was presented to

18   you in this case refutes the defense argument that the

19   defendant, his statements to the Speaker are not true

20   threats but instead the result of some manic episode in

21   which the defendant uses hyperbolic words that he wouldn't

22   otherwise use.  And it's certainly not that the statements

23   are not true threats because they are a political metaphor.

24   Neither theory fits the evidence presented in this case.

25         What evidence do you have in this case?  You have

1    the statements themselves.

2           The defense talks a lot about treason.  The

3    defense goes through the different voice mails.  The

4    defense attorney put up the transcripts of the voice mails

5    for you.  And in the transcripts of those voice mails, you

6    saw the term "treason."

7           But do you know where you did not see the word

8    treason?  In the voice mail from December 20th.  If you

9    look at that transcript, the word treason does not appear

10   anywhere in it because that call is different.  That call

11   is a true threat to kill Nancy Pelosi.

12          Because it's very clear that the defendant is

13   familiar with the term "treason."  As the defense attorney

14   points out, he uses it frequently.  So he's not shy about

15   that word.  He doesn't not know it.  He's very aware of it.

16          What statements are on that voice mail?  We're

17   coming for you.  You better have a bulletproof vest.  And

18   you're dead.

19          There are swear words, which shows that it's not a

20   joke or a careless remark.  The tone is menacing, at best.

21   It shows it's not a joke.  The tone is terrifying.  And you

22   can contrast it to all of these things in the other voice

23   mails because it is very different.

24          And he did communicate directly to the Speaker's

25   office.  He had to look up her number in San Francisco and

1    her leadership line and her direct office, and he had to

2    call every single one of those.  He didn't just post

3    something on Facebook and leave it out in ether, no.

4         He looked her up, and he called her ten different

5    times.  He left her five voice mails.  He calls her during

6    the day, and he calls her at all of her offices.

7         And you saw the reaction of Ms. Beltran.

8    Ms. Beltran stood up here and testified for you, I

9    forwarded this because when I heard it, it was a threat.

10   And she told you exactly what about it she thought was a

11   threat, and it is those statements.

12        So you can look at the numbers.  You can look at

13   the tone.  You can look at the voice mails themselves.

14        And the expert witness in this case, Dr. Rapa,

15   does not diminish the defendant's intent in this case.  As

16   you heard, Dr. Rapa relies on very limited experience with

17   this defendant.

18        She's not treating him.  Her medical records --

19   all she spends is three hours with him, which he takes a

20   300-question test and another 100-question test where he's

21   self-reporting after he's indicted.  She ignored the

22   characterization of the people who claim to know him best.

23        You saw his sisters up here.  Each sister got up

24   here and said, I've never noticed any mental health issues.

25   We're really close.  I talk to him all the time.  He's the

1    funcle.  He's happy-go-lucky every time he's with my

2    family.  Never noticed mental health issues.

3           And what does Dr. Rapa do with that information?

4    Discounts it.

5           And this includes the person that lives with him.

6    Right?  Because she told you that she did also listen to

7    the interview of his partner.  And in that interview, he

8    also said no mental health history.

9           You heard that he has no hallucinations, no

10   delusions.  You heard that he has the capacity to control

11   his behavior.  You heard that he knows what he's saying.

12   You heard that he can form intent even while manic.

13          And that's important because even under the

14   defense theory that he was manic when he was leaving these

15   voice mails, he still has the intent to leave them.  He

16   still has control over his behavior.  He just doesn't think

17   about the consequences.

18          So what happens when he's confronted with those

19   consequences?  He lies.  He tries to hide himself.  He

20   tries to give the agent misinformation to throw the agent

21   off.

22          That's another way you can see his intent and how

23   he operates whether or not he's in a manic phase.  Because

24   he didn't forget what he said.  He knew exactly what he

25   said.

1          The agent asks him, Did you tell Nancy Pelosi you

2    better have a bulletproof vest?

3          Nope.  I said I hope she has a bulletproof vest.

4          Did you tell Nancy Pelosi you were coming for her?

5          Yeah.  We protested, didn't we?

6          And that's another thing that I think is

7    important.  The defendant takes his time during the

8    interview to try to explain away what he said.

