1                    UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF FLORIDA
2                          ORLANDO DIVISION
                      CASE NUMBER 6:20-cr-00089
3

. . . . . . . . . . . . . . . . .
4    UNITED STATES OF AMERICA,     :
                                   :
5            Plaintiff,            :
                                   :           Orlando, Florida
6               v.                 :           November 18, 2020
                                   :           8:56 a.m.
7    JAMES LAPIN,                   :
                                   :
8            Defendant.            :
. . . . . . . . . . . . . . . . .
9

10         EXCERPT TRANSCRIPT OF JURY TRIAL, VOLUME II
                  TESTIMONY OF LAWRENCE ANYASO,
11          PAMELA NICHOLE MARGESON, AND MARIE NEER
             BEFORE THE HONORABLE ROY B. DALTON, JR.
12                UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15

16   Counsel for Government:      Amanda Sterling Daniels
                                  Chauncey A. Bratt
17

18   Counsel for Defendant:      Michael Shay Ryan
                                  Nicole Mouakar
19

20

21   Court Reporter:     Amie R. First, RDR, CRR, CRC, CPE
                         Federal Official Court Reporter
22                       401 West Central Boulevard, Suite 4600
                         Orlando, Florida  32801
23                       AmieFirst.CourtReporter@gmail.com

24   Proceedings recorded by Realtime Stenography.

25   Transcript produced by Computer-Aided Transcription.

<u>**INDEX OF PROCEEDINGS**</u>

<u>**GOVERNMENT WITNESSES**</u>

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Lawrence Anyaso | 5 | 25 | 54 | |

<u>**DEFENDANT WITNESSES**</u>

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Pamela Nichole Margeson | 61 | 73 | 80 | |
| Marie Neer | 85 | 92 | 97 | |

<u>**EXHIBITS**</u>

|  | ADMITTED |
|---|---|
| Government's Exhibit 11B | 11 |
| Government's Exhibit 13 | 17 |
| Government's Exhibit 16 | 23 |

```
 1                   P R O C E E D I N G S

 2                        * * * * *

 3           THE COURT:  Good morning, everyone.

 4           We're back on the record in United States versus

 5   Lapin, 6:20-cr-89.

 6           Our jurors are all present and ready to return.

 7           Ms. Daniels, you had a question?

 8           MS. DANIELS:  Yes, Your Honor.  I had two

 9   questions.

10           My first question is, how would Your Honor like me

11   to conduct the in-court identification?  I believe the

12   defendant is the only person at his table wearing a shield.

13           MR. RYAN:  Well, we're happy to stip.

14           THE COURT:  All right.  If you don't -- if the

15   defense has no difficulty with stipulating to the identity

16   of the defendant, if the Government is agreeable to that,

17   we can proceed by stipulation.

18           MS. DANIELS:  Yes, Your Honor.  Thank you.

19           THE COURT:  Okay.

20           MS. DANIELS:  And then the other question I have

21   is, during Mr. Ryan's opening yesterday, he mentioned that

22   Dr. Rapa would testify that the defendant has generalized

23   anxiety disorder and narcissistic personality disorder.

24           My understanding of the Court's order was that her

25   testimony was going to be limited to the bipolar disorder.
```

1    So I just wanted to clarify and make sure that I'm properly

2    understanding the Court's order.

3            THE COURT:  Okay.  I'll go back and look at that

4    and refresh my recollection about it.  Thank you for

5    bringing it to my attention.

6            MS. DANIELS:  Thank you, Your Honor.

7            THE COURT:  Bring our jurors in, Mr. Carter.

8            Is the first witness going to be your case agent?

9            MS. DANIELS:  Yes, Your Honor.

10           (Jury entered the courtroom at 8:59 a.m.)

11           THE COURT:  Good morning, ladies and gentlemen.  I

12   hope you all had a pleasant evening.  I appreciate you

13   being back and ready to start on time.

14           Were all of you able to following my instructions

15   not to discuss the case amongst yourselves or with others?

16           THE JURY:  Yes.

17           THE COURT:  Okay.

18           Is the Government ready to proceed, Ms. Daniels?

19           MS. DANIELS:  Yes, Your Honor.

20           THE COURT:  Call your next witness.

21           MS. DANIELS:  Your Honor, the Government calls

22   Special Agent Lawrence Anyaso.

23           THE COURT:  Agent, come forward to be sworn.

24           THE DEPUTY CLERK:  Please raise your right hand.

25           Do you solemnly swear or affirm under penalty of

1   perjury the testimony you will give will be the truth, the

2   whole truth, and nothing but the truth?

3           THE WITNESS:  I do.

4           (Witness sworn.)

5           THE DEPUTY CLERK:  Please have a seat in the

6   witness box to my left.

7           You can adjust the microphone so the court

8   reporter can hear you.

9           Once you're settled, please state and spell your

10  name for the record.

11          THE WITNESS:  (Indicating.)

12          THE COURT:  Yes, sir.  You can remove your mask if

13  you're comfortable doing it.

14          THE WITNESS:  I'm Special Agent Lawrence Anyaso

15  with the United States Capitol Police.

16          My first name is L-A-W-R-E-N-C-E.  Last name is

17  A-N-Y-A-S-O.

18          THE COURT:  You may inquire, Ms. Daniels.

19          MS. DANIELS:  Thank you, Your Honor.

20                    **DIRECT EXAMINATION**

21  BY MS. DANIELS:

22  Q    Good morning, Agent Anyaso.

23       Would you please tell the jury what you do for work.

24  A    I'm a special agent with the United States Capitol

25  Police, investigation division, specifically working in the

```
 1   threat assessment section.
 2   Q    What is the United States Capitol Police?
 3   A    We're the law enforcement arm for the legislative
 4   branch.  So we're sort of like the Secret Service but for
 5   Congress.  So we're responsible for protecting Congress.
 6   Q    Do you work for a specific elected official?
 7   A    No.  The Capitol Police, we're a neutral body.  So we
 8   work for -- we investigate and protect all 537 members of
 9   Congress regardless of who they are.
10   Q    How long have you been a special agent with the
11   U.S. Capitol Police?
12   A    Approximately six years as a special agent.  And I've
13   been with the agency approximately 18 years.
14   Q    In what city and state do you work?
15   A    Washington, D.C.
16   Q    What are your duties as a special agent with the
17   U.S. Capitol Police?
18   A    Generally, I'm in the investigation division.  So I
19   investigate any crimes or incidents of interest that are
20   directed towards members of Congress, their family, or
21   their staff in relation to the position with a member of
22   Congress.
23   Q    Were you so employed on February 24th, 2020?
24   A    Yes, I was.
25   Q    What, if anything, happened on that date?
```

```
 1   A     On that date, I was assigned a case that was related

 2   to a threatening voice mail that was received and reported

 3   by Speaker Nancy Pelosi's office.

 4   Q     What, if any, statements were identified within the

 5   voice mail itself?

 6   A     Upon reviewing the voice mail, there was a statement,

 7   We're coming for you, you better have a bulletproof vest,

 8   we're going to hang your dentures from the top of the

 9   Capitol, and you're dead.

10          MS. DANIELS:  Your Honor, at this point I would

11   like to request permission to publish Government's

12   Exhibits 1 and 2.

13          THE COURT:  Yes.  You may proceed.

14          MS. DANIELS:  Ms. Valente, would you please

15   publish that for the jury.

16          (Playing audio exhibit.)

17          MS. DANIELS:  Thank you, Ms. Valente.

18   BY MS. DANIELS:

19   Q     Agent Anyaso, is that the voice mail that you were

20   sent?

21   A     Yes, it is.

22   Q     Did you receive any voice mails in addition to this

23   one?

24   A     Yes.  With the original, when I was assigned the case,

25   I received an additional four voice mails.
```

1   Q     And how many voice mails did you receive in total?

2   A     Five total.

3   Q     Did you have any information at the time about who

4   made the call?

5   A     At the time of the call, the only information I could

6   discern from the voice mail was that it was a male caller

7   and the phone number that was captured by the caller I.D.

8   was also identified.

9   Q     Do you remember what this phone number was?

10  A     407-467-8865.

11  Q     What did you do once you received these voice mails?

12  A     Upon receiving the voice mails -- well, receiving the

13  whole report, I reviewed the voice mail for myself to

14  identify the threats that were being reported and then I

15  proceeded to make -- do some investigative techniques.

16        Basically we have access to certain law enforcement

17  databases, so we attempt to identify the person based on

18  identifiers we identify.

19        In this case, there was a phone number.  So I

20  attempted to identify the person who owned that phone

21  number but initially was unsuccessful.  So then I had to

22  submit some records requests to attempt to identify the

23  person.

24  Q     How quickly did you submit those records requests?

25  A     In terms of the -- the first record request was

1    submitted -- was actually asked for the initial date I

2    actually received the case.

3    Q    And did you submit any other records requests?

4    A    Yes.

5    Q    And what other records requests did you submit?

6    A    There was additional records requests -- well, let me

7    step back.  Are you saying the different types?

8        Okay.

9        So there was a records request that I requested for

10   additional phone records having to do with this phone

11   number.  There was records requests having to do with

12   license information, something to that effect.

13   Q    Okay.  Did you receive these records?

14   A    Yes.

15   Q    Who did you request the phone records from?

16   A    From Verizon Wireless.

17   Q    Did you review and analyze the records you received?

18   A    Yes.

19       MS. DANIELS:  Your Honor, permission to approach

20   the witness.

21       THE COURT:  Yes.

22   BY MS. DANIELS:

23   Q    Agent Anyaso, what did I just give you?

24   A    A disk.

25   Q    Okay.  And what's on that disk?

```
 1   A    This specific disk is a disk of a subset or filtered

 2   version of the original Verizon records I received.

 3   Q    Is the subscriber information on that disk as well?

 4   A    Yes, it is.

 5   Q    Is the cellular tower information on that disk as

 6   well?

 7   A    Yes, it is.

 8   Q    And when you say a subset or a filtered version of

 9   records, what do you mean?

10   A    So initially when we get any type of records, a lot of

11   times the records are voluminous.  There's lots of them.

12   So we want to actually focus our attention to what exactly

13   we're looking for.

14        So in this particular case, I knew that there was

15   calls to Speaker Nancy Pelosi's office.  So I had to go

16   through and analyze the records to filter down to

17   specifically the calls of interest that were made to

18   Speaker Nancy Pelosi's office.

19   Q    How do you recognize what's on this disk?

20   A    I initialed it and dated it.

21   Q    Is it a fair and accurate representation of what you

22   saw when you looked at the records?

23   A    Yes, it was.  It is.

24        MS. DANIELS:  Your Honor, the Government would

25   move Government's 11B into evidence.
```

```
 1              THE COURT:  Any objection?

 2              MR. RYAN:  No, Your Honor.

 3              THE COURT:  11B will be received without

 4    objection.

 5              You may publish.

 6              (Government's Exhibit 11B was received

 7               in evidence.)

 8              MS. DANIELS:  Ms. Valente, could you please

 9    publish the subscriber record from 11B first.

10    BY MS. DANIELS:

11    Q    Agent Anyaso, what, if anything, did this record

12    indicate to you?

13    A    So this is the subscriber record.  So it identified

14    the phone number, the 407-467-8865 number that I requested

15    the records for.

16         And then it identified the subscriber for the phone

17    record or the phone number as James R. Lapin.  It also

18    identifies his address as 119 Ocean Terrace in Ormond

19    Beach, Florida, 32176.

20              MS. DANIELS:  And, Ms. Valente, could you please

21    pull up the calls in 11B.

22    BY MS. DANIELS:

23    Q    And, Agent Anyaso, what is in these records?

24    A    So as I mentioned, there was five calls that we knew

25    about initially.  And so during the analysis of the overall
```

```
 1    records, I was able to identify that there was actually a
 2    total of ten calls that we could -- that I could tell that
 3    were actually made to offices belonging to Speaker Nancy
 4    Pelosi.  And that's what's reflected here.
 5    Q    And let's quickly go over the columns.
 6         So which of these columns shows you the defendant's
 7    number?
 8    A    So if you go to column J, you'll see the actual
 9    defendant's number, the 407-467-8865.
10    Q    And which of these columns shows the Speaker's
11    numbers?
12    A    Column K shows the numbers that are attributed to the
13    Speaker.
14    Q    Why are there different numbers for the Speaker in
15    column K?
16    A    So the Speaker of the House is also a Congresswoman.
17    So every member of Congress has a personal office, but when
18    you're elevated to leadership you also have leadership
19    offices but still have your personal office.
20         And then because each member is from a specific area,
21    they also have their district offices in whatever state
22    they're representing.
23         So in these records, the phone numbers are reflecting
24    calls to her leadership office in D.C., her personal
25    Congressional office in D.C., and then there's also a
```

```
 1   number that was directed at her San Francisco office in
 2   California.
 3   Q    Which of these numbers is the number for her personal
 4   office?
 5   A    So the number 202-225-4965 number is the number for
 6   her personal office.
 7   Q    Which number is the leadership one?
 8   A    202-225-0100.
 9   Q    And which number is Nancy Pelosi's San Francisco one?
10   A    415-556-4862.
11   Q    And from the records, are you able to see that these
12   calls were actually received or successfully placed to
13   Washington, D.C., and San Francisco?
14   A    Can you scroll over for me?
15        Yes.
16   Q    And where are you getting that information from?
17   A    In column P, it indicates those calls were successful.
18   Q    Did you notice whether the number made additional
19   calls that did not have voice mails associated with them?
20   A    Yes.
21   Q    And are the calls related to the voice mails also
22   listed here?
23   A    Yes, they are.
24   Q    How many calls total did you say there were?
25   A    Ten calls total.
```

```
 1   Q     When you looked at these records, were you able to
 2   determine what location the calls came from?
 3   A     Yes.
 4   Q     How were you able to figure this out?
 5   A     So when -- well, any phone company when they provide
 6   records, they're going to give us the phone records, but
 7   they're also going to give us additional records that have
 8   to do with their cell towers or the identification for
 9   their towers.
10        So in these specific records, Verizon produced the
11   call records or also known as the VoLTE records.  And then
12   they also provided -- it's called the Orlando LEA, but it's
13   also known as -- it's the tower key which identifies all
14   their towers.
15        So looking at these specific records, once I'm able to
16   identify the calls that are of interest to me in this case,
17   then I will look at, which is here, then I look at
18   column H, which states the eNB-ID.  In that column, it
19   shows the number of 145120, which corresponding to the key
20   chart will identify the actual cell tower that actually
21   made these calls.
22             MS. DANIELS:  Okay.  Ms. Valente, could you pull
23   up the spreadsheet entitled LEA Orlando.
24   BY MS. DANIELS:
25   Q     And, Agent Anyaso, what's this record?
```

```
 1   A     So this is the Orlando LEA or the cell site key for

 2   Orlando.

 3   Q     Okay.  And what did you -- how did you compare this

 4   spreadsheet to the spreadsheet you just saw with the VoLTE

 5   calls?

 6   A     So -- well, can you scroll to the right for me?

 7         Okay.  So going back to -- so from the other key,

 8   identified the number 145120.  In this spreadsheet,

 9   column Q shows the same number 145120.  So that tells me

10   that that is actually the cell tower, the same cell tower

11   information.

12         And what I'm looking for is where that's located.  So

13   this, it tells me the cell tower, but it also gives me the

14   address, the physical address of the cell tower.

15              MS. DANIELS:  And, Ms. Valente, could you scroll

16   back over.

17   BY MS. DANIELS:

18   Q     And which column has the physical address of the cell

19   tower?

20   A     So column G, H, and J has the address of the cell

21   tower.

22   Q     And just to complete, what does that mean to you?  So

23   if you're seeing a call from this cell tower and this is

24   the address of the cell tower, what does that mean to you?

25   A     So what this means is the cell phone -- all cell
```

1    phones have to use a tower.  So you have to be within a

2    certain distance, and then it's going to trigger and use

3    that tower to make the call.