9          That's how Americans come for elected officials.

10   We protested.  I was there.

11         But you heard up and down in the defense's case he

12   was not in D.C.  So he's trying to explain away to make it

13   better because he knows it's a threat.  He knows it's bad.

14   He knows it's wrong.  He knows he's in trouble.

15         So he lies.  He lies about where he lives, who he

16   lives with, what he drives, whether he's ever called the

17   Speaker.  That's how you know his intent.  That's how you

18   know he knows right from wrong.

19         Now, like I said before, you can use your common

20   sense.  But the defense spends a lot of time characterizing

21   the defendant's words as a political metaphor.  And I

22   strongly urge you to use your common sense when considering

23   what this might be a metaphor for.

24         What is the metaphor for "we're coming for you"?

25   What's the political metaphor for "you better have a

1    bulletproof vest"?  What's the political metaphor for

2    "you're dead"?

3           The defense claims he's expressing an opinion.

4    Where's the opinion in "you better have a bulletproof

5    vest"?  That's not an opinion.  That's a statement.

6           What's the opinion in "you're fucking dead"?

7    Again, that's not an opinion.  That's a statement.  That's

8    a threat.  That's a true threat.

9           And the defendant lies.  And the jury instructions

10   will instruct you, and the Court has instructed you, that

11   if the defendant gave a false statement in order to divert

12   suspicion from himself, you may, but are not required to,

13   infer that the defendant believed he was guilty.  That's in

14   the jury instructions.  You go back and read that for

15   yourself.

16          The defense states that the use of the term "we"

17   shows you that he's not talking about himself.  Couldn't be

18   talking about himself.  We the people.  We the American

19   people.  We, the taxpayers, are coming to kill you.

20          First, the definition of the term "we" includes

21   me, includes I.  Me and my friends.  Me and my people are

22   coming.

23          The defense attorney would like the Speaker to

24   believe that he has cohorts, right?  Because that makes him

25   scarier, me and all of these people are coming to get you.

1          Because as you heard his sister say, he's trying

2     to make himself seem bigger than he is.

3          Because he wants her to be scared because he's

4     issuing true threats.  "We" gives him more power.  "We"

5     gives him more effect.  "We" gives him more scare for his

6     words.  It's meant to enhance his threat, not detract from

7     it.

8          The defense calls his statements mean words.

9     These statements go beyond mean words.  They cross the line

10    beyond mean words to criminal threats.

11         And the defense states that they waited too long

12    to investigate it.  So how could it be a true threat?  It

13    took too long.

14         You heard Ms. Beltran say she heard that voice

15    mail on February 24th, and that's the day she forwards it.

16         You heard Agent Anyaso say, I got that email on

17    the 24th, and I started investigating it.  You heard him

18    say that he requested records.  He looked at the records.

19    He had to establish where the defendant lived, what he

20    drove, because the defendant had spent all this time lying

21    to him about who he was.

22         And this is not the test for a true threat.  The

23    test for a true threat is whether it's a serious threat,

24    whether it's idle talk or a careless remark -- it's not

25    something that's said jokingly -- and that is whether made

1  under circumstances that would place a reasonable person in

2  fear of being injured.

3       The test is not how long did it take you to arrest

4  this person.  The test is whether it's a true threat.

5       But here the defendant's words and his actions all

6  point to the fact that this was a true threat, and the only

7  verdict that fits the facts and the evidence in this case

8  is a verdict of guilty.

9       Thank you.

10      THE COURT:  Thank you, Ms. Daniels.

11                    **JURY CHARGE**

12      THE COURT:  So, ladies and gentlemen, as I

13  mentioned before, a verdict form will be prepared for you

14  -- it has been prepared for you to take to the jury room.

15      So when you all have retired to the jury room and

16  elected your foreperson, after your deliberations are

17  completed and you've reached a unanimous verdict, you

18  should have the foreperson fill out the verdict form, date

19  it, and sign it, and return it to the courtroom.

20      Now, if you should desire to communicate with me

21  at any time, please write down your message or question and

22  pass the note to my court security officer who will bring

23  it to my attention.  I'll then respond as promptly as

24  possible, either in writing or by having you return to the

25  courtroom so that I can address you orally.

1          I caution you, however, that with regard to any

2   message or question that you might send out that you should

3   not tell me what your numerical division is or anything

4   about the course of your deliberations.