4        So this is telling me that the call itself was made

5    from Ormond Beach, Florida, and that it utilized this

6    specific tower to actually initiate that call.

7            MS. DANIELS:  Your Honor, permission to approach

8    the witness.

9            THE COURT:  You may.

10   BY MS. DANIELS:

11   Q    Agent Anyaso, I've handed you United States

12   Exhibit 13, which is Bates Number 10483.

13       What is this?

14   A    This is a copy of a Google Earth image that I created

15   which -- where I plotted the locations found in the

16   spreadsheet for the cell tower.

17       And I've also indicated the address 119 Ocean Terrace,

18   which was the address for the subscriber that was sent.

19   Q    How do you recognize this image?

20   A    I created the document.

21   Q    Is the image a fair and accurate depiction of where

22   that cellphone tower was and where the address was?

23   A    Yes, it is.

24           MS. DANIELS:  Your Honor, the Government would

25   seek to move United States 13 into evidence.

```
 1              THE COURT:  Any objection?

 2              MR. RYAN:  No objection.

 3              THE COURT:  I'm sorry.

 4              Government's 13 will be received without

 5  objection.

 6              You may publish.

 7              (Government's Exhibit 13 was received

 8               in evidence.)

 9              MS. DANIELS:  Thank you, Your Honor.

10              Ms. Valente, could you please publish Bates Number

11  10483.

12              THE COURT:  Do you want to switch to the ELMO?

13              MS. DANIELS:  Yes, Your Honor.

14              THE COURT:  All right.

15  BY MS. DANIELS:

16  Q    Agent Anyaso, about how far apart are these two

17  points?

18  A    It's less than a mile.  It's approximately .9 miles

19  from what I know.

20  Q    Is Ormond Beach in the Middle District of Florida?

21  A    Yes, it is.

22              MS. DANIELS:  Thank you.

23  BY MS. DANIELS:

24  Q    Did you immediately go out after reviewing these

25  records and arrest the defendant?
```

1    A     No, I did not.

2    Q     Why not?

3    A     So at this time we know that the subscriber is listed

4    as James Lapin, we know that it's a male's voice, and we

5    know the phone where it was used.  But at that point, we

6    had never engaged with the subscriber to actually confirm

7    that that was the person who actually made the call.

8          So we have to make -- we have to be sure of anything

9    that we do before we can actually take additional action.

10   So we have to continue to investigate.

11   Q     What did you do after reviewing the phone records?

12   A     So after the phone records, I conducted an additional

13   phone interview of the subscriber, James Lapin.

14   Q     When did you do that?

15   A     That was May 18th, 2020.

16   Q     What number did you call?

17   A     407-467-8865.

18   Q     Is that the number that was used to make the voice

19   mail at Nancy Pelosi's office?

20   A     Yes, it was.

21   Q     Who answered the phone?

22   A     A male answered the phone.  And when asked to speak to

23   James Lapin, he identified himself as he was James Lapin.

24   Q     Was that interview recorded?

25   A     Yes, it was.

1          MS. DANIELS:  Your Honor, may I have permission to

2    publish Exhibits 14 and 15, which have been previously

3    admitted.

4          THE COURT:  You may.

5          MS. DANIELS:  Ms. Valente, could you please

6    publish those exhibits.

7          THE COURT:  While you're doing that, ladies and

8    gentlemen, this might be a good time for me to mention to

9    you something I didn't mention before.

10          These exhibits include both an audio as well as a

11    written transcript that goes with the audio.  Obviously the

12    audio -- the transcript is designed in order to assist you

13    in listening to the audio.

14          But if what you hear on the audio does not

15    correspond with what's written on the transcript, you go by

16    what you hear, not by what's written in the transcript.

17          Understood?

18          THE JURY:  Yes.

19          THE COURT:  Thank you.

20          (Playing audio exhibit.)

21    BY MS. DANIELS:

22    Q    Agent Anyaso, what happened after you conducted this

23    interview?

24    A    After I conducted the interview, I continued to

25    investigate to obtain additional information.  We wanted to

```
 1    verify some of the things that he stated in the call, and
 2    we wanted to confirm exactly where he lived.
 3          We did eventually do that.  And then in June, I was
 4    able to obtain an arrest warrant for James Lapin.
 5          I also reviewed the threatening voice mail and matched
 6    it with the recording, and the voice sounded to be the same
 7    person.  So that's why we moved -- to continue to
 8    investigate and move forward with obtaining the arrest
 9    warrant.
10    Q    Agent Anyaso, were you present when Mr. Lapin was
11    arrested?
12    A    I was.
13    Q    Is Mr. Lapin the defendant that's here today?
14    A    He is.
15    Q    During this interview, did you determine that the
16    defendant was the one who made the calls?
17    A    I was.
18    Q    What about the interview led to that conclusion?
19    A    The voice sounded like the same individual.  From the
20    Verizon records that I reviewed showed that James Lapin was
21    the subscriber.
22          During the interview he admitted that it was only him
23    that had the phone.  Nobody else uses the phone.  So we
24    were able to conclude that he's the caller.
25    Q    And did you ask the defendant about any specific
```

```
 1   statements in the voice mail?

 2   A    Yes.

 3   Q    What were those statements?

 4   A    So I talked about the statements, about him saying

 5   "You should have a bulletproof vest.  You're dead."

 6   Basically the statements from the call.

 7        And so he responded at least to the statement of "you

 8   should have a bulletproof vest," he stated that I said I

 9   hope she had a bulletproof vest.

10   Q    Did you ever get the impression that the defendant did

11   not believe you were a law enforcement officer?

12   A    No, I didn't.

13             MR. RYAN:  Objection.  Speculation.

14             THE COURT:  Sustained.

15   BY MR. RYAN:

16   Q    Were you able to determine if any statements the

17   defendant made during this call were untrue?

18   A    Yes, I was.

19   Q    You asked the defendant about -- did you ask the

20   defendant about a silver truck?

21   A    I did.

22   Q    And what did he say?

23   A    He said he drove a black Escalade.

24   Q    Did you determine if this statement was untrue?

25   A    I was.
```

```
 1   Q    How did you determine that?

 2   A    On the date that we arrested him, there was no black

 3   Escalade present at the residence.  There was a silver

 4   pickup truck that I had referenced.

 5        And also, yesterday I observed the defendant drive

 6   here in a silver pickup truck.

 7        MS. DANIELS:  Your Honor, may I have permission to

 8   approach the witness?

 9        THE COURT:  Yes.

10   BY MS. DANIELS:

11   Q    Agent Anyaso, I've just handed you United States

12   Exhibit 16.

13        What is that?

14   A    This is a copy of a picture of the silver pickup truck

15   that I saw when I arrested him in June.

16   Q    How do you know that's what it was?

17   A    I was physically present and observed the truck.  And

18   it's the same truck I've seen the whole time.

19   Q    Is it a fair and accurate depiction of what you saw on

20   the date of arrest?

21   A    It is.

22        MS. DANIELS:  Your Honor, the Government would

23   move Exhibit 16 into evidence.

24        THE COURT:  Any objection?

25        MR. RYAN:  No objection.
```

```
 1              THE COURT:  It will be received without objection.

 2         You may publish.

 3              (Government's Exhibit 16 was received

 4               in evidence.)

 5              MS. DANIELS:  Ms. Valente, could you please

 6    publish Bates Number 21.

 7    BY MS. DANIELS:

 8    Q    Agent Anyaso, did you ever observe a Cadillac on the

 9    date of arrest?

10    A    I did not.

11              MS. DANIELS:  Thank you, Ms. Valente.

12    BY MS. DANIELS:

13    Q    Did you ask the defendant whether he lived in Ormond

14    Beach?

15    A    I did.

16    Q    What did he say?

17    A    He said he did not live there and he lived in Orlando.

18    Q    Were you able to determine if that statement was

19    untrue?

20    A    Yes.

21    Q    How?

22    A    We take from the Verizon subscriber records the

23    address stated, 119 Ocean Terrace in Ormond Beach, and we

24    had physically arrested him at that same address when we

25    arrested him.
```

```
 1   Q    Did you ask the defendant about a person named Herman

 2   Jones?

 3   A    I did.

 4   Q    What did he say?

 5   A    He said he did not know of Herman Jones.  And then he

 6   later stated he might have had a teacher that was Herman

 7   Jones.

 8   Q    Did you determine if the statement of whether he knew

 9   Herman Jones was untrue?

10   A    Yes.

11   Q    How?

12   A    When we arrested him, Herman Jones, who owns the

13   residence that we went to, was physically there at

14   119 Ocean Terrace in Ormond Beach, Florida.

15   Q    In the interview you asked the defendant about whether

16   he's ever called Nancy Pelosi; is that correct?

17   A    Yes.

18   Q    Were you able to determine if this was untrue?

19   A    Yes.

20   Q    What did he say?

21   A    So he said he did not call Nancy Pelosi's office, or

22   that he can recall.

23   Q    And how did you determine if that was untrue?

24   A    So from the phone records, I was able to determine

25   that his phone that he admitted that he's the only one that
```

```
 1   uses made at least ten calls to offices belonging to

 2   Congresswoman Nancy Pelosi.

 3   Q    And did he say anything on the call about if anybody

 4   else uses the phone?

 5   A    No.  He said he's the only one that uses the phone.

 6        MS. DANIELS:  Your Honor, I tender this witness

 7   for cross-examination.

 8        THE COURT:  Thank you.

 9        Would you clean your area before you leave there,

10   Ms. Daniels, and take your microphone cover off.

11        Mr. Ryan, cross-examination.

12        Would you replace the microphone cover before you

13   begin your cross-examination.

14        Thank you.

15        MR. RYAN:  Thank you, Your Honor.

16                    CROSS EXAMINATION

17   BY MR. RYAN:

18   Q    Good morning.

19   A    Good morning.

20   Q    So Mr. Lapin variously denied making the calls and

21   telling you he doesn't remember; is that correct?

22   A    What are you talking about?

23   Q    Do you remember the voice mails?

24   A    Okay.  So you're saying --

25   Q    Do you remember the voice mails that we've been
```

1    talking about, the prosecutor asked you about?

2    A    Right.

3         So what I'm saying, the question, you're saying he

4    vehemently denied.  Are you talking about in the voice

5    mails?

6    Q    During your interview on May 18th --

7    A    Okay.

8    Q    -- he variously denied making -- leaving the voice

9    mails and telling you he didn't remember; is that correct?

10   A    That's correct.

11   Q    You obtained his phone number on February 24th,

12   2020; is that correct?

13   A    That's correct.

14   Q    You were able to ascertain subscribership information

15   by about March 6th, I believe, 2020?

16   A    That's correct.  About that.

17   Q    And you called him on May 18th, 2020?

18   A    That's correct.

19   Q    And arrested him on June 18th, 2020?

20   A    That's correct.

21   Q    During the arrest, a search was conducted, correct?

22        MS. DANIELS:  Objection, Your Honor.  This is

23   outside the scope of direct examination.

24        THE COURT:  Objection is overruled.

25        THE WITNESS:  Can you repeat your question?

1    BY MR. RYAN:

2    Q    Sure.

3         When you arrived at the home where Mr. Lapin was

4    arrested, you and your colleagues who were there that day

5    searched the house, correct?

6    A    That's partially correct.

7    Q    Okay.

8    A    Because we --

9    Q    That you partially searched or you partially didn't?

10   A    So just to explain, at the time that we went to arrest

11   him, we did not have a search warrant.  So we retained what

12   we call consensual search, which is authorized by the owner

13   of the residence.

14        But when it comes to consensual searches, we can only

15   search limited areas that are controlled by the owner that

16   allows them to.

17        So in this particular case, we searched areas that we

18   had consent to, but because there was indication that James

19   Lapin had certain other areas, we can't actually search his

20   specific areas without his consent.

21        And at that time, he was actually under arrest.  So we

22   actually can only do a limited search based on what the

23   homeowner is allowing us to search so we did not search the

24   whole premises.