5          Just a word to the wise, most of the time in

6   my years of experience, when jurors have a question the

7   first answer that they get is please refer to the written

8   jury instructions that were delivered to you to use in

9   connection with your deliberations.

10         I'm not suggesting they may answer every single

11  question you might have, but almost always that's the first

12  stopping point.  So I would encourage you to use that

13  resource that you'll have there available for you.

14         Also, bear in mind that if you send out a question

15  for me, I have to gather all the litigants.  I have to go

16  over the question with them.  I have to share with them how

17  I propose to respond to it.  I have to give them an

18  opportunity to have input as to whether they think my

19  response is appropriate or not.  So it takes some time.

20         So if you send out a question, just be patient.

21  No, I'm not ignoring you.  I have to go through these steps

22  before I can provide you with a response.

23         I mentioned to you that there's a verdict form.

24  The verdict form, as I've said before, is in interrogatory

25  or question format.

 1          It reads as follows:

 2          Count one of the Indictment.

 3          It has the style of the case, that is, the name of

 4   the case at the top and the location of the Court and the

 5   case number.

 6          Question one.

 7          Count one of the Indictment.

 8          As to the offense of making a true threat with

 9   intent to impede, intimidate, interfere, or retaliate

10   against an official engaged in the performance of official

11   duties, in violation of 18, U.S.C., Section 115(a)(1)(B),

12   we, the jury, find the defendant, James Lapin, and then a

13   place for you to record your verdict, either guilty or not

14   guilty.

15          Question two.

16          Count two of the Indictment.

17          As to the offense of knowingly transmitting a

18   threat in interstate commerce to injure, in violation of

19   18, U.S.C., Section 875(c), we, the jury, find the

20   defendant, James Lapin, and then a place for you to

21   indicate your verdict, either guilty or not guilty.

22          So say we all this blank day of November 2020, and

23   a signature line for the foreperson.

24          So with the exception of Ms. Behrens, I'm going to

25   ask Ms. Behrens to remain behind, if you would.  You might

```
 1    have to scoot out of the way just to let your colleague

 2    slide by the plexiglass barriers there.

 3              I'm going to discharge you all now with

 4    instructions to begin -- to retire and to begin your

 5    deliberations.  And Mr. Carter will show you the way.

 6              (Jury exited the courtroom at 3:49 p.m. to

 7               commence deliberations.)

 8         THE COURT:  So, Ms. Behrens, as you may have

 9    surmised, you are our alternate.  It's important for me to

10    mention a couple of things to you.

11              First of all, my gratitude for your service, but

12    you're not finished yet.  It happens more commonly than you

13    might think that something happens during the course of the

14    deliberations that, either for medical reasons or some

15    untoward development that we can't anticipate, one of our

16    jurors is not able to serve through the rendering of the

17    verdict.

18              So I'm going to ask you to stay subject to my

19    instructions not to discuss the case with anyone, not to

20    acquire any information about it.

21              You don't need to stay at the courthouse, but you

22    need to be reachable.  So if my courtroom deputy could get

23    a phone number for you where you could be reached.  You're

24    welcome to stay if you'd like to, but if you want to depart

25    you're welcome to do that as well.
```

 1            But if you give Ms. Hernandez a contact number,

 2    what she'll do is one of two things.  She's either call you

 3    and tell you that the jury was able to reach a verdict,

 4    thank you for your service; or something has developed, we

 5    need to have you report back to the courthouse and give you

 6    some instructions about getting back as quickly as you can.

 7            So I'm not sure how far away you live.

 8            THE DEPUTY CLERK:  We have her contact

 9    information.

10            THE COURT:  You do have her contact information

11    already.

12            But if you would stay at least proximate enough

13    that you could return to the courthouse if necessary

14    sometime this afternoon or tomorrow if you were summoned,

15    that would be helpful.

16            You don't need to stay here.  And if you want to

17    go home, you can do that.  Just make sure you let

18    Ms. Hernandez know, if you would, about how long it would

19    take you to get back just so I would have some idea how

20    long our wait might be.

21            ALTERNATE JUROR:  About an hour.

22            THE COURT:  About an hour.  So that's perfectly

23    fine.