25   Q    So that's a long explanation to tell us that you did

```
 1  not search James Lapin's bedroom; is that correct?
 2  A    That is correct.
 3  Q    And you did not seek a court order permitting you to
 4  search that bedroom, did you?
 5  A    No.  That's correct.
 6  Q    You did search the truck, though, right?
 7  A    Yes, we did.
 8  Q    And what did you find in the truck?
 9  A    I actually don't recall.  There wasn't -- it was -- I
10  don't recall.
11  Q    You don't recall because you found nothing of
12  evidentiary value, correct?
13  A    That's correct.
14  Q    You found nothing of evidentiary value in the
15  consensual search of the home, correct?
16  A    That is not totally correct.
17  Q    Okay.  What's partially correct about it?
18  A    So in the residence at the time of arrest, James
19  Lapin's cell phone was located in the residence in an area
20  that we could search.
21  Q    In fact, James Lapin was sitting right there near the
22  phone, correct?
23  A    That's correct.
24  Q    And he didn't do anything to try to hide the phone,
25  correct?
```

```
 1   A     That I'm aware.

 2   Q     He didn't deny that it was his phone?

 3   A     That's correct.

 4   Q     In fact, he asked you folks --

 5              MS. DANIELS:  Objection, Your Honor.

 6   Q     -- after you had him in custody --

 7              MS. DANIELS:  Objection.

 8              THE COURT:  I'm sorry.

 9              MS. DANIELS:  That calls for hearsay.

10              THE COURT:  Objection is overruled.

11   BY MR. RYAN:

12   Q     In fact, when you folks were taking him into custody,

13   he was concerned about a family member and asked to use the

14   phone, did he not?

15              MS. DANIELS:  Objection, Your Honor.

16              THE COURT:  Hearsay again?

17              MS. DANIELS:  Hearsay.

18              THE COURT:  Overruled.

19              THE WITNESS:  Can you rephrase -- repeat the

20   question.

21   BY MR. RYAN:

22   Q     When you were taking Mr. Lapin into custody, he

23   actually asked for the phone, he identified the phone as

24   his phone, and said, May I use the phone, I need to make a

25   phone call.
```

```
 1        Correct?
 2   A    That is correct.
 3   Q    But Mr. Lapin never denied that the phone belonged to
 4   him?
 5   A    That's correct.
 6   Q    The phone, you also obtained a lot of data on the
 7   phone, correct?
 8   A    Correct.
 9   Q    Did that include data like text messaging, social
10   media posts, and things of that nature?
11   A    The text messaging, yes.  And other stuff, I'm not --
12   I don't believe -- I'm not really 100 percent on the social
13   media.
14   Q    So when he told you that he was in Washington, D.C.,
15   did you have any evidence that he went to Washington,
16   D.C. -- let me start over.  I'm sorry.
17        When he told you that he went to Washington, D.C., to
18   protest Nancy Pelosi, was there any evidence?  Did you find
19   any evidence anywhere that corroborated that?
20   A    Yes.
21   Q    That he went to Washington, D.C.?
22   A    Yes.
23   Q    Oh, what is that?
24   A    He told me on the phone that he did.
25   Q    Okay.  So other than what James told you, you were not
```

```
1    able to confirm or deny that statement, correct?

2    A    That is correct.

3    Q    Got it.

4         You were not able to confirm that, in fact, James

5    Lapin did or did not go to Washington, D.C.?

6    A    That is correct.

7    Q    There is no information on the phone, such as text

8    messaging, indicating that he was there?

9    A    That I can tell.

10   Q    There was no social media posts indicating that he was

11   there?

12   A    That I can tell.

13   Q    Nothing suggesting that he was celebrating the

14   protests against Nancy Pelosi on that cell phone?

15   A    So there are references to Nancy Pelosi on the cell

16   phone.

17   Q    I'm talking about when he claimed to be in Washington,

18   D.C.

19   A    Not that I can tell.

20   Q    You mentioned memes.

21        There are memes found on the phone referencing Nancy

22   Pelosi, correct?

23   A    I didn't mention memes.

24   Q    I thought you did.

25   A    I did not.
```

```
1    Q    Are there memes on the phone mentioning Nancy Pelosi?

2    A    No.  I said that there's statements mentioning Nancy

3    Pelosi.  I didn't mention memes.

4    Q    Are there memes on the phone that you found mentioning

5    Nancy Pelosi?

6    A    No.  I don't recall that.

7    Q    You don't recall.

8         So you didn't find any memes or cartoons of Nancy

9    Pelosi with like a target on her face?

10   A    Can you repeat that?  I'm not sure --

11   Q    You didn't find any memes or cartoons of Nancy Pelosi

12   suggesting that she should be killed or murdered or hung or

13   anything like that, did you?

14   A    Well, I mean, I received statements to that effect.

15   Q    You didn't spot any memes or cartoons or things on the

16   cell phone suggesting that Nancy Pelosi should be killed,

17   such as a meme with a bull's-eye in the middle of her face,

18   did you?

19   A    No.  That's correct.

20   Q    Or a meme with Nancy Pelosi and a noose?

21   A    I don't -- on the cell phone, no.

22   Q    Other than the voice mails, there's no indication that

23   Mr. Lapin suggested similar sentiments against Nancy

24   Pelosi, is there?

25   A    Similar to what?
```

1    Q    Similar to the voice mails.

2    A    I don't recall.

3    Q    He didn't post on social media "let's go get Nancy

4    Pelosi," did he?

5    A    I wouldn't -- I wouldn't know.  I'd have to go through

6    a whole bunch -- I don't know.

7    Q    You didn't investigate his social media?

8    A    I did.  Well, some of it.  I don't know all his social

9    media.

10   Q    Now, getting back to Washington, D.C., all the

11   location data that you had on that phone, is there any

12   location data ever suggesting that the phone was in

13   Washington, D.C.?

14   A    Not that I could find.

15   Q    There was no -- there was no information, you found no

16   evidence, you found nothing suggesting that James Lapin was

17   tracking Nancy Pelosi, did you?

18   A    So that's not -- that's not totally true.

19   Q    Okay.  How is it totally -- how is it partially true?

20   A    So when we're looking at phone numbers, we have to be

21   able to see what the person's doing and the conduct as part

22   of the factual threat investigation.

23        In this particular case, we look at the intensity of

24   effort.  So there's several calls, but they also were

25   sporadic to different locations.  So the individual is

1    researching the actual target of his threats.

2        So that's what we're looking for.  So that's why, to

3    your answer, there was information suggesting that he did

4    research the target of his threats.

5    Q    You're telling us that the fact that he made a few

6    phone calls to Nancy Pelosi's office is equivalent to

7    researching her location?

8    A    That's correct.

9    Q    Is that what you just told me?

10   A    That is correct.

11   Q    But there's no information that he was following her

12   public appearances schedule, was there?

13   A    I'm not part of the office to know that.

14   Q    Did you research or investigate whether or not he was

15   attempting to locate Nancy Pelosi's physical locations?

16   A    Well, by her office, by researching the offices, he's

17   locating the addresses and the phone numbers of that

18   office.  So --

19   Q    So you either never looked for or uncovered any

20   information that James Lapin was attempting to confront

21   Nancy Pelosi in person such as by finding out and appearing

22   at her public appearances?

23   A    So that also -- by his own statements in the

24   threatening voice mail, it indicates "we're coming for

25   you," so that indicates to us that the person making the

```
 1   threat is actually wanting to approach and carry out the
 2   threat that they are claiming on the voice mail.
 3   Q    But there's no information that James Lapin ever
 4   attempted to even ascertain one public appearance by Nancy
 5   Pelosi, is there?
 6   A    It's not -- I don't have access to that information.
 7   Q    So you didn't seek to understand Nancy Pelosi's
 8   scheduling during the relevant time period?
 9   A    So I can't go into certain aspects because of security
10   concerns.  So I can't go into certain aspects of that
11   question.  I don't --
12   Q    But at the end of the day you don't have any evidence
13   to present to our jury that, in fact, James Lapin in any
14   way, shape, or form attempted to actually locate Nancy
15   Pelosi's physical location, do you?
16   A    So like I just stated, he researched the phone numbers
17   and the addresses to actually ascertain where her offices
18   are.  So she does work out of those offices.
19   Q    I think I may have asked this, but I'll ask again.
20        So no -- all the location data in the phone, all the
21   location data in the phone, all of it, there's not one time
22   the phone appears, pings, or appears to be in Washington,
23   D.C., correct?
24   A    That is correct.
25   Q    And you consider Mr. Lapin a liar, don't you?
```

```
1   A     I consider that he made false statements.

2   Q     So you have no reason to believe anything other than

3   the fact that this Washington, D.C., statement is also a

4   false statement, correct?

5   A     Can you repeat that?

6   Q     You have no reason to understand that the Washington,

7   D.C., statement isn't anything other than another lie,

8   correct?

9   A     Well, I don't know.  If somebody is saying that we're

10  coming for you and then we're getting information from the

11  actual person that is identified as calling saying that

12  they were actually physically there, I don't know.

13  Q     Did you research airlines to see if he took a plane to

14  Washington, D.C.?

15  A     No, I did not.

16  Q     Did you research Amtrak or bus lines to see if he

17  bought tickets in that way?

18  A     I did not.

19  Q     Did you look at his credit card records and ATM

20  records to see if he was utilizing them to travel to and

21  from Washington, D.C.?

22  A     No.

23  Q     He said that he was in Washington, D.C., apparently

24  during a time when there were 50 -- at one point, he said

25  50,000 protesters, that we are protesting.
```

```
 1        Do you recall those statements?
 2   A    Yes.
 3   Q    Was there a protest of 50,000 people during the
 4   impeachment time in Washington, D.C., that you know of?
 5   A    So I know that there were protests.  I can't speak to
 6   actually a specific protest.  It's not -- it's outside
 7   of --
 8   Q    Wouldn't a 50,000-numbered protest on the Capitol be a
 9   large one?
10   A    So, again, it's not something -- we have different
11   people that do different things.  So in my case, I know
12   that stuff is going on, but it's not something that I would
13   specifically --
14   Q    Wouldn't that be something that would be well known by
15   the United States Capitol Police if there was a protest
16   numbering upwards of 75,000 during the impeachment
17   proceedings?
18        MS. DANIELS:  Your Honor, objection.
19   Argumentative, calls for --
20        THE COURT:  Sustained.  Sustained.
21   BY MR. RYAN:
22   Q    Let's talk about the address a little bit.
23        He never changed -- well, since October of 2018, the
24   address on the driver's license, on the Florida driver's
25   license has been the same; is that correct?
```

```
 1   A    Based on records that I reviewed.
 2   Q    Okay.  Does the address remain the same on the
 3   driver's license since October 2018?
 4   A    From the records.
 5   Q    He didn't try to change that?
 6   A    That I know of.
 7   Q    There's no indication that he avoided the address
 8   after your phone call, is there?
 9   A    I wasn't always -- I wasn't physically there always so
10   I wouldn't know.
11   Q    Do you have any evidence that Mr. Lapin was in any way
12   avoiding the address after your phone call in May of 2018?
13   A    I do not.
14   Q    There's no indication that he stayed at hotels?
15   A    Stayed at hotels?
16   Q    There's no indication that after your May 28th --
17   sorry, May 18th, 2020, call that he started to avoid
18   the address by staying at hotels?
19   A    I wouldn't know.  I mean, I wouldn't know.  I didn't
20   check his credit cards.
21   Q    Or staying with friends?
22   A    I wouldn't know.
23   Q    You conduct -- the surveillance that you did conduct
24   indicated that he was at the house, in fact?
25   A    That is correct.
```

```
1    Q     In fact, he told you that there were -- you know, they
2    were roofing, there were workers working on the roof,
3    banging on the roof.
4          Do you recall that?
5    A     I do.
6    Q     And, in fact, there were people roofing that
7    particular house, correct?
8    A     You said if, in fact --
9    Q     There were people working on the roof, wasn't there?
10   A     So we did learn information about that, yes.
11   Q     You, in fact, confirmed that there were people working
12   on the house, banging on the house, correct?
13   A     I obtained information that suggested that, yeah,
14   correct.
15   Q     You called the company that was -- whose truck was
16   parked in front and confirmed -- or you had law enforcement
17   in Ormond Beach do that, to confirm that, in fact, there
18   were workers working on the roof?
19   A     That is correct.
20   Q     Okay.  And so the whole time we're listening to that
21   call, we hear the banging on the roof, don't we?
22   A     Yes.
23   Q     You, in fact, had someone drive by and talk to the
24   postman even?
25   A     Yes.  That's correct.
```

1    Q    And he said James Lapin was fine.  No issues with

2    James Lapin, correct?

3              MS. DANIELS:  Objection, Your Honor.  This calls

4    for hearsay.

5              THE COURT:  Sustained.

6    BY MR. RYAN:

7    Q    You went by the postal -- you actually talked to the

8    postman for that address, correct?

9    A    I did not.

10   Q    You had someone talk to the postman, did you not?

11   A    I had somebody -- yeah, I did contact somebody to

12   speak to the postal person.

13   Q    And when you showed up on June 18th, Mr. Lapin was

14   there, correct?

15   A    That is correct.

16   Q    When you came in the house, he didn't try to run in

17   the bathroom or run out a side door or anything like that,

18   did he?

19   A    No, he did not.

20   Q    He made no attempt to evade detection or even avoid

21   arrest?