24            So you're not under any restriction of any sort in

25    terms of your travel or your availabilities.  Just for my

```
 1   information, so I would know when we could expect you back
 2   if we needed you.
 3           If I don't have the pleasure of seeing you again,
 4   which is the more statistically likely outcome, I just want
 5   to tell you how grateful I am for your service.
 6           I know it can be frustrating sometimes to sit
 7   through the proceedings and get invested in it and then
 8   find out that you are the alternate.  So I do want you to
 9   know that your service is invaluable.  We couldn't proceed
10   without you.  And we may yet need you more.
11           But thank you very much for your service, if I
12   don't see you again.
13           ALTERNATE JUROR:  Thank you, Your Honor.
14           THE COURT:  The court security officer will show
15   you out.  You're going to go out the -- well, I guess
16   you'll go this way again.  So they'll take you back out
17   this way, especially if you have any belongings or anything
18   back there you can collect.
19           (Alternate Juror exited the courtroom at
20            3:52 p.m.)
21           THE COURT:  You all can be seated.
22           Does the Government have any objection to the
23   Court's instructions to the jury as delivered?
24           MS. DANIELS:  No, Your Honor.
25           THE COURT:  Mr. Ryan, does the defense have any
```

```
1    objection to the instructions as delivered?

2              MR. RYAN:  No, other than what has already been

3    noted.

4              THE COURT:  Right.

5              Okay.  We'll be in recess, then, pending further

6    word from the jury.

7              MR. RYAN:  Thank you.

8              (Recess taken at 3:53 had to 5:26 p.m.)

9              THE COURT:  All right.  Counsel, we have a couple

10   of questions.  One of them deals with how late they are

11   going to be expected to stay.

12             I was just getting ready, before I heard from

13   them, to give them word, after I talked to you all, that

14   they turn off the air conditioner at 6:00.  So I generally

15   require them to leave at 6:00 and come back the next day.

16             Ms. Gorion apparently has an appointment this

17   evening.  She's asked for permission to make a phone call.

18   I've allowed her to use the court security officer's phone

19   in his presence to call her appointment and let them know

20   that she's delayed.  So that's the scheduling question.

21             And I plan to bring them in here shortly and tell

22   them that they're free to go home for the evening and come

23   back tomorrow, if they'd like to do that, or they can stay

24   until 6:00, whatever their preference is.

25             Now, there is a substantive question which I'll
```

 1   read to you from the foreperson related to count two.

 2          The question is -- page 11 of the instructions,

 3   which includes the elements for the count two offense.

 4          The question is:  Page 11, does it need to be one

 5   and two or just one or the other?

 6          And, of course, the answer to that question is it

 7   needs to be one and two.  And that's what I intend to tell

 8   them, but I do want you all to know the question and my

 9   proposed response.

10          I don't think there's any ambiguity about that but

11   I'll give you all a chance to tell me if you think I'm

12   mistaken.

13          MS. DANIELS:  No, Your Honor.  The Government does

14   not think you're mistaken about that.

15          MR. RYAN:  I agree.

16          THE COURT:  All right.  So I'm going to write and

17   then just read it to you.

18          I'm going to write on the bottom -- I'm going to

19   date Mr. Burford's note.

20          Make sure that you instruct the jurors to preserve

21   all of these notes, not to throw them away.

22          COURT SECURITY OFFICER:  Yes, sir.

23          THE COURT:  So I'm going to write to the

24   foreperson:  Both one and two, not either/or.