22   A    That's correct.

23   Q    He was polite?

24   A    He was cooperative.

25   Q    And even deferential?

```
1    A    He was cooperative.

2    Q    He made a number of statements telling law enforcement

3    how appreciative he was of them, did he not?

4    A    He did.

5    Q    The voice mails end on January 16th, 2020; is that

6    correct?

7    A    That is correct.  That we could tell, yes.

8    Q    Pardon?

9    A    Yes, that's correct.  From what we could tell, yes.

10   Q    Do you have any other voice mails after

11   January 16th, 2020?

12   A    No, I do not.

13   Q    Did you look for other voice mails?

14   A    Yes, we did.

15   Q    And you found them?

16   A    From the time period, correct.

17   Q    After January 16th, 2020, until your phone call,

18   say, May 18th, 2020, did anybody reach out to Mr. Lapin

19   and say, Please stop calling Nancy Pelosi -- please stop

20   leaving voice mails on Nancy Pelosi's phone?

21   A    I'm sorry.  Repeat.  Repeat your question for me.

22   Q    Sure.

23        From the last voice mail on January 16th, 2020,

24   until your phone call, say, May 18th, did anybody reach

25   out to James Lapin and say, Please stop calling Nancy
```

```
 1   Pelosi, please stop leaving voice mails?

 2        Did anybody do that?

 3   A    We wouldn't have done that because he made a threat.

 4   Q    So that means you didn't?

 5   A    We wouldn't have done that.  That's correct.

 6   Q    So he stopped leaving voice mails on his own?

 7   A    He -- that we could tell.  There were still additional

 8   calls after the January 16th.  But voice mails, that's

 9   what we could tell.

10   Q    He stopped leaving voice mails all on his own; is that

11   correct?

12   A    We could not obtain that information, but we don't

13   know if he did or not.

14   Q    Let's talk about the May 18th interview.  Okay?

15        You never played any of the voice mails for Mr. Lapin,

16   did you?

17   A    No, I just spoke about the statements that were in it.

18   Q    And you were calling from a spam -- yeah, a spam

19   phone, correct, number -- spam phone number?

20   A    I don't recall what specific number I used.  It's just

21   something that he said.

22   Q    Okay.  So is this one of the true things he says or

23   one of the lying things he says when he picked up the phone

24   and said, Hello, potential spam?

25   A    It's a spontaneous statement that he's making.
```

1   Q    Don't you folks use like a -- when you make phone

2   calls, you use numbers that are designed to conceal that

3   you're calling from law enforcement?

4   A    No.  We generally want to let people know because --

5   especially if I'm calling on the phone, the person -- I

6   generally want them to know.  So it just depends.

7   Q    So if we looked at his phone, the caller I.D. would

8   say U.S. Capitol Police when you called him on May 18,

9   2020?

10  A    It would show a number.

11  Q    A phone number.  And according to his phone, it

12  indicated it was spam.

13       Do you have any reason to disregard that?

14  A    I didn't see that record so I don't know.

15  Q    Did you look?

16  A    Look at how the phone looked to him on that date?

17  Q    Yeah.  Yeah.

18  A    I didn't look for my call.

19  Q    He tells you a number of times -- oh, let's talk about

20  Herman Davis quickly.

21       So when Mr. Lapin is arrested, at one point he

22  actually identified Herman Davis Jones as his husband, did

23  he not?

24  A    That is correct.

25  Q    When you asked him several -- I mean, a few times, you

```
 1   asked him -- do you remember saying, We're fucking coming
 2   for you, cunt; we're fucking coming for you and your
 3   bullshit mother fucking ass, bitch?
 4       Do you remember asking him that?
 5   A   Yes.
 6   Q   And his response was yes, we protested, didn't we?
 7       Do you recall that answer?
 8   A   I do.
 9   Q   Did you ask him who the "we" was?
10   A   I didn't need to.
11   Q   You what?
12   A   I didn't need to.
13   Q   Okay.  How come?
14   A   Because in the threatening voice mail, he's saying,
15   We're coming for you.  When "we" -- that's including him.
16   So he's part of the group that's coming for -- at least by
17   his words, coming to cause harm.
18   Q   So you had no concern that Mr. Lapin was working with
19   others, did you?
20   A   That's part of our investigation.  We're going to
21   exhaust all those leads.
22       But he -- at a minimum, he's going to be a part of
23   that.  So the fact that he's saying "we" -- as part of our
24   training, content analysis is required.  So we're going to
25   do the content analysis on the voice mail that shows that
```

1  "we" is including him, because he's owning it.

2      And he also says "me," as you work for me.  So he's

3  owning it and he's saying he's going to cause harm to her.

4  Q    Did you ask Mr. Lapin who the "we" was, who his

5  cohorts might have been?

6  A    No.

7  Q    You didn't because you knew that the "we" was a

8  generalized expression, correct?

9  A    A generalized expression?

10 Q    You knew he was talking in a figurative sense when he

11 said we?

12 A    I don't know what's in his head, so I wouldn't know

13 that he was differentiating --

14 Q    You don't know what's in his head and you didn't ask

15 either, did you?

16 A    That's correct.  I didn't ask the question.

17 Q    You didn't do any investigation at all into the idea

18 that there were others working with James Lapin, did you?

19 A    Did I do investigation into if other people were

20 working with him?

21     I mean, part of the investigation does encompass that,

22 yes.

23         MR. RYAN:  Object to the narrative.

24         THE COURT:  Listen to the question, Special Agent,

25 and answer the question as directly as you can.

```
 1              Do you want to restate the question, Mr. Ryan, or
 2   do you want to move on?
 3              MR. RYAN:  Certainly.  Thank you.
 4   BY MR. RYAN:
 5   Q    You did not do any investigation into the idea that
 6   Mr. Lapin was working with others, did you?
 7   A    I don't know how to -- we do an overall investigation.
 8   So the one part -- we're looking at the totality of
 9   circumstances.
10              THE COURT:  So the question, Special Agent, is,
11   did your investigation include in any respect an
12   investigation into the possibility that Mr. Lapin was
13   working in concert or cohort with others?
14              Yes or no?
15              THE WITNESS:  Yes.
16   BY MR. RYAN:
17   Q    Okay.  How so?
18   A    So looking at the phone records, we would look at the
19   calls that are being made.  But also, as I previously
20   mentioned, I look at -- we did look at social media.
21         So through social media, we're going to also look at
22   if that person is saying anything or making statements in
23   conjunction with other people.
24         So we do have to kind of look at the totality of the
25   circumstances to determine if there are other people
```

```
 1   through social media, which is a -- at least these days, a
 2   primary way of people communicating.
 3   Q    And that component of your investigation came to the
 4   conclusion that James Lapin was not working with any other
 5   people, correct?
 6   A    That is correct.
 7   Q    So "we" is being expressed in a figurative sense.
 8   Wouldn't you agree to that?
 9   A    No, I would not agree to it.
10   Q    It goes on in that same line that the protest is how
11   Americans come for elected officials who are above the
12   people.
13        Do you recall him saying that?
14   A    I do.
15   Q    He asks you, Is Nancy Pelosi above the people?
16   A    He does.
17   Q    He again tells you in this same line, Well, we
18   protested -- we protested outside of her office, didn't we?
19   Did we not?
20        Do you recall that?
21   A    I do.
22   Q    And you asked him, Who are you talking about?
23        I don't know.  I don't know what people.
24        So who protested outside of her office?
25        He answers, Everybody.  Who didn't?
```

```
 1   A    He did.
 2   Q    Suggesting that he's speaking to you in a figurative
 3   political ideological sense, wouldn't you say?
 4   A    I don't differentiate the politics, but he does make
 5   statements about the protests.  So he is speaking about
 6   that.
 7   Q    There were 50,000 people there protesting the
 8   impeachment.
 9        Do you recall him saying that?
10   A    Yes.
11   Q    But you don't recall this protest?
12   A    I wasn't -- I don't know if I -- I wasn't a part of
13   that or involved in that.
14   Q    In fact, several times he said we protested outside
15   the Capitol?
16   A    Yes, he said that.
17   Q    He told you that we were protesting outside the
18   Capitol in November when they were trying to impeach the
19   president with no evidence, correct?
20   A    He says that.
21   Q    It was just the idea that anybody said anything about
22   Nancy Pelosi being dead, correct?
23   A    That's correct.
24   Q    In fact, he says, Nobody said anything about she's
25   dead.  And I didn't say anything on that phone call, did I?
```

```
 1   A     He did say that.

 2   Q     He told you he's a Pulse Nightclub survivor?

 3   A     He does.

 4   Q     Did you investigate whether or not there was truth to

 5   that statement?

 6   A     We did.

 7   Q     And?

 8   A     It was determined -- through investigation and the

 9   interviews, it was determined that to be not true.

10   Q     And you got the similar information that it wasn't

11   true in the same interviews that it wasn't true that he

12   went to Washington, D.C., correct?

13   A     Well, no.  The interview of him, he's talking to me

14   directly.  These were separate individual interviews of

15   other individuals that have knowledge of him that actually

16   told us that that's not true.

17   Q     Correct.

18         And in those collateral or interviews other than with

19   James Lapin, those interviewees told you the same thing,

20   that they had no knowledge of James Lapin ever going to

21   Washington, D.C.?

22   A     That's correct.

23   Q     In the very same interviews that you're using to

24   confirm that he never was a Pulse survivor?

25   A     Yes.  That's correct.
```

```
1   Q    And he's adamant in this interview that Nancy Pelosi

2   is some sort of traitor deserving to be charged with

3   treason, correct?

4   A    He does make those statements.

5   Q    Same kind of statements he makes in the voice mails,

6   correct?

7   A    Which voice mail?  Which particular voice mails?

8   Q    The December 19th voice mail.

9        MR. RYAN:  Can we have the transcript of that?

10       Can we publish it?

11       MS. MOUAKAR:  Joint Exhibit 2.

12       MR. RYAN:  2.

13       MS. MOUAKAR:  10485.

14       MR. RYAN:  Oh, I'm sorry.  The Bates Number.  I'm

15  sorry.  10485.

16       No, no, no, no.  10484.  That's the wrong one.

17  I'm sorry.

18       Yeah.  10484.

19  BY MR. RYAN:

20  Q    He says the same thing in the December 19, 2019, voice

21  mail, right, accusing Nancy Pelosi of treason, that she

22  should be hung for treason, correct?

23  A    Yes, he does.

24  Q    And he's repeating that same thing with you on the

25  phone five months later on May 18th, 2020, correct?
```

```
 1   A      Repeating that she should be hung for treason?

 2   Q      Repeating the themes of Nancy Pelosi being a traitor.

 3   A      I would have to go back through, but he does make --

 4   he does make statements about Nancy Pelosi and his dislike

 5   for her.

 6   Q      Like we were just going over it, he says that he

 7   proudly tells you I remember protesting with a sign that

 8   says fuck Nancy Pelosi, she's a traitor?

 9   A      Okay.  That's correct.

10   Q      That's what he tells you on May 18th?

11   A      That's correct.

12   Q      And he repeats the fact, he repeats his allegation

13   about Nancy Pelosi being a traitor in this May 18th

14   statement, doesn't he?

15   A      I believe so.

16   Q      And, again, he uses the expression she's a traitor to

17   the people.  She's committed treason against the people.

18   And I'm quoting.

19          Do you recall that?

20   A      Yes, I do.

21   Q      Even wonders why you, as a federal agent, aren't

22   investigating elected officials committing treason against

23   the people.

24          Doesn't he say that to you?

25   A      He does.
```

1   Q    And you're trying to figure out if he's threatening

2   Nancy Pelosi.  And you ask him again about -- you and he

3   start talking about what freedom of speech means and

4   whether threatening, making threats is part of that.

5   Right?

6        Do you remember that?

7   A    I do.

8   Q    So you're having this discussion about freedom of

9   speech and threats, and James says, Nobody's threatening

10  Nancy Pelosi.  I never threatened anyone.

11       So I said, fuck Nancy Pelosi.  She should be charged

12  with treason.

13       He says it again, right?

14  A    He says it during the interview, yes.

15  Q    And he point blank denied to you that he was

16  threatening Nancy Pelosi?

17  A    That's the statement -- that's one of the statements

18  he made, yes.

19  Q    But it's not one of the statements that you considered

20  to be true.  It's one of the statements you considered to

21  be false?

22  A    Well, the statement that he's making during the

23  interview is not the same as the voice mail that I've

24  heard.

25  Q    He wonders why you're not investigating Nancy Pelosi?

```
 1   A    That's correct.

 2   Q    And he sort of sums up at the end.

 3        I can't believe you would actually call the citizen

 4   telling Nancy Pelosi to go fuck herself for treason.  But

 5   whoever it was, good for them.

 6        Right?  That's almost the end of the interview.

 7   A    Yes.  That's correct.

 8   Q    So throughout the interview, he's repeating the themes

 9   over and over again that he believes Nancy Pelosi to have

10   committed treason and that the people were going to somehow

11   respond to that, correct?

12   A    I wouldn't necessarily -- that's a characterization

13   that I wouldn't necessarily fully -- I can't accept it

14   because I don't really understand exactly that's what he

15   was doing.  I know he's making themes.

16            MR. RYAN:  Thank you.

17            THE COURT:  Mr. Ryan, if you're through with your

18   examination, would you remove your cover for me, please,

19   and dispose of it and wipe the area.

20            And then I'll invite Ms. Daniels up for redirect

21   if she has any.

22            Ms. Daniels, redirect.

23            MS. DANIELS:  Very briefly, Your Honor.

24

25
```

1               **<u>REDIRECT EXAMINATION</u>**

2    BY MS. DANIELS:

3    Q    Agent Anyaso, you were asked about interviews

4    conducted with other people about whether the defendant had

5    traveled to D.C. and was a Pulse Nightclub survivor.

6         When did those interviews take place?

7    A    Well, they happened on June 18th, the same day I

8    arrested him.

9    Q    Now, I believe you have a binder up there with the

10   exhibits in it.

11        Could you please turn to Exhibit 15.

12   A    There's two.

13   Q    The black one.

14        MS. DANIELS:  Your Honor, may I have permission to

15   publish the interview?

16        THE COURT:  Is that in evidence?

17        MS. DANIELS:  Yes.

18        THE COURT:  Yes.  You may proceed.

19        THE WITNESS:  You said Exhibit 15?

20        MS. DANIELS:  Yeah.  I believe it's Exhibit 15.

21        THE COURT:  14 is the actual audio, and 15 is the

22   transcript.

23        MS. DANIELS:  Transcript.  That's correct, Your

24   Honor, yes.

25        THE COURT:  Okay.  Thank you.

1           MS. DANIELS:  Thank you.

2           Ms. Valente, could you please publish page 10496.

3           And then it will be on the bottom.

4    BY MS. DANIELS:

5    Q    Now, Agent Anyaso, what conversation was taking place

6    on this page?

7    A    James Lapin is talking about protesting the

8    impeachment.

9    Q    In this page, do you see -- have you been talking

10   about whether, you know, we are protesting?

11   A    So yes, I asked about who is -- I don't know who, what

12   people he's talking about.