25          I think that's relatively straightforward.  But if

```
 1    you all have any difficulty with that response --

 2            His question verbatim is, count two, page 11, does

 3    it need to be one and two or just one or the other?

 4            I've responded:  Both one and two, not either/or.

 5            Okay.  Any objection from the Government?

 6            MS. DANIELS:  No, Your Honor.

 7            THE COURT:  From the defense?

 8            MR. RYAN:  No, Your Honor.

 9            THE COURT:  All right.

10            As to the time question, I've added this

11    postscript on the bottom of this note.

12            You can adjourn any time and return tomorrow at

13    9:00.  The AC shuts off at 6:00 so I will send you home

14    then to return tomorrow.

15            Any objection to that from the Government?

16            MS. DANIELS:  No, Your Honor.

17            THE COURT:  From the defense?

18            MR. RYAN:  No, Your Honor.

19            THE COURT:  All right.

20            Mr. Carter, will you take this back?

21            And I'm going to keep this one and make this a

22    Court's exhibit.

23            I'm going to make Ms. Gorion's note about making a

24    phone call -- which I'll read to you.

25            Will we be able to leave at a certain time today
```

```
1   or be here until we reach a verdict?  Personally I'm
2   expected to be at a treatment at 5:30 today.  If I do not
3   call by 5:45, they will send police to do a safety check.
4   So I will need to call.
5           So I allowed her -- as soon as I got that note I
6   allowed her to make that call so that she wouldn't be
7   stressed about it.
8           And I'm going to ask this to be Court Exhibit 1,
9   if you would.
10          We'll make the other note Court Exhibit 2 once we
11  get it back from them at the conclusion of their
12  deliberation.
13          (Court's Exhibit 1 was marked for identification.)
14          THE COURT:  So you all should probably just stand
15  by for just a minute.  And I'll be back as soon as I get
16  word from them about when they want to leave.  Thank you.
17          (Recess taken at 5:32 is to 5:44 p.m.)
18          THE COURT:  All right.  Back on the record in
19  United States versus Lapin, 6:20-cr-89.
20          Our jurors have indicated they'd like to adjourn
21  for the evening and come back tomorrow.  So I'm going to
22  ask the jurors to come back tomorrow.
23          I'll give them their admonition, send them home,
24  and we'll reconvene in the morning.
25          (Pause in proceedings.)
```

```
 1              (Jury entered the courtroom at 5:45 p.m.)

 2              THE COURT:  Welcome back, ladies and gentlemen.

 3              I understand you'd like to adjourn for the evening

 4    and come back and resume your work in the morning.

 5              That's perfectly acceptable.  I probably should

 6    have told you before you retired that our landlords turn

 7    off the air conditioner here about 6:00.  And even when

 8    it's cool outside, it gets to be a little bit

 9    uncomfortable.  So 6:00 is sort of the witching hour

10    anyway.  And so we're right up against that.

11              I'm going to discharge you in just a minute.  I

12    just wanted to bring you back in and remind you that you're

13    still under my admonition not to talk with anyone else

14    about the case, not to acquire any information from any

15    source about the case over the evening.

16              Come back in the morning.  Once you're

17    reconstituted, I'll bring you back in here, check with you,

18    make sure you've been able to follow my instructions.  And

19    then send you right back in to continue with your work.

20              So thank you for all of your attention and for the

21    late day today.  I hope you have a pleasant evening.

22              I'll give you back over to the court security

23    officers.  They'll escort you out of the building.  I'll

24    see you back here in the morning at 9:00.

25              (Jury exited the courtroom at 5:46 p.m.)
```

```
 1              THE COURT:  Mark this as Court's Exhibit Number 2,
 2   please.
 3              (Court's Exhibit 2 was marked for identification.)
 4              THE COURT:  Anything further from the Government
 5   before we adjourn for the evening?
 6              MS. DANIELS:  No, Your Honor.
 7              THE COURT:  Mr. Ryan, anything from the defense?
 8              MR. RYAN:  No, Your Honor.
 9              THE COURT:  All right.  You all have a pleasant
10   evening.
11              We'll reconstitute at 9:00 -- we'll reconvene at
12   9:00 in the morning tomorrow for me to get them back to
13   work.
14              Just since I know that you all, I'm sure, have
15   other duties to attend to, please make sure that you're
16   close by even -- once I send them back, I don't know how
17   long it's going to take them to reach a verdict, but I need
18   you all to make sure that Ms. Hernandez can get ahold of
19   you and that you can get back here in a matter of 10 or
20   15 minutes.  All right?
21              We'll be in recess, then, until 9:00 tomorrow
22   morning.
23
24              (Proceedings adjourned at 5:48 p.m. until
25               Thursday, November 19, 2020, at 9:00 a.m.)
```

```
 1               C E R T I F I C A T E

 2

 3        I certify that the foregoing is a correct

 4   transcript from the record of proceedings in the

 5   above-entitled matter.

 6

 7   January 11, 2021

 8

 9        s\  Amie R. First
     _____
     Amie R. First, RDR, CRR, CRC, CPE
10   Federal Official Court Reporter
     United States District Court
11   Middle District of Florida

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```