13   Q    Okay.  Do you ask him whether he protests, whether he

14   came and protested in D.C.?

15   A    I do.

16   Q    And what does he say?

17   A    He said yes, he did.

18   Q    What does he say exactly?

19   A    Absolutely.

20   Q    Do you understand that to mean that he, Mr. Lapin, was

21   present protesting with the we?

22   A    That is correct.

23           MS. DANIELS:  No other questions.

24           THE COURT:  Thank you.

25           You can step down, Special Agent.

```
 1              We're going to take our morning break,

 2   Ms. Daniels.

 3              Well, I'll take that up with you after the jury is

 4   out.

 5              Ladies and gentlemen, let's take our mid-morning

 6   break.  I think Mr. Carter has made some coffee for you

 7   back there.  So we'll see you in 15 minutes.

 8              (Jury exited the courtroom at 10:30 a.m.)

 9              THE COURT:  Does the Government have any

10   additional witnesses, Ms. Daniels?

11              MS. DANIELS:  No, Your Honor.

12              THE COURT:  All right.  So is the Government

13   prepared to rest?

14              MS. DANIELS:  Yes, Your Honor.

15              THE COURT:  Are you going to have Rule 29 motions,

16   Mr. Ryan?

17              MR. RYAN:  Yes, Your Honor.

18              THE COURT:  Okay.

19              MR. RYAN:  Thank you.

20              THE COURT:  Let me give you all an opportunity to

21   take a break and then we'll come back.

22              And, Ms. Daniels, I'm going to give you an

23   opportunity to rest your case in front of the jury, but I'm

24   going to take advantage of this time while they're out to

25   take up their Rule 29 motion.
```

 1          So the Government has represented that it's

 2     concluded its case in chief.  I'll give you an opportunity

 3     to make your Rule 29 argument.  And then depending on the

 4     disposition, if we move forward, I'll give Ms. Daniels an

 5     opportunity to announce rest.

 6          How do you stand with respect to the availability

 7     of your witnesses, Mr. Ryan?

 8          MR. RYAN:  I think we're good.  I believe that

 9     we're good.

10          THE COURT:  Okay.

11          The Government raised a question or concern about

12     the scope of Dr. Rapa's testimony.  I have had an

13     opportunity to revisit my ruling there.

14          I'm going to permit, as I said in my written

15     order, Dr. Rapa to testify with respect to the manic

16     depressive -- I'm sorry, the bipolar disorder and the fact

17     that he was in a manic phase of bipolar disorder because in

18     my judgment that goes -- that tends to negate the element

19     of the Government's offense charged in count two with

20     respect to whether or not the threat was knowingly

21     transmitted.

22          That's the only thing that she's going to be

23     permitted to testify about.  She won't be permitted to

24     testify about narcissism, which I think was clear in my

25     order.

```
 1              But you did make reference to other things in your
 2    opening statement.  So I want to make sure you understand
 3    the scope of Dr. Rapa's testimony is narrow.
 4              My ruling was that she can testify that he suffers
 5    from a bipolar disorder, that it's her opinion that at the
 6    time of the commission of the offense he was in a manic
 7    phase with his bipolar disorder, which caused him to speak
 8    in hyperbolic terms that he would not have otherwise used.
 9              So don't go outside that area of inquiry with
10    Dr. Rapa.
11              MR. RYAN:  All right.  May I have further
12    clarification then?
13              May I ask her about habitual lying being a feature
14    of bipolarism?
15              THE COURT:  No, you may not.  You may ask her
16    exactly what I told you you might ask her and nothing else.
17              MR. RYAN:  Okay.
18              THE COURT:  All right.  We'll be in recess.
19              Let's come back -- we'll come back at 10:45.
20              I'm going to ask Mr. Carter to let the jurors know
21    we're going to be delayed a little bit longer than
22    15 minutes so that I can take up your Rule 29 motion.
23              (Recess taken at 10:33 a.m. to 10:47 a.m.)
24              THE COURT:  All right.  Back on the record in
25    United States versus Lapin, 6:20-cr-89.
```

```
 1              All counsel and the defendant are present.

 2              Mr. Ryan, does the defense have a Rule 29 motion?

 3              MR. RYAN:  We do, Your Honor.

 4                         RULE 29 MOTION

 5              MR. RYAN:  Judge, the defense asks that the Court

 6    enter a judgment of acquittal for both offenses because

 7    there is insufficient evidence to sustain a conviction.

 8              You have a lot of discussion about language and

 9    what it means, but there is no clear-cut threat here for

10    which a jury could reasonably convict Mr. Lapin.

11              THE COURT:  All right.  Motion denied.

12              Is the jury ready, Mr. Carter?

13              Bring them in, please.

14              I'm going to call on you, Ms. Daniels, to call

15    your next witness.  I expect you'll announce that you rest.

16              I'll explain to the jury that I've taken care of

17    the procedural issues already, and then I'll look to the

18    defense to call their first witness.

19              MS. DANIELS:  Thank you, Your Honor.

20              (Jury entered the courtroom at 10:50 a.m.)

21              THE COURT:  Let me know on our next break if that

22    works out for you.

23              Call your next witness, Ms. Daniels.

24              MS. DANIELS:  Your Honor, the Government rests.

25              THE COURT:  All right.  So ladies and gentlemen,
```

 1    the Government has rested its case in chief.

 2            You might remember that I mentioned to you that

 3    ordinarily I have to take up some procedural issues at this

 4    juncture of the trial.  I took advantage of the break that

 5    you were just on to do that.  So that's now been resolved.

 6            So we're ready to move on to the defense case.

 7            Mr. Ryan, is the defense ready to proceed?

 8            MR. RYAN:  Yes, Your Honor.

 9            THE COURT:  All right.  Call your first witness.

10            MS. MOUAKAR:  Yes, Your Honor.

11            The defense calls Ms. Pamela Nichole Lapin.

12            THE DEPUTY CLERK:  Ms. Lapin, please come forward

13    to be sworn.

14            And stop right there.  Raise your right hand.

15            Do you solemnly swear or affirm under penalty of

16    perjury the testimony you will give will be the truth, the

17    whole truth, and nothing but the truth?

18            THE WITNESS:  Yes, ma'am.

19            (Witness sworn.)

20            THE DEPUTY CLERK:  Please have a seat in the

21    witness box over here to my left.

22            Once you're seated, just adjust the microphone so

23    that the court reporter can hear you.

24            And once you're settled, please state and spell

25    your name for the record.

```
 1              THE WITNESS:  My full name is Pamela Nichole

 2   Margeson.

 3              THE COURT:  Ma'am, if you're comfortable removing

 4   your mask, you may do so.  If you're not comfortable, you

 5   can leave it on.  It's your choice.

 6              THE WITNESS:  Thank you.
```

**DIRECT EXAMINATION**

```
 8   BY MS. MOUAKAR:

 9   Q    Ma'am, I just want to clarify your name again.

10        Do you go by Ms. Lapin or Ms. Margeson?

11   A    I'm married.  I go by my married name, Margeson.  And

12   I go by my middle name Nichole.

13   Q    All right.  So, Ms. Margeson, I have a couple of

14   questions for you.

15        First, can you tell us where you live.

16   A    Orlando, Florida.

17   Q    And have you lived here in Orlando, Florida, for most

18   of your life?

19   A    Yeah.  When I was a kid I moved to South Carolina for

20   a few years and then back.

21   Q    So approximately how long have you been living in

22   Florida?

23   A    Probably 35 of my 38 years.

24   Q    Where do you work now?

25   A    For Total Enviro Services.  It's a family septic
```

```
 1    plumbing company in Orlando.

 2    Q    And so you have a family business; is that right,

 3    ma'am?

 4    A    Yes, ma'am.

 5    Q    And how long has that family business been in the

 6    family?

 7    A    Since 1992.

 8    Q    Do other members of your family work with you?

 9    A    Yeah.  Currently my stepbrother, my father, my

10    husband, and my sister.

11    Q    Now, I want to make clear for the jury, what is your

12    relationship to Mr. Lapin?

13    A    I call him Jimbo.  He's my youngest brother.

14    Q    And so how many siblings are there?

15    A    Of my mother and father, I have a younger sister and

16    Jimbo.

17    Q    Is your brother the youngest; is that right?

18    A    Yes, ma'am.

19    Q    Okay.  And then are you the oldest?

20    A    Yes, ma'am.

21    Q    So did you spend your childhood -- did you grow up

22    with your brother?

23    A    Yes, ma'am.

24    Q    Were you raised in the same household?

25    A    Yes, ma'am.
```

```
 1   Q    You mentioned earlier that there was a short period of
 2   time that you moved to South Carolina.
 3   A    My parents got divorced when I was about 10 or 12.
 4   We -- she remarried.  We moved to South Carolina for three
 5   or four years.
 6        Halfway there -- my brother didn't like living there,
 7   so he moved back to Florida with my dad.  But with custody
 8   arrangements, we seen each other on a monthly basis.
 9   Q    So how would you describe your relationship to your
10   brother, Mr. Lapin?
11   A    A loving relationship, yeah.  I love him.
12   Q    Would you consider yourselves close?
13   A    Yes, ma'am.
14   Q    Has there ever been a time in your life where you have
15   been distant from each other?
16   A    Not over a period of time, no.
17   Q    So are you familiar with his kind of day to day --
18   maybe not exactly what he's doing day to day but --
19   A    Yeah.  We're working adults.  He lives a couple
20   counties away.  We speak to each other a few times a month.
21   Q    So do you visit each other often?
22   A    Yeah.  When he comes to Orlando, he always -- we eat
23   lunch a couple times a month together, because dinner,
24   trying to line up the family and everything is just hard.
25   Q    Understood, with your other family responsibilities.
```

```
1    A    Yes, ma'am.

2    Q    Do you have children?

3    A    I have one daughter.

4    Q    Okay.  And then work full time as well?

5    A    And work full time, yes, ma'am.

6    Q    So in your relationship with your brother, how would

7    you describe your brother?  What type of individual is he?

8    A    Jimbo is very outgoing.  He's very opinionated.

9         He runs a Pokémon card shop where people come and play

10   games and swap Pokémon cards with each other and action

11   figures.

12        He loves animals.

13        He's the fun uncle.  He has no children.  So all of my

14   nieces and nephews, he's got the coolest action figure

15   stuff every year.  So he's the popular one.

16        He's dramatic at times.  Like a light switch.

17   Q    So let's talk about -- you said a lot there.

18        So one, Mr. Lapin, you said, he works at -- where does

19   he work, ma'am?

20   A    A Pokémon shop.  I believe the name of it is Geek

21   Nation or Geek Squad something.  Geek something.

22   Q    And maybe for those that may not have kids or not know

23   what Pokémon is, can you describe that a little bit.  What

24   exactly is that?

25   A    It's a game that adults and children play.  You have
```

```
 1  powers, and it's like fantasy fiction comic book style
 2  stuff.
 3  Q    So is it similar to a store called GameStop, something
 4  like that, except that there's a place that you go?
 5  A    I think GameStop, you buy video games there.
 6       I don't know if you buy video games there, but you can
 7  actually come in and like sell and swap cards.  Like people
 8  would do baseball cards.  You just do them with Pokémon.
 9  Q    So more like a comic shop?
10  A    Yeah.
11  Q    Okay.  And how long has your brother been working
12  there?
13  A    I would say three years, since he's been in
14  Ormond Beach.
15  Q    And you also mentioned, when you were describing your
16  brother, dramatic.
17       What do you mean by that, ma'am?
18  A    He's slightly flamboyant, so at times he will just --
19  a shiny object appears, and he might rant over it; or oh,
20  my gosh, and flap his arms and --
21  Q    Has your brother always been that way?
22  A    Yes, ma'am.
23  Q    You also described him as opinionated.
24  A    Yes, ma'am.
25  Q    Has your brother always been opinionated?
```

```
1    A    Yes, ma'am.
2    Q    And what is -- and how do you perceive, why do you
3    perceive him as being opinionated?
4    A    Because he says some things that a lot of people would
5    not.  He doesn't really hold back.  When he has something
6    to say, he tells you about it.
7    Q    And how receptive are you and family members about his
8    opinions?
9    A    At times it can be inappropriate, if it was like, you
10   know, your grandma around.  But even my grandma is used to
11   him being a little extra.
12   Q    How would you describe the way that he verbalizes his
13   opinions?
14   A    It has to be loud enough so everybody in the room can
15   hear him, because he loves to be the center of attention.
16   And he likes to use his hands.  And sometimes the language
17   isn't the best.
18   Q    In describing his opinions, you also described that he
19   becomes argumentative.
20   A    Yes, ma'am.
21   Q    When you say "argumentative," does he become --
22   describe that for me.  What do you mean by argumentative?
23   A    Like he wants you to see it his way.  And the more you
24   try to talk him out of it or show him your opinion, he'll
25   just talk a little louder.  And so you -- sometimes you
```

```
 1   just give up because it's not worth it.
 2   Q    Is he aggressive?
 3   A    No.
 4   Q    Does he become violent?
 5   A    No, ma'am.
 6   Q    Have you ever seen your brother get into a physical
 7   altercation over an opinion or becoming argumentative?
 8   A    No, ma'am.  He wouldn't hurt a fly.
 9   Q    Let's talk a little bit about your brother's character
10   trait for truthfulness.
11        Do you consider your brother to be a truthful person?
12        MS. DANIELS:  Objection, Your Honor.  Improper
13   characterizing.
14        THE COURT:  Let's have a quick sidebar.
15        (Discussion at sidebar on the record.)
16        THE COURT:  All right.  Are you on, Ms. Daniels?
17        MS. DANIELS:  Yes, Your Honor.
18        THE COURT:  Are you on, Ms. Mouakar?
19        MS. MOUAKAR:  Yes, Your Honor.
20        THE COURT:  Ms. Daniels, why would this not be
21   admissible under 608?
22        MS. DANIELS:  Your Honor --
23        THE COURT:  So let me tell you what my thinking
24   is, and then I'll give you a chance to respond.
25        It seems to me that Mr. Lapin's truthfulness has
```

1    been put at issue by the testimony of the special agent,

2    among other things.

3              So at first blush, it looks to me like his

4    reputation or character for truth-telling has been attacked

5    by the Government's case in chief.

6              And so under Rule 608, evidence of truthfulness --

7    I presume that is where Ms. Mouakar is going -- maybe the

8    testimony is going to be consistent with Agent Anyaso, the

9    testimony that he's not truthful.

10             Why is it not admissible under 608 or some other

11   provision of the rule?

12             MS. DANIELS:  Your Honor, my real concern was that

13   under the character evidence that his truthfulness is not

14   an element of this case.  And so I would think this would

15   be excludable under that.

16             THE COURT:  All right.  Well, I respectfully

17   disagree.

18             I think that the special agent's testimony, among

19   other things, has put the question of whether or not

20   Mr. Lapin has been truthful on a number of instances.

21             So I'm going to overrule the Government's

22   objection.

23             I just wanted to give you a chance to make your

24   record.

25             MS. DANIELS:  Thank you, Your Honor.

```
 1              THE COURT:  So objection is overruled.

 2              (End of discussion at sidebar.)

 3              THE COURT:  You may inquire, Ms. Mouakar.

 4              MS. MOUAKAR:  Thank you, Your Honor.

 5   BY MS. MOUAKAR:

 6   Q    Ma'am, I was asking in regards to your brother's

 7   character for truthfulness.

 8        In the years that you've been with him, can you

 9   describe what is your opinion for his character for

10   truthfulness?

11   A    He loves to exaggerate, even the simplest things.

12        I could tell him the sky was light blue and he'd say

13   it's medium light blue.

14        He does like to story-tell.

15   Q    Ma'am, is that your way of saying that he's not always

16   truthful?

17   A    Yes, ma'am.

18   Q    And what kind of things, if you can recall or if you

19   can -- you know, what would he be untruthful about?  Why

20   does he become untruthful?

21   A    I think he wants to be something more than he is.

22        He might say that I got a $100 suit on and it was

23   really $79.

24        You know what I mean?  Like he wants to be bigger than

25   he really is.
```

```
 1   Q    Has that been a constant in the years that you've
 2   known him?
 3   A    Yes, ma'am.
 4   Q    Do you know whether or not your brother has ever
 5   traveled to Washington, D.C.?
 6   A    No, he has never traveled there.
 7   Q    How do you know that?
 8   A    He's not very close with our parents.  So anytime he
 9   travels, he'll tell me or my other sister what he's doing.
10   Q    Now, I'm going to be more specific.  Do you have any
11   reason to believe that he ever traveled to Washington,
12   D.C., in December of 2019?
13   A    No, ma'am.
14   Q    Is your brother opinionated about politics?
15   A    Recently.  And -- yes.
16   Q    And when you say "recently," is that within -- can you
17   give me a more specific time frame?
18   A    He's never -- I think his first time he ever voted was
19   in the last election, not this most recent one but in the
20   last one.
21        And he might have found a home with other people who
22   have -- are liked-minded.  So he felt like he was a part of
23   it.  So he was trying to be a part of a movement.
24        He is a very red-blooded Republican.  He thinks his
25   voice is constantly being -- his opinions are not viewed by
```

```
 1    everybody else.  He thinks he's constantly being muffled.

 2    Q    Are you familiar with the Pulse Nightclub shooting?

 3    A    Yes, ma'am.

 4    Q    Do you know whether your brother was involved or was

 5    actually there when the Pulse Nightclub shooting occurred?

 6    A    He was not.

 7    Q    And how do you know that, ma'am?

 8    A    I woke up on a weekend, and I turned the news on like

 9    every Sunday at -- or maybe it was Saturday -- it was

10    Sunday or Saturday -- every weekend at 7:00 a.m.

11        I seen it.  It was the first thing on the news.  I

12    immediately called him because he frequents there a lot.

13    He answered the phone.  I told him.  He said, Oh, my God.

14    And he hung up and I'm assuming started calling around.

15    Q    So did he know other people who also frequented the

16    Pulse Nightclub?

17    A    Yes.

18            MS. DANIELS:  Objection.

19    BY MS. MOUAKAR:

20    Q    Do you know if he knows individuals --

21            THE COURT:  I'm sorry.  Just a second.  There's an

22    objection.

23            MS. DANIELS:  The objection, Your Honor, is

24    relevance.

25            THE COURT:  Sustained.
```

```
1   BY MS. MOUAKAR:

2   Q    Did he have a close connection to individuals from the

3   Pulse Nightclub shooting?

4          MS. DANIELS:  Objection, Your Honor, relevance.

5          THE COURT:  Sustained.

6   BY MS. MOUAKAR:

7   Q    To your knowledge, has Mr. Lapin ever had any issue

8   with neighbors or friends?  Has he ever been physical or

9   violent towards any friends or neighbors?

10  A    No, ma'am.

11  Q    Has he ever been physical or violent with anybody in

12  your family?

13  A    No, ma'am.

14  Q    You were interviewed in this case; is that right,

15  ma'am?

16  A    Yes, ma'am.

17  Q    By agents involved with the Capitol Police or part of

18  Capitol Police?

19  A    Yes, ma'am.

20  Q    You sat and spoke with them?

21  A    Yes.  They came to our place of work to interview me

22  and my sister.

23  Q    Would you describe yourself as being cooperative

24  during that interview?

25  A    Absolutely.
```

1    Q     Were you truthful with them?

2    A     Yes, ma'am.

3    Q     If you thought that your brother, Mr. Lapin, was a

4    danger, would you have told them that?

5              MS. DANIELS:  Objection, Your Honor.

6              THE COURT:  Sustained.

7    BY MS. MOUAKAR:

8    Q     Ma'am, do you understand the seriousness of this case?

9              MS. DANIELS:  Objection, Your Honor.

10             THE COURT:  Grounds?

11             MS. DANIELS:  Relevance.

12             THE COURT:  Sustained.

13             MS. MOUAKAR:  Just a moment, Your Honor.

14             THE COURT:  Yes.

15             MS. MOUAKAR:  I have no further questions.

16             Thank you.

17             THE COURT:  Thank you, Ms. Mouakar.

18             Would you mind disposing of your microphone cover

19   and wiping the area down before I invite Ms. Daniels up.

20                    **CROSS EXAMINATION**

21   BY MS. DANIELS:

22   Q     Good afternoon, Ms. Margeson.

23         Is that how you pronounce it?

24   A     (Nods head.)

25   Q     Ms. Margeson, you're Mr. Lapin's older sister; is that

1    correct?

2    A    Yes, ma'am.

3    Q    You were also interviewed by law enforcement on the

4    day Mr. Lapin was arrested?

5    A    Yes, ma'am.

6    Q    During that interview, you referred to Mr. Lapin as an

7    internet tough guy; is that correct?

8    A    Yes, ma'am.

9    Q    You mentioned that his outspokenness is one of the

10   reasons he doesn't work for the family business anymore?

11   A    Yes, ma'am.

12   Q    You stated that this outspokenness is one of the

13   reasons you don't call him very often?

14   A    I don't remember saying that.

15   Q    Would a transcript of that maybe refresh your

16   recollection?

17   A    Sure.

18          MS. DANIELS:  Your Honor, may I approach the

19   witness?

20          THE COURT:  Yes.

21          MS. DANIELS:  239.

22          MS. MOUAKAR:  Do you know what Bates Number that

23   is.

24          MS. DANIELS:  Yes.

25   BY MS. DANIELS:

```
 1   Q    Okay.  Ms. Margeson, has your recollection been

 2   refreshed?

 3   A    Yes, ma'am.

 4   Q    Go ahead and turn that transcript upside down.

 5   A    (Complying.)

 6   Q    Now, did you state that his outspokenness is one of

 7   the reasons you don't call him very often?

 8   A    Yes, ma'am.

 9   Q    You mentioned that he's very sharp-tongued and it's

10   hard to deal with?

11   A    Yes.

12   Q    In that interview you were also asked about his mental

13   health; is that right?

14   A    I asked about it?

15   Q    No.  You were asked about it.

16   A    Yes.

17   Q    During the interview, you mentioned that you don't

18   think he's mental, just extra?

19           MS. MOUAKAR:  Objection, Your Honor.

20           THE COURT:  Grounds?

21           MS. MOUAKAR:  Foundation and outside the scope.

22           THE COURT:  Objection is overruled.

23   BY MS. DANIELS:

24   Q    During the interview you mentioned that you don't

25   think he's mental, just extra; is that correct?
```

```
 1   A    Yes, ma'am.

 2   Q    You told the agents that Mr. Lapin doesn't think of

 3   consequences and does whatever he wants without thinking of

 4   tomorrow?

 5   A    Yes, ma'am.

 6   Q    Do you know a person named Herman Jones?

 7   A    Yes, ma'am.

 8        MS. MOUAKAR:  Objection, Your Honor.  Outside the

 9   scope.

10        THE COURT:  Do you want an opportunity to address

11   that?

12        MS. DANIELS:  Yes.

13        (Discussion at sidebar on the record.)

14        THE COURT:  Are you on?

15        Tell me what portion of the direct examination

16   this is relevant to, either directly or inferentially.

17        MS. DANIELS:  Your Honor, this goes to his

18   character of truthfulness again.  So it talks about that.

19   And also it was discussed within the interview that

20   Ms. Mouakar brought up on his direct examination.

21        MS. MOUAKAR:  If I may respond, Your Honor.

22        THE COURT:  Yes, you may.

23        MS. MOUAKAR:  I believe that this was just -- I

24   mean, we basically established that he's not truthful.  So

25   I don't know that it's -- I don't know that it's relevant.
```

1          I think it's going beyond the scope, but I also

2    think, again, we didn't bring up this specific individual.

3          So I'm not really sure the line of questioning

4    to -- you know, again, our testimony through the witness

5    was that he's not always truthful.  So I'm not sure that

6    it's additionally contradicting what was said previously.

7          But specifically as to the gentleman, Mr. Jones,

8    again, I don't know that it's relevant.  It's beyond the

9    scope.

10         THE COURT:  Well, I think the issue of Mr. Lapin's

11   truthfulness or untruthfulness has certainly been joined by

12   both sides, specific instances of truthfulness or

13   untruthfulness.  Once the issue has now been raised by both

14   parties, I think it's admissible, at least to a limited

15   extent.

16         So I'm going to overrule the objection as it

17   relates to scope and foundation and permit you to proceed

18   on the question that you have pending, Ms. Daniels, with

19   respect to Mr. Jones.

20         MS. DANIELS:  Thank you, Your Honor.

21         (End of discussion at sidebar.)

22         THE COURT:  Objection is overruled.

23         You may inquire.

24   BY MS. DANIELS:

25   Q    So you know someone named Herman Jones; is that

```
 1   correct?

 2   A     Yes, ma'am.

 3   Q     You know him as Davis; is that correct?

 4   A     Yes, ma'am.

 5   Q     You refer to Mr. Jones as Mr. Lapin's sugar daddy; is

 6   that correct?

 7              MS. MOUAKAR:  Objection, Your Honor.  Relevance

 8   and 403.

 9              THE COURT:  Sustained.

10   BY MS. DANIELS:

11   Q   You mentioned that as of the date that you were

12   interviewed they had been in a relationship for a couple

13   of years?

14              MS. MOUAKAR:  Objection, Your Honor.  401 and 403.

15              THE COURT:  Sustained.

16   BY MS. DANIELS:

17   Q     You also mentioned that Mr. Jones lets Mr. Lapin drive

18   his vehicle?

19   A     Yes.

20   Q     And you were asked specifically if Mr. Lapin cycles

21   through emotions where he's more sharp-tongued and hyper?

22   A     I don't remember that.

23   Q     Would a transcript of that maybe refresh your

24   recollection?

25   A     Yes.
```

```
 1   Q     If you will turn to page 9 on minute 12.

 2   A     (Complying.)

 3   Q     And just go ahead and look up at me when your

 4   recollection has been refreshed.

 5   A     Which number did you say it was?

 6   Q     Page 9, right around minute 12.

 7         Sorry, 11:41, I believe your answer is.

 8   A     Yes.  I was asked if he goes through cycles.

 9   Q     And you told law enforcement that Mr. Lapin is normal,

10   correct?

11   A     Yes.

12   Q     Meaning he doesn't go through cycles?

13   A     Yes.

14   Q     Now, you describe Mr. Lapin as someone who tries to

15   push his opinions on others; is that correct?

16   A     Yes.

17   Q     And you were not present when he left the voice mails

18   at issue in this case?

19   A     No, ma'am.

20         MS. DANIELS:  Your Honor, may I just have a brief

21   second to confer with co-counsel?

22         THE COURT:  Yes.

23   BY MS. DANIELS:

24   Q     Ms. Margeson, do you know who Herman Jones is?

25         MS. MOUAKAR:  Objection.  Relevance.
```

```
 1            THE COURT:  Overruled.
 2   BY MS. DANIELS:
 3   Q    Who is Herman Jones?
 4   A    He's my brother's partner.
 5            MS. DANIELS:  Thank you.
 6            Your Honor, I don't have any other questions at
 7   this time.
 8            Thank you.
 9            THE COURT:  If you'll dispose of your cover and
10   wipe the area before I let Ms. Mouakar return.
11                    REDIRECT EXAMINATION
12   BY MS. MOUAKAR:
13   Q    Ms. Margeson, you're not a psychologist; is that
14   right, ma'am?
15   A    No, ma'am.
16   Q    So when you were asked about your brother's mental
17   health, you're saying that as --
18   A    As his sister.
19   Q    Now, you were specifically asked on cross-examination
20   about your brother having this sharp tongue.  And you
21   describe him as he comes down and he goes up.
22        So even though you just testified about cycling, does
23   he, in fact, go through ups and downs?
24   A    Yes, when he's set off.
25   Q    So can you describe that a little bit more.  What is
```

```
 1   it like when you're saying he's going up and down?
 2   A    Like when he doesn't hear -- something that he doesn't
 3   really like, it just might set him off into a tangent on
 4   other things that really don't even have anything to do
 5   with it.
 6   Q    You have described him as being hot and cold.
 7        Can you tell us a little bit about that.
 8   A    Yeah.  One time when you see him and approach him, he
 9   might just be calm and cool.  And then depends on what just
10   came across the news station before I seen him at wherever
11   he was, he might be hot and worked up about whatever he
12   just seen on the news.
13   Q    So as far as mental health, are you familiar that he's
14   been diagnosed with mental health issues?
15             MS. DANIELS:  Objection, Your Honor.
16             THE COURT:  I'm going to sustain the objection.
17             MS. MOUAKAR:  Your Honor, if I may be heard.
18             THE COURT:  Okay.
19             (Discussion at sidebar on the record.)
20             MS. MOUAKAR:  Can you hear me?
21             THE COURT:  Yes.
22             MS. MOUAKAR:  The only question that I expect to
23   ask her, is she familiar whether he's been diagnosed?
24             I think it was put into question whether or not he
25   has mental health issues.  So I think that the Government
```

1   opened that door through cross-examination.

2            I'm not going to get into his diagnosis or

3   elaborate any more on that.  That would be the extent of

4   the questioning.

5            THE COURT:  Ms. Daniels.

6            MS. DANIELS:  Your Honor, I apologize.  I missed

7   the first part of Ms. Mouakar's argument because my thing

8   wasn't on.

9            THE COURT:  Let me see if I can restate it.  She

10   can correct me if I'm wrong.

11            But essentially the defense position is the

12   question of whether or not the defendant has mental health

13   issues has been joined by the Government and that she

14   intends to ask this witness, as I gather, just the

15   threshold question of whether she's aware that he was

16   diagnosed with mental health issues and not pursue what the

17   issues are or what the nature of the diagnosis is.

18            MS. DANIELS:  Yes, Your Honor.

19            So that answer, that question would call for

20   hearsay about what she had heard about his diagnosis.

21            And in addition -- or the question as posed to her

22   when she was interviewed on June 18th of 2020 was

23   whether she said that he has mental health issues and what

24   she knew at that time.

25            So the Government's argument did not open the

```
 1   door.
 2          Now, whether she knows he's been diagnosed with a
 3   mental health condition which would, of course, again be
 4   hearsay.
 5          THE COURT:  Again, I'm going to sustain the
 6   objection.
 7          I think it likely is to call for hearsay.  And I
 8   think it's marginally relevant, if at all, with respect to
 9   what this witness knows.
10          So I'm going to sustain the Government's objection
11   and direct you to proceed with a new question, Ms. Mouakar.
12          MS. MOUAKAR:  Your Honor, thank you.
13          (End of discussion at sidebar.)
14   BY MS. MOUAKAR:
15   Q    Ma'am, last question.
16        Despite all of your brother's sharp tongue and
17   different things that were described on cross-examination,
18   his opinions and argumentive, has your brother ever acted
19   in a violent manner towards people that disagree with his
20   opinions or his being argumentative?
21   A    No, ma'am.
22   Q    Is he at all -- do you consider his -- people who are
23   of a different opinion or a different stance for them to be
24   in danger?
25          MS. DANIELS:  Objection, Your Honor.
```

```
 1            THE COURT:  Sustained.

 2            MS. MOUAKAR:  I have no further questions.

 3            THE COURT:  May this witness be excused?

 4            MS. MOUAKAR:  Yes, Your Honor.

 5            THE COURT:  Ms. Daniels?

 6            MS. DANIELS:  Yes, Your Honor.

 7            THE COURT:  All right.  Thank you, ma'am.

 8            And if you're here under subpoena, you're released

 9   from it.

10            If you would do me a favor and discard that

11   microphone cover.  There's a trash can underneath you.  And

12   then take a couple of those wipes, if you would, and wipe

13   your area down.  I would appreciate it.

14            Thank you.

15            Ms. Daniels, do you want to retrieve your exhibit?

16            MS. MOUAKAR:  Your Honor, since she's been

17   released from subpoena, she's going to stay in the

18   courtroom for the Government.

19            THE COURT:  Yes.

20            MS. MOUAKAR:  Thank you.

21            THE COURT:  Call your next witness.

22            MS. MOUAKAR:  Your Honor, the defense calls

23   Ms. Marie Lynn Neer.

24            THE DEPUTY CLERK:  Ms. Neer, please come forward

25   to be sworn.
```

```
 1              You can stop right there.  Raise your right hand.
 2              Do you solemnly swear or affirm under penalty of
 3    perjury that the testimony you will give will be the truth,
 4    the whole truth, and nothing but the truth?
 5              THE WITNESS:  I do.
 6              (Witness sworn.)
 7              THE DEPUTY CLERK:  Please have a seat in the
 8    witness box over here to my left.
 9              Once you're seated, just adjust the microphone so
10    that the court reporter can hear you.
11              And state and spell your name for the record,
12    please.
13              THE COURT:  Ma'am, if you're comfortable removing
14    your face covering, you can remove it while you're
15    testifying.
16              THE WITNESS:  Thank you.
17              Marie Neer, M-A-R-I-E.  Neer, N, like Nancy,
18    E-E-R.
```

                            **DIRECT EXAMINATION**

```
20    BY MS. MOUAKAR:
21    Q    Good afternoon, Ms. Neer.  How are you?
22    A    Good.  How are you?
23    Q    Good.  Thank you.
24         Can you please tell the jury what is your relationship
25    to Mr. Lapin.
```

```
1   A     He is my youngest sibling.

2   Q     Is it right that there's three siblings?

3   A     Yes.

4   Q     Are you the middle?

5   A     Yes.

6   Q     And, ma'am, where do you live?

7   A     I live in Orlando.

8   Q     Have you lived in Orlando for a significant period of

9   time?

10  A     Yes.

11  Q     How long have you lived here?

12  A     Most of my life.  For a few years I lived in

13  South Carolina as a child, but we came back here.  So

14  pretty much my whole life except for those few years.

15  Q     Did you grow up with your brother?

16  A     Yes.

17  Q     And did you have a close relationship throughout

18  the years?

19  A     Yes.  I am close with my brother.  We are close.

20  Q     Has there ever been a period of time where you all

21  were distant from each other?

22  A     He moved back to Florida to live with our father from

23  South Carolina for a few years after we had been living

24  there, but when we came back, no.  Only as adults have we,

25  you know, lived separately.
```

```
 1   Q    But even now as adults, while you live separate, how
 2   would you describe your relationship to Mr. Lapin?
 3   A    Jimbo -- we call him that -- and I are very close.
 4   Him and I.
 5   Q    So you communicate often?
 6   A    Yes, weekly.  If not weekly, only because I'm busy.
 7   Every other week.
 8   Q    Do you see each other often?
 9   A    Not as often as I'd like.
10   Q    But you do communicate often.  Weekly, you said?
11   A    Yes, ma'am.
12   Q    So in growing up with your brother, how would you
13   describe your brother as a person?
14   A    He is very outgoing.  He is fun.  He's definitely the
15   fun uncle.  If you had to say, the favorite uncle.
16        He's a nice guy.  He's a good person.  He's very
17   opinionated.
18   Q    And so you say he's fun uncle.
19        Do you have children, ma'am?
20   A    Yes, I have two.
21   Q    And they both spend time with Mr. Lapin from time to
22   time?
23   A    Yes.
24           MS. DANIELS:  Objection, Your Honor.  Relevance.
25           MS. MOUAKAR:  It's foundational, Your Honor.
```

```
1              THE COURT:  Objection is overruled.

2              Limited foundation, Ms. Mouakar.

3         MS. MOUAKAR:  Yes, Your Honor.

4         THE WITNESS:  My two children and my three

5   soon-to-be stepchildren all spend time with him, yes.

6   BY MS. MOUAKAR:

7   Q    And then as far as your interactions with him, you

8   kind of started describing him as opinionated.

9        Can you tell us a couple other words used to describe

10  him.  You said dramatic?

11  A    He is dramatic.  I would definitely say he has a

12  tendency to be over the top.

13  Q    And despite all of his opinions, has your brother ever

14  been physical with someone who disagrees with his opinions?

15  A    Not that I know of.

16             MS. DANIELS:  Objection.  Improper evidence under

17  404.

18             MS. MOUAKAR:  Your Honor, I would say it's a

19  pertinent trait.  It has been raised by the charges in the

20  case.

21             THE COURT:  Objection is overruled.

22             MS. DANIELS:  Your Honor, may I have an

23  opportunity to respond?

24             THE COURT:  I don't need to hear any further

25  argument on it, but the objection is overruled.
```

BY MS. MOUAKAR:

Q     I'm sorry, ma'am.  If you can answer the question.

A     Can you repeat the question?  I'm sorry.

Q     Yes.

      So despite his opinions -- and I'm sorry.  I'm going to try to recall the question exactly.

      But has he ever been violent or aggressive with anybody whose -- or physically aggressive towards anybody?

A     No, ma'am.

Q     Is your brother, in particular, opinionated by certain topics or about everything?  What is he opinionated about?

A     He's opinionated about everything.  There's not one specific thing -- everybody gets an opinion, but his is the highest, the loudest.

Q     I want to talk to you a little bit about your brother's character for truthfulness.

      How would you describe your brother for his character for truthfulness?

A     My brother likes to stretch the truth about small things, any -- I mean, it can seem small to some people. You know, some people it may be a big deal to.  But even the smallest things, he's known to stretch the truth on, yes.

Q     And why does he do that?

A     I think he does it for attention.  I think he craves

```
 1   attention.
 2   Q    How would you describe your brother -- your brother's
 3   interactions when he's talking with you?  Have you ever --
 4   just all around being -- let's see.  Let me rephrase it.
 5        Are you familiar with whether your brother has mental
 6   health issues?
 7   A    I'm not a doctor.  I'm not a doctor.  I'm not sure.
 8   Q    Does your brother become hot or cold with you at
 9   times?
10   A    Yes.  Very -- yes.  He can be very quick to switch.
11   Yes.
12   Q    And you were interviewed by law enforcement in this
13   case, correct?
14   A    Yes, ma'am.
15   Q    And you described those types of interactions that
16   your brother may have during conversations where he may
17   think you're the world's best sister a moment and then the
18   world's worst sister the other moment?
19   A    Yes, ma'am.
20   Q    Has he been like that throughout his lifetime with
21   you?
22   A    Yes, ma'am.
23   Q    And so you've never recognized this as potential
24   mental health; is that right?
25   A    No, ma'am.
```

```
 1    Q    Okay.  So like you said, you're not a psychologist?

 2    A    No, I'm not.

 3          MS. DANIELS:  Objection, Your Honor, leading.

 4          THE COURT:  Sustained.

 5    BY MS. MOUAKAR:

 6    Q    Have you ever been trained in psychology, ma'am?

 7    A    No, ma'am.

 8    Q    Do you know whether your brother has ever traveled to

 9    Washington, D.C.?

10    A    No, ma'am.

11    Q    You don't know or he has not?

12    A    I do not know that he has.  Usually if he ever goes

13    out of town, he lets me know if he's going anywhere.  He

14    doesn't travel often.

15          If there was an emergency --

16    Q    Would you have known if he traveled to Washington,

17    D.C., in the last year?

18    A    Yes.

19    Q    What makes you say that?

20    A    Because he tells me when he goes somewhere.

21          MS. MOUAKAR:  Just a moment, Your Honor.

22          THE COURT:  Yes.

23          MS. MOUAKAR:  I have no further questions.

24          Thank you.

25          THE COURT:  Can you tidy up there, Ms. Mouakar,
```

1   before I invite Ms. Daniels up for cross-examination.

2          MS. MOUAKAR:   Thank you for the reminder,

3   Your Honor.

4                    **CROSS EXAMINATION**

5   BY MS. DANIELS:

6   Q    Good afternoon, Ms. Neer.

7   A    Hi.

8   Q    Ms. Neer, so you were also interviewed by law

9   enforcement in June; is that correct?

10  A    I believe so, yes.

11  Q    You said that you speak with the defendant every week

12  or so?

13  A    Yes, ma'am.

14  Q    You would say that you and the defendant have a good

15  relationship?

16  A    Yes, ma'am.

17  Q    You even say you know him well?

18  A    Yes.

19  Q    And you were asked if the defendant struggles with any

20  sort of mental illness; is that correct?

21  A    Yes.

22  Q    And you told law enforcement that he does not; is that

23  correct?

24  A    Yes.

25  Q    You were asked if he struggles with depression or

1    anything like that?

2    A    I believe so, yes.

3    Q    And you told law enforcement that you had never

4    observed anything like that; is that correct?

5    A    I would have to read my statement.

6          MS. DANIELS:  Your Honor, may I have permission to

7    approach the witness?

8          THE COURT:  Yes, you may.

9          THE WITNESS:  Thank you.

10   BY MS. DANIELS:

11   Q    You're looking at page 3, about minute 2:16.

12   A    2:16.

13        I don't think he has -- I don't think so.  He's always

14   been really happy-go-lucky around the kids.

15   Q    Okay.  So has your recollection been refreshed?

16   A    Yes.

17   Q    If you can go ahead and turn that transcript over.

18   A    Okay.

19   Q    Okay.  So you told law enforcement that you had never

20   observed anything like depression or anything else in

21   Mr. Lapin; is that correct?

22   A    Right.

23   Q    And you told them that he was always happy-go-lucky

24   around your family?

25   A    At that point in time, yes, during my interview.

```
1    Q    During your interview?

2    A    Uh-huh.

3    Q    And you stated that he had never mentioned any mental

4    health problems to you; is that correct?

5    A    Yes.

6    Q    And you know Mr. Lapin's partner, Herman Jones; is

7    that correct?

8    A    Yes.  I've met him.

9    Q    You know him by the name of Davis?

10   A    Yes.

11   Q    And you know that they've been in a relationship

12   for years at the time of your interview; is that right?

13            MS. MOUAKAR:  Objection, Your Honor, 401, 403.

14            THE COURT:  Objection is overruled.

15   BY MS. DANIELS:

16   Q    Do you need me to rephrase?

17   A    Yes.  I'm sorry.

18   Q    You know that they had been in a relationship

19   for years at the time you were interviewed by law

20   enforcement?

21   A    Yes.

22   Q    You told law enforcement that Mr. Lapin was with

23   Mr. Jones?

24   A    Correct.

25            At that point in time?
```

1    Q    Yes, in your interview.

2    A    Yes.

3    Q    Yes.

4         And you believed that at that time of your interview

5    he had lived with Mr. Jones for years?

6    A    It had been a few years, yes.  I wasn't positive how

7    long -- exactly how long it has been.

8    Q    And when you were asked, you told law enforcement that

9    your brother was not at the Pulse Nightclub the night of

10   the shooting?

11   A    Correct.

12            MS. MOUAKAR:  Objection, Your Honor.

13            THE COURT:  Overruled.

14   BY MS. DANIELS:

15   Q    I'm sorry.  What was your answer?

16   A    Correct.

17   Q    You also mentioned that your brother drives a Chevy

18   truck?

19   A    Correct.

20   Q    You told law enforcement on your interview that your

21   brother has a big mouth?

22   A    I did.

23   Q    And that his biggest issue is his mouth?

24   A    I did.

25   Q    You mentioned that he gets in fights with people

```
1    online and over the phone?

2    A    I did.

3    Q    You told the agents that the defendant is very

4    opinionated and everyone is going to know his opinion

5    whether they want to or not?

6    A    I did.

7    Q    You had mentioned that this behavior might have gotten

8    him kicked off a Facebook group?

9    A    Yes.

10   Q    And I believe you refer to this as Facebook Jail.

11   A    Yes.

12   Q    Is that correct?

13   A    Yeah.

14   Q    When you were speaking with agents, you stated that

15   the defendant does not know a boundary when he has his

16   attitude going; is that correct?

17   A    Yes.

18   Q    And finally, near the end of the interview, you told

19   the agents that you didn't think your brother had a mental

20   illness; he just has a big mouth?

21   A    Yes.

22        MS. DANIELS:  May I confer with counsel,

23   Your Honor?

24        THE COURT:  Yes.

25        MS. DANIELS:  No other questions at this time,
```

```
 1    Your Honor.
 2              THE COURT:  Redirect, Ms. Mouakar?
 3              MS. MOUAKAR:  Yes, Your Honor.
 4                      REDIRECT EXAMINATION
 5    BY MS. MOUAKAR:
 6    Q    Ms. Neer, have you learned since you were interviewed
 7    by law enforcement --
 8              MS. DANIELS:  Objection.
 9    Q    -- whether or not your brother suffered from mental
10    health?
11              MS. DANIELS:  Objection.
12              THE COURT:  Sustained.
13              MS. MOUAKAR:  Your Honor, I believe the Government
14    has opened the door to this line of questioning through
15    their cross-examination and that the witness should be
16    allowed to answer.
17              THE COURT:  I appreciate your position.
18              My ruling stands.  Objection sustained.
19              MS. MOUAKAR:  Thank you, Your Honor.
20    BY MS. MOUAKAR:
21    Q    Was your brother close to Pulse Nightclub shooting
22    survivors?
23              MS. DANIELS:  Objection, Your Honor.
24              THE COURT:  Do you want to be heard on the
25    relevance of this, Ms. Mouakar?
```

```
 1              MS. MOUAKAR:  Yes, Your Honor.  They opened the

 2   door during cross-examination.

 3              THE COURT:  Objection is overruled.

 4              Not on that point.  His relative closeness or

 5   distance to people there, I don't see the connection.

 6              MS. MOUAKAR:  I'm sorry.  So you said overruled or

 7   sustained?

 8              THE COURT:  I'm sorry.  Objection is sustained.

 9   I'm sorry if I misspoke.

10              I don't see -- the connection is not readily

11   apparent to me.

12   BY MS. MOUAKAR:

13   Q    When you mentioned that your brother was put in

14   Facebook Jail, can you explain what you meant by that?

15   A    He -- so sometimes -- I guess there's not really a

16   Facebook Jail, but people get censored on Facebook.  And

17   maybe he was censored on Facebook or his posts were removed

18   or not able to, you know, post something.

19   Q    Do you know whether he was ever censored for making

20   any sort of comments or threats to Nancy Pelosi?

21   A    No.

22              MS. MOUAKAR:  I have no further questions.

23              THE COURT:  Thank you.

24              May this witness be excused?

25              MS. MOUAKAR:  Yes, Your Honor.
```

 1          MS. DANIELS:  Yes, Your Honor.

 2          THE COURT:  All right.  Thank you, ma'am.  You're

 3  excused.

 4          And if you're here under subpoena, you're released

 5  from it.  You can go on about your business.

 6          If you would do me a favor and dispose of that

 7  microphone cover.  Take one of those wipes and just kind of

 8  generally wipe down your area before you leave, I'd be

 9  appreciative.

10          MS. MOUAKAR:  And, Your Honor, we'll ask if the

11  witness can remain in the courtroom with the Government.

12          THE COURT:  She may.

13          MS. MOUAKAR:  Thank you.

14          THE COURT:  Call your next witness.

15          MR. RYAN:  Your Honor, our next witness is Sheila

16  Rapa.

17          In light of our conversations today, may I have a

18  few moments with her before we bring her out?

19          THE COURT:  How many moments do you need?

20          MR. RYAN:  Oh, five.

21          THE COURT:  Okay.  Let's take a short recess,

22  ladies and gentlemen.  And we'll come back --

23          How long do you think this witness' testimony is

24  likely to take?

25          MR. RYAN:  On direct, maybe 20 minutes, 30.

1          THE COURT:  I'll tell you what, why don't we do

2     this, ladies and gentlemen.  It's a little bit early, but

3     let's take our lunch break and that way we can get these

4     things done and not have you all just wasting time back

5     there in the jury room.

6          So let's go ahead and adjourn for lunch.  It's

7     11:45.  Let's come back at 1:00 and we'll resume with the

8     defense case.

9              (Jury exited the courtroom at 11:43 a.m.)

10         THE COURT:  So just to take a quick opportunity

11    for this break, not that you need it necessarily, but to

12    the extent that it might be of any utility to the Eleventh

13    Circuit, there are a couple of rulings that I wanted to

14    give you, give my -- the basis for my rulings on the

15    record.

16         With respect to the Government's hearsay objection

17    to -- I'll call them the self-exculpatory statements made

18    by the defendant to the officer at the time of the

19    interview.  I admitted those not because -- not because I

20    didn't recognize his self-exculpatory statements are not

21    admissible as admissions against the interest of the

22    defendant but because I did not perceive them to be offered

23    for the truth of the matter asserted.

24         I perceived them to be offered to establish that

25    Mr. Lapin was cooperative.  Whether he actually needed to

 1   call somebody on the phone or not was not the point.  The

 2   point was whether or not he was cooperative with law

 3   enforcement during the time that they were executing their

 4   search.

 5            So that was the basis for my ruling there.

 6            With respect to the objection made by the

 7   Government, the testimony about Mr. Lapin's trait for

 8   violence, I admitted that testimony and overruled the

 9   objection pursuant to Rule 404.

10            And with respect to the defense objection to -- or

11   the Government's objection to the relationship of Mr. Lapin

12   with the people that had gone to the -- had been victims of

13   the Pulse Nightclub, I sustained that objection because the

14   original point of the testimony was to show that Mr. Lapin

15   had been untruthful in his statement given to the law

16   enforcement officers.

17            So whether he was present or not is relevant to

18   that issue.  Whether he has some close relationship to

19   people at Pulse does not have any relevance to the question

20   of whether he was truthful, at least in my mind.

21            So those are the bases for my rulings on those

22   things that came up during the course of the testimony this

23   morning.

24            We'll be in recess.  I'll see you back here at

25   1:00.

```
 1              Yes, sir.
 2              MR. RYAN:  Can I ask you a question?
 3              I presented the Government on the deadline for
 4   demonstrative exhibits some demonstrative exhibits.  I have
 5   received no objections.
 6              So may I assume that I can use those without there
 7   being an issue, or would you like to see them first?
 8              THE COURT:  I would like to see them and see if
 9   there is going to be an issue.
10              MS. DANIELS:  Has the time line been -- I think
11   you did get an objection to the time line.  Has that been
12   revised now that the Court has ruled on judicial notice?
13              MR. RYAN:  I don't know.
14              One would be this time line, Your Honor, that has
15   the one, two, three, four, five, six, seven data points
16   that you agreed to judicially notice about the time frames
17   of the impeachment proceedings at the bottom.
18              And then on the top are the --
19              And get ready to switch over to your side because
20   I have to show him stuff on ours.
21              -- and on the top are the voice messages, when
22   they were left.
23              THE COURT:  Okay.  And what witness do you intend
24   to use that exhibit with?
25              MR. RYAN:  No, in closing.
```

```
 1              THE COURT:  In closing.  Okay.

 2          Do you have an objection to that, Ms. Daniels?

 3          MS. DANIELS:  Yes, Your Honor.

 4          So the original objection was I was asked whether

 5   I thought this graph was judicially noticeable.  And so now

 6   the Court has ruled on that.

 7          But I do believe that the statements -- I believe

 8   they are statements from September 24th, October -- I'm

 9   sorry, which October date?  October 31st.  And

10   December 3rd.

11          I don't believe that those are relevant to the

12   offenses charged here.  They happened so far in time.  I

13   understand that they are judicially noticeable facts.  But

14   I don't believe they meet the relevance threshold because

15   they happened so early in time from when the first voice

16   mail was left as to be irrelevant.

17          THE COURT:  Okay.  I think they certainly have

18   enough marginal relevance to overcome a general relevance

19   objection.

20          I'm going to overrule the Government's objection.

21          And I don't see anything objectionable about their

22   demonstrative aid.  It seems to me that it fairly and

23   accurately reflects the facts through the evidence in the

24   case, at least what the evidence will be, I think, as

25   represented by the lawyers at the time of closing.
```

```
 1          So unless something doesn't happen that's
 2   reflected on your chart or is not admitted, which I think
 3   it's all happened already, then I have no problem with it.
 4          So I'll overrule the Government's objection to
 5   your use of that during closing.
 6          MR. RYAN:  Okay, Your Honor.  I also have some
 7   others, but they're all in the same style.
 8          (Conferring.)
 9          MR. RYAN:  For example, Your Honor, this is
10   another demonstrative I'd like to use in closing.  I have a
11   whole series of these.
12          They are essentially the transcripts of the voice
13   mails where I've emphasized the words I choose to emphasize
14   in my closing.
15          THE COURT:  Does the Government object to this
16   exhibit?
17          MS. DANIELS:  No, Your Honor.
18          THE COURT:  Okay.
19          MR. RYAN:  And there's four more if you want to
20   see each of them in the same style.
21          THE COURT:  I'm happy to accept your
22   representation that they are verbatim transcripts of the
23   voice mails that are in evidence and that all you've done
24   is enlarge certain words for emphasis.
25          If that's your representation, I don't have a
```

```
 1    difficulty with them.  And I gather the Government does not

 2    either.

 3              MS. DANIELS:  That's correct, Your Honor.

 4              THE COURT:  Other than Dr. Rapa, while we have an

 5    opportunity here, have you had a chance to discuss with

 6    Mr. Lapin whether he intends to testify?

 7              MR. RYAN:  Uh-huh.

 8              THE COURT:  And has he reached a decision about

 9    that?

10              MR. RYAN:  We have.  He's not going to testify.

11              THE COURT:  He is not going to testify.  Okay.

12              At the appropriate time, Mr. Lapin, whenever that

13    is --

14              Will Dr. Rapa be your last witness?

15              MR. RYAN:  Yes.

16              THE COURT:  Why don't we take care of this right

17    now since we have the opportunity.

18              MR. RYAN:  Yes.

19              THE COURT:  And that will allow me just to ask you

20    to affirm it for me later on, Mr. Lapin.

21              But my question to you is, as you know, you have a

22    right to remain silent.  No one can force you to testify.

23    You cannot be compelled to testify in any respect.

24              THE DEFENDANT:  Yes, Your Honor.

25              THE COURT:  You also, however, have a right to
```

```
1    testify if you choose to do that.
2            But the question I have for you, have you had a
3    chance to talk it over with your lawyers, to discuss the
4    pros and cons of testifying in your own behalf?
5            THE DEFENDANT:  Yes, Your Honor.
6            THE COURT:  And have you reached a decision as to
7    whether or not you wish to testify?
8            THE DEFENDANT:  Yes, Your Honor.
9            THE COURT:  And what is your decision?
10           THE DEFENDANT:  I trust my lawyer has my best
11   interest.
12           THE COURT:  All right.  And so tell me what that
13   means as far as your decision to testify?
14           Do you wish to testify, or do you wish to not
15   testify?
16           THE DEFENDANT:  I wish to not testify.
17           THE COURT:  Okay.  Great.  Thank you very much.
18           THE DEFENDANT:  Thank you.
19           THE COURT:  So I'll see you all back here at 1:00.
20           We'll take Dr. Rapa's testimony.  I don't know
21   whether the Government will have any rebuttal evidence.  I
22   need to go over with you the jury instructions.  So we'll
23   probably take a recess after Dr. Rapa's testimony.
24           But I would encourage you to take a look at the
25   jury instructions.  Also take advantage of the lunch break
```

```
 1   so that we'll -- because we'll move quickly through this
 2   charge conference.  I don't expect there's going to be a
 3   lot of controversy about the jury instructions, but we will
 4   take that up pretty immediately after you close the
 5   testimony.
 6            All right?
 7            MS. DANIELS:  Thank you, Your Honor.
 8            THE COURT:  We'll be in recess.  I'll see you at
 9   1:00.
10            (Luncheon recess at 11:53 a.m. to 1:02 p.m.)
11                         * * * * *
12
13               C E R T I F I C A T E
14
15       I certify that the foregoing is a correct
16   transcript from the record of proceedings in the
17   above-entitled matter.
18
19   January 11, 2021
20
21       s\  Amie R. First
     _____
     Amie R. First, RDR, CRR, CRC, CPE
22   Federal Official Court Reporter
     United States District Court
23   Middle District of Florida
24
25
```